**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RAYMOND L. AND TERRYLL ANN WALLS, AS CO-TRUSTEES OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013,<br><br>*Plaintiffs*,<br><br>v.<br><br>VRE CHICAGO ELEVEN, LLC,<br><br>VERDAD REAL ESTATE, INC.,<br><br>EXP REALTY ADVISORS, INC.,<br><br>TARTAN REALTY GROUP, INC.,<br><br>and<br><br>BAKER MONROE PLLC,<br><br>*Defendants*. | Case No. 1:16-cv-04048<br><br>Judge Thomas M. Durkin<br><br>Magistrate Jeffrey T. Gilbert<br><br>**PLAINTIFFS DEMAND TRIAL BY JURY** |

## AMENDED COMPLAINT

Come now Raymond L. and Terryll Ann Walls ("Plaintiffs"), as Co-Trustees of the Raymond L. Walls and Terryll Ann Walls Declaration of Trust dated May 30, 2002, as amended July 18, 2013 (the "Trust"), and state as follows for their Amended Complaint:

## PARTIES AND JURISDICTION

1. Plaintiffs are the Co-Trustees of the Trust. Plaintiffs are citizens and residents of the State of California. Consequently, the Trust also is a citizen and resident of the State of California for purposes of 28 U.S.C. § 1332.

**Exhibit A**

2. Defendant VRE Chicago Eleven, LLC ("VRE") is a limited liability company organized and existing under the laws of the State of Texas. Each member of VRE is a citizen of the State of Texas or some state other than California. VRE sold to Plaintiffs real property and improvements located in Cook County, Illinois, which sale forms the basis for this action. By its contract with Plaintiffs, VRE consented to the exercise of personal jurisdiction by state or federal courts located in Cook County, Illinois.

3. Defendant Verdad Real Estate, Inc. ("Verdad") is a corporation organized and existing under the laws of the State of Texas, and having its principal place of business in Texas. Verdad advertises itself, on its website, as being "one of the nation's leading single-tenant real estate developers," having "almost 500 projects completed in 33 states, and over $800mm in real estate transactions." According to Verdad, "[t]he largest national brands trust Verdad from site selection to store opening." Among the services Verdad advertises are project financing, development and capital solutions, underwriting, and "expert economic analysis & sales week increases." As described more fully below, on information and belief, Verdad and VRE are the alter ego of one another.

4. Defendant EXP Realty Advisors, Inc. ("EXP") is a corporation organized and existing under the laws of the State of New York, and having its principal place of business in New York. EXP served as Verdad's and/or VRE's broker in their sale of real property and improvements located in Cook County, Illinois, which forms the basis for this action.

5. Defendant Tartan Realty Group, Inc. ("Tartan") is a corporation organized and existing under the laws of the State of Illinois, and having its principal place of business in Illinois. Tartan served as the Illinois broker of record for EXP, VRE and/or Verdad in connection with the listing and sale of the property that is the subject of this litigation.

6. Defendant Baker Monroe PLLC ("Baker Monroe") is a limited liability company organized and existing under the laws of the State of Texas, and having its principal place of business in Texas. Baker Monroe is a law firm and acted as counsel for VRE and Verdad in connection with the sale of the property that is the subject of this litigation.

7. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a), because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. This Court may exercise personal jurisdiction over Defendants VRE, Verdad, EXP and Tartan because: (a) VRE consented to same by contract; (b) on information and belief, VRE and Verdad are the alter ego of one another; (c) Verdad executed a letter of intent pertaining to the sale of the subject real property in Illinois, which letter of intent contained material misrepresentations; (d) EXP served as Verdad and/or VRE's broker in their sale of real property and improvements located in Cook County, Illinois, which forms the basis for this action; and (e) Tartan is an Illinois citizen and resident. With respect to the referenced out-of-state defendants, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over the out-of-state defendants comports with constitutional due process.

9. This Court may exercise personal jurisdiction over Defendant Baker Monroe because: (a) it acted as legal counsel for VRE and Verdad in connection with the sale of real estate which forms the basis of this action, and negotiated and drafted the sale contract, which designated Illinois as the forum for any lawsuits arising in connection with the transaction; (b) on information and belief, Baker Monroe transacted business in Illinois, either directly or through one or more agents, in connection with the transaction from which this action arises; and/or (c) Baker Monroe committed tortious acts and omissions outside of Illinois, which caused

harm within Illinois. With respect to Baker Monroe, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over it comports with constitutional due process.

10. Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because Tartan is a resident of this judicial district, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and/or some or all of the defendants may be deemed residents of this district or otherwise may be subject to suit in this district.

## FACTS COMMON TO ALL COUNTS

### I. VERDAD'S AND VRE'S ACQUISITION OF PROPERTY

11. This action concerns real property located at 5852 S. Western Ave., in Chicago, Illinois, which, as of March, 2014, was leased for use as a Kentucky Fried Chicken restaurant (the "Western Ave. KFC," or the "Property"). The Western Ave. KFC was part of a group of 11 properties located on the south side of Chicago, leased for use as Kentucky Fried Chicken restaurants, that Verdad and VRE purchased from an entity controlled by Jason LeVecke ("LeVecke"), JC123 Holdings LLC ("JC"), in March, 2014. (Those 11 properties are sometimes referred to as the "Chicago 11.")

12. LeVecke is a grandson of Carl Karcher, the founder of CKE Restaurants Holdings, Inc. ("CKE"), which operates Hardee's and Carl's Jr. restaurants, among others. As of early 2015, LeVecke claimed to operate approximately 200 fast food restaurants. At that time, LeVecke primarily operated through a network of companies under the umbrella of a holding company known as Frontier Star 1, LLC ("FS1"). Among the principal operating companies under the FS1 umbrella were Frontier Star, LLC ("Frontier Star"), which operated Hardee's, and Frontier Star CJ, LLC ("Frontier Star CJ"), which operated Carl's Jrs.

13. LeVecke and Verdad began doing deals together in 2013. As of that time, LeVecke had a checkered past. For instance, in or around 2004, LeVecke was sued by his mother, who alleged he had defrauded her into transferring an ownership stake in several restaurants to himself and his siblings. Also, in or around 2008, LeVecke and his entities were in arrears to CKE for approximately $5 million, and they had to bring in an outside investor and restructure the business. By 2014-15, it appears that LeVecke again was having difficulty meeting his payment obligations to CKE.

14. In or around 2013, Verdad began engaging in a series of transactions with LeVecke, most of which were construction or conversion sale/leasebacks. Overall, LeVecke and Verdad engaged in deals relating to more than 20 properties – including the Chicago 11 – before late July, 2015. Verdad effected the said acquisitions and subsequent sales through various special purpose entities it created and controlled, including VRE; VRE Chandler, LLC; VRE Waxahachie, LLC; VRE Forsyth, LLC; VRE Grayslake, LLC; VRE Joliet, LLC; and VRE Libertyville, LLC.

15. Upon information and belief, Verdad's special purpose entities, including VRE, were controlled entirely by Verdad, inadequately capitalized, and had no separate existence from Verdad, and they and Verdad were the alter ego of one another. Among other things, Jason Keen ("Keen") – a principal of Verdad and one of the six "team members" featured on Verdad's website – is the manager of VRE. Also, all actions taken by and on behalf of VRE pertinent to this action were undertaken by Keen and/or other principals, employees and/or agents of Verdad, acting in their capacity as such. Accordingly, Verdad is liable for the acts, omissions and wrongful conduct of VRE on either or both of two grounds: (a) they are the alter ego of one another; and (2) principals, employees and/or agents of Verdad committed the wrongful acts and

omissions underlying this action, and Verdad is directly liable for its own wrongful conduct and that of its principals, employees and agents.

16. Verdad and VRE purchased the Chicago 11 properties from JC in March, 2014. The original plan for the deal was: LeVecke identified 11 KFC restaurants owned and operated by an unrelated party, which LeVecke could purchase for approximately $1 million each. LeVecke then reached a deal with Verdad to immediately resell the properties to Verdad for $1.9 million each, with each property to be accompanied by a 20-year lease, dated March 6, 2014 (the "2014 Lease"), under which an entity owned and/or controlled by LeVecke, Frontier Star, would agree to pay rent at a vastly higher level than the rent that had been paid in the past. Prior to the sale, the Chicago 11 properties were commanding rents of approximately $76,000 per store, per year. In contrast, the leases that Verdad and VRE put in place with LeVecke provided for the payment of rent in the minimum amount of $171,000 per store, per year, to be increased over time pursuant to certain escalation clauses. (A copy of the March 6, 2014 lease for the Western Ave. KFC is appended hereto as Exhibit 1.)

17. JC's purchase of the Chicago 11 properties from an unrelated party, and its immediate resale of those properties to Verdad and VRE for nearly double the purchase price that JC paid, both closed in late March, 2014, with the closings occurring at the same time through a double escrow arrangement.

18. Following the closings, and continuing at least through May 15, 2015, when the sale to Plaintiffs closed, the Chicago 11 properties continued to operate as KFC stores. For most of that period, the stores were operated by the same entity that had operated them prior to the sale to JC, under a contractual arrangement between LeVecke and the operator. Thus, before and after March, 2014, the same KFC stores were being operated, in the same manner, and at the

same locations. Nothing other than financial engineering by Verdad, VRE and LeVecke accounted for the property prices almost doubling, and the rents more than doubling.

19. In purchasing the Chicago 11 properties from LeVecke, Verdad and VRE did not care what price they paid for the properties in the abstract. Their sole focus was on how the prices related to the rents payable under the leases. Verdad wished to earn a nine (9) percent return, or cap rate, on the monies it was paying to purchase the properties.

20. Ultimately, Verdad, VRE and LeVecke agreed that the purchase price for the Chicago 11 properties would be $1.9 million each, and the rent under the leases for each of the stores would be at least $171,000 per year (calculated as nine percent of $1,900,000). As noted, above, those rent levels represented more than a doubling of the rents that had been paid on the properties prior to the sale.

21. The sale terms between Verdad, VRE and LeVecke were designed to enable LeVecke to make large and quick profits in that he would be acquiring 11 properties for $1 million each and immediately flipping them to Verdad and VRE for $1.9 million each. And, the terms similarly were designed to enable Verdad and VRE to make large short-term profits by reselling the properties within a short time for prices reflecting further large mark-ups.

22. How the Verdad/VRE side of the deal was intended to work was: they had no intention of owning the properties long term; rather, they planned to dispose of the properties within a year or so. And, how they planned to price the properties for resale was to select an exit cap rate they believed the market would bear in connection with the sale of triple net properties to investors – *e.g.*, 6.5 to 7 percent – and apply that cap rate to the rent payable under the lease on each property to arrive at the listed sale price.

23. Specifically, with the rent having been set at a minimum of $171,000 per year, Verdad and VRE would divide the annual rent by the selected cap rate, *e.g.*, 7 percent (.07), which would result in a proposed sale price of approximately $2,443,000 per store. If realized, that sale price would net Verdad a profit of at least $543,000 for each of the Chicago 11 properties, from merely buying the properties and then reselling them within a year or so. Moreover, the actual return was even higher in that Verdad and VRE began collecting rent from LeVecke immediately upon the closing of the Chicago 11 transaction.

24. One wrinkle in the foregoing scenario was that, for the long-term owner of the property to have a reasonable expectation of receiving the rent payments promised under the leases (for at least 20 years), the business operations at the premises would have to be sufficiently profitable to support those rent payments. Here, that was not going to happen. As Verdad and VRE, as well as EXP and Tartan, knew or should have known, the typical annual rent to sales ratio for a fast food restaurant is 7 to 9 percent. The annual sales at the Chicago 11 properties were in the range of $1 million or less per store, and the rent between the prior owner and operator had been approximately $76,000 per year. So, as compared to the normal 7 to 9 percent rent to sales ratio, Verdad, VRE and LeVecke loaded up the Chicago 11 properties with rent obligations amounting to at least 17 percent of sales, approximately double the market.

25. The unsustainable rents resulting from the foregoing financial engineering were not a problem for Verdad and VRE, who planned to flip the properties and be out of them within a year or so. Nor were they a problem for LeVecke, at least initially. He had just made a large profit by buying properties for $1 million apiece and then immediately reselling them to Verdad and VRE for $1.9 million each. However, the foregoing circumstances created huge potential problems for third parties who might buy one or more of the Chicago 11 properties, based on an

expectation that they would receive rent payments for 20 years of $171,000 per year or more. (The leases provided for periodic increases in rent and contained renewal options.) In light of the circumstances discussed above, it was only a matter of time before the expected rent payments became unsustainable and ceased.

26. The inflated leases might pose a problem for LeVecke longer term, to the extent he was called upon to actually pay rent at the levels provided for in the leases, or he or the related entity that guaranteed the leases (FS1) were called upon to perform their guaranties. What ultimately happened, though – and likely always was the plan – was that a short time after the property sales closed, LeVecke went to the buyers, asserted that he could not continue to pay rent at the level provided for in the lease, and sought a drastic rent reduction. He likely banked on the expectation that the buyers, while unhappy at the prospect of a rent reduction, would survey the marketplace, find that the proposed reduced rent actually represented market rent for the property, and reluctantly accept the rent reductions since they were not likely to obtain payment of greater rents from anyone else. LeVecke also likely banked on the fact that if buyers sought to enforce the lease guaranties, they would find there was not much prospect of successfully doing so. The corporate guarantor was a holding company which had no liquid assets, and its holdings in subsidiaries – whose assets likely were substantially encumbered by liens of secured creditors – would be difficult to collect against. And, as to LeVecke personally, his assets were jointly held with his wife, but she had not joined in the guaranty, thus making the LeVecke guaranty pyrrhic and worthless.

27. Another significant aspect of the Chicago 11 deal was that, originally, the KFCs were to be converted to Hardee's restaurants, which are generally more valuable than KFCs; and, it was recognized that the costs of conversion would amount to at least $400,000 per store, to be

paid by the tenant, which was part of the rationale for the large markup in what Verdad paid LeVecke for the properties, over and above the price LeVecke paid to buy the properties on the same day. In essence, the Chicago 11 deal was supposed to involve conversions and leasebacks, in which part of the funds paid by Verdad for the properties represented conversion financing, to be used for improvements to the properties, and part of the rent under the leases represented repayment of the funds provided for the conversions.

## II. POST-ACQUISITION EVENTS

28. Following the March, 2014 closing of Verdad's and VRE's acquisition of the Chicago 11 properties, little, if anything, unfolded according to the original plan with respect to conversions, re-openings and prompt re-sales. While Verdad and VRE contemplated that the first conversions hopefully would be open by June, 2014, and in any event no later than October, 2014, nothing happened towards that end for more than a year. For months, the project supposedly was mired in the planning and permitting process. Months later, LeVecke began discussing a different plan, under which some or all of the restaurants might remain as KFCs instead of being converted to Hardee's. Finally, in early 2015, it was decided that all of the Chicago 11 properties would remain as KFCs, LeVecke would seek franchise agreements from KFC to operate them as such, and Verdad and VRE would endeavor to sell them as KFCs.

29. The delays and uncertainties concerning the Chicago 11 properties caused enormous headaches for Verdad and VRE. They had financed a large portion of the acquisition through bank loans and had expected to be out of the deal much earlier. Their loan agreements called for substantial balloon payments to be made on September 28, 2015, and the loan obligations were personally guaranteed by Verdad's principals. Also, Verdad and VRE had a capital partner in the deal, Aaron Stearns, who had invested $5.4 million for a 25 percent stake.

He, too, expected to be out of the deal within a short time. And, Stearns recognized that LeVecke kept dissembling and making unfulfilled promises, leading Stearns to express great distrust of LeVecke. Verdad and VRE, on the other hand, were afraid to rock the boat and push LeVecke too hard, for fear of jeopardizing their ongoing stream of deals with LeVecke, which they perceived to be highly lucrative.

30. Keeping the properties KFCs posed real problems for Verdad and VRE in that they now were put in the position of trying to market KFCs which had, in their own words, "Rent Coverage Ratio[s]" that were "unhealthy" and rents that were significantly higher than what was common in the market. Indeed, in internal discussions, Verdad and VRE expressed the need to "start working on restructuring the leases and economics to keep them as KFCs and then put them on the market[.]" In correspondence with LeVecke's top lieutenant, Matt Langfield ("Langfield'), Jason Keen of Verdad and VRE characterized the $171,000 annual rent as "[t]he ultimate challenge we are faced with[.]" Verdad and VRE were well aware that the rent paid by many KFCs was in the range of $60,000 to $80,000 per year. (See e-mails attached hereto as Exhibits 2, 3 and 4.)

31. Abandoning the plan to convert the Chicago 11 properties to Hardee's also raised issues as to how to handle the $400,000 per store in conversion costs that Verdad and VRE had funded, LeVecke had received, and LeVecke had committed – in the leases on the properties – to spend on conversion costs, but which no longer were going to be necessary if the properties were to remain as KFCs.

32. To address those issues, Verdad, VRE and LeVecke entered into new leases on the Chicago 11 properties, dated February 27, 2015, which deleted the language concerning conversion to Hardee's, and eliminated the requirement for the tenant to spend $400,000 per

store on conversion costs or other improvements. Notwithstanding those changes, the rent of at least $171,000 per store, per year remained unchanged. The tenant under these leases was a different entity owned and/or controlled by LeVecke, MJC Holdings 123, LLC ("MJC"). (A copy of the lease dated February 27, 2015 for the Western Ave. KFC is appended hereto as Exhibit 5.)

## III. MARKETING EFFORTS AND SECRET SIDE AGREEMENT

33. In February, 2015, Verdad and VRE decided to try to extricate themselves from the morass they were in with respect to the Chicago 11 properties by putting four of them on the market, on a test basis, to see what kind of prices they could induce buyers to pay. Verdad and LeVecke decided to deal with the anomaly of the $400,000 in conversion costs, when there no longer were going to be conversions, as follows.

34. They agreed that if Verdad and VRE could induce a potential buyer to pay roughly the same for a property that it would have paid had the property been converted to a Hardee's, and $400,000 been spent to improve the property, they would allow LeVecke to keep the $400,000 and never have to account for it. If, however, Verdad and VRE could not induce a buyer to pay the price they expected for the Chicago 11 properties – such expectations having been formed when the properties were to be converted to Hardee's, with at least $400,000 per store spent on improvements – Levecke would have to account for the $400,000 per store by refunding it – in which case the rent would be reduced – or spending that amount on improving the property.

35. Of course, if potential buyers were aware of these terms, that would serve as a substantial disincentive to pay the prices Verdad and VRE were seeking, as they would realize that at least $400,000 of the price of each property was attributable to contemplated tenant

improvements, which the tenant no longer had any obligation to make. So, Verdad and VRE, with substantial advice and assistance from their lawyers, Baker Monroe, schemed with LeVecke to conceal their agreement regarding the $400,000 per store from prospective buyers. The agreement was purposely omitted from the February 27, 2015 leases, and instead incorporated into a secret side agreement (the "Side Agreement").

36. The pertinent facts relating to the secret Side Agreement may be summarized as follows. At the same time that the February, 2015 leases were prepared, Baker Monroe, through its principal and/or employee, Chris Baker, also prepared an initial version of the Side Agreement (copy appended hereto as Exhibit 6). *See* e-mails among Chris Baker, Langfield and others dated February 26 and 27, 2015 (copies appended hereto as Exhibit 7). The proposed Side Agreement stated, among other things, that the Landlord and Tenant under the March 6, 2014 leases for the Chicago 11 properties wished to terminate the leases, "execute new leases and guaranties in place thereof," and "delay and potentially terminate the obligation in Section 9.7 of the Leases to invest at least $400,000 in constructing improvements to each of the Properties ('Construction Obligation')."

37. With respect to the $400,000 per store, the initial version of the Side Agreement provided that the Landlord would attempt to sell the properties without any Construction Obligation in the leases; however, if the Landlord was unable to do so prior to August 1, 2015, then, for each unsold property, the Tenant would need to address the $400,000 Construction Obligation in one of the following three ways: (1) invest at least $400,000 in construction renovations in the property; (2) pay $400,000 to the Landlord, and receive an annual rent reduction of $34,000; or (3) if Tenant had spent money for construction renovations but less than $400,000, pay the difference to the Landlord and receive a specified rent reduction.

38. Chris Baker and Baker Monroe prepared the initial version of the secret Side Agreement on or before February 26, 2015 and sent it to Langfield and LeVecke. Langfield made certain minor changes to it, which were accepted; and Chris Baker and Baker Monroe then confirmed that the secret Side Agreement would be executed after the execution of the new February 27, 2015 leases.

39. Subsequently, on March 4, 2015, Chris Baker sent an e-mail to Langfield, reflecting further thoughts he had concerning the secret Side Agreement. *See* e-mails dated March 4-17, 2015 among Baker, Langfield and others (copy appended hereto as Exhibit 8). In his March 4, 2015 e-mail, Chris Baker wrote:

> So … I think I left some language out of the side letter that helps both of us and was the intent. There is nothing in the side letter that allows us to expressly terminate the side letter with respect to a certain property at the time of sale or any other time. It does say we can notify you if we don't sell, and then there are options, but there is nothing about terminating the side letter. ***Therefore, the side letter is arguably an amendment to the lease and we have to disclose it when we go under contract and you would have to disclose it when you sign an estoppel.*** We have two LOI's and are drafting contracts. Looked at the side letter again and I think the language needs to be cleaned up. (Emphasis added)

40. Langfield responded, "[s]ounds like we did miss our intent on the side letter. I think we would be fine with your suggestions…send over whatever you like and we will take a look." (Exhibit 8 hereto). Thereafter, on March 8, 2015, Chris Baker sent a revised version of the secret Side Agreement to Langfield and LeVecke, with a copy to Jason Keen, stating: "Attached is the revised letter agreement with proposed changes. It allows us to terminate the letter agreement with respect to properties that sell, so the letter agreement doesn't remain binding and arguably be an amendment to the lease. . . ." *(Id.)* Jason Keen and LeVecke then proceeded to execute the revised secret Side Agreement as of March 17, 2015 (copy appended hereto as Exhibit 9).

41. The main difference between the two versions of the secret Side Agreement was that the later one, dated March 17, 2015 and ultimately executed, contained the following additional language (Exhibit 9 hereto):

> Landlord, in its discretion, may (by written notice to Tenant) unilaterally terminate this Letter Agreement as to some or all of the Properties in its efforts to market and sell the Properties on terms acceptable to Landlord. Such termination will only affect those specific Properties specified by Landlord and this Letter Agreement shall remain in full force and effect as to all other Properties as to which Landlord has not elected to terminate this Letter Agreement.

## IV. SALE OF WESTERN AVE. KFC TO PLAINTIFFS

42. In February, 2015, Verdad and VRE began marketing the Western Ave. KFC and other of the Chicago 11 properties. Verdad and VRE engaged EXP and Tartan to act as the seller's brokers and agents in marketing and selling the properties.

43. Verdad, VRE and their brokers set a list price for the stores of $2,443,000 each, advertising that this price reflected a 7 percent cap rate, when considered in the context of the $171,000 annual rent. (A copy of the offering memorandum for the Western Ave. KFC [the "Offering Memorandum"] prepared, approved and circulated by Defendants Verdad, VRE, EXP and Tartan is appended hereto as Exhibit 10.)

44. In marketing the Chicago 11 properties, Verdad and VRE, as well as their broker and agents, EXP and Tartan, disseminated false and misleading material information in an effort to induce unsuspecting third parties to purchase the Chicago 11 properties for inflated prices that were vastly in excess of their fair market value. Such information included the Offering Memorandum, as well as an additional Confidential Information Memorandum (the "CIM," a copy of which is appended hereto as Exhibit 11.) The CIM contained purported financial information for FS1, which was a guarantor of the leases on the properties, representing that FS1 had a net worth of nearly $70 million, and annual net income of nearly $15 million. As

demonstrated by the bankruptcies that ultimately ensued a short time later, as well as other facts, that information was false and misleading.

45. Further, the marketing materials misrepresented the identity of the tenant of the properties, claiming it was Frontier Star when, in fact, it was a different entity, MJC, which was not part of the FS1 hierarchy of companies; and misrepresented that the actual tenant operated some 200 restaurants. Upon information and belief, at that time, MJC had no significant track record as a restaurant operator, and had not been finally approved as a KFC franchisee.

46. Additionally, the Offering Memorandum represented that rent of at least $171,000 per year (plus escalations) would be earned on the properties, for at least 20 years, when, as Verdad, VRE, EXP and Tartan knew or must have known, rent at that level was entirely unsustainable.

47. On or about March 6, 2015, as a result of Plaintiffs learning about the Western Ave. KFC through the Offering Memorandum coming to their attention, Plaintiffs and Verdad entered into a letter of intent for the purchase of the Property.

48. On or about March 19, 2015, Russell Smith of EXP represented to Plaintiffs, through Plaintiffs' agent, that the present tenant of the Property was "Frontier Star, LLC" and that "Frontier Star I, LLC is the parent and a guarantor." The representation that Frontier Star, LLC was the tenant of the Property was false, as was the representation that FS1 was the parent of the tenant.

49. On or about March 24, 2015, Plaintiffs and VRE entered into a Purchase and Sale Agreement (the "PSA" or "Sale Contract"), pursuant to which Plaintiffs agreed to buy, and VRE agreed to sell, the Property subject to the terms and conditions described in that contract. (A copy of the PSA is appended hereto as Exhibit 12.) The PSA provided for a purchase price of

$2,443,000.00. Plaintiffs entered into the PSA in reliance on the information set forth in the Offering Memorandum or otherwise conveyed to them by VRE, Verdad, EXP and/or Tartan.

50. Prior to entering into the Sale Contract, Plaintiffs made clear to EXP and Tartan, and through them to Verdad and VRE, that Plaintiffs wished to see financial statements and sales data relating specifically to the Property. EXP and Tartan, on behalf of Verdad and VRE, represented to Plaintiffs that the franchise agreement with KFC relating to the Property prohibited such financial statements and sales data pertaining to the Property from being disclosed. On that basis, Verdad and VRE refused and failed to disclose the requested information, and it was not disclosed.

51. On information and belief, the representations that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed were false; the information requested to be disclosed, but not disclosed, would have shown that the rent levels provided for in the February 27, 2015 lease were not viable or sustainable; and the non-disclosed information, therefore, was material. On information and belief, Verdad, VRE, EXP and Tartan knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

52. On April 16, 2015, the PSA was amended by a First Amendment. (A copy of the said First Amendment is appended hereto as Exhibit 13.)

53. In connection with due diligence under the PSA, Verdad, VRE and their brokers provided to Plaintiffs the February 27, 2015 Lease, but not the secret Side Agreement or the earlier lease for the Western Ave. KFC dated March 6, 2014; and also provided the CIM to

Plaintiffs, representing that FS1 – the guarantor of the tenant's obligations under the February 27, 2015 lease – had a net worth of $70 million and earnings of $15 million per year.

54. In addition, EXP and Tartan, on behalf of Verdad and VRE, represented to Plaintiffs, through Plaintiffs' agent, that there had been consideration of converting the Property to a Hardee's restaurant, but since the Property was doing so well as a KFC restaurant, it was decided to continue to operate the Property as a KFC restaurant. The representation that the Property "was doing so well as a KFC restaurant" was false in that, from and after February 27, 2015, there was no reasonable expectation that the KFC restaurant on the Property could or would generate net operating income in amounts sufficient to provide for the ongoing payment of rent at the levels provided for in the February 27, 2015 lease. On information and belief, Verdad, VRE, EXP and Tartan knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

55. All of the foregoing information and representations served to induce Plaintiffs to enter into the PSA, waive contingencies and/or otherwise go forward with the transaction.

56. The sale of the Property closed on May 15, 2015. In connection with the closing, Plaintiffs succeeded to the Landlord's rights under the February 27, 2015 Lease.

57. In connection with the closing, and as an inducement to Plaintiffs to proceed to close the transaction, Baker Monroe participated in preparing, approving, obtaining the execution of, and disseminating to the parties involved in the transaction, an Estoppel Certificate and Subordination, Non-Disturbance and Attornment Agreement ("SNDA") – which were prerequisites to the transaction closing. Among the persons involved in doing so on behalf of Baker Monroe was Justin Huston, another of its principals and/or employees. *See* e-mail dated

May 12, 2015 from Justin Huston to Jon Frank, with attached Estoppel Certificate and SNDA (copy appended hereto as Exhibit 14).

58. The Estoppel Certificate and SNDA represented that the February 27, 2015 Lease constituted the sole agreement between Landlord and Tenant relating to the property; the Lease had not been amended, modified or supplemented; and there were no other agreements relating to the premises. Those representations were false in light of the secret Side Agreement.

59. On information and belief, the secret Side Agreement never was terminated with respect to the Western Ave. KFC. Moreover, even assuming *arguendo* it was terminated, that would have occurred only after the sale to Plaintiffs closed (on May 15, 2015). So, prior to closing, the secret Side Agreement should have been disclosed to Plaintiffs in that it indisputably served to amend and modify the February 27, 2015 Lease on the Western Ave. KFC – as Chris Baker admitted in his e-mail dated March 4, 2015 – and was an understanding and agreement relating to the Property and the Lease.

60. Before, at and after the time that they closed the purchase and sale of the Western Ave. KFC, and continuing until they became involved in litigation and obtained the information in the course of discovery, Plaintiffs had no knowledge of the secret Side Agreement or the terms agreed to therein. Had they known of such information, they would not have proceeded to purchase the Western Ave. KFC on the terms reflected in the PSA.

## V. LEVECKE DEFAULT

61. Following the closing, Plaintiffs received payment of the rent called for under the February 27, 2015 Lease for a mere two months. On July 27, 2015, less than 75 days after the closing, Frontier Star – the main operating subsidiary of FS1 – filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. And, commencing in August, 2015, the

LeVecke entity that was the tenant of Plaintiffs' property under the February 27, 2015 Lease, MJC, defaulted on its rent obligations.

62. Upon information and belief, Verdad and/or VRE had a close and ongoing business relationship with Frontier Star, FS1 and/or LeVecke as of March, 2015. Counsel for Verdad and VRE stated that those parties had engaged in more than 30 transactions with one another. Upon information and belief, Verdad and VRE knew of Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy, prior to the date on which VRE and Plaintiffs closed on the sale of the Property under the PSA.

63. On August 24, 2015, LeVecke sent an e-mail to Raymond Walls (copy appended hereto as Exhibit 15), stating: "Regrettably, we are having to make serious adjustments to our business. A recent culmination of events are putting real pressure on us. Frankly we are going to need to adjust the rents. We are working with consultants on restructuring and will be in touch soon."

64. Five days later, on August 29, 2015, LeVecke sent a further e-mail to Raymond Walls (copy appended hereto as Exhibit 16), stating, in part: "While our MJC entity that is your tenant has not filed [for bankruptcy] we have no choice but to make adjustments to our business in order to move forward. Otherwise MJC may also have to file. As such, we need to adjust our rents for this location to $70,000 in annual rent. . . ." MJC did not receive the rent payments required under the Lease in or after August, 2015.

65. FS1 filed for bankruptcy in November, 2015 and LeVecke personally filed for bankruptcy in January, 2016.

66. In late 2015, MJC vacated the premises. Since that time, Plaintiffs have been able to secure a replacement tenant only on terms under which the tenant pays rent in the range of $70,000 per year.

67. The financial impact of all of the foregoing on the Walls has been devastating. At a rental rate of $70,000 per year, the value of the Western Ave. KFC property is no more than approximately $1,150,000. Accordingly, the Walls were induced to overpay for the property in the amount of at least $1.3 million. Moreover, over the 20-year lease term, the differential in the rents provided for under the lease, and the rents the Walls realistically may be able to collect, is approximately $2 million. Additional damages include, but are not necessarily limited to, unpaid rent, additional borrowing costs incurred to pay the inflated purchase price, excessive transfer taxes, and attorney's fees and costs incurred in addressing MJC's default and in connection with the present litigation. Overall, the Walls' damages in this matter are well in excess of $3 million.

68. Notably, Verdad and VRE still own seven of the Chicago 11 properties, having been unable to sell them, and they experienced the same defaults by MJC that Plaintiffs did. Prior to September, 2016, Verdad and VRE were able to re-lease their seven Chicago 11 properties to a new tenant-operator, but only on terms providing for rent payments at a level of $70,000 to $80,000 per year.

69. More recently, with respect to three of the properties, Verdad and VRE have entered into 15-year leases, at rents ranging from $82,000 to $90,000 per year, and listed those properties for sale at asking prices of approximately $1.5 to $1.6 million. All of the foregoing facts confirm that the rent and sale price relating to the sale to Plaintiffs were grossly inflated.

70. At no time prior to the closing of the Sale Contract did Verdad, VRE, EXP or Tartan disclose to Plaintiffs any of the following material facts:

a. that the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee, and, at the time of various communications, may not even have been an approved KFC franchisee;

g. the falsity of the information that the Property was doing so well as a KFC restaurant so as to generate net operating income in amounts sufficient to provide for the ongoing payment of rent at the levels provided for in the February 27, 2015 lease; and/or

h. the falsity of the information that the franchise agreement with KFC relating to the Property prohibited disclosure to Plaintiffs of financial statements and sales data specifically relating to the Property.

71. As a direct and proximate result of the foregoing, Plaintiffs have suffered substantial losses and damages, including but not limited to lost rents; paying $2,443,000.00 for the Property when its actual fair market value was approximately $1.3 million less than that amount; and legal fees and expenses.

**COUNT I – FRAUDULENT INDUCEMENT-MISREPRESENTATIONS**
**(Against Verdad, VRE, EXP and Tartan)**

72. Paragraphs 1 through 71 are incorporated by this reference as though set forth in full herein.

73. Prior to entering into the Sale Contract, Verdad, VRE, EXP and Tartan, and each of them, made a number of false representations to Plaintiffs, in order to induce Plaintiffs to enter into the Sale Contract, including but not limited to the following:

a. the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

b. Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c. the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of

$171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d. Defendants represented that the Property was doing so well as a KFC restaurant, thereby implying that the Property was generating sales, revenue and net operating income sufficient to support ongoing payment of rent at the levels provided for in the February 27, 2015 lease, which was false; and/or

e. Defendants represented that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiffs, which, on information and belief was false, and precluded Plaintiffs from obtaining financial information, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

74. In addition, VRE, Verdad, EXP and Tartan, directly or through agents, were involved in preparing, effecting the execution of, and disseminating to Plaintiffs and the other parties involved in the transaction, the Estoppel Certificate and SNDA, which falsely represented that the February 27, 2015 Lease constituted the sole agreement between Landlord and Tenant relating to the property; the Lease had not been amended, modified or supplemented; and there were no other agreements relating to the premises. Those representations were false in light of the secret Side Agreement.

75. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of such facts, or any of them, they would not have proceeded with the purchase of the Property.

76. Verdad, VRE, EXP and Tartan, and each of them, made the foregoing false representations knowing the same to be false, or without any proper basis for knowing whether they were true, and with intent to deceive Plaintiffs.

77. Plaintiffs relied on the foregoing false representations, their reliance was reasonable, and Plaintiffs in fact were deceived by the false representations.

78. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to enter into the Sale Contract and purchase the Property.

79. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $3,000,000.

80. The actions of Verdad, VRE, EXP and Tartan were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of the said defendants; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT II – FRAUDULENT INDUCEMENT-OMISSIONS
## (Against Verdad, VRE, EXP and Tartan)

81. Paragraphs 1 through 80 are incorporated by this reference as though set forth in full herein.

82. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP and Tartan, and each of them, omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee;

g. financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable; and/or

h. the existence of the secret Side Agreement and the terms agreed to therein.

83. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

84. Verdad, VRE, EXP and Tartan, and each of them, omitted to disclose the foregoing facts with intent to deceive Plaintiffs, and Plaintiffs thereby were deceived.

85. Verdad, VRE, EXP and Tartan, and each of them, had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, the said defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their partial disclosures conveyed a false impression, and because the said defendants had superior knowledge and information concerning the omitted facts.

86. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to enter into the Sale Contract and purchase the Property.

87. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $3,000,000.

88. The actions of Verdad, VRE, EXP and Tartan were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor on this Count, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of the said defendants; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT III – NEGLIGENT MISREPRESENTATIONS-AFFIRMATIVE STATEMENTS
## (Against Verdad, VRE, EXP and Tartan)

89. Paragraphs 1 through 88 are incorporated by this reference as though set forth in full herein.

90. Plaintiffs allege this Count in the alternative to the claims alleged in Counts I and II.

91. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP and Tartan, and each of them, made a number of false representations to Plaintiffs, which operated to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

b. Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c. the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d. Defendants represented that the Property was doing so well as a KFC restaurant, thereby implying that the Property was generating sales, revenue and net operating income sufficient to support ongoing payment of rent at the levels provided for in the February 27, 2015 lease, which was false; and/or

e. Defendants represented that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiffs, which, on information and belief was false, and precluded Plaintiffs from obtaining financial information, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

92. In addition, VRE, Verdad, EXP and Tartan, directly or through agents, were involved in preparing, effecting the execution of, and disseminating to Plaintiffs and the other parties involved in the transaction the Estoppel Certificate and SNDA, which falsely represented

that the February 27, 2015 Lease constituted the sole agreement between Landlord and Tenant relating to the property; the Lease had not been amended, modified or supplemented; and there were no other agreements relating to the premises. Those representations were false in light of the secret Side Agreement.

93. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

94. Verdad, VRE, EXP and Tartan, and each of them, made these statements to Plaintiffs in the course of their business and in a transaction in which they had an interest.

95. Verdad, VRE, EXP and Tartan, and each of them, failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading, and thus were negligent in making the misrepresentations set forth above.

96. Plaintiffs justifiably relied on the statements by Verdad, VRE, EXP and Tartan, and each of them.

97. As a direct and proximate result of the foregoing negligent misrepresentations, Plaintiffs were damaged, and the amount of their damages exceeds $3,000,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiffs appropriate equitable relief to

remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT IV – NEGLIGENT MISREPRESENTATION-OMISSIONS**
**(Against Verdad, VRE, EXP and Tartan)**

98. Paragraphs 1 through 97 are incorporated by this reference as though set forth in full herein.

99. Plaintiffs allege this Count in the alternative to the claims alleged in Counts I and II.

100. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP and Tartan, and each of them, omitted to disclose a number of material facts to Plaintiffs, which operated to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels

represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee;

g. financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable; and/or

h. the existence of the secret Side Agreement and the terms agreed to therein.

101. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

102. Verdad, VRE, EXP and Tartan, and each of them, failed to disclose the foregoing facts to Plaintiffs in the course of their business and in a transaction in which they had an interest.

103. Verdad, VRE, EXP and Tartan, and each of them, failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading; additionally, they failed to take reasonable care to ensure they disclosed the foregoing material information of which they had superior knowledge and which was not reasonably discoverable by Plaintiffs in the exercise of ordinary due diligence. In each and all of the foregoing respects, Verdad, VRE, EXP and Tartan, and each of them, were thereby negligent.

104. As a direct and proximate result of the negligent omissions by Verdad, VRE, EXP and Tartan, and each of them, Plaintiffs were damaged, and the amount of their damages exceeds $3,000,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc., jointly and severally; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; alternatively, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT V – FRAUDULENT INDUCEMENT-MISREPRESENTATIONS**
**(Against Baker Monroe)**

105. Paragraphs 1 through 104 are incorporated by this reference as though set forth in full herein.

106. In connection with the closing of the sale of the Western Ave. KFC to Plaintiffs, Baker Monroe participated in the drafting, obtaining the execution, and dissemination – to Plaintiffs, the title company, Plaintiffs' lender and others – of the Estoppel Certificate and the SNDA, in order to induce Plaintiffs to close the sale transaction

107. The Estoppel Certificate and SNDA contained false representations, including but not limited to representations that there were no agreements among the Landlord and Tenant relating to the property other than the February 27, 2015 Lease. Those representations were false in light of the agreements embodied in the secret Side Agreement.

108. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

109. Baker Monroe made the foregoing false representations knowing the same to be false, or without any proper basis for knowing whether they were true, and with intent to deceive Plaintiffs – particularly in light of its role in conceiving of and implementing the strategy of having the terms of the secret Side Agreement reflected in a separate agreement, to be kept secret from purchasers of the Chicago 11 properties, rather than embodying them in the leases.

110. Plaintiffs relied on the foregoing false representations, their reliance was reasonable, and Plaintiffs in fact were deceived by the false representations.

111. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to purchase the Property.

112. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $3,000,000.

113. The actions of Baker Monroe were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against Baker Monroe.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from Baker Monroe; award to Plaintiffs from Baker Monroe pre and post-judgment interest, and the costs of this action, including

reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT VI – FRAUDULENT INDUCEMENT-OMISSIONS**
**(Against Baker Monroe)**

114. Paragraphs 1 through 113 are incorporated by this reference as though set forth in full herein.

115. Prior to the closing of the sale of the Property to Plaintiffs, Baker Monroe omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, to-wit: the terms of agreement set forth in the secret Side Agreement.

116. All of the foregoing omitted facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

117. Baker Monroe omitted to disclose the foregoing facts with intent to deceive Plaintiffs, and Plaintiffs thereby were deceived.

118. Baker Monroe had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, Defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their partial disclosures conveyed a false impression, and because the Defendants had superior knowledge and information concerning the omitted facts.

119. As a direct and proximate result of the foregoing, Plaintiffs were wrongfully induced to purchase the Property.

120. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $3,000,000.

121. The actions of Baker Monroe were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against it.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from Baker Monroe; award to Plaintiffs from Baker Monroe pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT VII – NEGLIGENT MISREPRESENTATIONS-AFFIRMATIVE STATEMENTS**
**(Against Baker Monroe)**

122. Paragraphs 1 through 121 are incorporated by this reference as though set forth in full herein.

123. Plaintiffs allege this Count in the alternative to the claims alleged in Counts V and VI.

124. In connection with the closing of the sale of the Western Ave. KFC to Plaintiffs, Baker Monroe participated in the drafting, obtaining the execution, and dissemination – to Plaintiffs, the title company, Plaintiffs' lender and others – of the Estoppel Certificate and the SNDA, in order to induce Plaintiffs to close the sale transaction.

125. The Estoppel Certificate and SNDA contained false representations, including but not limited to representations that there were no agreements among the Landlord and Tenant relating to the property other than the February 27, 2015 Lease. Those representations were false in light of the agreements embodied in the secret Side Agreement.

126. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded to purchase the Property.

127. Baker Monroe participated in the drafting, obtaining the execution, and dissemination of the foregoing false representations in the course of its business, and in connection with a transaction in which they had an interest.

128. Baker Monroe failed to take reasonable care to ensure that the representations they drafted and disseminated were true and sufficiently complete that they would not be misleading, and thus were negligent in making the misrepresentations set forth above.

129. Plaintiffs justifiably relied on the foregoing false representations.

130. As a direct and proximate result of the foregoing, Plaintiffs were damaged, and the amount of their damages exceeds $3 million.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs from Baker Monroe pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT VIII – NEGLIGENT REPRESENTATIONS-OMISSIONS
**(Against Baker Monroe)**

131. Paragraphs 1 through 130 are incorporated by this reference as though set forth in full herein.

132. Plaintiffs allege this Count in the alternative to the claims alleged in Counts V and VI.

133. Prior to the closing of the sale of the Property to Plaintiffs, Baker Monroe omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, to-wit: the terms of agreement set forth in the secret Side Agreement.

134. Baker Monroe had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, Defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their partial disclosures conveyed a false impression, and because the Defendants had superior knowledge and information concerning the omitted facts.

135. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

136. Baker Monroe omitted to disclose the foregoing facts in the course of their business and in a transaction in which they had an interest.

137. Baker Monroe failed to take reasonable care to ensure that the representations they drafted and disseminated were true and sufficiently complete that they would not be misleading; additionally, they failed to take reasonable care to ensure they disclosed the foregoing material information of which they had superior knowledge and which was not reasonably discoverable by Plaintiffs in the exercise of ordinary diligence. In each and all of the foregoing respects, Baker Monroe was thereby negligent.

138. As a direct and proximate result of the foregoing, Plaintiffs were wrongfully induced to enter into the Sale Contract and purchase the Property.

139. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $3,000,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs from Baker Monroe pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT IX – AIDING AND ABETTING**
**(Against Baker Monroe)**

140. Paragraphs 1 through 139 are incorporated by this reference as though set forth in full herein.

141. By its acts and omissions set forth above, including but not limited to its conceiving and implementing the concept of incorporating Verdad's and VRE's agreement with LeVecke into a secret Side Agreement; its participation in providing an Estoppel Certificate and SNDA in connection with the transaction, which falsely represented there were no other agreements relating to the Western Ave. KFC other than the February 27, 2015 Lease; and its otherwise concealing and failing to disclose the agreement embodied in the secret Side Agreement; Baker Monroe knowingly and substantially assisted the wrongful conduct of Verdad, VRE, EXP and Tartan alleged above in wrongfully inducing Plaintiffs to purchase the property at a vastly inflated price.

142. In engaging in the foregoing wrongful acts and omissions, Baker Monroe was regularly aware of its role as part of the overall or tortious activity being engaged in by the other defendants, at the time Baker Monroe provided its assistance.

143. Baker Monroe's acts and omissions, as aforesaid, in assisting, aiding and abetting the other defendants' wrongful conduct, were a proximate cause of the damages suffered by Plaintiffs as a result of their being wrongfully induced to purchase the property at a vastly inflated price.

144. The actions of Baker Monroe were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against it.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from Baker Monroe; award to Plaintiffs from Baker Monroe pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

**<u>COUNT VI – CIVIL CONSPIRACY</u>**
**(Against Baker Monroe, Verdad and VRE)**

145. Paragraphs 1 through 144 are incorporated by this reference as though set forth in full herein.

146. By its acts and omissions set forth above, Baker Monroe entered into a civil conspiracy with VRE, Verdad, LeVecke, MJC and others to endeavor to cause Plaintiffs to unwittingly purchase the Western Ave. KFC for a vastly inflated price.

147. The said conspiracy involved, as a starting point, an agreement to endeavor to cause Plaintiffs to unwittingly purchase the Western Ave. KFC for a vastly inflated price through making misrepresentations of and/or omissions to disclose material facts, including but not

limited to concealing from Plaintiffs the terms set forth in the secret Side Agreement, and making the misrepresentations set forth in the Estoppel Certificate and SNDA, that there were no agreements between the Landlord and Tenant other than the February 27, 2015 Lease.

148. The said conspiracy also involved overt acts in furtherance of same by Baker Monroe, including but not limited to its conceiving and implementing the concept of incorporating Verdad's and VRE's agreement with LeVecke into a secret Side Agreement; its participation in providing an Estoppel Certificate and SNDA in connection with the transaction, which falsely represented there were no other agreements relating to the Western Ave. KFC other than the February 27, 2015 Lease; and its otherwise concealing and failing to disclose the terms of agreement embodied in the secret Side Agreement.

149. The said conspiracy further involved other overt acts on the part of VRE and Verdad in contracting to sell the Western Ave. KFC to Plaintiffs, closing the transaction, and failing to disclose the omitted and concealed facts, as set forth above.

150. The acts and omissions of Baker Monroe, Verdad and VRE, as aforesaid, were a proximate cause of the damages suffered by Plaintiffs as a result of their being wrongfully induced to purchase the property at a vastly inflated price.

151. The actions of Baker Monroe Verdad and VRE, as aforesaid, were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe, Verdad and VRE, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $3,000,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from Baker Monroe, Verdad

and VRE; award to Plaintiffs from Baker Monroe, Verdad and VRE pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

**PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted,

/s/Gerald P. Greiman

Gerald P. Greiman, MO Bar No. 26668
Ryan C. Hardy, IL Bar No. 6304782
SPENCER FANE LLP
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
314-863-7733 (Telephone)
314-862-4656 (Facsimile)
ggreiman@spencerfane.com
rhardy@spencerfane.com

Sharon Doherty Sirott, IL Bar No. 6236973
MARTINSIROTT LLC
30 N LaSalle St., Suite 3400
Chicago, IL 60602
312-368-9000 (Telephone)
312-962-4448 (Facsimile)
ssirott@martinsirott.com

*Attorneys for Plaintiffs*

## LEASE AGREEMENT

5852 S. Western Ave., Chicago, Illinois 60636

THIS LEASE AGREEMENT is made and entered into as of the Lease Date by and between VRE CHICAGO ELEVEN, LLC, a Texas limited liability company, ("Landlord") and FRONTIER STAR, LLC, a Delaware limited liability company, ("Tenant").

1. Fundamental Lease Provisions. The following is a summary schedule of certain fundamental terms of this Lease:

1.1 Lease Date: March 6, 2014

1.2 Landlord: VRE Chicago Eleven, LLC

1.3 Address of Landlord: 1211 S. White Chapel Blvd., Southlake, Texas 76092

1.4 Tenant: Frontier Star, LLC

1.5 Address of Tenant: 5210 S. Priest Dr. Guadalupe, Suite 3, AZ 85283

1.6 Address of Premises: 5852 S. Western Ave., Chicago, Illinois 60636

1.7 Initial Lease Term: 20 years

1.8 Effective/Commencement Date: Upon Landlord's acquisition of Premises

1.9 Lease Expiration Date: 20 years after Commencement Date

1.10 Minimum Monthly Rent during the Initial Term:

1.10.1 First 5 years of the Initial Term: $ 14,250.00

1.10.2 Second 5 years of the Initial Term: $ 15,675.00

1.10.3 Third 5 years of the Initial Term: $ 17,242.50

1.10.4 Fourth 5 years of the Initial Term: $ 18,966.75

1.11 Minimum Monthly Rent during the Option Periods:

1.11.1 First 5 year Option Period: Market Rate (Determined pursuant to Section 4)

1.11.2 Second 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.05

**Exhibit 1**

1.11.3 Third 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.10

1.11.4 Fourth 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.15

1.12 Premises. The real property described on Exhibit A attached hereto and incorporated herein, and all improvements belonging to Landlord now or in the future located on and all rights and privileges appurtenant to the real property (the "Premises").

2. Lease; Fundamental Lease Provisions. Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord, subject to the terms and conditions contained herein. The Fundamental Lease Provisions set forth in Section 1 of this Lease are an integral part of this Lease and each of the Fundamental Lease Provisions shall be deemed a definition of an essential term of this Lease, and whenever any such term shall appear in this Lease, it shall be deemed to have the meaning set forth in Section 1 except as otherwise explicitly set forth in this Lease.

3. Term.

3.1 Effective/Commencement and Expiration Dates of Term. The Term of this Lease shall commence on the Effective/Commencement Date defined in Section 1.8 above. The Term shall expire, unless sooner terminated in accordance with the provisions contained in the Lease, at 12:00 midnight on the Lease Expiration Date. For purposes of this Lease, the word "Term" shall mean the Initial Term and any Option Period (as defined in Section 3.2 below).

3.2 Option Periods. Landlord hereby grants to Tenant options to extend and renew this Lease for four (4) consecutive five (5) year periods (each, an "Option Period") upon the same terms and conditions set forth in this Lease, at the an adjusted Minimum Monthly Rent equal to the Market Rate of the Premises as determined at the beginning of each Option Period pursuant to Section 5 below. Tenant's renewal option shall be exercised by Tenant upon written notice to Landlord at least ninety (90) days but no more than two hundred seventy (270) days prior to the expiration of the Initial Term of this Lease or any Option Period; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such extension, if Tenant fails to give the foregoing notice, Tenant's right to exercise such extension shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant a written notice of such failure, and Tenant may exercise the extension at any time prior to the expiration of such thirty (30) day period.

4. Market Rate.

4.1 Market Rate Definition. "Market Rate" shall be defined as the bona fide rates, terms and conditions then being paid by tenants in "arm's length" transactions for comparable space, for comparable uses, in comparable buildings in the same geographic submarket as the Premises within the previous six (6) month period. To determine the Market Rate the parties must also take into consideration the quality, size, design and location of the Premises.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001019

4.2 Determination and Appraisal Process. To initiate the negotiation, Tenant shall notify Landlord in writing of Tenant's determination of the Market Rate for the applicable Option Period (the "Tenant's Initial Determination"). Landlord shall, within thirty (30) days following receipt of Tenant's Initial Determination, then notify Tenant in writing that it accepts Tenant's Initial Determination or, if it does not, notify Tenant of Landlord's determination of the Market Rate ("Landlord's Initial Determination"). Tenant shall have the sole option, but not the obligation, to retract its election notice to extend the Term of the Lease by written notice to Landlord within fifteen (15) days following receipt of Landlord's Initial Determination. If Tenant does not retract its extension election notice within such time period, then within thirty (30) days after receipt by Tenant of Landlord's Initial Determination, if Tenant rejects in writing Landlord's determination, the parties agree to negotiate their differences in good faith within thirty (30) days following Tenant's notice of objection or deemed rejection. Should the parties be unable to agree upon the Market Rate within such thirty (30) day period, the parties will each appoint a real estate appraiser who is a member of the American Institute of Real Estate Appraisers with at least five (5) years full-time commercial appraisal experience in the area in which the Premises are located to determine the Market Rate. If either the Landlord or the Tenant does not notify the other party in writing that it has appointed an appraiser within ten (10) days after the other party has provided written notice of its appointed appraiser, the single appraiser appointed will determine the Market Rate. If two (2) appraisers are appointed, they will meet promptly and attempt to set the Market Rate. If the two appraisers agree upon a Market Rate, such determination shall be final and binding on the parties. If they are unable to agree on the Market Rate within thirty (30) days after the second appraiser has been appointed, the appraisers will appoint, or request that the American Institute of Real Estate Appraisers appoint, a third appraiser meeting the qualifications stated in this paragraph and the appraisers will then notify Landlord and Tenant of such appraiser's name, address and selection within ten (10) days following the failure of the parties to agree upon the Market Rate. Landlord and Tenant will bear one-half (1/2) of the cost of the third appraiser. The third appraiser, however selected, must be a person who has not previously acted in any capacity for either Landlord or Tenant. Within thirty (30) days after the selection of the third appraiser, a majority of the appraisers will determine the Market Rate. If a majority of the appraisers cannot agree on the Market Rate within thirty (30) days after selection of the third appraiser, the high and the low appraisal will be thrown out and the middle appraisal shall be the final and binding determination of the Market Rate.

4.3 Amendment. The parties will execute an amendment to this Lease within fifteen (15) days after determination of the new Market Rate.

4.4 Lease Right of First Refusal. In the event that Landlord rejects Tenant's Initial Determination of the Market Rate and Tenant subsequently retracts its election notice to extend the Term of the Lease pursuant to Section 3.2 above, then if Landlord's heirs, executors, grantees, successors or assigns, at any time during the Term of this Lease or within one hundred eighty (180) days following the termination of the Lease, receive an offer to lease the Premises, or any part thereof, and Landlord desires to accept such offer; or should Landlord during any such time make an offer to lease the Premises, or any part thereof, Landlord shall give Tenant thirty (30) days notice in writing of such offer setting forth the name and address of the proposed tenant, the amount of the proposed rental amount, and all other terms and conditions of such offer, and Tenant shall have the first option to lease the Premises which is



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001020

the subject of the offer by giving written notice to Landlord of its intention to lease and accept Landlord's offer within said thirty (30) day period at the same rental amount and on the same terms of any such offer.

5. Memorandum of Lease. Contemporaneously with the execution of this Lease, or at any time or from time to time hereafter, at the request of the Landlord or Tenant, the parties will execute and deliver a Memorandum of Lease in recordable form. The Memorandum of Lease shall not contain rental amounts.

6. Tenant Payments.

6.1 Minimum Rent. Beginning on the Commencement Date, Tenant shall pay Landlord as rent for the Premises a sum equal to the Minimum Monthly Rent set forth in Section 1.10 on or before the first day of each and every month during the Term of this Lease. If any installment of Rent due from Tenant shall not be received by Landlord within ten (10) days following written notice that such amount is past due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Except as expressly set forth herein, any amount due to Landlord not paid within thirty (30) days after written notice that such payment is past due shall bear interest at eight percent (8%) per annum until the date such amount is paid.

6.2 Utilities. Tenant shall promptly pay for all utilities and other services including, but not limited to, telephone, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, for any heating in the Premises furnished to and or used in or at the Premises for any purpose, from and after the date Tenant shall have possessed the Premises, whether prior to, during or after the Term hereof. Landlord shall not be liable for any interruption or curtailment whatsoever in the furnishing of utility services or other services to the Premises, unless caused by Landlord.

6.3 Net Lease. This Lease is what is commonly called a "net lease", it being understood that Landlord shall receive the Rent set forth in this Section 6 free and clear of any and all impositions, taxes, liens, charges or expenses of any nature whatsoever in connection with its ownership and leasing of the Premises except those expenses specifically designated in this Lease to be borne by Landlord. In addition to the Minimum Monthly Rent, Tenant shall pay all impositions, taxes, insurance premiums, operating costs, costs and expenses which arise or may be contemplated under any provisions of this Lease during the Term (i) when required to be made hereunder or (ii) if no payment date is specified, by the later to occur of (A) the due date for the next installment of Minimum Monthly Rent or (B) ten (10) days from demand. All of such charges, costs and expenses shall constitute additional rent, and upon the failure of Tenant to pay any of such costs, charges or expenses, Landlord shall have the same rights and remedies as otherwise provided in this Lease for the failure of Tenant to pay Rent. "Rent" shall mean Minimum Monthly Rent, additional rent and all other amounts to be paid by Tenant to Landlord pursuant to this Lease. It is the intention of the parties hereto that Tenant shall in no event be entitled to any abatement of or reduction in Rent or additional rent payable hereunder, except as expressly provided herein. Any present or future law to the contrary shall not alter this agreement of the parties.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001021

6.4 <u>Pro Rata Rent</u>. Rent for any period during the Term of this Lease which is for less than one month shall be a pro rata portion of the monthly installment. Except as expressly set forth herein, Rent shall be payable, without deduction or offset, in lawful money of the United States to Landlord at the address set forth in <u>Section 1.3</u> or to such other persons or at such other places as Landlord may designate in writing.

7. <u>Use of the Premises</u>.

7.1 The Premises may be used for the purpose of the operation of a restaurant business or, with prior written approval of Landlord, such other lawful use as Tenant may desire. Tenant shall promptly comply with all present and future laws, ordinances, rules, orders, regulations and requirements of the federal, state and municipal governments in its occupancy and use of the Premises.

7.2 During the Term of this Lease, Tenant agrees to abide by, at its expense, the provisions of any rules, regulations, easements, covenants or restrictions which are disclosed in the public records ("Restrictions"), and Tenant shall perform any duties required of Landlord thereunder. Landlord will reasonably cooperate with Tenant, if necessary, to satisfy the obligations and duties required of the owner of the Premises under the Restrictions.

7.3 <u>Rubbish Removal.</u> Tenant at its own expense shall keep the Premises clean, both inside and outside, and shall remove all rubbish, garbage and other refuse from the Premises.

8. <u>Insurance and Indemnification</u>. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises.

8.1 <u>Property Insurance</u>. During the Term of this Lease, Tenant shall, at its own cost and expense, keep the Premises and other improvements insured against loss by fire and all of the risks and perils usually covered by an extended coverage endorsement to a policy of fire insurance, including, but not limited to, vandalism, malicious mischief, and wind damage, in an amount equal to the full replacement value thereof and flood insurance if in a flood zone. Such insurance shall show Landlord and its Lender as an additional insured and naming Tenant as insured, as the respective parties' interests may appear. All proceeds of such insurance shall be paid to Landlord or its Lender and Tenant to be applied to the extent necessary to the repair and restoration of the Premises as more particularly described in this Lease, provided however that any insurance proceeds paid for losses or damages to Tenant's inventory, fixtures or supplies shall be paid to Tenant.

8.2 <u>Liability Insurance</u>. During the Term of this Lease, Tenant shall, at its own cost and expense, carry comprehensive public liability insurance in the name of Tenant with Landlord as an additional insured covering the Premises and the use and occupancy thereof in such amount or amounts as may be reasonably required but in no event less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate. Tenant shall also keep in force at its own cost and expense as set forth herein, fire, extended coverage, sprinkler and water damage insurance on Tenants property and other contents of the Premises, including, but not limited to betterments and improvements made by

Tenant, Tenants inventory, trade fixtures, furnishings and other personal property whether or not removable by Tenant, in an amount sufficient to cover the full replacement cost of such property.

8.3 Workers Compensation. Tenant shall keep in force workmen's compensation or similar insurance for statutory limits as required by the State in with the Property is located or in which the employees are hired.

8.4 Waiver of Subrogation. Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

8.5 Business Interruption. Tenant shall maintain business interruption insurance and landlord rental insurance in such amount as will protect against loss attributable to the perils insured against in this Section 8.

8.6 General Requirements. Tenant shall deliver the certificates for the insurance required by this Section 8 to Landlord within ten (10) days of the Commencement Date, and thereafter thirty (30) days prior to the expiration of any existing policy of insurance. Should Tenant fail to obtain or maintain in effect the insurance called for herein, or to pay the premiums therefor, Tenant shall indemnify and hold Landlord harmless from all loss or damage incurred by Landlord arising out of such failure and Landlord, may, at its election and in addition to any other remedy available to Landlord, procure said insurance and pay the requisite premiums therefor, in which event, Tenant shall pay the Landlord on demand as additional rent all sums so expended by Landlord. Tenant shall also provide certificates for the insurance upon Landlord's written request in the event of a transfer or potential transfer.

8.7 Plate Glass. Tenant shall replace, at its sole cost and expense, any and all plate and other glass in or about the Premises damaged or broken from any cause whatsoever.

8.8 Indemnification of Landlord. Tenant agrees to indemnify and defend Landlord and to save harmless Landlord, and the tenants, licensees, invitees, agents, servants and employees of Landlord against and from any and all claims by or on behalf of any person, firm or corporation arising by reason or injury to person or property occurring on the Premises occasioned by any act or omission on the part of Tenant or any servant, agent, employee, licensee, assignee or subtenant of Tenant, or by reason of any unlawful use of the Premises or any reason of any breach, violation or nonperformance of any covenant in this Lease on the part of Tenant to be observed or performed, and also by reason of any matter or thing growing out of the occupancy or use of the Premises by Tenant or anyone holding or claiming to hold through or under Tenant, unless caused by or due to the negligence of Landlord, its agents, servants or employees.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001023

9. Alterations and Repairs.

9.1 Tenant may make alterations, additions or improvements to the Premises including the exterior, the building structure, or the storefront thereof without the prior written consent of the Landlord, so long as such alterations or improvements do not exceed $25,000.00 and such consent may not be unreasonably withheld. All franchisor alterations are permitted without consent. All alterations, additions and improvements (excluding personal property, machinery, equipment, signage, trade improvements and trade fixtures of Tenant, no part of the cost of which shall have been paid by Landlord, collectively "Tenant's Property") made by, for or at the direction of Tenant, shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease or at such time as Landlord shall re-enter and take possession of the Premises without terminating this Lease pursuant to the provisions of Section 17 hereof. Landlord shall have no obligation to make any alterations, improvements, repairs or replacements to the Premises other than those, if any, specifically provided for in this Lease.

9.2 Tenant's Property shall remain the property of Tenant. Upon the termination or expiration of the Term, Tenant may remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall, at its sole cost and expense, repair any damage to the Premises or the improvements caused by such removal, including patching and filling holes. In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, or utility or electrical components located inside the walls or HVAC systems. All other utility systems will be capped and returned to a condition compatible with code requirements at Tenant's sole cost and expense.

9.3 Any of Tenant's Property not removed from the Premises within thirty (30) days following the date the Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. Landlord may possess and dispose of such property provided that Landlord shall not use or permit anyone holding under Landlord to use on the Premises (a) any trademark, trade dress, trade name, millwork, copyrighted floorplan, copyrighted color palette, or sign used by Tenant in the Premises; or (b) any item that is similar to any other item protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant under this Lease. The costs incurred by Landlord in removing and disposing of such Tenant's Property shall be paid by Tenant within thirty (30) days after delivery to Tenant of an invoice therefor.

9.4 Tenant shall, at Tenant's own cost and expense, keep, maintain, repair and replace the Premises and appurtenances thereto, including the roof, parking lot and exterior in good condition and repair, normal wear and tear excepted. Tenant shall be liable for any damages due or attributable to Tenant's failure to perform or cause such maintenance or repairs to be performed. All damage or injury to the Premises, caused by any act or negligence of Tenant, its agents, employees, licensees, invitees or visitors, shall be promptly repaired by Tenant.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001024

9.5 From time to time, some or all of Tenant's Property may be financed or owned by someone other than Tenant. To the extent that any of Tenant's Property is financed or owned by someone other than Tenant, Landlord agrees that Tenant's Property is not owned by Landlord no matter how the same is affixed to the Premises or used by Tenant, and Landlord agrees to recognize the rights of the lender or owner of Tenant's Property. Landlord waives any claim arising by way of any Landlord's lien (whether created by statute, by contract or otherwise) with respect to Tenant's Property and agrees to sign and deliver to any lender or secured creditor or lessor a waiver of any lien Landlord may have on Tenant's Property if required by such lender, secured creditor or lessor. Landlord also agrees that all of Tenant's Property that is not subject to a security interest or leased from another shall be the property and remain the property of Tenant or Tenant's assignee or transferee no matter how the same is affixed to the Property.

9.6 Notwithstanding anything contained in this Lease to the contrary, no buildings, improvements or structures shall be erected, and no existing access roads, parking areas or any other area (as the same existed as of the Lease Date) located on the Premises shall be changed or altered in any way without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion.

9.7 Notwithstanding anything contained herein, Tenant warrants that it is accepting the Premises in its as is condition and will invest at least $400,000.00 to improve the Premises and convert the existing restaurant into a Hardee's restaurant. Tenant shall provide evidence that at least $400,000.00 was expended on the improvement of the Premises prior to December 31, 2014 or Tenant shall be in default.

10. Assignment and Subletting. Tenant may assign this Lease, or sublet or permit any other person to occupy, part or all of the Premises. Further, Tenant may assign this lease pursuant to Section 22.8. In the event of any assignment or sublease by Tenant, including pursuant to Section 22.8, Tenant and guarantor, if any, shall remain primarily liable for all obligations under this Lease.

11. Subordination. Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any mortgage, deed to secure debt, deed of trust, trust deed, security agreement, financing statement, or other collateral conveyance of, or lien or encumbrance against, the Property encumbering all or any portion of the Property and placed thereon by Landlord (collectively "Mortgage"), an estoppel, subordination, non-disturbance and attornment agreement in form and substance satisfactory to Tenant (the "SNDA"), executed by the holder of such Mortgage, providing that if the Lease is in full force and effect and there are no defaults thereunder on the part of the Tenant, the right of possession of Tenant to the Premises and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed by the lender, mortgagee, trustee, or beneficiary in the exercise of any of its rights under the Mortgage, nor shall Tenant be named as a party defendant to any foreclosure of the Mortgage nor in any other way be deprived of its rights under this Lease**Error! Reference source not found.**. Tenant hereby agrees that this Lease shall be subject and subordinate to any Mortgage which Landlord has already or may place upon the Premises; provided, however, that Tenant will agree to such subordination only so long as the lender executes a SNDA. In the event that the lender, mortgagee, beneficiary, or any other person, acquires title to the Premises pursuant to the



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001025

exercise of any remedy provided for in the Mortgage, this Lease shall not be terminated or affected by said foreclosure or sale, or any such proceeding, and the lender, mortgagee or beneficiary shall agree that any sale of the Premises pursuant to the exercise of any rights and remedies under the Mortgage, shall be made subject to this Lease and the rights of the Tenant hereunder and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed. Tenant agrees to attorn to the lender, beneficiary or such other person as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between Tenant and Lender, mortgagee, beneficiary or such other person, upon all the terms, covenants, and agreements set forth in this Lease. The parties hereto agree to execute or obtain execution of such reasonable documents as may be necessary to effectuate such subordination, non-disturbance, and attornment.

12. Taxes.

12.1 Tenant shall pay during the Term of the Lease all of the real and personal property taxes levied or assessed against the Premises and improvements thereon for any period, all of which is included in the Term of this Lease, and also its pro rata share of all such taxes levied or assessed thereon for any period, part of which is included in the Term of this Lease, subject to the terms of Section 12.2 below. This Section shall not be deemed or construed to require Tenant to pay or discharge any tax which may be levied by any governmental authority upon the income, profits, or business of Landlord, including Rent due Landlord hereunder, or any personal property taxes, franchise, inheritance or estate bases, or taxes upon inheritance or right of succession which may be levied against any estate or interest of Landlord, even if such taxes become a lien against the Premises.

12.2 Landlord agrees that Tenant shall have the right, at Tenant's sole cost and expense, to contest the legality or validity of any of the taxes which are to be paid by Tenant pursuant to the foregoing provisions, and in the event of any such contest, failure on the part of Tenant to pay any such tax, prior to the delinquency date thereof shall not constitute a default hereunder. Tenant, upon the final determination of such contest, shall immediately pay and discharge any judgment rendered against it, together with all costs and charges incidental thereto. Landlord further agrees at the request of Tenant, to execute, or join in the execution of any instrument or documents necessary in connection with any such contest, but at no expense to Landlord.

12.3 Landlord agrees either to (i) forward to Tenant in a timely fashion the periodic statements for taxes, or (ii) join with Tenant in the necessary formalities to insure that such statements are sent directly to Tenant. Failure of Landlord to provide Tenant with the subject tax bill within one hundred eighty (180) days after the delinquency date of any such tax bill shall relieve Tenant of any responsibility whatsoever for the payment of any penalties associated with such delinquency.

12.4 Landlord expressly waives and relinquishes in favor of Tenant any rights to claim the benefit of or to use any federal or state investment tax credits that are currently or may become available during the Term of this Lease as a result of any installation of any equipment, furniture or fixtures installed by Tenant in or on the Premises, whether or not such



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001026

items become a part of the realty, and agrees to execute and deliver to Tenant any election form required to evidence Tenant's right to claim investment tax credits.

13. Liens. Any work on the Premises performed by Tenant hereunder shall be performed subject and pursuant to the provisions of this Lease. Upon completion thereof and Landlord's written request, Tenant shall furnish Landlord with waivers and affidavits confirming that all contractors, subcontractors, laborers and materialmen who have performed work on the Premises have been paid in full. Such waivers and affidavits shall be in a form acceptable to Landlord and in accordance with applicable laws of the State where the Premises are located. If any such lien or claim of lien shall at any time be filed against the Premises, or Tenant's interest therein or hereunder, by reason of Tenant's acts or omissions or because of a claim against Tenant or any contractor, subcontractor or materialman of Tenant, Tenant shall either contest the lien, indemnifying and saving Landlord harmless from the lien or cause the lien or claim of lien to be canceled and discharged of record by bond or otherwise within ten (10) days after receipt of notice from Landlord. If Tenant does not indemnify Landlord, or fails to cause such lien or claim of lien to be so discharged or bonded within such period, Tenant shall be in default hereunder, and, in addition to any other right or remedy it may have, the Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by procuring the discharge of such lien or claim by deposit in court or bonding, and in any such event, the Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien or claim by the lienor or claimant and to pay the amount of the judgment, if any, in favor of the lienor, with interest, costs and allowances. Tenant shall pay as additional rent on demand any sum so paid by Landlord for the aforesaid purposes with interest as hereinafter provided and all costs and expense incurred by Landlord including, but not limited to attorney's fees in processing such discharge or in defending any such action.

14. Damage or Destruction.

14.1 In the event that during the Term of this Lease, the Premises shall be damaged by fire or other casualty which renders the Premises untenantable, Tenant, shall repair said damage. Such repairs shall be commenced within sixty (60) days of the date of said damage and such repairs shall be completed within one two hundred seventy (270) days of said damage; provided, however, if the Premises are damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within such time period, Tenant shall have such additional time as necessary, so long as Tenant is using diligent, good faith efforts to repair and restore the Premises.

14.2 In the event (i) the building is damaged by fire or other casualty during the last three (3) years of the Initial Term, or during any Extension Period, and (ii) said damage is equal to or greater than fifty percent (50%) of the then replacement cost of the Restaurant building and related improvements, then Tenant shall have the option to terminate this Lease upon written notice to Landlord within thirty-five (35) days of such damage, and said termination shall be effective as of the date of damage. In the event of a termination of the Lease under this provision, Landlord shall be entitled to the proceeds of the building insurance.

14.3 If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, either Landlord or Tenant may



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001027

terminate this Lease by thirty (30) days written notice to the other of its election so to do and the Lease shall be deemed to have terminated as of such date unless the other party agrees in writing to pay for such repairs or restoration.

15. Condemnation.

15.1 The term "total taking" means the taking of or a voluntary transfer under the threat of the exercise of the right of eminent domain or other authority (i) of all or a portion of the Premises that is necessary for Tenant's occupancy and gainful operation of the Premises in compliance with applicable laws, rules, ordinances and regulations, (ii) of all or a portion of the Premises so that the Premises are not suitable for Tenant's intended use, (iii) of the driveways serving the Premises, or (iv) of more than 20% of the parking spaces on the Premises. The term "partial taking" means the taking of only a portion of the Premises which does not constitute a total taking whereby Tenant can continue to gainfully operate the its business on the Premises in compliance with applicable laws, rules, ordinances and regulations.

15.2 If a total taking occurs during the Term of this Lease, this Lease will terminate as of the date of the taking. The phrase "date of the taking" means the date of taking actual physical possession by the condemning authority or such earlier date as the condemning authority gives notice that it is deemed to have taken possession.

15.3 If a partial taking occurs during the Term of this Lease, either Landlord or Tenant may cancel this Lease as to the portion of the Premises taken, by written notice given within thirty (30) days after the date of the taking, and this Lease will terminate as to the portion of the Premises taken on the date of the taking. This Lease will continue in full force and effect as to the remainder of the Premises. The Rent payable by Tenant for the balance of the Term will be abated in the same proportion that the area of the Premises taken bears to the total area of the Premises immediately prior to such taking, and Landlord will make all necessary repairs or alterations to make the remaining Premises a complete architectural unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation.

15.4 If more than twenty percent (20%) of the parking spaces of the Premises (or lesser amount if the taking results in the Premises not meeting municipal parking requirements) dedicated to customer parking area acquired or condemned under power of eminent domain or other authority of law, or a voluntary transfer under the threat of an exercise of the right of eminent domain or other authority, then Tenant shall have the option to cancel this lease by written notice given within 30 days after the date of taking, and if Tenant exercises its option, the Term of this Lease will terminate as of the date of the taking unless Landlord takes reasonable steps to provide other parking facilities substantially equal in all respects to the previously existing ratio between the parking areas and the leasable area of the Restaurant building, and such parking facilities are provided by Landlord provides such other parking facilities, then this Lease will continue in full force.

15.5 All compensation and damages awarded for a total or partial taking of the Premises, will belong to Landlord; however, Tenant may make its own claim for any separate award that may be made by the condemnor for Tenant's moving expenses, loss of business or for the taking of or injury to Tenant's improvements, or on account of any cost or loss Tenant

may sustain in the removal of Tenant's trade fixtures, equipment, and furnishing, or as a result of any alterations, modifications, or repairs which may be reasonably required by Tenant in order to place the remaining portion of the Premises not so condemned in a suitable condition for the continuance of Tenant's occupancy, provided that no such award shall reduce the award to Landlord.

15.6 If this Lease is terminated pursuant to the provisions of this Section 15, then all rentals and other charges payable by Tenant to Landlord under this Lease will be paid up to the day of the taking, and any rentals and other charges paid in advance and allocable to the period after the date of the taking will be repaid to Tenant by Landlord. Landlord and Tenant will then be released from all further liability under this Lease.

16. Covenant of Title and Quiet Enjoyment. Landlord covenants that Landlord is well seized of and has good title to the Premises, does warrant and will defend the title thereto, and will indemnify, defend and hold Tenant harmless against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Premises. If, at any time, Landlord's title or right to receive Rent hereunder is disputed, or there is a change of ownership of Landlord's estate by act of the parties or operation of law, Tenant may withhold Rent or any other payments due to Landlord thereafter accruing until Tenant is furnished proof satisfactory to it as to the party entitled thereto. So long as Tenant is not in default under the terms of this Lease, Tenant shall have quiet enjoyment of the Premises during the entire Term of the Lease.

17. Event of Default.

17.1 Tenant Default. Each of the following events shall constitute an Event of Default:

17.1.1 If Tenant shall fail to pay any Rent or any other charge or sum to be paid by Tenant to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of ten (10) days after written notice to Tenant of such default; or

17.1.2 if Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease or of any notice given Tenant by Landlord pursuant to the terms of this Lease, and such default shall continue for a period of thirty (30) days after notice to Tenant of such default; provided however, if more than thirty (30) days is reasonably required to correct the breach, then no Event of Default shall occur so long as Tenant has commenced to promptly correct such breach and prosecute the same to completion with reasonable diligence; or

17.1.3 if Tenant shall file a petition in bankruptcy or take or consent to any other action seeking any such judicial decree or shall file any debtor proceeding or a petition for an arrangement or for corporate reorganization or shall make any assignment for the benefit of its creditors or shall admit in writing its inability to pay its debts generally as they become due or if any court of competent jurisdiction shall enter a decree or order adjudicating it bankrupt or insolvent or if any trustee or receiver for Tenant or for any substantial part of its property be appointed or if any person shall file a petition for involuntary bankruptcy against Tenant and



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001029

such appointment or petition shall not be stayed or vacated within sixty (60) days of entry thereof or if Tenants interest hereunder shall pass to another by operation of law in any other manner.

17.2 Landlord's Remedies. Upon the occurrence of an Event of Default, Landlord may, in accordance with procedures required by applicable law, pursue one of the following remedies:

17.2.1 Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall surrender possession of the Premises to Landlord within thirty (30) days after written notice from Landlord to Tenant. In such event, Landlord shall be entitled to recover from Tenant all damages reasonably incurred by Landlord by reason of Tenant's default including the cost of recovering possession of the Premises and expenses of reletting the Premises; or

17.2.2 Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease including the right to recover the Minimum Monthly Rent as it becomes due hereunder.

With respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to use commercially reasonable efforts to mitigate its damages.

17.3 Landlord Default and Tenant Remedies. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord: (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion); or (b) the failure of any representation or warranty to be true when deemed given hereunder if such failure has a material adverse effect on Tenant's use of the Premises or the business conducted by Tenant at the Premises (e.g., increased costs). In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein: (a) to remedy such default or breach and deduct the costs thereof (including reasonable attorneys' fees) from the installments of Rent next falling due; (b) to pursue the remedy of specific performance; (c) to seek money damages for loss arising from Landlord's failure to discharge its obligations under the Lease; and (d) to terminate the Lease. Nothing herein contained shall relieve Landlord from its obligations hereunder.

18. Right of Entry. At reasonable times and in such a manner as shall not interfere with Tenant's business, Landlord shall have the right to enter and to grant licenses to enter the Premises at any time and for such lengths of time as are reasonable to make emergency repairs to the Premises. No such entry by Landlord shall in any manner affect Tenant's obligations and covenants under this Lease and no such entry shall of itself render Landlord liable for any loss of or damage to the property of Tenant.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001030

19. Surrender of Premises.

19.1 At the end of the Term of this Lease or upon any earlier termination of this Lease or Tenant's right to possess the Premises, Tenant shall vacate and surrender possession of the Premises to Landlord broom clean and in as good order and condition as the Premises were at the time Landlord shall have delivered possession thereof to Tenant, ordinary wear and tear, damage by fire or other casualty not caused by Tenant, its servants, agents or employees and (subject to the provisions of this Lease) alterations, additions and improvements to the Premises excepted. Tenant shall have no right (except as it may be obligated to do so pursuant to this Lease) to remove any betterments and improvements whether made by Tenant or Landlord, including but not limited to, floor and wall coverings, lighting, cooling and ventilating, plumbing and other such fixtures, partitions, alterations, improvements, systems and all such similar apparatus and equipment. Tenant shall, however, have the right to remove Tenant's Property, provided that Tenant promptly repair any damage to the Premises caused by such removal.

19.2 Tenant shall comply with all environmental laws affecting the Premises during the Term of the Lease, and the termination of this Lease shall not terminate Tenant's obligations to Landlord for acts or omissions of Tenant as to environmental laws in effect during the Lease Term. Provided however, Tenant's liability to Landlord shall be limited to damages proven to have arisen because of an act or omission of Tenant during the Lease Term and only for contamination of the Premises caused by Tenant.

20. Right of First Refusal.

20.1 If Landlord, or Landlord's heirs, executors, grantees, successors or assigns, at any time after the second (2nd) anniversary of the Commencement Date of this Lease receives an offer to purchase the Premises, or any part thereof, and Landlord desires to accept such offer; or should Landlord during any such time make an offer to sell the Premises, or any part thereof, Landlord shall give Tenant thirty (30) days notice in writing of such offer setting forth the name and address of the proposed purchaser, the amount of the proposed purchase price, and all other terms and conditions of such offer, and Tenant shall have the first option to purchase the Premises which is the subject of the offer by giving written notice to Landlord of its intention to purchase within said thirty (30) day period at the same price and on the same terms of any such offer, it being understood that in the event Tenant does not give notice of its intention to exercise such option to purchase within such period, this Lease and all of its terms and conditions shall nevertheless remain in full force and effect and Landlord and any purchaser or purchasers of the Premises, shall be bound thereby. In the event that the Premises set forth in the offer is not sold for any reason, Tenant shall have, upon the same conditions and notice, the continuing right of first refusal to purchase the Premises or any part thereof upon the terms of any subsequent offer or offers to purchase and this Section 20.1 shall remain in full force and effect.

20.2 Notwithstanding anything herein contained to the contrary, title to the Premises shall be delivered to Tenant at the close of escrow free and clear of all monetary liens and



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001031

encumbrances (other than the lien for current real property taxes not yet due and payable) and such monetary liens and encumbrances shall be released from the Premises by Landlord at Landlord's sole expense on or before the close of escrow.

20.3 In the event there are any conflicts between the terms of this Lease concerning the exercise of the right of first refusal, and the terms contained in the offer which Tenant must accept if Tenant desires to purchase the Premises, then the terms of this Lease shall control and supersede those contained in such offer.

21. Notices. Any notice or demand or statement which by any provision of this Agreement is required or allowed to be given by either party to the other shall be in writing and shall be deemed to have been sufficiently given for all purposes when made by personal delivery, or sent via a recognized overnight delivery service, or deposited in the United States mail as certified or registered mail, return receipt requested, postage prepaid to the addresses provided below or such other address as Landlord or Tenant may designate in writing.

If to Tenant:

Frontier Star, LLC
5210 S. Priest Drive
Guadalupe, Arizona 85283
Attn: Jason LeVecke
(480) 736-2461 phone
(480) 214-2519 fax

If to Landlord:

VRE Chicago Eleven, LLC
1211 South White Chapel Blvd.
Southlake, Texas 76092
Attn: Jason Keen
(817) 912-0522

If to Franchisor/CKE:

CKE Restaurants, Inc.
6307 Carpinteria Ave, Suite A
Carpinteria, CA 93013-2901

22. Provisions Required by Franchisor. Landlord is leasing the Premises to Tenant for the operation of a franchised Carl's Jr. Restaurant or Carl's Jr./Green Burrito Dual Concept Restaurant [Hardee's Restaurant or Hardee's/Red Burrito Dual Concept Restaurant] ("Restaurant"). Landlord acknowledges that Tenant will develop and operate the Restaurant pursuant to a commitment agreement (the "Commitment Agreement") and a franchise agreement (the "Franchise Agreement") (collectively, the "Agreements") with Carl's Jr. Restaurants LLC or its affiliates (collectively "CJR"). The Agreements require, among other things, that this Lease contain certain provisions. Therefore, Landlord and Tenant hereby agree as follows:

22.1 The effectiveness of the Lease, and the rights and obligations of Landlord and Tenant thereunder, are contingent upon Tenant's execution of the Commitment Agreement with CKE within 30 days after the date of this Lease.

22.2 Landlord consents to Tenant's use of the proprietary signs, distinctive exterior and interior designs, colors and layouts, and the trademarks prescribed by CJR ("Proprietary Marks"), and upon expiration or the earlier termination of the Lease, consents to permit Tenant, at Tenant's expense, to remove all such items and other trade fixtures, so long as Tenant makes repairs to the Premises caused by such removal.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001032

22.3 Landlord and Tenant each agrees to provide CJR (at the same time as sent to the other party) a copy of all amendments, assignments, any notices of default, option and refusal rights notices and any other material documents or correspondence or notices pertaining to the Lease and the Premises, including without limitation, tenant estoppel certificates and subordination agreements. CJR's mailing address, until further notice, for this purpose is Attention: Asset Management, 1325 N. Anaheim Blvd., Anaheim, CA 92801-2409.

22.4 Following reasonable notice to Landlord, CJR shall have the right to enter the Premises to make any modifications or alterations necessary to protect the "Carl's Jr. Restaurant System" and the Proprietary Marks and to cure any Tenant default under the Lease within the time periods provided by the Lease, and charge Tenant for all costs incurred in making such modifications or alterations and for curing any such default, all without being guilty of trespass or other tort.

22.5 Landlord agrees that Tenant, and not CJR, shall be solely responsible for all obligations, debts and payments under the Lease and that CJR shall have no liability in that regard.

22.6 Landlord agrees that, following the expiration or earlier termination of the Lease or the Franchise Agreement, Tenant shall have the right to make those alterations and modifications (including removal and demolition of improvements installed by Tenant or CJR if necessary) to the Premises or any part thereof as may be necessary to clearly distinguish to the public the Premises from a Carl's Jr. Restaurant or a Carl's Jr./Green Burrito Dual Concept Restaurant and also to make those specific additional changes as CJR reasonably may require for that purpose. Landlord further agrees that, if Tenant fails to promptly make the necessary alterations and modifications, CJR shall have the right to do so without being guilty of trespass or other tort so long as CJR makes repairs to the building caused by such removal.

22.7 Notwithstanding anything to the contrary contained in the Lease, Landlord agrees not to amend or otherwise modify the Lease in any manner that would affect any of the requirements set forth herein without CJR's prior written consent.

22.8 Tenant may assign the Lease, or any right or rights therein (including without limitation purchase options or rights of first refusal), to CJR or its parent, affiliates or subsidiaries (without Landlord's consent) or its designee (with Landlord's consent which consent shall not be unreasonably withheld) and without payment of any assignment fee or similar charge or increase in any rentals or other charges payable to Landlord.

22.9 Landlord consents to Tenant's collateral assignment of the Lease to CJR or its designee, granting CJR the option, but not the obligation, to assume the Lease and/or any or all rights therein.

22.10 If Tenant fails to exercise, for any reason, any term renewal or term extension right under the Lease, then CJR may exercise such right, and upon the exercise of such right by CJR, Tenant agrees that the Lease shall be deemed transferred and assigned to CJR, effective upon the commencement of the renewal or extension term, without any further action of the parties, and Landlord consents to such transfer and assignment, and Tenant shall



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001033

remain obligated under the Lease. If Tenant fails to exercise, for any reason, any purchase option or right of first refusal or similar right under the Lease, then CJR may exercise such right, and upon the exercise of such right by CJR, Tenant agrees that such right shall be deemed transferred and assigned to CJR without any further action of the parties, and Landlord consents to such transfer and assignment, and Tenant shall remain obligated under the Lease. Landlord and Tenant acknowledge that CJR's exercise of the foregoing rights is subject to Tenant's right to exercise such rights, and that if Tenant legally exercises such right within the time permitted under the Lease, CJR's exercise of such rights, whether before or after Tenant's exercise, shall be void.

22.11 CJR is hereby deemed a third party beneficiary of the Lease and this Addendum solely for the purpose of enforcing any rights granted to or otherwise available to CJR under this Addendum.

22.12 The foregoing provisions shall apply during the entire term of the Lease, including any renewal term. To the extent there is any conflict between the terms set forth in the body of the Lease and the terms set forth in this Lease Addendum, the terms of this Lease Addendum will control.

22.13 This Addendum may be executed in counterparts, and each copy so executed and delivered shall be deemed to be an original.

22.14 Each of the persons executing this Addendum on behalf of each party represents and warrants that said party has the full right, power and authority to execute and deliver this Addendum and that each person signing on said party's behalf is authorized to do so.

23. Protected Area. As a material inducement for Tenant to enter into this Lease, Landlord acknowledges and agrees that during the Initial Term and any Option Period no portion of the Premises and no property presently or hereafter owned, leased or controlled directly or indirectly by Landlord within a two (2) mile radius of the Premises shall be sold, leased, managed, used or occupied for a fast food restaurant serving hamburgers. In the event of a breach by Landlord under the terms of this Section, Tenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity, Landlord acknowledging and agreeing that Tenant does not have an adequate remedy at law for breach of this provision.

24. Holdover. Should Tenant, with or without Landlord's written consent, hold over after the termination of this Lease, Tenant shall become a tenant at will and shall be bound by each and all of the terms herein provided as may be applicable to such tenancy at will. Any such holding over shall not constitute an extension of this Lease by law or otherwise. During such holding over, Tenant shall pay rent (including minimum and percentage rental, maintenance costs and expenses, tax impositions, insurance costs, and other charges hereunder), at the rate equal to one hundred twenty-five percent (125%) of the rate or rates then applicable under the provisions of this Lease.

25. Waiver. No waiver by Landlord of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach by Tenant of the



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001034

same or any other provision. Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act. No agreement to accept Tenant's surrender of the Premises shall be valid unless in writing and signed by Landlord.

26. Successors and Assigns. Except as otherwise provided in this Lease, all of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns, when permitted hereunder.

27. Headings, Captions and References. The article and section captions contained in this Lease are for convenience only and do not in any way limit or amplify any term or provision hereof. The terms "Landlord" and "Tenant" as used herein shall include the plural as well as the singular, the neuter shall include the masculine and feminine genders and, if there be more than one tenant the obligations herein imposed upon Tenant shall be joint and several.

28. Landlord and Tenant Relationship. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any other party, as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto, it being understood and agreed that neither method of computation of Rent, nor any other provision contained herein nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than that set forth in Section 30 below.

29. No Estate by Tenant. This Lease shall create the relationship of landlord and tenant between Landlord and Tenant.

30. Written Consent. Whenever the consent of either Landlord or Tenant is referred to in this Lease, it is understood and agreed that such consent shall not be unreasonably withheld or delayed by Landlord or Tenant, unless otherwise provided.

31. Entire Agreement and No Offer. This Lease constitutes the entire agreement intent and understanding between the parties hereto with respect to the Premises, and no prior or contemporaneous agreement or understanding with regard to the Premises shall be effective for any purpose unless reduced to writing herein. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successor in interest. The submission of this Lease for examination or consideration by Landlord shall not constitute an offer to lease by Tenant and this lease shall be effective only upon execution and delivery hereof by both Landlord and Tenant.

32. Jurisdiction. This Lease shall be construed in accordance with the laws of the State where the Premises are located.

33. Estoppel Certificate. Tenant and Landlord agree at any time and from time to time, upon not less than twenty (20) business days prior written request from the other party, to execute, acknowledge and deliver to the requesting party in writing, in form and content reasonably acceptable to both parties, an estoppel certificate certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rent has been paid and certifying



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001035

that it is not in default (or if a default is alleged, stating the nature of the alleged default), and further certifying such other matters as the requesting party shall require. It is intended that any such statement delivered pursuant to this Section may be relied upon by any prospective purchaser, lender, subtenant, assignee or any entity which is a party to a potential merger, consolidation with or to the acquisition of the Premises or stock of Landlord or Tenant. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord or otherwise modify the terms of the Lease.

34. Protected Area. Landlord shall not subdivide, parcel or otherwise divide the Premises, erect any buildings, improvements or structures, change any access roads, parking areas or create any easements in or over the Premises without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

35. Brokerage. Landlord and Tenant each warrant that it has had no dealings with any broker or agent in connection with this Lease, and covenants to pay, hold harmless and indemnify the other from and against any and all cost, expense, or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiations thereof.

36. Qualification. Each party represents that it is authorized to do business in the state in which the Premises are located and will remain so during the Term hereof, and in all respects is duly authorized to enter into and perform this Lease.

37. Authority. Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

38. Time of Essence. Time is of the essence in this Lease.

39. Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, approval delays by municipalities or governmental entities, riots, insurrection, was, military or usurped power, sabotage, terrorism, unusually severe weather, acts of God, fire or other casualty or other reason (but excluding financial inability) of a like nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of the delay.

40. Confidentiality of Lease. From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Premises (including, without limitation, architectural plans, specifications, site plans and



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001036

drawings) or Tenant's business (collectively, "Confidential Information"), to any person including, without limitation, any brokers, any other tenants or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its attorneys, employees, partners, consultants, lenders, accountants, current or potential mortgagees or purchasers of the Premises who have a reasonable need for such Confidential Information and who agree to be bound by the terms of this Section and Tenant may disclose the terms of this Lease to attorneys, employees, partners, consultants, current or potential lenders, assigns or subtenants who agree to be so bound.

41. Legal Expenses. In the event of the bringing of any action by either party hereto against the other hereon or hereunder, or by reason of the breach of any term, covenant or condition on the part of the other party, or arising out of this Lease, the party in whose favor final judgment shall be entered shall be entitled to have and recover from the other party costs and reasonable attorneys' fees to be fixed by the court which shall have rendered such judgment.

42. Applicable Law. The invalidity of unenforceability of any provision of this Lease shall not affect or impair any other provision. If any provision of this Lease is capable of two constructions, one of which would render the provision invalid and the other of which would make the provision valid, then the provision shall have the meaning which renders it valid. The laws of the State where the Premises are located shall govern the validity, performance, and enforcement of this Lease. The submission of this document for examination does not constitute an offer to lease and becomes effective only upon execution and delivery thereof by Landlord and Tenant.

43. Financial Information. Tenant shall provide Landlord with financial statements upon Landlord's written request, but no more than twice a year.

**[Signatures Follow On Next Page]**

IN WITNESS WHEREOF, the parties have executed, or if a corporation, caused its duly authorized officers to execute this Agreement as of the day and year first above written.

**LANDLORD:**

**VRE CHICAGO ELEVEN, LLC**
a Texas limited liability company

By: ______________________
Jason Keen, Manager

**TENANT:**

**FRONTIER STAR, LLC**
a Delaware limited liability company

By: ______________________
Name: JASON LAVECCHIA
Title: MANAGER / CEO

062613.1

Loan No. 9370799

CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001038

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

LOTS 19 TO 28 INCLUSIVE IN BLOCK 8 IN COBE AND MCKINNON'S 59TH STREET AND WESTERN AVENUE SUBDIVISION IN THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 13, TOWNSHIP 38 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FOR INFORMATION ONY: TAX ID # 19-13-227-039-0000

**From:** Joe Mann
**Sent:** Wednesday, January 21, 2015 11:45 AM
**To:** Jason Keen; Matt Langfield
**Subject:** RE: Schaumburg, IL

Matt

Looking forward to this afternoon/evening.

One question to check into ... Becky Davis mentioned that the Paris deal still needs to be "officially" approved by corporate. That there won't be an issue at all, just need to fast track the paperwork...

Anything we can do to help here?

Joe Mann
Verdad Real Estate, Inc.
504.957.1363

**From:** Jason Keen
**Sent:** Wednesday, January 21, 2015 11:19 AM
**To:** Matt Langfield
**Cc:** Joe Mann; Jason Keen
**Subject:** RE: Schaumburg, IL

Sounds great Matt, thank you very much.

We land around 1 and can meet earlier if it works for you guys. If not, we will see you at 4.

There are a few things we would like to make sure we time to cover in the office, everything else can be discussed over dinner.

Topics for discussion:

- We really want to express our gratitude for our relationship and get feedback from you guys to see how we can serve you better or what we need to do differently to be a more effective partner
- Harlingen – update on our progress
- Joliet – Update on our progress
- Opening calendar and construction progress - Harvard, Orland Hills and Paris (LL Turnover 5/1)
- Maps of what you are currently working in the TX and IL markets so we aren't overlapping efforts
- Chicago 11 – Top priority on figuring these out
  - Need sales on the KFC's if we are going to take them to the market
  - Progress on upgrades to the buildings ($400,000 per store)
  - Pictures, etc...
  - Franchise agreements?
  - KFC and CKE's approval to operate as a kfc franchisee
  - Rent Coverage Ratio – unhealthy – our concerns about ability to sell, you had some ideas about how to re-calibrate the rent—let's try to get resolution on what works the best
- Processes – how best to move forward with communication on deals – weekly calls/trackers/etc...



Exhibit 2

- Other opportunities?

Thanks again, look forward to visiting.
JK

JASON KEEN •
t 817.912.0585 m 214.317.9700
a 1211 SOUTH WHITE CHAPEL BOULEVARD | SOUTHLAKE, TEXAS 76092

INFORMATION CONTAINED IN AND TRANSMITTED WITH THIS ELECTRONIC COMMUNICATION IS CONFIDENTIAL AND INTENDED EXCLUSIVELY FOR THE PERSON TO WHOM ADDRESSED. ANY DISCLOSURE, DISTRIBUTION, FURTHER TRANSMISSION OR USE OF THIS COMMUNICATION OR ANY INFORMATION HEREIN BY ANYONE OTHER THAN THE INTENDED RECIPIENT IS UNAUTHORIZED AND PROHIBITED. ANYONE OTHER THAN THE INTENDED RECIPIENT OR HIS/HER AGENT WHO RECEIVES THIS COMMUNICATION IN ERROR SHOULD IMMEDIATELY DELETE, ERASE AND PERMANENTLY REMOVE IT FROM HIS/HER ELECTRONIC MAILBOX, COMPUTER DRIVES AND ALL OTHER ELECTRONIC STORAGE AREAS, DESTROY ANY PRINTED COPIES, AND NOTIFY VERDAD REAL ESTATE AT 817.912.0222.

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Wednesday, January 21, 2015 10:15 AM
**To:** Jason Keen
**Cc:** Joe Mann
**Subject:** Re: Schaumburg, IL

Let me know if you guys will be here around 4PM???

We have you booked at the Palomar downtown which is across from the US Airways center.

Matt

On Wed, Jan 21, 2015 at 9:12 AM, Jason Keen <JKeen@verdadrealestate.com> wrote:

Cool, thanks man

Jason Keen

Verdad Real Estate
O: 817.912.0585
C: 214.317.9700

On Jan 21, 2015, at 10:08 AM, "Matt Langfield" <mrlangfield@gmail.com> wrote:

Sorry sir....this is too close to another property we already control in the market.

Thanks
Matt

On Tue, Jan 20, 2015 at 9:36 PM, Jason Keen <JKeen@verdadrealestate.com> wrote:
Matt, just checking in to see if you had any thoughts on this deal.

Thanks, see you tomorrow

Jk

Jason Keen

Verdad Real Estate
O: 817.912.0585
C: 214.317.9700

On Jan 15, 2015, at 4:53 PM, "Matt Langfield" <mrlangfield@gmail.com> wrote:

I'll check it out right now.....stay tuned.

On Thu, Jan 15, 2015 at 3:06 PM, Jason Keen <JKeen@verdadrealestate.com> wrote:

Matt, will you check out the site at:

1500 E. Algonquin

Schamburg, IL

It is a closed Wendy's....closest Hardees is 8.2 Miles away.

Thanks,

JK

<image001.png>

JASON KEEN •
t 817.912.0585 m 214.317.9700
a 1211 SOUTH WHITE CHAPEL BOULEVARD | SOUTHLAKE, TEXAS 76092
Website Email <image002.gif>

--
*Matt Langfield*
C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

--
*Matt Langfield*
C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

--
*Matt Langfield*
C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

**From:** Joe Mann </O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOE MANNE86>
**Sent:** Friday, November 14, 2014 8:50 AM
**To:** Jason Keen
**Subject:** Re: any update from Langfeld or LeVecke?
**Attachments:** image001.png; image002.gif

Have we funded all of the conversions?

Let's start working on restructuring the leases and economics to keep them as KFCs and then put them on the market??

Joe Mann
Verdad Real Estate, Inc.
504.957.1363
Sent from my iPhone

On Nov 14, 2014, at 8:43 AM, "Jason Keen" <JKeen@verdadrealestate.com> wrote:

> Meeting with Stearns in an hour and half.
>
> It weird they aren't responding...there is something going on
>
> <image001.png> | **JASON KEEN** •
> t 817.912.0585 m 214.317.9700
> a 1211 SOUTH WHITE CHAPEL BOULEVARD | SOUTHLAKE, TEXAS 76092
> Website Email <image002.gif>



**Exhibit 3**

**From:** Matt Langfield <mrlangfield@gmail.com>
**Sent:** Friday, December 26, 2014 3:52 PM
**To:** Jason Keen; Jason LeVecke
**Cc:** Joe Mann
**Subject:** Re: Estoppel Edinburg

Jason-

Without an exact number in front of me....we have invested a lot into each of these. Once we have agreements in hand and long term formal commitments to the locations, our investments will far exceed the 400K. 400K was always just a portion of our total investment.

We have offered to make a cap rate adjustment or someone make sure you guys win on this transaction. What kind of variation in CAP do you anticipate at sale?

Matt

On Fri, Dec 26, 2014 at 2:48 PM, Jason Keen <JKeen@verdadrealestate.com> wrote:

Thanks Matt, very helpful. Much appreciated.

On another note, how is the $400K/TIA per store handled? It was to be invested, but hasn't. The ultimate challenge we are faced with is a KFC on the market w/rent at $171K. This will ultimately impact the cap rate on the exit, do you have any ideas how we should handle this or address it? Have you guys already invested the $400K, or can it be reduced, refunded, etc? Just thinking out loud....

Joe and I have much appreciation for our partnership with you guys and want to be as accommodating as possible. Hopefully, you and Jason view us in the same light and operating with the best intentions.

Thanks again.

jk

JASON KEEN •
t 817.912.0585 m 214.317.9700
a 1211 SOUTH WHITE CHAPEL BOULEVARD | SOUTHLAKE, TEXAS 76092



**Exhibit 4**

326 (L)

**LEASE AGREEMENT**

5852 S. Western Ave., Chicago, Illinois 60636

THIS LEASE AGREEMENT is made and entered into as of the Lease Date by and between VRE CHICAGO ELEVEN, LLC, a Texas limited liability company, ("Landlord") and MJC HOLDINGS 123, LLC, a Delaware limited liability company, ("Tenant").

1. Fundamental Lease Provisions. The following is a summary schedule of certain fundamental terms of this Lease:

1.1 Lease Date: February 27, 2015

1.2 Landlord: VRE Chicago Eleven, LLC, a Texas limited liability company

1.3 Address of Landlord: 1211 S. White Chapel Blvd., Southlake, Texas 76092

1.4 Tenant: MJC Holdings 123, LLC, a Delaware limited liability company

1.5 Address of Tenant: 5210 S. Priest Dr., Suite 3, Guadalupe, AZ 85283

1.6 Address of Premises: 5852 S. Western Ave., Chicago, Illinois 60636

1.7 Initial Lease Term: 20 years

1.8 Lease Expiration Date: 20 years after Lease Date

1.9 Minimum Monthly Rent during the Initial Term:

1.9.1 First 5 years of the Initial Term: $ 14,250.00

1.9.2 Second 5 years of the Initial Term: $ 15,675.00

1.9.3 Third 5 years of the Initial Term: $ 17,242.50

1.9.4 Fourth 5 years of the Initial Term: $ 18,966.75

1.10 Minimum Monthly Rent during the Option Periods:

1.10.1 First 5 year Option Period: Market Rate (Determined pursuant to Section 4)

1.10.2 Second 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.05

1.10.3 Third 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.10



**Exhibit 5**

CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001544

1.10.4 Fourth 5 year Option Period: Multiply the negotiated rate for the First five (5) year option period by 1.15

1.11 Premises. The real property described on Exhibit A attached hereto and incorporated herein, and all improvements belonging to Landlord now or in the future located on and all rights and privileges appurtenant to the real property (the "Premises").

2. Lease; Fundamental Lease Provisions. Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord, subject to the terms and conditions contained herein. The Fundamental Lease Provisions set forth in Section 1 of this Lease are an integral part of this Lease and each of the Fundamental Lease Provisions shall be deemed a definition of an essential term of this Lease, and whenever any such term shall appear in this Lease, it shall be deemed to have the meaning set forth in Section 1 except as otherwise explicitly set forth in this Lease.

3. Term.

3.1 Commencement and Expiration Dates of Term. The Term of this Lease shall commence on the Lease Date. The Term shall expire, unless sooner terminated in accordance with the provisions contained in the Lease, at 12:00 midnight on the Lease Expiration Date. For purposes of this Lease, the word "Term" shall mean the Initial Term and any Option Period (as defined in Section 3.2 below).

3.2 Option Periods. Landlord hereby grants to Tenant options to extend and renew this Lease for four (4) consecutive five (5) year periods (each, an "Option Period") upon the same terms and conditions set forth in this Lease, at the an adjusted Minimum Monthly Rent equal to the Market Rate of the Premises as determined at the beginning of each Option Period pursuant to Section 5 below. Tenant's renewal option shall be exercised by Tenant upon written notice to Landlord at least ninety (90) days but no more than two hundred seventy (270) days prior to the expiration of the Initial Term of this Lease or any Option Period; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such extension, if Tenant fails to give the foregoing notice, Tenant's right to exercise such extension shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant a written notice of such failure, and Tenant may exercise the extension at any time prior to the expiration of such thirty (30) day period.

4. Market Rate.

4.1 Market Rate Definition. "Market Rate" shall be defined as the bona fide rates, terms and conditions then being paid by tenants in "arm's length" transactions for comparable space, for comparable uses, in comparable buildings in the same geographic submarket as the Premises within the previous six (6) month period. To determine the Market Rate the parties must also take into consideration the quality, size, design and location of the Premises.

4.2 . Determination and Appraisal Process. To initiate the negotiation, Tenant shall notify Landlord in writing of Tenant's determination of the Market Rate for the applicable Option Period (the "Tenant's Initial Determination"). Landlord shall, within thirty (30) days following receipt of Tenant's Initial Determination, then notify Tenant in writing that it accepts



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001545

Tenant's Initial Determination or, if it does not, notify Tenant of Landlord's determination of the Market Rate ("Landlord's Initial Determination"). Tenant shall have the sole option, but not the obligation, to retract its election notice to extend the Term of the Lease by written notice to Landlord within fifteen (15) days following receipt of Landlord's Initial Determination. If Tenant does not retract its extension election notice within such time period, then within thirty (30) days after receipt by Tenant of Landlord's Initial Determination, if Tenant rejects in writing Landlord's determination, the parties agree to negotiate their differences in good faith within thirty (30) days following Tenant's notice of objection or deemed rejection. Should the parties be unable to agree upon the Market Rate within such thirty (30) day period, the parties will each appoint a real estate appraiser who is a member of the American Institute of Real Estate Appraisers with at least five (5) years full-time commercial appraisal experience in the area in which the Premises are located to determine the Market Rate. If either the Landlord or the Tenant does not notify the other party in writing that it has appointed an appraiser within ten (10) days after the other party has provided written notice of its appointed appraiser, the single appraiser appointed will determine the Market Rate. If two (2) appraisers are appointed, they will meet promptly and attempt to set the Market Rate. If the two appraisers agree upon a Market Rate, such determination shall be final and binding on the parties. If they are unable to agree on the Market Rate within thirty (30) days after the second appraiser has been appointed, the appraisers will appoint, or request that the American Institute of Real Estate Appraisers appoint, a third appraiser meeting the qualifications stated in this paragraph and the appraisers will then notify Landlord and Tenant of such appraiser's name, address and selection within ten (10) days following the failure of the parties to agree upon the Market Rate. Landlord and Tenant will bear one-half (1/2) of the cost of the third appraiser. The third appraiser, however selected, must be a person who has not previously acted in any capacity for either Landlord or Tenant. Within thirty (30) days after the selection of the third appraiser, a majority of the appraisers will determine the Market Rate. If a majority of the appraisers cannot agree on the Market Rate within thirty (30) days after selection of the third appraiser, the high and the low appraisal will be thrown out and the middle appraisal shall be the final and binding determination of the Market Rate.

4.3 Amendment. The parties will execute an amendment to this Lease within fifteen (15) days after determination of the new Market Rate.

4.4 Lease Right of First Refusal. In the event that Landlord rejects Tenant's Initial Determination of the Market Rate and Tenant subsequently retracts its election notice to extend the Term of the Lease pursuant to Section 3.2 above, then if Landlord's heirs, executors, grantees, successors or assigns, at any time during the Term of this Lease or within one hundred eighty (180) days following the termination of the Lease, receive an offer to lease the Premises, or any part thereof, and Landlord desires to accept such offer; or should Landlord during any such time make an offer to lease the Premises, or any part thereof, Landlord shall give Tenant thirty (30) days notice in writing of such offer setting forth the name and address of the proposed tenant, the amount of the proposed rental amount, and all other terms and conditions of such offer, and Tenant shall have the first option to lease the Premises which is the subject of the offer by giving written notice to Landlord of its intention to lease and accept Landlord's offer within said thirty (30) day period at the same rental amount and on the same terms of any such offer.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001546

5. Memorandum of Lease. Contemporaneously with the execution of this Lease, or at any time or from time to time hereafter, at the request of the Landlord or Tenant, the parties will execute and deliver a Memorandum of Lease in recordable form. The Memorandum of Lease shall not contain rental amounts.

6. Tenant Payments.

6.1 Minimum Rent. Beginning on the Lease Date, Tenant shall pay Landlord as rent for the Premises a sum equal to the Minimum Monthly Rent set forth in Section 1.9 on or before the first day of each and every month during the Term of this Lease. If any installment of Rent due from Tenant shall not be received by Landlord within ten (10) days following written notice that such amount is past due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. Except as expressly set forth herein, any amount due to Landlord not paid within thirty (30) days after written notice that such payment is past due shall bear interest at eight percent (8%) per annum until the date such amount is paid.

6.2 Utilities. Tenant shall promptly pay for all utilities and other services including, but not limited to, telephone, water, sewage service charges, garbage or trash removal, fuels, including natural gas, and electricity, for any heating in the Premises furnished to and or used in or at the Premises for any purpose, from and after the date Tenant shall have possessed the Premises, whether prior to, during or after the Term hereof. Landlord shall not be liable for any interruption or curtailment whatsoever in the furnishing of utility services or other services to the Premises, unless caused by Landlord.

6.3 Net Lease. This Lease is what is commonly called a "net lease", it being understood that Landlord shall receive the Rent set forth in this Section 6 free and clear of any and all impositions, taxes, liens, charges or expenses of any nature whatsoever in connection with its ownership and leasing of the Premises except those expenses specifically designated in this Lease to be borne by Landlord. In addition to the Minimum Monthly Rent, Tenant shall pay all impositions, taxes, insurance premiums, operating costs, costs and expenses which arise or may be contemplated under any provisions of this Lease during the Term (i) when required to be made hereunder or (ii) if no payment date is specified, by the later to occur of (A) the due date for the next installment of Minimum Monthly Rent or (B) ten (10) days from demand. All of such charges, costs and expenses shall constitute additional rent, and upon the failure of Tenant to pay any of such costs, charges or expenses, Landlord shall have the same rights and remedies as otherwise provided in this Lease for the failure of Tenant to pay Rent. "Rent" shall mean Minimum Monthly Rent, additional rent and all other amounts to be paid by Tenant to Landlord pursuant to this Lease. It is the intention of the parties hereto that Tenant shall in no event be entitled to any abatement of or reduction in Rent or additional rent payable hereunder, except as expressly provided herein. Any present or future law to the contrary shall not alter this agreement of the parties.

6.4 Pro Rata Rent. Rent for any period during the Term of this Lease which is for less than one month shall be a pro rata portion of the monthly installment. Except as expressly set forth herein, Rent shall be payable, without deduction or offset, in lawful money of the



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001547**

United States to Landlord at the address set forth in Section 1.3 or to such other persons or at such other places as Landlord may designate in writing.

7. Use of the Premises.

7.1 The Premises may be used for the purpose of the operation of a Kentucky Fried Chicken restaurant or, with prior written approval of Landlord, such other lawful use as Tenant may desire. Tenant shall promptly comply with all present and future laws, ordinances, rules, orders, regulations and requirements of the federal, state and municipal governments in its occupancy and use of the Premises.

7.2 During the Term of this Lease, Tenant agrees to abide by, at its expense, the provisions of any rules, regulations, easements, covenants or restrictions which are disclosed in the public records ("Restrictions"), and Tenant shall perform any duties required of Landlord thereunder. Landlord will reasonably cooperate with Tenant, if necessary, to satisfy the obligations and duties required of the owner of the Premises under the Restrictions.

7.3 Rubbish Removal. Tenant at its own expense shall keep the Premises clean, both inside and outside, and shall remove all rubbish, garbage and other refuse from the Premises.

8. Insurance and Indemnification. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises.

8.1 Property Insurance. During the Term of this Lease, Tenant shall, at its own cost and expense, keep the Premises and other improvements insured against loss by fire and all of the risks and perils usually covered by an extended coverage endorsement to a policy of fire insurance, including, but not limited to, vandalism, malicious mischief, and wind damage, in an amount equal to the full replacement value thereof and flood insurance if in a flood zone. Such insurance shall show Landlord and its Lender as an additional insured and naming Tenant as insured, as the respective parties' interests may appear. All proceeds of such insurance shall be paid to Landlord or its Lender and Tenant to be applied to the extent necessary to the repair and restoration of the Premises as more particularly described in this Lease, provided however that any insurance proceeds paid for losses or damages to Tenant's inventory, fixtures or supplies shall be paid to Tenant.

8.2 Liability Insurance. During the Term of this Lease, Tenant shall, at its own cost and expense, carry comprehensive public liability insurance in the name of Tenant with Landlord as an additional insured covering the Premises and the use and occupancy thereof in such amount or amounts as may be reasonably required but in no event less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate. Tenant shall also keep in force at its own cost and expense as set forth herein, fire, extended coverage, sprinkler and water damage insurance on Tenants property and other contents of the Premises, including, but not limited to betterments and improvements made by Tenant, Tenants inventory, trade fixtures, furnishings and other personal property whether or not removable by Tenant, in an amount sufficient to cover the full replacement cost of such property.



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001548**

8.3 Workers Compensation. Tenant shall keep in force workmen's compensation or similar insurance for statutory limits as required by the State in with the Property is located or in which the employees are hired.

8.4 Waiver of Subrogation. Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

8.5 Business Interruption. Tenant shall maintain business interruption insurance and landlord rental insurance in such amount as will protect against loss attributable to the perils insured against in this Section 8.

8.6 General Requirements. Tenant shall deliver the certificates for the insurance required by this Section 8 to Landlord within ten (10) days of the Lease Date, and thereafter thirty (30) days prior to the expiration of any existing policy of insurance. Should Tenant fail to obtain or maintain in effect the insurance called for herein, or to pay the premiums therefor, Tenant shall indemnify and hold Landlord harmless from all loss or damage incurred by Landlord arising out of such failure and Landlord, may, at its election and in addition to any other remedy available to Landlord, procure said insurance and pay the requisite premiums therefor, in which event, Tenant shall pay the Landlord on demand as additional rent all sums so expended by Landlord. Tenant shall also provide certificates for the insurance upon Landlord's written request in the event of a transfer or potential transfer.

8.7 Plate Glass. Tenant shall replace, at its sole cost and expense, any and all plate and other glass in or about the Premises damaged or broken from any cause whatsoever.

8.8 Indemnification of Landlord. Tenant agrees to indemnify and defend Landlord and to save harmless Landlord, and the tenants, licensees, invitees, agents, servants and employees of Landlord against and from any and all claims by or on behalf of any person, firm or corporation arising by reason or injury to person or property occurring on the Premises occasioned by any act or omission on the part of Tenant or any servant, agent, employee, licensee, assignee or subtenant of Tenant, or by reason of any unlawful use of the Premises or any reason of any breach, violation or nonperformance of any covenant in this Lease on the part of Tenant to be observed or performed, and also by reason of any matter or thing growing out of the occupancy or use of the Premises by Tenant or anyone holding or claiming to hold through or under Tenant, unless caused by or due to the negligence of Landlord, its agents, servants or employees.



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001549**

9. Alterations and Repairs.

9.1 Tenant may make alterations, additions or improvements to the Premises including the exterior, the building structure, or the storefront thereof without the prior written consent of the Landlord, so long as such alterations or improvements do not exceed $25,000.00 and such consent may not be unreasonably withheld. All franchisor alterations are permitted without consent. All alterations, additions and improvements (excluding personal property, machinery, equipment, signage, trade improvements and trade fixtures of Tenant, no part of the cost of which shall have been paid by Landlord, collectively "Tenant's Property") made by, for or at the direction of Tenant, shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease or at such time as Landlord shall re-enter and take possession of the Premises without terminating this Lease pursuant to the provisions of Section 17 hereof. Landlord shall have no obligation to make any alterations, improvements, repairs or replacements to the Premises other than those, if any, specifically provided for in this Lease.

9.2 Tenant's Property shall remain the property of Tenant. Upon the termination or expiration of the Term, Tenant may remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items and structural characteristics installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall, at its sole cost and expense, repair any damage to the Premises or the improvements caused by such removal, including patching and filling holes. In no event shall Tenant remove or be required to remove any restrooms, flooring, ceilings, or utility or electrical components located inside the walls or HVAC systems. All other utility systems will be capped and returned to a condition compatible with code requirements at Tenant's sole cost and expense.

9.3 Any of Tenant's Property not removed from the Premises within thirty (30) days following the date the Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord. Landlord may possess and dispose of such property provided that Landlord shall not use or permit anyone holding under Landlord to use on the Premises (a) any trademark, trade dress, trade name, millwork, copyrighted floor plan, copyrighted color palette, or sign used by Tenant in the Premises; or (b) any item that is similar to any other item protected by Tenant's intellectual property rights. This provision shall apply under all circumstances, including default by Tenant under this Lease. The costs incurred by Landlord in removing and disposing of such Tenant's Property shall be paid by Tenant within thirty (30) days after delivery to Tenant of an invoice therefor.

9.4 Tenant shall, at Tenant's own cost and expense, keep, maintain, repair and replace the Premises and appurtenances thereto, including the roof, parking lot and exterior in good condition and repair, normal wear and tear excepted. Tenant shall be liable for any damages due or attributable to Tenant's failure to perform or cause such maintenance or repairs to be performed. All damage or injury to the Premises, caused by any act or negligence of Tenant, its agents, employees, licensees, invitees or visitors, shall be promptly repaired by Tenant.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001550

9.5 From time to time, some or all of Tenant's Property may be financed or owned by someone other than Tenant. To the extent that any of Tenant's Property is financed or owned by someone other than Tenant, Landlord agrees that Tenant's Property is not owned by Landlord no matter how the same is affixed to the Premises or used by Tenant, and Landlord agrees to recognize the rights of the lender or owner of Tenant's Property. Landlord waives any claim arising by way of any Landlord's lien (whether created by statute, by contract or otherwise) with respect to Tenant's Property and agrees to sign and deliver to any lender or secured creditor or lessor a waiver of any lien Landlord may have on Tenant's Property if required by such lender, secured creditor or lessor. Landlord also agrees that all of Tenant's Property that is not subject to a security interest or leased from another shall be the property and remain the property of Tenant or Tenant's assignee or transferee no matter how the same is affixed to the Property.

9.6 Notwithstanding anything contained in this Lease to the contrary, no buildings, improvements or structures shall be erected, and no existing access roads, parking areas or any other area (as the same existed as of the Lease Date) located on the Premises shall be changed or altered in any way without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion.

10. Assignment and Subletting. Tenant may assign this Lease, or sublet or permit any other person to occupy, part or all of the Premises. In the event of any assignment or sublease by Tenant, Tenant and guarantor, if any, shall remain primarily liable for all obligations under this Lease.

11. Subordination. Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any mortgage, deed to secure debt, deed of trust, trust deed, security agreement, financing statement, or other collateral conveyance of, or lien or encumbrance against, the Property encumbering all or any portion of the Property and placed thereon by Landlord (collectively "Mortgage"), an estoppel, subordination, non-disturbance and attornment agreement in form and substance satisfactory to Tenant (the "SNDA"), executed by the holder of such Mortgage, providing that if the Lease is in full force and effect and there are no defaults thereunder on the part of the Tenant, the right of possession of Tenant to the Premises and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed by the lender, mortgagee, trustee, or beneficiary in the exercise of any of its rights under the Mortgage, nor shall Tenant be named as a party defendant to any foreclosure of the Mortgage nor in any other way be deprived of its rights under this Lease. Tenant hereby agrees that this Lease shall be subject and subordinate to any Mortgage which Landlord has already or may place upon the Premises; provided, however, that Tenant will agree to such subordination only so long as the lender executes a SNDA. In the event that the lender, mortgagee, beneficiary, or any other person, acquires title to the Premises pursuant to the exercise of any remedy provided for in the Mortgage, this Lease shall not be terminated or affected by said foreclosure or sale, or any such proceeding, and the lender, mortgagee or beneficiary shall agree that any sale of the Premises pursuant to the exercise of any rights and remedies under the Mortgage, shall be made subject to this Lease and the rights of the Tenant hereunder and Tenant's rights arising out of this Lease shall not be enlarged, affected or disturbed. Tenant agrees to attorn to the lender, beneficiary or such other person as its new landlord, and the Lease shall continue in full force and effect as a direct Lease between Tenant and Lender, mortgagee, beneficiary or such other person, upon all the terms, covenants, and agreements set forth in this Lease. The parties hereto agree to execute



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001551

or obtain execution of such reasonable documents as may be necessary to effectuate such subordination, non-disturbance, and attornment.

12. Taxes.

12.1 Tenant shall pay during the Term of the Lease all of the real and personal property taxes levied or assessed against the Premises and improvements thereon for any period, all of which is included in the Term of this Lease, and also its pro rata share of all such taxes levied or assessed thereon for any period, part of which is included in the Term of this Lease, subject to the terms of Section 12.2 below. This Section shall not be deemed or construed to require Tenant to pay or discharge any tax which may be levied by any governmental authority upon the income, profits, or business of Landlord, including Rent due Landlord hereunder, or any personal property taxes, franchise, inheritance or estate bases, or taxes upon inheritance or right of succession which may be levied against any estate or interest of Landlord, even if such taxes become a lien against the Premises.

12.2 Landlord agrees that Tenant shall have the right, at Tenant's sole cost and expense, to contest the legality or validity of any of the taxes which are to be paid by Tenant pursuant to the foregoing provisions, and in the event of any such contest, failure on the part of Tenant to pay any such tax, prior to the delinquency date thereof shall not constitute a default hereunder. Tenant, upon the final determination of such contest, shall immediately pay and discharge any judgment rendered against it, together with all costs and charges incidental thereto. Landlord further agrees at the request of Tenant, to execute, or join in the execution of any instrument or documents necessary in connection with any such contest, but at no expense to Landlord.

12.3 Landlord agrees either to (i) forward to Tenant in a timely fashion the periodic statements for taxes, or (ii) join with Tenant in the necessary formalities to insure that such statements are sent directly to Tenant. Failure of Landlord to provide Tenant with the subject tax bill within one hundred eighty (180) days after the delinquency date of any such tax bill shall relieve Tenant of any responsibility whatsoever for the payment of any penalties associated with such delinquency.

12.4 Landlord expressly waives and relinquishes in favor of Tenant any rights to claim the benefit of or to use any federal or state investment tax credits that are currently or may become available during the Term of this Lease as a result of any installation of any equipment, furniture or fixtures installed by Tenant in or on the Premises, whether or not such items become a part of the realty, and agrees to execute and deliver to Tenant any election form required to evidence Tenant's right to claim investment tax credits.

13. Liens. Any work on the Premises performed by Tenant hereunder shall be performed subject and pursuant to the provisions of this Lease. Upon completion thereof and Landlord's written request, Tenant shall furnish Landlord with waivers and affidavits confirming that all contractors, subcontractors, laborers and materialmen who have performed work on the Premises have been paid in full. Such waivers and affidavits shall be in a form acceptable to Landlord and in accordance with applicable laws of the State where the Premises are located. If any such lien or claim of lien shall at any time be filed against the Premises, or Tenant's interest therein or



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001552

hereunder, by reason of Tenant's acts or omissions or because of a claim against Tenant or any contractor, subcontractor or materialman of Tenant, Tenant shall either contest the lien, indemnifying and saving Landlord harmless from the lien or cause the lien or claim of lien to be canceled and discharged of record by bond or otherwise within ten (10) days after receipt of notice from Landlord. If Tenant does not indemnify Landlord, or fails to cause such lien or claim of lien to be so discharged or bonded within such period, Tenant shall be in default hereunder, and, in addition to any other right or remedy it may have, the Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by procuring the discharge of such lien or claim by deposit in court or bonding, and in any such event, the Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien or claim by the lienor or claimant and to pay the amount of the judgment, if any, in favor of the lienor, with interest, costs and allowances. Tenant shall pay as additional rent on demand any sum so paid by Landlord for the aforesaid purposes with interest as hereinafter provided and all costs and expense incurred by Landlord including, but not limited to attorney's fees in processing such discharge or in defending any such action.

14. Damage or Destruction.

14.1 In the event that during the Term of this Lease, the Premises shall be damaged by fire or other casualty which renders the Premises untenantable, Tenant, shall repair said damage. Such repairs shall be commenced within sixty (60) days of the date of said damage and such repairs shall be completed within one two hundred seventy (270) days of said damage; provided, however, if the Premises are damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within such time period, Tenant shall have such additional time as necessary, so long as Tenant is using diligent, good faith efforts to repair and restore the Premises.

14.2 In the event (i) the building is damaged by fire or other casualty during the last three (3) years of the Initial Term, or during any Extension Period, and (ii) said damage is equal to or greater than fifty percent (50%) of the then replacement cost of the Restaurant building and related improvements, then Tenant shall have the option to terminate this Lease upon written notice to Landlord within thirty-five (35) days of such damage, and said termination shall be effective as of the date of damage. In the event of a termination of the Lease under this provision, Landlord shall be entitled to the proceeds of the building insurance.

14.3 If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, either Landlord or Tenant may terminate this Lease by thirty (30) days written notice to the other of its election so to do and the Lease shall be deemed to have terminated as of such date unless the other party agrees in writing to pay for such repairs or restoration.

15. Condemnation.

15.1 The term "total taking" means the taking of or a voluntary transfer under the threat of the exercise of the right of eminent domain or other authority (i) of all or a portion of the Premises that is necessary for Tenant's occupancy and gainful operation of the Premises in compliance with applicable laws, rules, ordinances and regulations, (ii) of all or a portion of the



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001553

Premises so that the Premises are not suitable for Tenant's intended use, (iii) of the driveways serving the Premises, or (iv) of more than 20% of the parking spaces on the Premises. The term "partial taking" means the taking of only a portion of the Premises which does not constitute a total taking whereby Tenant can continue to gainfully operate the its business on the Premises in compliance with applicable laws, rules, ordinances and regulations.

15.2 If a total taking occurs during the Term of this Lease, this Lease will terminate as of the date of the taking. The phrase "date of the taking" means the date of taking actual physical possession by the condemning authority or such earlier date as the condemning authority gives notice that it is deemed to have taken possession.

15.3 If a partial taking occurs during the Term of this Lease, either Landlord or Tenant may cancel this Lease as to the portion of the Premises taken, by written notice given within thirty (30) days after the date of the taking, and this Lease will terminate as to the portion of the Premises taken on the date of the taking. This Lease will continue in full force and effect as to the remainder of the Premises. The Rent payable by Tenant for the balance of the Term will be abated in the same proportion that the area of the Premises taken bears to the total area of the Premises immediately prior to such taking, and Landlord will make all necessary repairs or alterations to make the remaining Premises a complete architectural unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation.

15.4 If more than twenty percent (20%) of the parking spaces of the Premises (or lesser amount if the taking results in the Premises not meeting municipal parking requirements) dedicated to customer parking area acquired or condemned under power of eminent domain or other authority of law, or a voluntary transfer under the threat of an exercise of the right of eminent domain or other authority, then Tenant shall have the option to cancel this lease by written notice given within 30 days after the date of taking, and if Tenant exercises its option, the Term of this Lease will terminate as of the date of the taking unless Landlord takes reasonable steps to provide other parking facilities substantially equal in all respects to the previously existing ratio between the parking areas and the leasable area of the Restaurant building, and such parking facilities are provided by Landlord provides such other parking facilities, then this Lease will continue in full force.

15.5 All compensation and damages awarded for a total or partial taking of the Premises, will belong to Landlord; however, Tenant may make its own claim for any separate award that may be made by the condemnor for Tenant's moving expenses, loss of business or for the taking of or injury to Tenant's improvements, or on account of any cost or loss Tenant may sustain in the removal of Tenant's trade fixtures, equipment, and furnishing, or as a result of any alterations, modifications, or repairs which may be reasonably required by Tenant in order to place the remaining portion of the Premises not so condemned in a suitable condition for the continuance of Tenant's occupancy, provided that no such award shall reduce the award to Landlord.

15.6 If this Lease is terminated pursuant to the provisions of this <u>Section 15</u>, then all rentals and other charges payable by Tenant to Landlord under this Lease will be paid up to the day of the taking, and any rentals and other charges paid in advance and allocable to the period



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001554

after the date of the taking will be repaid to Tenant by Landlord. Landlord and Tenant will then be released from all further liability under this Lease.

16. Covenant of Title and Quiet Enjoyment. Landlord covenants that Landlord is well seized of and has good title to the Premises, does warrant and will defend the title thereto, and will indemnify, defend and hold Tenant harmless against any damage and expense which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description herein of the Premises. If, at any time, Landlord's title or right to receive Rent hereunder is disputed, or there is a change of ownership of Landlord's estate by act of the parties or operation of law, Tenant may withhold Rent or any other payments due to Landlord thereafter accruing until Tenant is furnished proof satisfactory to it as to the party entitled thereto. So long as Tenant is not in default under the terms of this Lease, Tenant shall have quiet enjoyment of the Premises during the entire Term of the Lease.

17. Event of Default.

17.1 Tenant Default. Each of the following events shall constitute an Event of Default:

17.1.1 If Tenant shall fail to pay any Rent or any other charge or sum to be paid by Tenant to Landlord when due in accordance with the terms of this Lease and such default shall continue for a period of ten (10) days after written notice to Tenant of such default; or

17.1.2 if Tenant shall fail to keep or perform or abide by any other requirement, term, condition, covenant or agreement of this Lease or of any notice given Tenant by Landlord pursuant to the terms of this Lease, and such default shall continue for a period of thirty (30) days after notice to Tenant of such default; provided however, if more than thirty (30) days is reasonably required to correct the breach, then no Event of Default shall occur so long as Tenant has commenced to promptly correct such breach and prosecute the same to completion with reasonable diligence; or

17.1.3 if Tenant shall file a petition in bankruptcy or take or consent to any other action seeking any such judicial decree or shall file any debtor proceeding or a petition for an arrangement or for corporate reorganization or shall make any assignment for the benefit of its creditors or shall admit in writing its inability to pay its debts generally as they become due or if any court of competent jurisdiction shall enter a decree or order adjudicating it bankrupt or insolvent or if any trustee or receiver for Tenant or for any substantial part of its property be appointed or if any person shall file a petition for involuntary bankruptcy against Tenant and such appointment or petition shall not be stayed or vacated within sixty (60) days of entry thereof or if Tenants interest hereunder shall pass to another by operation of law in any other manner.

17.2 Landlord's Remedies. Upon the occurrence of an Event of Default, Landlord may, in accordance with procedures required by applicable law, pursue one of the following remedies:

17.2.1 Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall surrender possession of the Premises to Landlord within thirty (30) days after written notice from Landlord to Tenant. In such event, Landlord shall be entitled to recover from Tenant all damages reasonably incurred



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001555

by Landlord by reason of Tenant's default including the cost of recovering possession of the Premises and expenses of reletting the Premises; or

17.2.2 Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease including the right to recover the Minimum Monthly Rent as it becomes due hereunder.

With respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to use commercially reasonable efforts to mitigate its damages.

17.3 Landlord Default and Tenant Remedies. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord: (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion); or (b) the failure of any representation or warranty to be true when deemed given hereunder if such failure has a material adverse effect on Tenant's use of the Premises or the business conducted by Tenant at the Premises (e.g., increased costs). In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein: (a) to remedy such default or breach and deduct the costs thereof (including reasonable attorneys' fees) from the installments of Rent next falling due; (b) to pursue the remedy of specific performance; (c) to seek money damages for loss arising from Landlord's failure to discharge its obligations under the Lease; and (d) to terminate the Lease. Nothing herein contained shall relieve Landlord from its obligations hereunder.

18. Right of Entry. At reasonable times and in such a manner as shall not interfere with Tenant's business, Landlord shall have the right to enter and to grant licenses to enter the Premises at any time and for such lengths of time as are reasonable to make emergency repairs to the Premises. No such entry by Landlord shall in any manner affect Tenant's obligations and covenants under this Lease and no such entry shall of itself render Landlord liable for any loss of or damage to the property of Tenant.

19. Surrender of Premises.

19.1 At the end of the Term of this Lease or upon any earlier termination of this Lease or Tenant's right to possess the Premises, Tenant shall vacate and surrender possession of the Premises to Landlord broom clean and in as good order and condition as the Premises were at the time Landlord shall have delivered possession thereof to Tenant, ordinary wear and tear, damage by fire or other casualty not caused by Tenant, its servants, agents or employees and (subject to the provisions of this Lease) alterations, additions and improvements to the Premises excepted.



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001556

Tenant shall have no right (except as it may be obligated to do so pursuant to this Lease) to remove any betterments and improvements whether made by Tenant or Landlord, including but not limited to, floor and wall coverings, lighting, cooling and ventilating, plumbing and other such fixtures, partitions, alterations, improvements, systems and all such similar apparatus and equipment. Tenant shall, however, have the right to remove Tenant's Property, provided that Tenant promptly repair any damage to the Premises caused by such removal.

19.2 Tenant shall comply with all environmental laws affecting the Premises during the Term of the Lease, and the termination of this Lease shall not terminate Tenant's obligations to Landlord for acts or omissions of Tenant as to environmental laws in effect during the Lease Term. Provided however, Tenant's liability to Landlord shall be limited to damages proven to have arisen because of an act or omission of Tenant during the Lease Term and only for contamination of the Premises caused by Tenant.

20. Right of First Refusal.

20.1 If Landlord, or Landlord's heirs, executors, grantees, successors or assigns, at any time after the second (2nd) anniversary of the Lease Date receives an offer to purchase the Premises, or any part thereof, and Landlord desires to accept such offer; or should Landlord during any such time make an offer to sell the Premises, or any part thereof, Landlord shall give Tenant thirty (30) days notice in writing of such offer setting forth the name and address of the proposed purchaser, the amount of the proposed purchase price, and all other terms and conditions of such offer, and Tenant shall have the first option to purchase the Premises which is the subject of the offer by giving written notice to Landlord of its intention to purchase within said thirty (30) day period at the same price and on the same terms of any such offer, it being understood that in the event Tenant does not give notice of its intention to exercise such option to purchase within such period, this Lease and all of its terms and conditions shall nevertheless remain in full force and effect and Landlord and any purchaser or purchasers of the Premises, shall be bound thereby. In the event that the Premises set forth in the offer is not sold for any reason, Tenant shall have, upon the same conditions and notice, the continuing right of first refusal to purchase the Premises or any part thereof upon the terms of any subsequent offer or offers to purchase and this Section 20.1 shall remain in full force and effect.

20.2 Notwithstanding anything herein contained to the contrary, title to the Premises shall be delivered to Tenant at the close of escrow free and clear of all monetary liens and encumbrances (other than the lien for current real property taxes not yet due and payable) and such monetary liens and encumbrances shall be released from the Premises by Landlord at Landlord's sole expense on or before the close of escrow.

20.3 In the event there are any conflicts between the terms of this Lease concerning the exercise of the right of first refusal, and the terms contained in the offer which Tenant must accept if Tenant desires to purchase the Premises, then the terms of this Lease shall control and supersede those contained in such offer.

21. Notices. Any notice or demand or statement which by any provision of this Agreement is required or allowed to be given by either party to the other shall be in writing and shall be deemed to have been sufficiently given for all purposes when made by personal delivery, or sent



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001557**

via a recognized overnight delivery service, or deposited in the United States mail as certified or registered mail, return receipt requested, postage prepaid to the addresses provided below or such other address as Landlord or Tenant may designate in writing.

If to Tenant:

MJC Holdings 123, LLC
5210 S. Priest Drive, Suite 3
Guadalupe, Arizona 85283
Attn: Jason LeVecke
(480) 736-2461 phone
(480) 214-2519 fax

If to Landlord:

VRE Chicago Eleven, LLC
1211 South White Chapel Blvd.
Southlake, Texas 76092
Attn: Jason Keen
(817) 912-0522 phone
(817) 912-0550 fax

22. Protected Area. As a material inducement for Tenant to enter into this Lease, Landlord acknowledges and agrees that during the Initial Term and any Option Period no portion of the Premises and no property presently or hereafter owned, leased or controlled directly or indirectly by Landlord within a two (2) mile radius of the Premises shall be sold, leased, managed, used or occupied for a fast food restaurant serving hamburgers. In the event of a breach by Landlord under the terms of this Section, Tenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity, Landlord acknowledging and agreeing that Tenant does not have an adequate remedy at law for breach of this provision.

23. Holdover. Should Tenant, with or without Landlord's written consent, hold over after the termination of this Lease, Tenant shall become a tenant at will and shall be bound by each and all of the terms herein provided as may be applicable to such tenancy at will. Any such holding over shall not constitute an extension of this Lease by law or otherwise. During such holding over, Tenant shall pay rent (including minimum and percentage rental, maintenance costs and expenses, tax impositions, insurance costs, and other charges hereunder), at the rate equal to one hundred twenty-five percent (125%) of the rate or rates then applicable under the provisions of this Lease.

24. Waiver. No waiver by Landlord of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent or continuing breach by Tenant of the same or any other provision. Landlord's consent to or approval of any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act. No agreement to accept Tenant's surrender of the Premises shall be valid unless in writing and signed by Landlord.

25. Successors and Assigns. Except as otherwise provided in this Lease, all of the covenants, conditions, and provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns, when permitted hereunder.

26. Headings, Captions and References. The article and section captions contained in this Lease are for convenience only and do not in any way limit or amplify any term or provision hereof. The terms "Landlord" and "Tenant" as used herein shall include the plural as well as the



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER VERDAD001558

singular, the neuter shall include the masculine and feminine genders and, if there be more than one tenant the obligations herein imposed upon Tenant shall be joint and several.

27. Landlord and Tenant Relationship. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any other party, as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto, it being understood and agreed that neither method of computation of Rent, nor any other provision contained herein nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than that set forth in Section 30 below.

28. No Estate by Tenant. This Lease shall create the relationship of landlord and tenant between Landlord and Tenant.

29. Written Consent. Whenever the consent of either Landlord or Tenant is referred to in this Lease, it is understood and agreed that such consent shall not be unreasonably withheld or delayed by Landlord or Tenant, unless otherwise provided.

30. Entire Agreement and No Offer. This Lease constitutes the entire agreement intent and understanding between the parties hereto with respect to the Premises, and no prior or contemporaneous agreement or understanding with regard to the Premises shall be effective for any purpose unless reduced to writing herein. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successor in interest. The submission of this Lease for examination or consideration by Landlord shall not constitute an offer to lease by Tenant and this lease shall be effective only upon execution and delivery hereof by both Landlord and Tenant.

31. Jurisdiction. This Lease shall be construed in accordance with the laws of the State where the Premises are located.

32. Estoppel Certificate. Tenant and Landlord agree at any time and from time to time, upon not less than twenty (20) business days prior written request from the other party, to execute, acknowledge and deliver to the requesting party in writing, in form and content reasonably acceptable to both parties, an estoppel certificate certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rent has been paid and certifying that it is not in default (or if a default is alleged, stating the nature of the alleged default), and further certifying such other matters as the requesting party shall require. It is intended that any such statement delivered pursuant to this Section may be relied upon by any prospective purchaser, lender, subtenant, assignee or any entity which is a party to a potential merger, consolidation with or to the acquisition of the Premises or stock of Landlord or Tenant. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord or otherwise modify the terms of the Lease.

33. Protected Area. Landlord shall not subdivide, parcel or otherwise divide the Premises, erect any buildings, improvements or structures, change any access roads, parking areas or create any easements in or over the Premises without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001559**

34. Brokerage. Landlord and Tenant each warrant that it has had no dealings with any broker or agent in connection with this Lease, and covenants to pay, hold harmless and indemnify the other from and against any and all cost, expense, or liability for any compensation, commissions and charges claimed by any other broker or other agent with respect to this Lease or the negotiations thereof.

35. Qualification. Each party represents that it is authorized to do business in the state in which the Premises are located and will remain so during the Term hereof, and in all respects is duly authorized to enter into and perform this Lease.

36. Authority. Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

37. Time of Essence. Time is of the essence in this Lease.

38. Force Majeure. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, approval delays by municipalities or governmental entities, riots, insurrection, was, military or usurped power, sabotage, terrorism, unusually severe weather, acts of God, fire or other casualty or other reason (but excluding financial inability) of a like nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of the delay.

39. Confidentiality of Lease. From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Premises (including, without limitation, architectural plans, specifications, site plans and drawings) or Tenant's business (collectively, "Confidential Information"), to any person including, without limitation, any brokers, any other tenants or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its attorneys, employees, partners, consultants, lenders, accountants, current or potential mortgagees or purchasers of the Premises who have a reasonable need for such Confidential Information and who agree to be bound by the terms of this Section and Tenant may disclose the terms of this



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001560**

Lease to attorneys, employees, partners, consultants, current or potential lenders, assigns or subtenants who agree to be so bound.

40. Legal Expenses. In the event of the bringing of any action by either party hereto against the other hereon or hereunder, or by reason of the breach of any term, covenant or condition on the part of the other party, or arising out of this Lease, the party in whose favor final judgment shall be entered shall be entitled to have and recover from the other party costs and reasonable attorneys' fees to be fixed by the court which shall have rendered such judgment.

41. Applicable Law. The invalidity of unenforceability of any provision of this Lease shall not affect or impair any other provision. If any provision of this Lease is capable of two constructions, one of which would render the provision invalid and the other of which would make the provision valid, then the provision shall have the meaning which renders it valid. The laws of the State where the Premises are located shall govern the validity, performance, and enforcement of this Lease. The submission of this document for examination does not constitute an offer to lease and becomes effective only upon execution and delivery thereof by Landlord and Tenant.

42. Financial Information. Tenant shall provide Landlord with financial statements upon Landlord's written request, but no more than twice a year.

**[Signatures Follow On Next Page]**



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001561**

IN WITNESS WHEREOF, the parties have executed, or if a corporation, caused its duly authorized officers to execute this Agreement as of the day and year first above written.

**LANDLORD:**

**VRE CHICAGO ELEVEN, LLC**
a Texas limited liability company

By: ______________________
Jason Keen, Manager

**TENANT:**

**MJC HOLDINGS 123, LLC**
a Delaware limited liability company

By: ______________________
Name: Jason Le Vecke
Title: CEO



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001562**

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

Real property in the City of Chicago, County of Cook, State of Illinois, described as follows:

LOTS 19 TO 28 INCLUSIVE IN BLOCK 8 IN COBE AND MCKINNON'S 59TH STREET AND WESTERN AVENUE SUBDIVISION IN THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 13, TOWNSHIP 38 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FOR INFORMATION ONLY: TAX ID # 19-13-227-039-0000

The Real Property is commonly known as: 5852 S. Western Avenue, Chicago, IL 60636



**CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER** **VERDAD001563**

**VRE Chicago Eleven, LLC**
1211 South White Chapel Boulevard
Southlake, Texas 76092

February _____, 2015

Frontier Star, LLC
5210 S. Priest Drive, Suite 3
Guadalupe, Arizona 85283

Re: Termination of Lease Agreements and Guaranties and Execution of Replacement Lease Agreements and Guaranties

Gentlemen:

As you know, Frontier Star, LLC ("Tenant") and VRE Chicago Eleven, LLC ("Landlord") have entered into those certain Lease Agreements dated March 6, 2014 (collectively, the "Leases") and Unconditional Guaranties of Payment and Performance dated March 6, 2014, executed by Frontier Star I, LLC (collectively, the Guaranties"), relating to the following properties (collectively, the "Properties"):

1. 5852 S. Western Avenue in Chicago, Illinois;
2. 1600 W. Marquette in Chicago, Illinois;
3. 7508 S. Lafayette Avenue in Chicago, Illinois;
4. 1914 W. 79th Street in Chicago, Illinois;
5. 8307 S. Chicago Avenue in Chicago, Illinois;
6. 107 E. 95th Street in Chicago, Illinois;
7. 10200 S. Halstead Street in Chicago, Illinois;
8. 8307 S. King Drive in Chicago, Illinois;
9. 300 E. 35th Street in Chicago, Illinois;
10. 3696 S. Archer Avenue in Chicago, Illinois; and
11. E. Garfield Boulevard in Chicago, Illinois.

Landlord and Tenant desire to terminate the Leases and Guaranties as of the date set forth above (the "Effective Date") and, contemporaneous herewith, execute new leases and guaranties in place thereof. Specifically, the parties have agreed to revise the Leases to (i) permit the Properties to be used as Kentucky Fried Chicken restaurants; and (ii) delay, and potentially terminate the obligation in Section 9.7 of the Leases to invest at least $400,000 in constructing improvements to each of the Properties ("Construction Obligation"). The parties have agreed to revise the Guaranties to add Jason LeVecke, individually, as an additional Guarantor. Accordingly, upon the full execution and delivery by the parties of both (i) this Letter Agreement, and (ii) each of the new leases and guaranties related to the Properties, the Leases and the Guaranties shall be deemed terminated as of the Effective Date.

Landlord has agreed to place the Properties on the market and attempt to sell the Properties without any Construction Obligation in the Leases. If Landlord is unable to sell any or all of the Properties, prior to August 1, 2015, then Landlord may notify Tenant when Landlord desires which Property has not sold to a third party and Tenant shall have the following options with regard to each Property not sold, such options to be performed within sixty (60) days of Tenant's receipt of such notice ("Due Date"):

(i) show evidence of an investment of at least $400,000 in construction renovations into each Property not sold, provided that (i) the renovations to be performed must be reasonably anticipated to increase the value of each Property; and (ii) Landlord shall have approval

**Exhibit 6**

rights over the planned expenditures, with such approval not to be unreasonably withheld;

(ii) deliver to Landlord $400,000 for each Property not sold or under contract, in exchange for a reduction in Tenant's Annual Minimum Rent of $34,000; or

(iii) if Tenant has spent money for construction renovations on a specific Property, but less than $400,000, then Tenant shall deliver to Landlord the difference between $400,000 and the amount spent on the construction improvements to the respective Property after the Effective Date hereof and reduce the Annual Minimum Rent for each Property by an amount equal to .085 multiplied by the amount delivered to Landlord for the respective Property.

For any of the options above, Tenant shall deliver proof of invoices from third parties for construction work performed on the Property and proof that such invoices were paid.

Should Tenant fail to meet either obligation (i), (ii) or (iii) by the Due Date, then the Annual Minimum Rent for each Property still owned by Landlord shall automatically be increased by 150%, which shall be in addition to, and not in limitation of, any and all other rights and remedies for any breach which may be available to Landlord under the Leases, the Guaranties and/or applicable law or equity.
Tenant represents and warrants to Landlord that it is diligently pursuing permanent KFC or YUM ("KFC") approval for the operation of KFC restaurants on the Properties upon the terms set forth herein, and that it shall enter into a franchise agreement with KFC to operate the stores by March 30, 2015. Should Tenant be unable to deliver evidence of a copy of the franchise agreement to Landlord or provide evidence of such KFC approval by the time period set forth herein, then the Minimum Rent for each Property owned by Landlord shall automatically be increased by 150%, and the Tenant shall be in default under the respective Leases, until a fully executed franchise agreement with KFC is delivered to Landlord. This remedy shall be in addition to, and not in limitation of, any and all other rights and remedies for any breach which may be available to Landlord under the Leases, the Guaranties and/or applicable law or equity.

Terms used but not defined herein shall have the same meanings ascribed to them in the Leases or the Guaranties. Upon execution and delivery of the new leases and guaranties, the terms "Leases" and "Guaranties," as defined herein, shall mean and refer to the new leases and guaranties to be executed as of the Effective Date.

Any breach or default by Tenant under this Letter Agreement shall be a breach and default by Tenant under each of the Leases.

This Letter Agreement may be executed in any number of counterparts, each of which when so executed and delivered, shall be an original, but all of which shall constitute one and the same instrument. This Letter Agreement shall be binding upon each of Landlord and Tenant and each of their respective successors and assigns.

Please sign below in the space provided, it being understood and agreed that a binding contractual obligation is being created by this Letter Agreement.

Very truly yours,

**VRE Chicago Eleven, LLC**

By: ______________________________
B. Jason Keen, Manager

**ACKNOWLEDGED AND AGREED TO AS OF THE EFFECTIVE DATE:**

**TENANT:**

FRONTIER STAR, LLC,
a Delaware limited liability company

By: ______________________
Printed Name: JASON LEVECKE
Title: CEO

**GUARANTORS:**

FRONTIER STAR 1, LLC,
a Delaware limited liability company

By: ______________________
Printed Name: JASON LEVECKE
Title: CEO

______________________
JASON LEVECKE

**From:** Matt Langfield <mrlangfield@gmail.com>
**Sent:** Friday, February 27, 2015 11:25 AM
**To:** Chris Baker
**Cc:** chris baker; Jason Keen; Joe Mann; Jason LeVecke
**Subject:** Re: Chicago Docs
**Attachments:** 2014 CIM.pdf

Chris-

See my confirmations and detail below. I'm printing and signing leases now.

Thanks
Matt

On Fri, Feb 27, 2015 at 10:17 AM, Chris Baker <cbaker@bamolaw.com> wrote:

We are good with these changes. Can you confirm a couple things by responding to this email:

1. Are you making the modifications to all 11 leases and guaranties? **YES...I'll send scans of each in the next hour. I'll print two copies and send you to Jason Keen as well.**

2. Can you confirm by responding to this email that the side letter for Chicago 11 is executed after the execution of the Chicago 11 leases and guaranties? **YES....I'll send a scan and two copies to Jason Keen as well.**

3. Can you confirm that the guaranties for the 11 chicago stores is a guaranty for both Jason Levecke individually and for Frontier Star I, LLC. **YES**

4. Can you send the financials for MJC Holdings 123, LLC to Shane when you get a chance or whenever they are created? I assume this is the new KFC entity. **Will do. MJC is a subsidiary of FS1. As with Frontier Star, LLC and Frontier Star CJ, LLC (your other tenants), the financials we publish are for the entire FS1 group. These internally prepared YE financials are attached.**

Thanks for your help.

Chris Baker

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Friday, February 27, 2015 10:59 AM
**To:** chris baker; Jason Keen; joe mann; Jason LeVecke
**Subject:** Fwd: Chicago Docs



**Exhibit 7**

Chris-

See below. If you are good with minor edits we made, I'll get these printed and signed.

Matt

---------- Forwarded message ----------
From: **Matt Langfield** <mrlangfield@gmail.com>
Date: Thu, Feb 26, 2015 at 4:16 PM
Subject: Re: Chicago Docs
To: Chris Baker <cbaker@murphymahon.com>
Cc: Jason LeVecke <jasonlevecke@gmail.com>, Joe Mann <JMann@verdadrealestate.com>, Jason Keen <JKeen@verdadrealestate.com>, Shane Josephson <SJosephson@verdadrealestate.com>, Lisa Leaton <lleaton@murphymahon.com>, "Justin P. Huston" <jhuston@murphymahon.com>

Chris and All-

Letter Agreement:
Attached is the Letter Agreement with a couple very minor edits.

Chicago Lease:
I've also attached a copy of the Chicago Lease RL. Frontier Star 1, LLC should remain the corporate guarantor and should remain as a signature block on the Guaranty. This is our large entity of 200+ locations that our operating entities roll up under. The only change I've made to the lease is that the tenant for our KFC locations is MJC HOLDINGS 123, LLC. All of our KFC locations are in this entity.

Chicago Guaranty:

The only change I made on the attached is the name of the tenant referenced in the first paragraph.

Let me know if everything looks good and I will have all signed and scanned.

Thanks

Matt

On Thu, Feb 26, 2015 at 2:00 PM, Chris Baker <cbaker@murphymahon.com> wrote:

Thanks Matt. I have received approval from our lender on the new lease, the guaranty form and side letter. Need to fill in a blank or two on the side letter and get these documents signed and sent to us tomorrow so I can satisfy the bank on our extension and close Chandler and Libertyville.

We are working through the documents from your counsel and from Sarah Buvala on Chandler and Libertyville. So far

the documents are looking good. Lisa and Justin are working on the title, settlements statements and conveyance documents. Did you approve the leases and guaranties for these two sites? May have, but I didn't see it.

I am out this afternoon at a fundraiser (HORRIBLE timing). However, Lisa and Justin in my office are helping me through the details. Please copy them on all correspondence and lets gets these deals closed! They will be sending around some emails on items needed for closing as they come up.

Thanks and look forward to putting another two in the books.

This will serve as notice that effective 3.1.15 the firm name will become Baker Monroe PLLC. My email address will be cbaker@bamolaw.com, while my address and phone will remain the same. Thank you.


Chris Baker
Tindall Square Building No. 2
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
817-632-6306 (direct)
817-300-6222 (cell)
cbaker@murphymahon.com



Internet Disclaimer:
*************************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
*************************************************************************


---

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Thursday, February 26, 2015 2:46 PM
**To:** Chris Baker
**Cc:** Jason LeVecke; Joe Mann; Jason Keen
**Subject:** Re: Chicago Docs

Chris-

Gettting through these now. The leases look good...I may have a comment or two, will know shortly. I'll review quickly with Jason and turn them around.

Thanks!

Matt

On Thu, Feb 26, 2015 at 10:32 AM, Chris Baker <cbaker@murphymahon.com> wrote:

Matt and Jason: Attached is a revised side letter with some modifications I made after reviewing further and comparing to the existing lease. Please review and provide comments. Also, how do the leases and guaranties look?

Thanks,

This will serve as notice that effective 3.1.15 the firm name will become Baker Monroe PLLC. My email address will be cbaker@bamolaw.com, while my address and phone will remain the same. Thank you.

Chris Baker
Tindall Square Building No. 2
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
817-632-6306 (direct)
817-300-6222 (cell)
cbaker@murphymahon.com

Internet Disclaimer:
**********************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
**********************************************************************

--

*Matt Langfield*

C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the

individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

--

*Matt Langfield*

C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

--

*Matt Langfield*

C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

--

*Matt Langfield*

C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in

error, do not read it. Please immediately notify the sender and delete
it.

| | |
|---|---|
| **From:** | Matt Langfield <mrlangfield@gmail.com> |
| **Sent:** | Tuesday, March 17, 2015 1:10 PM |
| **To:** | Chris Baker |
| **Cc:** | Jason LeVecke; Jason Keen |
| **Subject:** | Re: Re: |

Thanks

On Tue, Mar 17, 2015 at 10:37 AM, Chris Baker <cbaker@bamolaw.com> wrote:

Matt: Attached is the fully executed side letter. Thank you again.

BAKER MONROE PLLC

**Chris Baker**
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
D: 817.632.6306
C: 817.300.6222
E: cbaker@bamolaw.com

Internet Disclaimer:
**********************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
**********************************************************************

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Monday, March 16, 2015 7:32 PM

**To:** Chris Baker
**Cc:** Jason LeVecke; jkeen@verdadrealestate.com
**Subject:** Re: Re:

**Exhibit 8**

Chris-

Signed letter is attached. Let me know if you need anything else.

Thanks

Matt

On Mon, Mar 16, 2015 at 9:06 AM, Matt Langfield <mrlangfield@gmail.com> wrote:

Chris-

Should have it to you today.

Thanks

Matt

On Mon, Mar 16, 2015 at 9:06 AM, Chris Baker <cbaker@bamolaw.com> wrote:

Matt: Hope you had a good weekend. Did you have a chance to review those changes to the side letter? We are under contract on at least one deal and need to get this buttoned up this week if possible. Thanks,

BAKER MONROE
PLLC

**Chris Baker**
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
D: 817.632.6306
C: 817.300.6222
E: cbaker@bamolaw.com

Internet Disclaimer:
*******************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
*******************************************************************

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Tuesday, March 10, 2015 4:26 PM
**To:** Chris Baker
**Cc:** Jason LeVecke; jkeen@verdadrealestate.com
**Subject:** Re: Re:

Sorry, not quite yet. Working on getting there.

Matt

On Tue, Mar 10, 2015 at 2:02 PM, Chris Baker <cbaker@bamolaw.com> wrote:

Did y'all have a chance to review the proposed changes to the side letter? Thanks,

BAKER MONROE PLLC

**Chris Baker**
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
D: 817.632.6306
C: 817.300.6222
E: cbaker@bamolaw.com

Internet Disclaimer:
***********************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
***********************************************************************

**From:** Chris Baker
**Sent:** Sunday, March 08, 2015 7:39 PM
**To:** 'Matt Langfield'; Jason LeVecke
**Cc:** jkeen@verdadrealestate.com
**Subject:** RE: Re:

Attached is the revised letter agreement with proposed changes. It allows us to terminate the letter agreement with respect to properties that sell, so the letter agreement doesn't remain binding and arguably be an amendment to the lease. I got a little wordy, so modify if necessary. Thanks,

BAKER MONROE PLLC

**Chris Baker**
505 Pecan Street, Suite 101
Fort Worth, Texas 76102

D: 817.632.6306
C: 817.300.6222
E: cbaker@bamolaw.com

Internet Disclaimer:
**********************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
**********************************************************************

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Wednesday, March 04, 2015 4:43 PM
**To:** Chris Baker; Jason LeVecke
**Subject:** Re:

Chris-

Glad to hear your guys are working toward contracts. Sounds like we did miss our intent on the side letter. I think we would be fine with your suggestions...send over whatver you like and we will take a look.

Thanks
Matt

On Wed, Mar 4, 2015 at 3:36 PM, Chris Baker <cbaker@bamolaw.com> wrote:

So ... I think I left some language out of the side letter that helps both of us and was the intent. There is nothing in the side letter that allows us to expressly terminate the side letter with respect to a certain property at the time of sale or any other time. It does say we can notify you if we don't sell, and then there are options, but there is nothing about terminating the side letter. Therefore, the side letter is arguably an amendment to the lease and we have to disclose it when we go under contract and you would have to disclose it when you sign an estoppel. We have two LOI's and are drafting contracts. Looked at the side letter again and think the language needs to be cleaned up.

Make sense?

BAKER MONROE
PLLC

**Chris Baker**
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
D: 817.632.6306
C: 817.300.6222
E: cbaker@bamolaw.com

Internet Disclaimer:
******************************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
******************************************************************************

**From:** Matt Langfield [mailto:mrlangfield@gmail.com]
**Sent:** Wednesday, March 04, 2015 4:14 PM
**To:** chris baker
**Subject:**

Chris-

Picked up you VM....what's up? Email will be my best option for the next seveal days.

Matt

--

*Matt Langfield*

C-(623) 734-3788

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

VRE Chicago Eleven, LLC
1211 South White Chapel Boulevard
Southlake, Texas 76092

March 17, 2015

Frontier Star, LLC
5210 S. Priest Drive, Suite 3
Guadalupe, Arizona 85283

Re: Termination of Lease Agreements and Guaranties and Execution of Replacement Lease Agreements and Guaranties

Gentlemen:

As you know, Frontier Star, LLC ("Tenant") and VRE Chicago Eleven, LLC ("Landlord") have entered into those certain Lease Agreements dated March 6, 2014 (collectively, the "Leases") and Unconditional Guaranties of Payment and Performance dated March 6, 2014, executed by Frontier Star I, LLC (collectively, the Guaranties"), relating to the following properties (collectively, the "Properties"):

1. 5852 S. Western Avenue in Chicago, Illinois;
2. 1600 W. Marquette in Chicago, Illinois;
3. 7508 S. Lafayette Avenue in Chicago, Illinois;
4. 1914 W. 79th Street in Chicago, Illinois;
5. 8307 S. Chicago Avenue in Chicago, Illinois;
6. 107 E. 95th Street in Chicago, Illinois;
7. 10200 S. Halstead Street in Chicago, Illinois;
8. 8307 S. King Drive in Chicago, Illinois;
9. 300 E. 35th Street in Chicago, Illinois;
10. 3696 S. Archer Avenue in Chicago, Illinois; and
11. E. Garfield Boulevard in Chicago, Illinois.

Landlord and Tenant desire to terminate the Leases and Guaranties as of the date set forth above (the "Effective Date") and, contemporaneous herewith, execute new leases and guaranties in place thereof. Specifically, the parties have agreed to revise the Leases to (i) permit the Properties to be used as Kentucky Fried Chicken restaurants; and (ii) delay, and potentially terminate the obligation in Section 9.7 of the Leases to invest at least $400,000 in constructing improvements to each of the Properties ("Construction Obligation"). The parties have agreed to revise the Guaranties to add Jason LeVecke, individually, as an additional Guarantor. Accordingly, upon the full execution and delivery by the parties of both (i) this agreement ("Letter Agreement"), and (ii) each of the new leases and guaranties related to the Properties, the Leases and the Guaranties shall be deemed terminated as of the Effective Date.

Landlord has agreed to place the Properties on the market and attempt to sell the Properties without any Construction Obligation in the Leases. Landlord, in its discretion, may (by written notice to Tenant) unilaterally terminate this Letter Agreement as to some or all of the Properties in its efforts to market and sell the Properties on terms acceptable to Landlord. Such termination will only affect those specific Properties specified by Landlord and this Letter Agreement shall remain in full force and effect as to all other Properties as to which Landlord has not elected to terminate this Letter Agreement. If Landlord has not sold all of the Properties on terms acceptable to Landlord prior to August 1, 2015, then Landlord may notify Tenant which Properties have not sold and Tenant shall have the following options with regard to each Property not sold, such options to be performed within sixty (60) days of Tenant's receipt of such notice ("Due Date"):

**Exhibit 9**

(i) invest at least $400,000 in construction renovations into each Property not sold, provided that (i) the renovations to be performed must be reasonably anticipated to increase the value of each Property, and (ii) Landlord shall have approval rights over the planned expenditures, with such approval not to be unreasonably withheld;

(ii) deliver to Landlord $400,000 for each Property not sold or under contract, in exchange for a reduction in Tenant's Annual Minimum Rent of $34,000; or

(iii) if Tenant has spent money for construction renovations on a specific Property, but less than $400,000, then Tenant shall deliver to Landlord the difference between $400,000 and the amount spent on the construction improvements to the respective Property after the Effective Date hereof and reduce the Annual Minimum Rent for each Property by an amount equal to .085 multiplied by the amount delivered to Landlord for the respective Property.

For any of the options above, Tenant shall deliver proof of invoices from third parties for construction work performed on the Property and proof that such invoices were paid.

Should Tenant fail to meet either obligation (i), (ii) or (iii) by the Due Date, then the Annual Minimum Rent for each Property still owned by Landlord shall automatically be increased by 150%, which shall be in addition to, and not in limitation of, any and all other rights and remedies for any breach which may be available to Landlord under the Leases, the Guaranties and/or applicable law or equity.

Tenant represents and warrants to Landlord that it is diligently pursuing permanent KFC or YUM ("KFC") approval for the operation of KFC restaurants on the Properties upon the terms set forth herein, and that it shall enter into a franchise agreement with KFC to operate the stores by March 30, 2015. Should Tenant be unable to deliver a copy of the franchise agreement to Landlord or provide evidence of such KFC approval by the time period set forth herein, then the Minimum Rent for each Property owned by Landlord shall automatically be increased by 150%, and the Tenant shall be in default under the respective Leases, until a fully executed franchise agreement with KFC is delivered to Landlord. This remedy shall be in addition to, and not in limitation of, any and all other rights and remedies for any breach which may be available to Landlord under the Leases, the Guaranties and/or applicable law or equity.

Terms used but not defined herein shall have the same meanings ascribed to them in the Leases or the Guaranties. Upon execution and delivery of the new leases and guaranties, the terms "Leases" and "Guaranties," as defined herein, shall mean and refer to the new leases and guaranties to be executed as of the Effective Date.

Any breach or default by Tenant under this Letter Agreement shall be a breach and default by Tenant under each of the Leases.

This Letter Agreement may be executed in any number of counterparts, each of which when so executed and delivered, shall be an original, but all of which shall constitute one and the same instrument. This Letter Agreement shall be binding upon each of Landlord and Tenant and each of their respective successors and assigns.

Please sign below in the space provided, it being understood and agreed that a binding contractual obligation is being created by this Letter Agreement.

Very truly yours,

VRE Chicago Eleven, LLC

By:______________________________
B. Jason Keen, Manager

ACKNOWLEDGED AND AGREED TO
AS OF THE EFFECTIVE DATE:

TENANT:

FRONTIER STAR, LLC,
a Delaware limited liability company

By: ______________________________
Printed Name: Jason LeVecke
Title: CEO

GUARANTORS:

FRONTIER STAR 1, LLC,
a Delaware limited liability company

By: ______________________________
Printed Name: Jason LeVecke
Title: CEO

______________________________
JASON LEVECKE

**Exhibit 10**




# INVESTMENT OFFERING | $2,443,000 | 7.0% CAP

**KFC**

eXp REALTY ADVISORS

**5852 SOUTH WESTERN AVE, CHICAGO, IL**

214.915.8890
**BOB MOORHEAD**
bob@exp1031.com
**JOE CAPUTO**
joe@exp1031.com
**RUSSELL SMITH**
russell@exp1031.com

***property.*** *2.788 SF building on .71± acres.*

***tenant.*** *Franchisee operates 22 KFC restaurants in the Chicago Market. One of the largest multi-unit franchise restaurant operators with over 200 locations.*

***lease structure.*** *Brand new, 20-year, NNN lease with 10% rent increases every 5-years in initial term.*

***location.*** *KFC is located on the intersection of South Western Ave (30,533 Cars / Day) and W 59th Street (16,007 Cars / Day). W 59th Street is a major east-west thoroughfare that runs from University of Chicago to Chicago Midway Airport while Western Avenue is an arterial north-south street, the longest continuous street in the city of Chicago at 23.5 miles. The subject property is just west of a major transportation center for CSX Corporation; one of the nation's leading transportation suppliers with over 21,000 route miles of track in 23 states, the District of Columbia, Ontario, and Quebec. The immediate trade area is in an extremely dense residential area with over 340,259 people in a 3-mile radius. Major retailers in the vicinity include Subway, Pizza Hut, Walgreens, CVS, ALDI, Sears, Family Dollar, Aaron's, Rent A Center, Boost Mobil, U.S. Cellular, AT&T, Cricket Wireless, Dunkin Donuts, Baskin Robins, and many others.*

# TABLE OF CONTENTS | DISCLAIMER
## KFC

5852 SOUTH WESTERN AVE, CHICAGO, IL


| | |
|---|---|
| PAGE 1: | COVER |
| PAGE 2: | TABLE OF CONTENTS \| DISCLAIMER |
| PAGE 3: | INVESTMENT \| TENANT \| LEASE OVERVIEW |
| PAGE 4-5: | AERIAL PHOTOS |
| PAGE 6: | LOCATION OVERVIEW |
| PAGE 7-8: | LOCATION MAPS |
| PAGE 9: | DEMOGRAPHICS |





## DISCLAIMER

EXP Realty Advisors, Inc. ("Agent") has been engaged as an agent for the sale of the property located at 5852 South Western Ave, Chicago, IL by the owner of the Property ("Seller"). The Property is being offered for sale in an "as-is, where-is" condition and Seller and Agent make no representations or warranties as to the accuracy of the information contained in this Offering Memorandum. The enclosed materials include highly confidential information and are being furnished solely for the purpose of review by prospective purchasers of the interest described herein. The enclosed materials are being provided solely to facilitate the prospective investor's own due diligence for which it shall be fully and solely responsible. The material contained herein is based on information and sources deemed to be reliable, but no representation or warranty, express or implied, is being made by Agent or Seller or any of their respective representatives, affiliates, officers, employees, shareholders, partners and directors, as to the accuracy or completeness of the information contained herein. Summaries contained herein of any legal or other documents are not intended to be comprehensive statements of the terms of such documents, but rather only outlines of some of the principal provisions contained therein. Neither the Agent nor the Seller shall have any liability whatsoever for the accuracy or completeness of the information contained herein or any other written or oral communication or information transmitted or made available or any action taken or decision made by the recipient with respect to the Property. Interested parties are to make their own investigations, projections and conclusions without reliance upon the material contained herein. Seller reserves the right, at its sole and absolute discretion, to withdraw the Property from being marketed for sale at any time and for any reason. Seller and Agent each expressly reserves the right, at their sole and absolute discretion, to reject any and all expressions of interest or offers regarding the Property and/or to terminate discussions with any entity at any time, with or without notice. This offering is made subject to omissions, correction of errors, change of price or other terms, prior sale or withdrawal from the market without notice. Agent is not authorized to make any representations or agreements on behalf of Seller. Seller shall have no legal commitment or obligation to any interested party reviewing the enclosed materials, performing additional investigation and/or making an offer to purchase the Property unless and until a binding written agreement for the purchase of the Property has been fully executed, delivered, and approved by Seller and any conditions to Seller's obligations hereunder have been satisfied or waived. By taking possession of and reviewing the information contained herein, the recipient agrees that (a) the enclosed materials and their contents are of a highly confidential nature and will be held and treated in the strictest confidence and shall be returned to Agent or Seller promptly upon request; and (b) the recipient shall not contact employees or tenants of the Property directly or indirectly regarding any aspect of the enclosed materials or the Property without the prior written approval of the Seller or Agent; and (c) no portion of the enclosed materials may be copied or otherwise reproduced without the prior written authorization of Seller and Agent.

Listed in association with ILLINOIS broker of record:
TARTAN REALTY GROUP INC | license #: 478.011278

# INVESTMENT OVERVIEW
## KFC

5852 SOUTH WESTERN AVE, CHICAGO, IL

| | |
|---|---|
| PRICE \| CAP: | $2,443,000 \| 7.0% |
| NET OPERATING INCOME: | $171,000 |
| PROJECTED BUILDING AREA: | 2,788± Square Feet |
| LAND AREA: | .71± Acres |
| YEAR BUILT: | 1984 |
| LANDLORD RESPONSIBILITY: | None |
| OWNERSHIP: | Fee Simple Interest |
| OCCUPANCY: | 100% |

## LEASE OVERVIEW

| | |
|---|---|
| **Initial Lease Term:** | 20-Years, Plus 4, 5-Year Options to Renew |
| **Projected Rent Commencement:** | May 2014 |
| **Projected Lease Expiration:** | May 2034 |
| **Lease Type:** | Absolute NNN |
| **Rent Increases:** | 10% Increase Every 5 Years In Initial Term |
| **Year 1-5 Annual Rent (Current):** | $171,000 |
| **Year 6-10 Annual Rent:** | $188,100 |
| **Year 11-15 Annual Rent:** | $206,910 |
| **Year 16-20 Annual Rent:** | $227,601 |
| **Year 21-25 Annual Rent (Option 1):** | market rate |
| **Year 26-30 Annual Rent (Option 2):** | negotiated rate for first 5 year option x 1.05 |
| **Year 31-35 Annual Rent (Option 3):** | negotiated rate for first 5 year option x 1.10 |
| **Year 36-40 Annual Rent (Option 4):** | negotiated rate for first 5 year option x 1.15 |

## TENANT OVERVIEW

Frontier Star 1, LLC, a Delaware limited liability company

**FRONTIER STAR 1, LLC**

Franchisee operates 22 KFC restaurants in the Chicago Market and is currently one of the largest multi-unit franchise restaurant operators with over 200 locations.

**KFC | www.kfc.com**

Based in Louisville, KY, KFC Corporation is the franchisor of the world's most popular chicken restaurant chain, specializing in Original Recipe®, Extra Crispy™, Kentucky Grilled Chicken® and Extra Crispy™ Strips with home-style sides, Hot Wings™ and freshly made chicken sandwiches. KFC has been serving customers complete, freshly prepared, family meals since Colonel Harland Sanders founded the concept in 1952.

Famous for its Original Recipe® fried chicken, which is made with the same secret blend of 11 herbs and spices Colonel Sanders perfected more than a half century ago, it is estimated that, on average, more than 185 million people see a KFC commercial at least once a week – that's more than half the U.S. population.

The KFC system serves more than 12 million customers each day in more than 115 countries and territories around the world. KFC operates more than 17,000 restaurants in the Unites States and internationally. KFC's parent company is Yum! Brands, Inc., the world's largest restaurant company in terms of system restaurants, with more than 40,000 locations in more than 130 countries and territories and employing more than one million associates. Yum! is ranked number 201 on the Fortune 500 List, with revenues exceeding $13 billion in 2012.

# AERIAL PHOTO
## KFC

5852 SOUTH WESTERN AVE, CHICAGO, IL



# AERIAL PHOTO
## KFC

5852 SOUTH WESTERN AVE, CHICAGO, IL



## IMMEDIATE TRADE AREA

KFC is located on the intersection of South Western Ave (30,533 Cars / Day) and W 59th Street (16,007 Cars / Day). W 59th Street is a major east-west thoroughfare that runs from University of Chicago to Chicago Midway Airport while Western Avenue is an arterial north-south street, the longest continuous street in the city of Chicago at 23.5 miles. The subject property is just west of a major transportation center for CSX Corporation; one of the nation's leading transportation suppliers with over 21,000 route miles of track in 23 states, the District of Columbia, Ontario, and Quebec.

The immediate trade area is in an extremely dense residential area with over 340,259 people in a 3-mile radius. This has contributed to the growth of major retailers in the vicinity such as Subway, Pizza Hut, Walgreens, CVS, ALDI, Sears, Family Dollar, Aaron's, Rent A Center, Boost Mobil, U.S. Cellular, AT&T, Cricket Wireless, Dunkin Donuts, Baskin Robins, and many others.

## CHICAGO, IL

Chicago is located in northeastern Illinois along the shore of Lake Michigan. The city currently has a population of 2,714,856 making it the third largest city in the US.

The economy of Chicago is the fourth largest metropolitan economy in the world measured by gross metropolitan product (GMP). In 2010 the GMP was approximately $532 billion falling only behind New York City and Los Angeles. Due to the city's economic diversification it is voted regularly as the most balanced economy in the United States. It ranks seventh on the world global cities index and is listed as an Alpha+ global city by the Globalization of World Cities Research Network. Recently, Chicago was named the fourth most important business center in the world. The area also recorded the greatest number of new or expanded corporate facilities in the United States in six out of seven years from 2001 to 2008. In 2009, UBS named Chicago as the ninth wealthiest city in the world.

Chicago is a major world financial center, with the second largest central business district in the United States. The city is the headquarters of the Federal Reserve Bank of Chicago the Seventh District of the Federal Reserve). The city is also home to major financial and futures exchanges, including the Chicago Stock Exchange, the Chicago Board Options Exchange (CBOE), and the Chicago Mercantile Exchange (the "Merc"), which is owned, along with the Chicago Board of Trade (CBOT) by Chicago's CME Group

The CME Group, in addition, owns the New York Mercantile Exchange (NYMEX), the Commodities Exchange Inc. (COMEX) and the Dow Jones Indexes. Perhaps due to the influence of the Chicago school of economics, the city also has markets trading unusual contracts such as emissions (on the Chicago Climate Exchange) and equity style indices (on the U.S. Futures Exchange). Chase Bank has its commercial and retail banking headquarters in Chicago's Chase Tower.

The tourism and convention industry contributes significantly to the local economy. The city is the United States' third-largest convention destination. Chicago attracted 32.4 million domestic leisure travelers, 11.7 million domestic business travelers and 1.3 million overseas visitors. These visitors contributed more than US$11.8 billion to Chicago's economy.

Manufacturing, printing, publishing and food processing also play major roles in the city's economy. Moreover, the construction of the Illinois and Michigan Canal, which helped move goods from the Great Lakes south on the Mississippi River, and of the railroads in the 19th century made the city a major transportation center in the United States.

The city and its surrounding area are home to the second largest labor pool in the US with approximately 4.25 million workers. A high number of Fortune 1000, Fortune Global 500, and Financial Times 500 companies operate within Chicago in order to capitalize on this labor pool. These companies include, Boeing, which moved its headquarters from Seattle to Chicago in 2001, McDonald's, Kraft Foods, and Sears Holding Corporation. Additionally, United Continental Holdings (United Airlines), Baxter International, and Abbot Laboratories are headquartered in the Chicago area.

## CHICAGOLAND

The Chicago-Joliet-Naperville, IL-IN-WI MSA, or colloquially known Chicagoland is the statistical area associated with the city of Chicago as outlined by the US Office of Management and Budget (OMB). Chicagoland is the 3rd largest MSA by population in the US with a total population of 9,461,105 as of the 2010 Census. It is the larger portion of an even greater statistical area; the Great Lakes Megalopolis. The Great Lakes Megalopolis includes the group of North American metropolitan areas which surround the Great Lakes region mainly within the midwestern United States and the southern Ontario area of Canada. With a total population of 59,144,461 residents; it is arguably the most important economic region in the world.

# LOCATION MAP
## KFC

### 5852 SOUTH WESTERN AVE, CHICAGO, IL



**5852 SOUTH WESTERN AVE, CHICAGO, IL**



# DEMOGRAPHICS
## KFC

5852 SOUTH WESTERN AVE, CHICAGO, IL

### DEMOGRAPHIC SNAPSHOT

| Radius | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| **Population:** | | | |
| 2018 Projection | 50,742 | 337,782 | 824,468 |
| 2013 Estimate | 51,252 | 340,259 | 822,150 |
| 2010 Census | 54,230 | 357,507 | 840,170 |
| **Households:** | | | |
| 2018 Projection | 12,877 | 93,717 | 262,764 |
| 2013 Estimate | 13,106 | 95,089 | 262,996 |
| 2010 Census | 14,149 | 101,851 | 271,592 |
| Owner Occupied | 6,080 | 47,279 | 123,643 |
| Renter Occupied | 7,026 | 47,810 | 139,352 |
| **2013 Avg Household Income** | **$42,190** | **$45,210** | **$49,867** |
| **2013 Med Household Income** | **$33,206** | **$34,304** | **$35,378** |
| **2013 Households by Household Inc:** | | | |
| <$25,000 | 4,774 | 34,843 | 96,620 |
| $25,000 - $50,000 | 4,329 | 27,935 | 70,753 |
| $50,000 - $75,000 | 2,170 | 16,000 | 42,618 |
| $75,000 - $100,000 | 1,136 | 9,031 | 24,823 |
| $100,000 - $125,000 | 414 | 4,022 | 12,520 |
| $125,000 - $150,000 | 176 | 1,463 | 5,632 |
| $150,000 - $200,000 | 64 | 1,347 | 6,206 |
| $200,000+ | 43 | 448 | 3,822 |






# Frontier Star 1, LLC

## Franchisees of Carl's Jr. & Hardee's Restaurants

## Confidential Information Memorandum!



Exhibit 11

# Frontier Star 1, LLC

## Franchisees of Carl's Jr. & Hardee's Restaurants

## Confidential Information Memorandum!

This Confidential Information Memorandum ("Memorandum") has been prepared solely for information purposes. In this Confidential Information Memorandum (the "Memorandum"), the term "Transaction" means, whether effected in one Transaction or a series of related Transactions, placement of debt related to the Assets. The sole purpose of this Memorandum is to assist the recipient in deciding whether it wishes to proceed with a proposed Transaction.

The recipient will hold this Memorandum and all information made available hereunder in strict confidence for the benefit of Frontier Star 1, LLC and its subsidiaries ("Company") and will use such information only for the purpose of evaluating the proposed Transac-on and only in a manner which is consistent with the agreed to Confidentiality Agreement. The reproduction of this memorandum in whole or in part without the prior permission of the Company is strictly prohibited. Further, the receipt of this Memorandum shall confirm that recipient will adhere to the terms of the Confidentiality Agreement.



Neither the Company nor any of their affiliates or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the information contained herein or any other written or oral communication transmitted or made available to any recipient. The Company and their respective affiliates and representatives expressly disclaim any and all liability based, in whole or in part, on such information, errors therein or omissions there from.

In addition, this Memorandum may include certain pro forma calculations, projections and forward looking statements provided by the Company and other sources believed to be reliable with respect to anticipated future performance. Such projections and forward looking statements reflect various assumptions of management concerning future performance, which assumptions may or may not prove to be correct. The actual results may vary from the anticipated results and such variations may be material. No representations or warranties are made as to the accuracy or reasonableness of such assumptions or the projections or forward looking statements based thereon. Only those representations and warranties, which may be made in a definitive written agreement relating to the Transaction, when and if executed, and subject to any limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect.

# BRAND STRENGTH & HISTORY



Founded in 1941 by Carl Karcher. "The place to go" for a big, juicy burger in the Western U.S. Signature menu items include the 100% Angus beef Thickburgers™ on Fresh Baked Buns, Hand Breaded Chicken Tenders, and Made from Scratch™ Biscuits.




Founded in 1961 by Wilber Hardee. Acquired by CKE Restaurants, Inc. in July 1997. "The place to go" for a big juicy burger in the Midwestern and Southeastern U.S. Signature menu items include 100% Angus beef Thickburgers™ on Fresh Baked Buns, Hand Breaded Chicken Tenders, and Made from Scratch™ Biscuits.






# PRINCIPALS



**JASON LEVECKE**

With over 25 years of restaurant experience, Jason is a grandson of Carl's Jr. founder, Carl Karcher, who started in Los Angeles, California with a hot dog cart. From a very early age Jason toured restaurants with his grandfather, learning the importance of quality, service, cleanliness, and hard work in building a successful restaurant enterprise. Jason started his working career on the front lines of the restaurant business, working as a cook and cashier at Carl's Jr. Ultimately, after several years as a Carl's Jr. General Manager Jason married the love of his life, Andi, and then enlisted in the United States Marine Corps where he spent five years active duty as an Arabic linguist. He and his family have carried their Grandfather's values into both their business and community efforts. Today Jason, Andi and their five children enjoy an active life, staying involved in their local community and work with their partners on their growing enterprise.



**CARL LEVECKE**

Carl brings over 20 years of restaurant experience to the Company. Carl is also a grandson of Carl's Jr. founder, Carl Karcher. As a namesake to his Grandfather, Carl grew up very close to the restaurant business and always aimed to become a restaurateur himself. Carl has led operations as COO of this growing franchise enterprise. Carl has shown remarkable success in keeping managers and employees motivated while maintaining a tight grasp on revenues and expenditures. Carl is also extremely competitve and has a knack for building loyalty and team spirit within the organization. Carl married the love of his life, Neisha, and today, they, their four children enjoy an active life, are involved in their local community and work alongside their partners on their growing enterprise



**MARGARET LEVECKE EDGAR**

Margaret brings over 18 years of restaurant experience to the Company. Margaret is also a granddaughter of Carl's Jr. founder, Carl Karcher. Like her brothers Margaret grew up very close to the restaurant business. Margaret is a Graduate of the University of San Diego, has also worked from the ground up, starting at other concepts, and then also starting as a cook and cashier at Carl's Jr.. Today Margaret is Chief Administrative Officer of their growing enterprise. With expertise in several disciplines, a hard work ethic and her shared passion for this industry, its people and these brands, Margaret is a tremendous asset and integral part of the team. Margaret, her husband Gregg, and their growing family also enjoy an active life, are involved in their local community and work along side their partners on their growing enterprise.

# LOCATIONS



**CHICAGO**



**DALLAS**



**PUERTO VALLARTA**



**PHOENIX**

# GROWTH









$53,456,932.88
$54,366,205.51
$61,201,324.04
$84,030,460.21
$117,744,528.14
$161,929,753.29

**Frontier Star 1, LLC**
**Balance Sheet**

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash | 400,678 | 2,132,043 | 7,482,743 | 6,020,789 | 4,625,000 |
| Inventory | 390,884 | 596,597 | 779,174 | 1,048,645 | 1,808,575 |
| Fixed Assets | 16,804,059 | 46,636,213 | 58,468,640 | 92,725,490 | 109,342,025 |
| Receivables | 6,114,745 | 1,904,943 | 0 | 1,242,024 | 1,471,360 |
| **TOTAL ASSETS** | 23,710,365 | 51,269,795 | 66,730,557 | 101,036,948 | 117,246,960 |
| **LIABILITIES & EQUITY** | | | | | |
| Current Liabilities | 2,737,559 | 3,764,207 | 5,503,696 | 5,975,392 | 6,541,244 |
| Notes Payable | 1,214,050 | 20,358,309 | 24,328,560 | 44,127,815 | 40,712,568 |
| Equity | 19,758,756 | 27,147,279 | 36,898,301 | 50,933,741 | 69,993,148 |
| **TOTAL LIABILITIES & EQUITY** | 23,710,365 | 51,269,795 | 66,730,557 | 101,036,948 | 117,246,960 |

**Frontier Star 1, LLC**
**Income Statement**

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Sales** | | | | | |
| Net Sales | 54,366,205.51 | 61,201,324.04 | 84,030,460.21 | 117,744,528.14 | 161,929,753.29 |
| **Total Sales** | **54,366,205.51** | **61,201,324.04** | **84,030,460.21** | **117,744,528.14** | **161,929,753.29** |
| **Cost of Sales** | | | | | |
| Food | 14,909,196.78 | 17,866,005.66 | 24,343,879.10 | 34,527,135.36 | 47,623,480.64 |
| Paper | 1,778,799.22 | 2,102,760.69 | 2,980,698.21 | 3,992,471.70 | 5,640,729.09 |
| Payroll Hourly | 12,990,138.98 | 14,423,772.73 | 18,519,044.32 | 25,719,082.55 | 35,587,289.21 |
| Supplies | 377,316.49 | 437,049.95 | 561,430.90 | 813,311.96 | 875,652.03 |
| POS | 187,407.15 | 144,979.14 | 211,487.39 | 214,479.88 | 410,212.94 |
| Repair & Maintenance | 982,530.49 | 1,002,889.03 | 1,392,363.00 | 2,242,657.14 | 3,324,240.49 |
| **Total Cost of Sales** | **31,225,389.11** | **35,977,457.20** | **48,008,902.92** | **67,509,138.59** | **93,461,604.40** |
| **Total Gross Profit** | **23,140,816.40** | **25,223,866.84** | **36,021,557.29** | **50,235,389.55** | **68,468,148.89** |
| **Operating Expenses** | | | | | |
| Cash Over/Short | 257,032.44 | 128,286.26 | 31,785.04 | 98,670.88 | 120,392.19 |
| **Total Cash Over/Short** | **257,032.44** | **128,286.26** | **31,785.04** | **98,670.88** | **120,392.19** |
| **Controllable Expenses** | | | | | |
| GM Salaries | 2,535,143.44 | 2,709,759.78 | 3,528,750.35 | 5,069,641.10 | 7,430,409.07 |
| Gift Cards / NonSales | (53,054.26) | 7,733.29 | 8,306.39 | (26,589.49) | (19,709.98) |
| CO2 | 81,391.17 | 72,161.79 | 123,443.48 | 123,886.39 | 183,993.37 |
| Soda Rebates | (970,026.44) | (903,955.88) | (1,759,965.30) | (2,495,150.00) | (3,437,867.28) |
| **Total Controllable Expenses** | **1,593,453.91** | **1,885,698.98** | **1,900,534.92** | **2,671,788.00** | **4,156,825.18** |
| **Allocated Controllable Expenses** | | | | | |
| Payroll Taxes/Service Fees | 1,777,225.52 | 2,546,782.14 | 2,735,639.11 | 3,683,548.16 | 5,109,356.21 |
| Workers Comp Insurance | - | 622.59 | 393,888.28 | 680,657.27 | 951,676.25 |
| Insurance, Prop and Liab | 349,093.25 | 345,354.55 | 353,365.72 | 528,752.44 | 746,833.38 |
| Health Benefits | 343,103.99 | (98,440.77) | 328,517.73 | 587,719.65 | 901,313.89 |

| | | | | | |
|---|---|---|---|---|---|
| Security | 375,120.95 | (30,024.17) | 59,228.41 | 514,412.53 | 1,323,222.86 |
| Music/TV | 25,921.55 | 32,848.90 | 23,419.91 | 20,589.58 | 50,533.89 |
| POP | 98,074.07 | 33,652.66 | 129,050.99 | 243,390.13 | 314,484.26 |
| Fire/Hoods/Grease/Windows/Pest/Landscape | 90,266.49 | 86,805.73 | 198,925.30 | 440,543.36 | 599,412.16 |
| MIII Order Form | 59,388.98 | (3,052.26) | 2,292.26 | - | - |
| Allocated Controllable Expense Allocation | - | 609,844.00 | 47,025.38 | (175,958.67) | (267,658.89) |
| **Total Allocated Controllable Expenses** | **3,118,194.80** | **3,524,393.37** | **4,271,353.09** | **6,523,654.45** | **9,729,174.01** |
| **Utilities** | | | | | |
| Electricity | 1,976,287.71 | 1,955,625.13 | 2,492,374.85 | 3,616,337.17 | 4,736,795.96 |
| Gas | 614,582.37 | 617,174.07 | 785,515.54 | 1,004,350.16 | 1,545,216.21 |
| Water | 355,053.40 | 349,747.36 | 598,229.42 | 757,842.98 | 960,078.91 |
| Telephone/ Broadband Access | 121,840.63 | 167,984.68 | 208,582.91 | 272,461.89 | 567,876.97 |
| Trash/Refuse Service | 139,820.80 | 159,890.68 | 169,559.64 | 336,295.72 | 560,027.40 |
| **Total Utilities** | **3,207,584.91** | **3,250,421.92** | **4,254,262.36** | **5,987,287.92** | **8,369,995.45** |
| **Fixed Costs** | | | | | |
| Rent | 3,388,178.81 | 4,555,329.76 | 7,105,715.90 | 11,416,572.30 | 13,916,466.19 |
| Common Area Maint (CAM) | - | 21,010.70 | 152,375.86 | 225,296.61 | 241,499.41 |
| Property Taxes | 860,871.13 | 1,038,678.44 | 1,386,468.12 | 1,802,380.52 | 2,825,742.76 |
| Licenses and Permits | 41,705.25 | 39,877.03 | 50,304.93 | 106,009.01 | 328,444.93 |
| Merchant Service Fees | 344,969.09 | 481,591.64 | 890,880.22 | 1,311,551.24 | 1,917,615.90 |
| Dist Taxes | 27,134.40 | 28,879.78 | 39,614.69 | 60,874.38 | 106,726.47 |
| Advertising | 2,372,733.85 | 2,650,858.42 | 3,713,961.04 | 5,756,440.86 | 7,713,390.18 |
| Royalties | 2,142,539.84 | 2,387,012.23 | 3,190,338.92 | 4,307,487.94 | 5,784,433.15 |
| Delivery Charges | - | - | 17,443.50 | 5,610.66 | 5,276.97 |
| Lease Income/Other | (116,656.38) | (248,798.21) | (539,965.29) | (707,368.26) | (1,659,848.83) |
| **Total Fixed Costs** | **9,061,475.99** | **10,954,439.79** | **16,007,137.89** | **24,284,855.26** | **31,179,747.13** |
| **Total Operating Expenses** | **17,237,742.05** | **19,743,240.32** | **26,465,073.30** | **39,566,256.51** | **53,556,133.96** |
| **Total Operating Profit** | **5,903,074.35** | **5,480,626.52** | **9,556,483.99** | **10,669,133.04** | **14,912,014.93** |
| **Total General & Administrative** | **2,162,992.24** | **2,098,882.52** | **3,197,388.61** | **3,532,335.84** | **4,857,892.60** |
| **EBITDA** | **3,740,082.11** | **3,381,744.00** | **6,359,095.38** | **7,136,797.20** | **10,054,122.33** |

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Contract**") is made and entered into and is effective as of the 24 day of March 2015 (the "**Contract Date**"), by and between **VRE CHICAGO ELEVEN, LLC**, a Texas limited liability company ("**Seller**") and **RAYMOND L. WALLS OR TERRYLL ANN WALLS, TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013** ("**Purchaser**").

RECITALS:

A. Seller is the owner of the Project (as defined below).

B. Upon the satisfaction of, and subject to, the terms and conditions set forth in this Contract, Seller has agreed to sell the Project to Purchaser, and Purchaser has agreed to purchase the Project from Seller.

AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants set forth in this Contract, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as set forth below.

## 1. PURCHASE AND SALE OF THE PROJECT.

Subject to and in accordance with the terms and conditions contained in this Contract, Seller agrees to sell, assign, convey, and transfer to Purchaser in the manner herein provided all of Seller's right, title and interest in and to the following real and personal property (collectively referred to herein as the "**Project**"), and Purchaser hereby agrees to purchase and accept the Project:

1.1 Land. Subject to general and special real estate taxes and assessments not yet due and payable and the Permitted Exceptions (as defined below), fee title to that certain real property located at 5852 S. Western Avenue, in the City of Chicago, Cook County, Illinois, which real property is more particularly described in Exhibit 1.1 (the "**Land**").

1.2 Improvements. All fixtures and improvements owned by Seller located on the Land, (collectively, the "**Improvements**"), it being understood and agreed, however, that Purchaser shall not have the right, pursuant to this Contract, to purchase any of such fixtures and improvements which are the property of Tenant (defined below) during the term of the Tenant Lease, as hereinafter defined. The Improvements include an existing approximately 2,788 square foot retail building, all of which is occupied by Frontier Star, LLC, a Delaware limited liability company ("Tenant"), pursuant to the terms of the Tenant Lease.

1.3 Personalty. All equipment and personal property owned by Seller, if any, which is located on or in the Land or the Improvements (collectively, the "**Personalty**"), it being understood and agreed that Purchaser shall not have the right, pursuant to this Contract, to purchase any personal property on the Improvements which is the personal property of any tenants and other occupants of the Project during the term of the Tenant Lease.

1.4 Appurtenances. All rights, privileges and easements appurtenant to the Land, all water, wastewater and other utility rights relating to the Land and any and all easements, rights-of-way and other appurtenances used in connection with the beneficial use and enjoyment of the Land, in each case to the extent assignable (collectively, the "**Appurtenances**").



**Exhibit 12**

1.5 Tenant Lease. All of Seller's right, title and interest in and to that certain Lease Agreement by and between Seller, as lessor, and Tenant, as lessee dated effective February 27, 2015 (the "**Tenant Lease**"), covering the Improvements on the Land.

1.6 Awards. All right, title and interest to any unpaid insurance claims or proceeds or awards for damages to the Land and/or Improvements resulting from any casualty or any taking in eminent domain or by reason of change of grade of any street.

1.7 Intangible Property. Except the name of the Seller or affiliated entities, all of the interest of Seller in any intangible property now or hereafter owned by Seller and used or designed for use in connection with the Land, Improvements and/or Personalty, and any contract or lease rights, licenses, permits, certificates of occupancy, franchises, agreements, utility contracts, unexpired claims, warranties, guaranties and sureties belonging to Seller, or other rights relating to the ownership, development, construction, design, use and operation of the Land and/or Improvements, in each case to the extent assignable (collectively, "**Intangible Property**").

## 2. INDEPENDENT CONSIDERATION; EARNEST MONEY; CLOSING; DUE DILIGENCE MATERIALS AND INSPECTIONS.

2.1 Independent Consideration. Purchaser has or will as of the Contract Date deliver to Seller the sum of ONE HUNDRED DOLLARS ($100.00) (the "**Independent Consideration**") in cash or immediately available funds, in consideration for Seller's entering into this Contract to the exclusion of potential other purchasers and granting Purchaser the rights to inspect and evaluate the Project during the Contingency Period (hereinafter defined). The Independent Consideration is not refundable to Purchaser under any circumstances, but will be applied to the Purchase Price (hereinafter defined) if Closing (hereinafter defined) occurs.

2.2 Earnest Money. Within two (2) business days after the Contract Date, Purchaser shall also deliver a deposit to Fidelity National Title Agency, Inc., 850 E. State Highway 114, Suite 200, Attn: Stephanie Kleam; Phone: 817.442.1111; Fax: 817.442.9997; E-Mail: skleam@fidelity-usa.com ("**Title Company**"), in the form of a cashier's check made payable to the Title Company or a wire transfer in the amount of TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($25,000.00) (the "**Initial Earnest Money**"). On the expiration of the Contingency Period (hereinafter defined), Purchaser shall deliver an additional deposit to the Title Company, in the form of a cashier's check made payable to the Title Company or a wire transfer, in the amount of TWENTY-FIVE THOUSAND AND 00/100 DOLLARS ($25,000.00) (the "**Additional Earnest Money**"), which shall be non-refundable to Purchaser except for Seller default. The Initial Earnest Money and the Additional Earnest Money shall be collectively referred to herein as the "Earnest Money." The Title Company shall retain possession of the Earnest Money until delivery or return thereof is permitted or required under this Contract. The Earnest Money shall be deposited in an interest bearing account with the interest thereon to be disbursed with the Earnest Money in accordance with the provisions hereof. If the purchase and sale of the Project shall close pursuant to the terms and provisions of this Contract, the Earnest Money shall be credited against the Purchase Price at Closing. The timely delivery of the Earnest Money as provided for herein is a condition precedent to Seller's obligations hereunder, and the failure of Purchaser to timely deliver the Earnest Money as provided for herein shall at Seller's option cause this Contract to be terminated, and thereafter neither party shall have any further right or obligation under this Contract unless expressly provided to the contrary in this Contract.

2.3 Due Diligence Materials. Within five (5) days after the Contract Date, Seller shall deliver to Purchaser copies of various materials relating to the Project (the "**Due Diligence Materials**"). The Due Diligence Materials to be delivered to Purchaser are listed on Exhibit 2.3 attached hereto, to the extent in Seller's possession. Purchaser agrees not to disclose the Due Diligence Materials to anyone other than its

lenders and its agents and attorneys who are directly involved in conducting due diligence with respect to the Project and then only if Purchaser has obtained the agreement of such lenders, agents and attorneys to keep the Due Diligence Materials strictly confidential. Upon termination of this Contract for any reason, the Due Diligence Materials (together with all copies thereof) shall be promptly returned to Seller to the extent Purchaser has made or received copies thereof. This obligation survives the termination of this Contract. **IT IS ACKNOWLEDGED THAT THE DUE DILIGENCE MATERIALS INCLUDE REPORTS, INVESTIGATIONS, FINDINGS, ANALYSES, CONCLUSIONS, DATA AND OTHER INFORMATION WHICH MAY BE OR HAVE BEEN PREPARED BY THIRD PARTIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, PURCHASER AGREES THAT WITH RESPECT TO SUCH THIRD PARTY MATERIALS: (A) SELLER HAS NOT MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION CONSTITUTING THE DUE DILIGENCE MATERIALS OR THE CONCLUSIONS CONTAINED THEREIN OR THE QUALIFICATIONS OF THE PERSONS WHO HAVE PREPARED THE DUE DILIGENCE MATERIALS, OR ANY PART THEREOF, AND (B) PURCHASER'S RELIANCE ON THE DUE DILIGENCE MATERIALS IN DETERMINING WHETHER TO PURCHASE THE PROJECT SHALL BE AT PURCHASER'S OWN RISK AND SELLER SHALL HAVE NO LIABILITY THEREFOR. THE THIRD PARTY DUE DILIGENCE MATERIALS ARE DELIVERED OR MADE AVAILABLE WITHOUT REPRESENTATION OR WARRANTY BY SELLER (EXPRESS OR IMPLIED).**

2.4 Inspections; Indemnity; Insurance.

2.4.1 Inspections. Purchaser and its employees and agents shall have the right and permission from and after the Contract Date through Closing to enter upon the Project or any part thereof at all reasonable times upon at least one (1) business day advance notice by Purchaser to Seller and Tenant, in a manner not to disturb Tenant or other occupants of the Project nor damage or injure the Project, to inspect all aspects of the Project, at Purchaser's sole risk, cost and expense, and to make such physical inspections, studies and tests of the Project which Purchaser deems reasonably necessary or advisable. Any entry by Purchaser also shall be in compliance with the terms of the Tenant Lease. Purchaser shall not have the right to interview Tenant or its employees prior to Closing without the express consent of Seller. Any testing that requires a material invasion of the Land or Improvements, including a Phase II environmental site assessment, shall require Seller's written consent, which consent may be withheld in Seller's sole discretion

Purchaser agrees that it will not reveal to any third party not approved by Seller the results of its inspections or tests, unless required by law, and to provide Seller with copies of any inspection or test report received by Purchaser.

2.4.2 Indemnity. Purchaser shall INDEMNIFY AND HOLD HARMLESS Seller, its partners, and it officers, directors, employees and agents from all claims, liability and expense (including attorneys' fees) arising as a result of any activities of Purchaser or its employees, agents, contractors or representatives on the Project in connection with such inspections, studies and tests, and Purchaser shall restore any portion of the Land or Improvements disturbed by any such inspections, studies and tests to the condition existing immediately prior to such operation. The foregoing indemnification obligation of Purchaser shall survive Closing or any termination of this Contract.

2.4.3 Insurance. Without limiting the generality of the foregoing indemnity, Purchaser shall maintain or cause its contractors to maintain commercial general liability insurance in amounts not less

than $1,000,000.00 per occurrence during all periods when Purchaser is conducting inspections of the Project. Purchaser shall cause Seller to be named as an additional insured on such insurance policy and shall provide Seller with evidence of such insurance prior to entering the Project.

2.5 Survey. Within five (5) days after the Contract Date, Seller shall deliver to Purchaser the most recent boundary survey of the Land in Seller's possession (the "**Survey**").

2.6 Title Commitment.

2.6.1 Title Commitment. Within fifteen (15) days after the Contract Date, Seller shall cause the Title Company to deliver to Purchaser a current commitment for the issuance of an owner policy of title insurance (the "**Title Commitment**"), including true, correct and, to the extent reasonably available from the public records, legible copies of all instruments referred to in the Title Commitment as conditions or exceptions to title to the Land and the Improvements.

2.6.2 Title/Survey Review Period. All items shown on the Title Commitment and the Survey not objected to by Purchaser by written notice to Seller within ten (10) days after the receipt by Purchaser of the Title Commitment and the Survey (the "**Title/Survey Review Period**"), shall be deemed to be "**Permitted Exceptions.**" Should Purchaser make written objection to Seller within the Title/Survey Review Period to exceptions, defects or conditions shown on the Title Commitment and/or the Survey which materially and adversely affect the use, operation, value or marketability of the Project (collectively, "**Purchaser's Objections**"), Seller may, but shall not be obligated, to use good faith efforts to cure such Purchaser's Objections prior to the later to occur of the expiration of the Contingency Period or twenty (20) days after Seller's receipt of written notice of Purchaser's Objections; provided, however, that it is expressly understood and agreed that Seller shall have no obligation to expend funds or institute any litigation in effecting such curative matters. In no event may Purchaser include any of the standard printed exceptions set forth in the Title Commitment in Purchaser's Objections which are normally included in title commitments in Illinois but which will be removed at closing by appropriate seller's affidavit(s), lien searches and updated surveys, all of which shall be deemed Permitted Exceptions. If Seller does not cure any or all of Purchaser's Objections prior to the later to occur of the expiration of the Contingency Period or twenty (20) days after Seller's receipt of written notice of Purchaser's Objections, then prior to the later to occur of the expiration of the Contingency Period or said twenty (20)-day period and Seller's written notice to Purchaser that Seller has not or will not cure any such Objection, Purchaser, as its sole remedies, either may (i) terminate this Contract by giving written termination notice to Seller, or (ii) waive any uncured Purchaser Objection, and Purchaser's failure to timely terminate this Contract as a result of Seller's failure to cure Purchaser's Objections shall be deemed an election of remedy (ii).

2.6.3 Revised Title Commitment. With respect to matters, defects, conditions or exceptions first brought to the attention of Purchaser in a revised title commitment delivered to Purchaser on or after the date of notice of Purchaser's Objections are delivered in accordance with the preceding paragraph, Purchaser shall have a period of five (5) days following delivery of such revised title commitment to notify Seller in writing of any additional Purchaser's Objections regarding such new matters. Seller shall, within five (5) business days after receipt of Purchaser's notice to Seller of the additional Purchaser's Objections, notify Purchaser in writing that: (i) Seller will cure all or certain of the additional Purchaser's Objections as of or prior to Closing, or (ii) Seller will not cure all or certain of the additional Purchaser's Objections. In the event Seller fails to deliver the foregoing notice with respect to all or any of the additional Purchaser's Objections, Seller shall be deemed to have elected option (ii) above with respect to any such Purchaser's Objections. If Seller elects or is deemed to have elected not to cure any or all of the additional

Purchaser's Objections, Purchaser may, as Purchaser's sole and exclusive remedies, (x) waive said Purchaser's Objections, (y) by written notice to Seller given within five (5) days after the expiration of Seller's cure period described above, terminate this Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money, and Seller and Purchaser shall have no further obligations hereunder (except as otherwise expressly provided herein) or (z) elect to cure said additional Purchaser's Objections at Purchaser's expense (subject to Purchaser's right to deduct from the Purchase Price the cost of the cure of any Curable Matters (hereinafter defined) that Purchaser elects to cure after Seller's failure or refusal to cure such Curable Matter). Failure by Purchaser to terminate this Contract by notice to Seller within such period shall be deemed a waiver by Purchaser of any Purchaser's Objections previously raised and not cured.

2.6.4 Curable Matters. Notwithstanding anything in this Section 2.6 to the contrary, Seller shall be obligated to cure and/or satisfy (a) any mortgage liens or mechanics and materialman's liens not caused by the acts or omissions of Purchaser or its agents against the Project, (b) any consensual liens or encumbrances agreed to by Seller without Purchaser's consent on or after the Contract Date and (c) any real estate taxes, personal property taxes, or special assessments due and payable prior to Closing (collectively, the "**Curable Matters**"). Insuring over or bonding around mechanics', materialmen's and judgment liens in a manner that permits the Title Company to issue the Title Policy (hereinafter defined) without exceptions for such liens shall be deemed satisfactory for compliance with this Section 2.6.4. Except for the Curable Matters and the Purchaser's Objections that Seller cures or agrees to cure on or prior to the Closing, all exceptions to title shown by the Title Commitment, any revised title commitment, the Survey and any encumbrance arising from the acts of Purchaser shall be Permitted Exceptions for all purposes hereunder.

2.7 Contingency Period. Purchaser's obligations under this Contract shall be conditioned upon the Due Diligence Materials, the Title Commitment, the Survey, and the Project and all aspects thereof, including by way of illustration all physical and environmental matters relating to the Project, being acceptable to Purchaser in its sole discretion. Purchaser, at its election and in its sole discretion, may terminate this Contract by giving written notice thereof to Seller at any time prior to 5:00 p.m. Fort Worth, Texas time on the date which is thirty (30) days after Purchaser's receipt of the Due Diligence Material (the "**Contingency Period**"), in which event Purchaser shall thereafter be entitled to obtain prompt return of the Earnest Money, and neither party shall have any further obligation under this Contract, except as may be expressly provided to the contrary herein. In the event Purchaser fails to terminate this Contract as provided in the immediately preceding sentence, Purchaser shall be deemed to have waived its right to terminate this Contract under this Section 2.7 and to have accepted the Land, the Improvements, the Title Commitment (as such may have been modified but subject to Purchaser's rights under Section 2.6.3), and the Survey, and the Earnest Money will become non-refundable (except in the event this Agreement terminates as a result of Seller's default of the terms hereof or Seller fails to satisfy a contingency provided herein) but applicable to the Purchase Price at Closing. Thereafter, Purchaser shall have no further right to terminate this Contract except as specifically provided elsewhere herein, and Purchaser shall be deemed to have accepted all then-existing matters relating to the Project.

2.8 Financing Contingency. Purchaser's obligations under this contract are further conditioned upon Purchaser's ability to obtain financing for the acquisition of the Project at market rate and terms (the "**Financing Contingency**"). The Financing Contingency is contingent on Purchaser submitting an application for financing within ten (10) days of the contract Date and shall expire on the date that is thirty (30) days after Purchaser's receipt of the Due Diligence Material. Purchaser shall, within said 10-day period, deliver to Seller evidence of its loan application, and Purchaser shall further provide Seller with confirmation of approval or denial of the loan immediately upon receipt.

3. **PURCHASE PRICE.**

The "**Purchase Price**" for the Project shall be TWO MILLION FOUR HUNDRED FORTY-THREE THOUSAND AND NO/100 DOLLARS ($2,443,000.00), payable in all cash or other immediately available funds at the Closing, payable pursuant to the terms and conditions contained in this Contract, but subject to prorations as provided below.

4. **PRORATIONS.**

The following items shall be prorated as of the Closing Date and such prorations shall be reflected on the settlement statements prepared by the Title Company on the Closing Date and shall serve to adjust the Purchase Price. Such prorations shall be made on the basis of a 365-day year, as of 11:59 p.m. on the day preceding the Closing Date.

4.1 Revenues. All rentals, receipts and other revenues from the Project, if any, which have been actually received by Seller and which are allocable to the period from and after the Closing Date shall be credited to Purchaser. Purchaser shall be entitled to collect all rentals, receipts and other revenues from the Project which are delinquent or due on or after the Closing Date. All rentals, receipts, and other revenues of any kind whatsoever (together, "**Revenues**") from the Project collected by Purchaser shall be credited: (a) if specifically identified by reference to invoice or month, to such invoice or month; and (b) if not so specifically identified, first to current Revenues not delinquent, and second to delinquent Revenues, in the inverse order of delinquency. All Revenues which relate to the month in which the Closing Date occurs shall be credited first to Revenues for the month in which the Closing Date occurs, and second to delinquent Revenues, in the inverse order of delinquency. Any such delinquent Revenues when applied as provided herein which relate in whole or in part to any period prior to the Closing Date shall be remitted by Purchaser to Seller when collected by Purchaser (net only of any reasonable collection expenses actually incurred by Purchaser). Any such delinquent Revenues when applied as provided herein, which relate in whole or part to any period on or subsequent to the Closing Date shall be remitted by Seller to Purchaser when and if collected by Seller (net only of any reasonable collection expenses actually incurred by Seller). Seller shall have the right to enforce and collect any Revenues that are attributable to periods before the Closing Date by any means other than exercising termination or termination of possession rights or other rights under the Tenant Lease (except that Seller shall at all time have the right to bring a suit or suits for damages to collect any Revenues), and Purchaser shall reasonably cooperate in such enforcement and collection efforts at no cost to Purchaser other than any attorneys' fees incurred by Purchaser.

4.2 Property Taxes. Seller shall be responsible for all ad valorem taxes and assessments, general and special, with respect to the Project for periods prior to the calendar year containing the Closing Date. Ad valorem taxes and assessments, general and special, with respect to the Project for the calendar year containing the Closing Date shall be prorated between Seller and Purchaser at Closing, as of the Closing Date. All ad valorem tax prorations shall be based on tax rates and assessments for the calendar year containing the Closing Date unless such rates and/or assessments are unavailable. If either the tax rates or the tax assessments for the Project for the calendar year containing the Closing Date are not available, then such proration shall be made based on the tax rates and assessments for the prior year (or if only the assessed value for the calendar year containing the Closing Date is known, then based on the prior year's tax rates and the current year's assessed value), and shall be adjusted by cash settlement between Seller and Purchaser after the Closing as soon as such rates and assessments for the year of the Closing are available. The provisions of this Section 4.2 shall survive Closing.

4.3 Security Deposit. All security and other deposits, if any, including any accrued interest thereon, if such interest is required to be remitted to Tenant pursuant to the Tenant Lease, held by Seller on the Closing Date on behalf of Tenant under the Tenant Lease shall be credited to Purchaser.

4.4 Utility Charges. Final meter readings on all utilities charged to the Project and not payable by Tenant shall be made as of the day preceding the Closing Date. Seller shall arrange for and pay for final billings of utilities to the day preceding the Closing Date, and Purchaser shall be responsible for utilities used on or after the Closing Date. Any prepaid water, sewer, and other utility charges allocable to the period from and after the Closing Date shall be credited to Seller.

4.5 Service Contracts. Seller shall pay (or be charged by a proration for) all charges due pursuant to any service contracts affecting the Project, if any, which are allocable to the period prior to the Closing Date, and Purchaser shall be responsible for all such charges due from and after the Closing Date pursuant to such contracts, if any. Prepaid charges allocable to the period from and after the Closing Date in connection with such contracts shall be credited to Seller at Closing. Accrued and unpaid charges allocable to the period prior to the Closing Date in connection with such contracts shall be credited to Purchaser at Closing. The provisions of this Section 4.5 shall survive Closing.

4.6 Licenses and Permits. Prepaid charges allocated to the period from and after the Closing Date in connection with any licenses or permits for continued operation of the Project, if any, shall be credited to Seller at Closing. Accrued and unpaid charges allocable to the period prior to the Closing Date in connection with any such licenses or permits, if any, shall be credited to Purchaser at Closing.

4.7 Operating Expenses. Except as otherwise expressly provided herein to the contrary and except to the extent the responsibility of Tenant under the Tenant Lease, Seller shall be responsible for and bear all operating expenses for the Project accrued for the period prior to the Closing Date and Purchaser shall be responsible for and bear all operating expenses of the Project accrued for the period on and after the Closing Date. Prorations of items under Sections 4.5 and 4.6, shall be made at Closing on the best information available with an adjustment and reconciliation to the extent necessary on a mutually agreed date within ninety (90) days following the Closing Date, with payment from one party to the other (to the extent required) to be made within thirty (30) days following reconciliation. Such prorations, as adjusted as of the ninetieth (90th) day following the Closing Date, shall be considered final and binding for all purposes absent material mistake of fact. To the extent that the Tenant Lease provides for any adjustment of previously paid estimated amounts of real estate tax or operating expense reimbursements on a date subsequent to the Closing Date, Seller shall be entitled to receive, or shall be responsible to pay, as the case may be (when such amounts are actually received or payable by Purchaser), Seller's pro-rata share of any such adjusted amounts that are applicable to periods ending prior to the Closing Date. After Closing, Seller agrees to reasonably cooperate with Purchaser in providing Purchaser access to Seller's books and records relating to such adjustments under the Tenant Lease so that Purchaser may adequately perform such adjustments.

The provisions of this Section 4 shall survive Closing.

## 5. CONDITIONS PRECEDENT TO CLOSING.

5.1 Purchaser's Conditions to Closing. The obligation of Purchaser to purchase the Project from Seller, and to perform the obligations required to be performed by Purchaser at the Closing, are subject to each of the following conditions ("**Purchaser's Conditions**"):

5.1.1 Closing Documents. Seller shall have tendered at Closing all Closing Documents (as hereinafter defined) to which Seller is a party or which are otherwise required to be delivered to Purchaser as set forth herein.

5.1.2 Compliance with Agreement. Seller shall have performed and complied in all material respects with its covenants and obligations under this Contract such that any default or failure of

performance of Seller as to which Purchaser has delivered written notice to Seller shall be cured in all material respects prior to or at Closing.

5.1.3 Representations and Warranties. All of Seller's representations and warranties under Section 8.2 are true and correct in all material respects as of Closing; provided, however, it shall not be a condition to Purchaser's obligations hereunder if any items which may indicate Seller's representations and warranties under Section 8.2 are not true and correct have been (i) disclosed to Purchaser prior to the expiration of the Contingency Period, or (ii) discovered by Purchaser during the Contingency Period, and Purchaser has elected not to terminate this Contract due to such item(s) prior to the expiration of the Contingency Period.

5.1.4 Title. The Title Company shall be prepared to issue an owner's policy of title insurance in the amount of the Purchase Price (the "**Title Policy**") insuring Purchaser's fee simple title to the Land and the Improvements showing no exceptions other than the Permitted Exceptions.

If any of the Purchaser's Conditions have not occurred or been satisfied within the time periods and in accordance with the terms set forth herein, then Purchaser shall have the right to exercise its remedies provided in Section 12.2 hereof.

5.2 Closing Conditions for Seller. Seller's obligations to close on the Closing Date are conditional and contingent on the following, unless waived in writing by Seller (the "**Seller's Conditions**"):

5.2.1 Purchase Price. Purchaser shall have tendered the Purchase Price into escrow with the Title Company.

5.2.2 Closing Documents. Purchaser shall have tendered at Closing all Closing Documents to which Purchaser is a party.

5.2.3 Compliance with Agreement. Purchaser shall have performed and complied with its monetary obligations under this Contract such that any default or failure of performance of Purchaser as to which Seller has delivered written notice to Purchaser shall be timely cured prior to or at Closing and Purchaser shall have performed and complied in all material respects with its other obligations under this Contract such that any default or failure of performance of Purchaser as to which Seller has delivered written notice to Purchaser shall be timely cured in all material respects prior to or at Closing.

5.2.4 Representations and Warranties. All of Purchaser's representations and warranties under Section 9.1 and Section 9.2 are true and correct in all material respects as of Closing.

If any of the Seller's Conditions have not occurred or been satisfied within the time periods and in accordance with the terms set forth herein (subject to Purchaser's right to cure set forth herein), then Seller shall have the right to terminate this Contract by written notice to Purchaser, in which event the Earnest Money shall be paid to Seller, all obligations of the parties hereto shall thereupon cease (except as may be expressly provided to the contrary herein) and this Contract shall thereafter be of no further force and effect, unless such failure of the condition constitutes a default on the part of Seller under any other provision of this Contract.

## 6. CLOSING DOCUMENTS.

On the Closing Date, (or such earlier date as expressly hereinbelow provided), Seller (and Purchaser where applicable) shall deliver, or cause to be delivered, to the Title Company the following fully executed documents and/or items, acknowledged where appropriate(collectively referred to herein as the "**Closing Documents**"):

6.1 Deed. A Special Warranty Deed ("**Deed**") in the form attached hereto as Exhibit 6.1 conveying the Land, the Improvements, and the Appurtenances to Purchaser, subject only to current, non-delinquent real property taxes and assessments and the Permitted Exceptions.

6.2 Bill of Sale. A duly executed Bill of Sale in the form attached hereto as Exhibit 6.2 conveying title to the Personalty to Purchaser and assigning to Purchaser the Intangible Property and all of Seller's interest in the Service Contracts, together with an assumption thereof by Purchaser of all obligations accruing thereunder from and after the Closing Date. The Service Contracts, if any, in Seller's possession will be delivered to Purchaser immediately after Closing.

6.3 Assignment and Assumption of Lease. An Assignment and Assumption of Lease in the form attached hereto as Exhibit 6.3 assigning to Purchaser all of Seller's (or Seller's affiliate's) interest as landlord in the Tenant Lease together with an assumption thereof by Purchaser of all obligations accruing from and after the Closing Date. The Tenant Lease in Seller's possession will be delivered to Purchaser immediately after the Closing.

6.4 Tenant Notice. Notice to Tenant under the Tenant Lease in the form attached hereto as Exhibit 6.4 informing Tenant of the sale of the Project to Purchaser.

6.5 Settlement Statement. A settlement statement prepared by the Title Company and acceptable to Purchaser and Seller showing all cash receipts and disbursements to be made by the Title Company on the Closing Date.

6.6 Non-Foreign Status Affidavit. An Affidavit of Non-Foreign Status executed by Seller in the form of that attached hereto as Exhibit 6.6.

6.7 Other Documents. Other certificates and documents that are reasonably acceptable to the signing party and are customarily required to effect the closing of the sale of the Project and related transactions contemplated by this Contract including, without limitation, a lien and possession Affidavit as attached hereto as Exhibit 6.7.

Purchaser shall execute and acknowledge the assignment documents tendered by Seller with respect to the Tenant Lease, the Bill of Sale and other documents requiring execution by Purchaser as set forth in Sections 6.1 - 6.7 above.

7. **CLOSING.**

7.1 Closing. This transaction shall close, as evidenced by recordation of the Deed and delivery of the Purchase Price (net of prorations and Seller's share of closing costs pursuant to this Contract) (the "**Closing**"), on or before the date that is fifteen (15) days after the expiration of the Contingency Period (or such earlier date as both parties may mutually agree in writing) (the "**Closing Date**") (provided that if such date is not a business day in Tarrant County, Texas or Huntington Beach, California, and Chicago, Illinois, the Closing shall be held on the next business day thereafter). Purchaser will have the one-time option to extend the Closing Date for up to ten (10) days by delivering written notice of such extension to Seller and Title Company prior to the original Closing Date.

7.2 Place. The Closing shall take place through escrow on the Closing Date in the offices of the Title Company, or such other office as is reasonably acceptable to the parties. Neither party shall be required to attend the Closing in person. Upon the completion of the Closing, the parties shall instruct the Title Company to record the Deed in the appropriate land records (provided that Title Company has committed to deliver the Title Policy) to effect the transfer and conveyance of the Project to Purchaser. Upon such recording and agreement to deliver the Title Policy as described in this Contract: (a) the

parties shall cause the Title Company to disburse funds to Seller in the amount of the Purchase Price (subject to the prorations provided for herein and less Seller's share of closing costs provided for herein) and (b) the parties shall cause the Title Company to deliver all documents executed in accordance with this Contract to the parties in accordance with written instructions received by the parties.

7.3 Payment of Purchase Price. Purchaser shall deliver to the Title Company on the Closing Date immediately available funds in the amount of the Purchase Price plus any prorations credited to Seller, costs and expenses hereunder payable by Purchaser, and less the amount of the Independent Consideration and the Earnest Money (and any interest thereon) and any costs payable by Seller and prorations credited to Purchaser. The net amount of the Purchase Price, including the Earnest Money, due to Seller as shown on the settlement statement approved by Seller shall be paid to Seller on the Closing Date.

7.4 Possession. Possession of the Project shall be delivered to Purchaser on the Closing Date, subject only to the rights of Tenant under the Tenant Lease and possessory rights of other parties contained in the Permitted Exceptions.

7.5 Closing Costs. Seller shall pay at Closing the premium for the Standard Owner's Title Policy (excluding the premium for any extended coverage and endorsements, if Purchaser requests same, which shall be the responsibility of Purchaser), one-half of any escrow fees, State of Illinois Transfer Tax, Cook County, Illinois Transfer Tax, and Chicago Municipal Transfer Taxes up to $1.50 per $500 of Sales Price. Purchaser shall pay for one-half of any escrow fees, all costs associated with any financing, the portion of the premium for any endorsements Purchaser desires to obtain to the Title Policy, any costs to update the Survey, the costs of all appraisals, engineering and environmental reports and feasibility and market studies which it may obtain, warranty transfer fees, transfer and/or documentary stamp taxes not paid by Seller, and recording fees for the Deed and assignments to be delivered at Closing. Seller and Purchaser shall each be responsible for paying their respective legal fees and costs, if any.

7.6 Brokerage Commissions. Each party shall pay any brokerage commissions due as provided in Section 13 below.

## 8. COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER.

8.1 Seller's Covenants. Seller hereby covenants and agrees as follows:

8.1.1 Insurance. At all times from the date hereof to the date preceding the Closing Date, Seller shall cause to be maintained in force, fire and extended coverage insurance and commercial general liability insurance upon the Project in amounts not less than the amounts of the insurance coverage on the Project on the Contract Date.

8.1.2 Operation and Maintenance. At all times from the Contract Date to the day immediately before the Closing Date, Seller shall operate and maintain the Project in substantially the same manner as it is now operated and maintained, and Seller shall maintain the physical condition of the Project in substantially its current condition, reasonable and ordinary wear and tear and damage by Purchaser and its agents and by fire and casualty excepted.

8.1.3 Personalty. Seller shall not transfer nor remove any Personalty that is material to the operation or value of the Project from the Project subsequent to the Contract Date unless Seller replaces the same prior to the Closing Date with Personalty of equivalent or better utility and quality to the items replaced.

8.1.4 Title. From and after the Contract Date, Seller shall not further encumber the Project in any consensual manner without the written consent of Purchaser, and in all events Seller shall not place any further monetary liens on the Project except those arising by operation of law which will be satisfied at Closing.

8.1.5 Copies of Material Notices. Seller shall provide to Purchaser promptly following Seller's receipt (i) any written notices of material default or alleged material default under the Tenant Lease or by any party under any of the Service Contracts delivered or received by Seller from and after the Contract Date and (ii) any written notices with respect to the Project received by Seller from and after the Contract Date.

8.1.6 Service Contracts. Seller shall not enter into any new service contracts affecting the Project without Purchaser's prior written approval, which shall not be unreasonably withheld or delayed.

8.1.7 Tenant Lease. From and after the expiration of the Contingency Period, Seller shall not terminate or materially modify the Tenant Lease or enter into any new leases without the prior written consent of Purchaser, not to be unreasonably withheld or delayed except (a) as may be required under the terms of the Tenant Lease, or (b) with respect to termination, in the event of a default by the tenant thereunder. Seller shall not grant any consent to any assignment or sublease under any Lease unless, in Seller's good faith judgment, it is obligated to grant such consent. Seller shall comply in all material respects with the obligations of the landlord under the Tenant Lease.

8.1.8 Estoppel Certificate. No later than five (5) days prior to the Closing Date, Seller will cause Tenant to deliver to Purchaser for its benefit an executed Estoppel Certificate in the form substantially similar to that attached hereto as Exhibit 8.1.8. The Closing Date may be extended as necessary to comply with this provision by no more than thirty (30) days.

8.1.9 Subordination, Non-disturbance and Attornment Agreement. No later than five (5) days prior to the Closing Date, Seller will cause Tenant to deliver to Purchaser and its lender for their benefit an executed Subordination, Non-disturbance and Attornment Agreement in the form substantially similar to that attached hereto as Exhibit 8.1.9. The Closing Date may be extended as necessary to comply with this provision by no more than thirty (30) days.

8.2 Seller's Representations and Warranties. Seller hereby represents and warrants to Purchaser the following as of the Contract Date:

8.2.1 Company and Authorization Matters. Seller is a limited liability company duly organized and validly existing under the laws of the State of Texas. Seller is in good standing in Texas and is authorized to transact business in Texas. Seller has full power and authority to execute and deliver this Contract and perform all of its obligations under this Contract. All consents, authorizations and approvals which may be required in order for Seller to enter into this Contract or consummate the transactions contemplated hereby have been obtained. The person executing this Contract on behalf of Seller has been duly authorized and empowered to bind Seller to this Contract.

8.2.2 No Conflict with or Breach of Other Agreements. Neither the execution and delivery of this Contract, nor the incurrence of the obligations herein set forth, nor the consummation of the transactions provided for herein, nor compliance with the terms of this Contract, conflict with or result in a breach of any of the terms, conditions, or provisions of, or constitute a default under, any bond, note, or other evidence of indebtedness, or any indenture, mortgage, deed of trust,

loan agreement, lease, or other material agreement or instrument to which Seller is a party or by which any of the Project may be bound.

8.2.3 No Bankruptcy, Insolvency or Reorganization Proceedings. Seller has not filed any assignments for the benefit of creditors, insolvency, bankruptcy or reorganization proceedings and no such proceedings have been filed against Seller.

8.2.4 Litigation. To the best of Seller's current, actual knowledge, there is no pending litigation or other proceeding against Seller relating to the Project, including without limitation any condemnation action.

8.2.5 No Pending Sale Contracts. Except for this Contract, Seller has not entered into any other currently effective agreements for the sale of the Project.

8.2.6 Not a Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

8.3 Survival. The representations and warranties of Seller contained in this Contract shall survive the Closing Date and the recordation of the Deed for a period of twelve (12) months, at which time they will be deemed to be merged into and superseded by the Closing Documents, except to the extent written notice of specific claims have been delivered by Purchaser to Seller prior to the expiration of such twelve-month period.

8.4 Limitations. Notwithstanding anything in this Contract to the contrary, Seller's liability for breaches of the foregoing covenants, representations and warranties is subject to the following limitations:

8.4.1 Claim Must be Brought Within Twelve Months. Any claim by Purchaser against Seller for a breach of a covenant, representation or warranty must be brought within six months following the Closing Date.

8.4.2 No Claim for Breach of Representation as to which Purchaser has Actual Knowledge. Purchaser shall have no claim for any breach of a representation or warranty by Seller as to which Purchaser has actual knowledge of the untruth or inaccuracy thereof on the Contract Date or unless Purchaser asserts such claim prior to Closing.

8.4.3 Breach of Covenant as to which Purchaser has Actual Knowledge. Purchaser shall have no claim for any breach of a covenant by Seller as to which Purchaser has actual knowledge prior to Closing.

8.4.4 No Liability for Consequential or Punitive Damages. Seller shall never be liable to the Purchaser under this Contract for lost profits or other Special, incidental or consequential damages or for punitive or exemplary damages.

## 9. PURCHASER'S REPRESENTATIONS AND WARRANTIES.

Purchaser hereby represents and warrants to Seller the following as of the Contract Date:

9.1 Authorization Matters. Purchaser is (are) the trustee(s) of the RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST. Purchaser is, duly authorized under the Declaration of Trust dated May 30, 2002, as amended July 18, 2013, to transact business for the benefit of the Trust. Purchaser has full power and authority to execute and deliver this Contract and perform all of its obligations under this Contract. All consents, authorizations and approvals which may be required in order for Purchaser to

enter into this Contract or consummate the transactions contemplated hereby, have been obtained. The person executing this Contract is empowered to bind Purchaser to this Contract. This Contract, when executed and delivered by Purchaser, shall constitute the valid and binding agreement of Purchaser and be enforceable against Purchaser in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws or regulations presently or hereafter in effect which affect the enforcement of creditors' rights generally.

9.2 No Conflict with or Breach of Other Agreements. Neither the execution and delivery of this Contract, nor the incurrence of the obligations herein set forth, nor the consummation of the transactions provided for herein, nor compliance with the terms of this Contract, conflict with or result in a breach of any of the terms, conditions, or provisions of, or constitute a default under, any bond, note, or other evidence of indebtedness, or any indenture, mortgage, deed of trust, loan agreement, lease, or other material agreement or instrument to which Purchaser is a party.

9.3 Survival. The representations and warranties of Purchaser shall survive the Closing Date and the recordation of the Deed for a period of twelve (12) months, except to the extent written notice of specific claims have been delivered by Seller to Purchaser prior to the expiration of such twelve-month period.

9.4 Limitations. Notwithstanding anything in this Contract to the contrary, Purchaser's liability for breaches of the foregoing covenants, representations and warranties is subject to the following limitations:

9.4.1 Claim Must be Brought Within Twelve Months. Any claim by Seller against Purchaser for a breach of a covenant, representation or warranty must be brought within six months following the Closing Date.

9.4.2 No Claim for Breach of Representation as to which Seller has Actual Knowledge. Seller shall have no claim for any breach of a representation or warranty by Purchaser as to which Seller has actual knowledge of the untruth or inaccuracy thereof on the Contract Date or unless Seller asserts such claim prior to Closing.

9.4.3 Breach of Covenant as to which Seller has Actual Knowledge. Seller shall have no claim for any breach of a covenant by Purchaser as to which Seller has actual knowledge prior to Closing.

9.4.4 No Liability for Consequential or Punitive Damages. Purchaser shall never be liable to the Seller under this Contract for lost profits or other Special, incidental or consequential damages or for punitive or exemplary damages.

## 10. CONDITION OF THE PROJECT.

10.1 As Is Conveyance. EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS CONTRACT OR ANY CLOSING DOCUMENTS, PURCHASER ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER BY SELLER OR ANY AGENT OR EMPLOYEE THEREOF REGARDING THE PROJECT, INCLUDING, WITHOUT LIMITATION, ITS PHYSICAL CONDITION, ITS SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS COMPLIANCE WITH LAWS, INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS, OR THE PRESENCE OR ABSENCE OF CHEMICALS, TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES THEREUPON, AND SELLER EXPRESSLY DISCLAIMS ANY AND ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, EXCEPT FOR ANY LIMITED WARRANTIES CONTAINED HEREIN AND THE SPECIAL WARRANTY OF TITLE

TO BE CONTAINED IN THE DEED TO BE DELIVERED AT THE CLOSING. PURCHASER SHALL ACCEPT THE PROJECT IN ITS "AS IS", "WHERE IS", "WITH ALL FAULTS" CONDITION, AND SELLER HEREBY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXPRESS OR IMPLIED. AFTER CLOSING, SELLER SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIR, ALTERATION, REMEDIATION OR OTHER WORK OF ANY KIND WITH RESPECT TO ANY PORTION OF THE PROJECT.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS CONTRACT OR ANY CLOSING DOCUMENTS, SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.

PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR WHO SHALL HAVE HAD, AS OF THE CLOSING DATE, OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PROJECT THAT PURCHASER ELECTS TO CONDUCT, AND CONDUCT A COMPLETE AND THOROUGH INSPECTION, ANALYSIS AND EVALUATION OF THE PROJECT, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL ISSUES, IF ANY, AND SHALL CONDUCT SUCH TESTS, PRIOR TO THE CLOSING DATE, AND RECEIVE AND REVIEW SUCH INFORMATION AS PURCHASER SHALL REQUIRE IN THE COURSE OF ITS INVESTIGATION.

PURCHASER SHALL UNDERTAKE SUCH INVESTIGATION AS SHALL BE REQUIRED TO MAKE PURCHASER FULLY AWARE OF THE CONDITION OF THE PROJECT, INCLUDING THE ENVIRONMENTAL CONDITION OF THE LAND, AS WELL AS ALL FACTS, CIRCUMSTANCES AND INFORMATION WHICH MAY AFFECT THE USE AND OPERATION OF THE PROJECT, AND PURCHASER COVENANTS AND WARRANTS TO SELLER THAT PURCHASER SHALL RELY, EXCEPT TO THE EXTENT OF SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREUNDER, OR IN ANY CLOSING DOCUMENTS, SOLELY ON PURCHASER'S OWN DUE DILIGENCE INVESTIGATION IN DETERMINING TO PURCHASE THE PROJECT.

THE PROVISIONS OF THIS SECTION 10.1 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS CONTRACT WHETHER OR NOT INCORPORATED INTO THE DEED TO BE DELIVERED AT CLOSING.

## 11. CASUALTY AND CONDEMNATION.

11.1 Risk of Loss. Seller shall bear all risk of loss or damage to the Project from all causes until the Closing; provided, however, that Seller shall have no obligation to repair such loss or damage.

11.2 Purchaser's Option to Terminate. If prior to the Closing (i) any portion of the Project (other than an immaterial portion) is destroyed by fire, the elements or by any other casualty which is not repaired prior to Closing, or (ii) any portion of the Project is taken by eminent domain, or made the subject of condemnation proceedings (or proposed or threatened condemnation proceedings), Seller shall give Purchaser prompt written notice thereof and Purchaser may elect, by written notice to Seller within the earlier of (i) ten (10) days after Purchaser shall have received written notice of such event from Seller, or (ii) the Closing Date, to terminate this Contract without further liability. If prior to the Closing an immaterial portion of the Project is destroyed by fire, the elements or by any other casualty which is not repaired prior to Closing, (x) if such casualty occurs prior to the expiration of the Contingency Period,

Purchaser may either terminate this Contract in accordance with Section 2.7 or receive a credit of the proceeds at Closing in accordance with Section 11.3.1 below, or (y) if such casualty occurs after the expiration of the Contingency Period and prior to the Closing Date, Seller may elect to either (1) terminate this Contract, in which event the Earnest Money shall be returned to Purchaser and Seller and Purchaser shall have no further obligations hereunder, or (2) credit any proceeds on account of the Purchase Price, including the sum of any deductible under any applicable insurance policy, in accordance with Section 11.3.1 below. For the purposes of this Section 11, an "**immaterial portion**" of the Project shall mean any portion thereof valued at less than $50,000.00. If Purchaser elects to terminate this Contract, as aforesaid, then the Title Company will return the Earnest Money to Purchaser free and clear of all rights and claims of Seller with respect thereto, and thereafter neither Seller nor Purchaser shall have any further rights or obligations hereunder (except as otherwise provided herein).

11.3 Failure to Terminate. If any portion of the Project is destroyed by casualty, taken by eminent domain or made the subject of condemnation proceedings (or proposed or threatened condemnation proceedings), and Purchaser does not elect to terminate this Contract pursuant to Section 11.2 hereof, then at the Closing the following shall occur

11.3.1 Credit of Award or Proceeds. Seller shall credit on account of the Purchase Price the amount, as applicable, of all condemnation awards actually received by Seller or any sums of money collected by Seller (whether retained by Seller or paid directly to a holder of any lien on the Project) under its policies of insurance or renewals thereof insuring against the loss in question.

11.3.2 Assignment of Future Awards. In the case of a condemnation, Seller shall also assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to (a) such claims and further sums payable thereunder, and (b) any awards that may be made with respect to any pending or future condemnation proceeding.

11.4 Control of Condemnation Proceedings Before End of Contingency Period. In the event of condemnation proceedings, Seller shall have total control and authority over such proceedings and the prosecution of any claim therein unless the Contingency Period has expired (or Purchaser affirmatively waives the Contingency Period in writing), and unless and until Purchaser has waived its right to terminate under this Section 11. Seller shall keep Purchaser currently apprised of all actions taken or agreed to by Seller in such proceeding prior to Purchaser's election to waive the Contingency Period (if not already expired) and/or its termination option hereunder, such that any decision by Purchaser shall be made based on the then-current status of the proceeding, and the Closing Date may be extended at Purchaser's option. If the Contingency Period has expired, Seller agrees that it will not agree to an award or convey the Project to the condemning authority in lieu of condemnation during Purchaser's termination election period set forth in Section 11.2.

11.5 Control of Condemnation Proceedings After Purchaser is "At-Risk." After the Contingency Period has expired or been waived and after Purchaser makes an election under this Section 11 not to terminate (if Purchaser so elects), Purchaser shall be entitled to participate in any condemnation proceeding on an equal basis with Seller and veto any proposed award or settlement not acceptable to Purchaser.

## 12. DEFAULT AND REMEDIES.

12.1 Purchaser's Default. If Purchaser is in default (which default includes Purchaser failing to close as required by and in accordance with the terms of this Contract) of this Contract prior to or at the Closing and continues to be in default after notice thereof from Seller and ten (10) days' opportunity to cure the same, Seller's sole remedy for such default shall be to terminate this Contract due to Purchaser's default, and the Earnest Money shall be forfeited by Purchaser and retained on behalf of Seller, and both

parties shall thereafter be released from all further obligations under this Contract, except as expressly provided to the contrary herein.

Purchaser and Seller acknowledge that Seller's damages would be difficult or impossible to determine in the event of Purchaser's failure to perform its obligations under this Contract and that the Earnest Money and such other things of value are a reasonable estimate of such damages. The Earnest Money and such other payments and things of value shall, therefore, be liquidated damages to Seller and retention thereof shall be Seller's sole and exclusive remedy for Purchaser's failure to perform its obligations under this Contract. Seller waives all other remedies, including suit for damages other than retention of the Earnest Money.

12.2 Seller's Default. If Seller is in default of any covenant contained in this Contract and continues to be in default after notice thereof from Purchaser and ten (10) days' opportunity to cure the same, Purchaser may elect by written notice to Seller:

(i) To terminate this Contract, in which case Seller shall, within two (2) business days after receipt of such notice, notify the Title Company in writing to return the Earnest Money and all interest earned thereon to Purchaser, and thereafter neither party shall have any further obligation under this Contract, except as expressly provided to the contrary herein, or,

(ii) To maintain this Contract in full force and effect and bring suit for specific performance. Purchaser expressly waives all other remedies, including suit for damages, provided that nothing herein precludes a claim against Seller after Closing for a breach of any representations and warranties, subject to the limitations of Section 8.4 hereof. If Purchaser does not bring suit within sixty (60) days of the scheduled Closing Date, Purchaser shall be deemed to have elected option (i) above.

13. **BROKERAGE COMMISSIONS.**

Purchaser hereby represents and warrants to Seller that Purchaser has not incurred, and shall not have incurred as of the Closing Date, any liability for the payment of any brokerage fee or commission in connection with the transaction contemplated in this Contract, except for DTZ Retail, and Seller hereby represents and warrants to Purchaser that Seller has not incurred, and shall not have incurred as of the Closing Date, any liability for the payment of any brokerage fee or commission in connection with the transaction contemplated in this Contract, except for EXP Realty Advisors and DTZ Retail as the co-broker, whose commissions shall be paid by Seller pursuant to the terms of a separate written agreement. Seller and Purchaser hereby agree to defend, indemnify and hold harmless the other from and against any and all claims of any other person claiming a brokerage fee or commission through the indemnifying party.

14. **MISCELLANEOUS.**

14.1 Entire Agreement. This Contract supersedes all prior and contemporaneous discussions, agreements and understandings between Seller and Purchaser and constitutes the entire agreement between Seller and Purchaser with respect to the transaction herein contemplated. This Contract may be amended or modified only by a written instrument executed by Seller and Purchaser.

14.2 Waiver. Each party hereto may waive any breach by the other party of any of the provisions contained in this Contract or any default by such other party in the observance or performance of any covenant or condition required to be observed or performed by it contained herein; PROVIDED, ALWAYS, that such waiver or waivers shall be in writing, shall not be construed as a continuing waiver, and shall not extend to or be taken in any manner whatsoever to affect any subsequent breach, act or omission or default or affect each party's rights resulting therefrom. No waiver will be implied from any delay or

failure by either party to take action on account of any default by the other party. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

14.3 Notices. All notices and demands given or required to be given by any party hereto to any other party ("**Notices** ") shall be in writing and shall be delivered in person or sent by facsimile with electronic confirmation of receipt thereof, or by a reputable overnight carrier that provides a receipt, such as Federal Express or UPS, or by registered or certified U.S. mail, postage prepaid, addressed as follows (or sent to such other address as any party shall Specify to the other party pursuant to the provisions of this Section):

| | |
|---|---|
| Seller: | Verdad Real Estate, Inc.<br>1211 S. White Chapel Blvd.<br>Southlake, Texas 76092<br>Attention: Jason Keen<br>Tel: 817.912.0222<br>Fax: 817.912.0550<br>Email: jkeen@verdadrealestate.com |
| with a copy to: | Baker Monroe PLLC<br>505 Pecan Street, Suite 101<br>Fort Worth, Texas 76102<br>Attn: Justin Huston<br>Tel: 817.632.6301<br>Fax: 817.877.3668<br>E-Mail: jhuston@bamolaw.com |
| To Purchaser: | Raymond L. Walls and Terryll Ann Walls, Co-Trustees of the Raymond L. Walls Declaration of Trust dated May 30, 2002<br>8541 Afton Circle<br>Huntington Beach, California 92646<br>Tel: 714.612.4684<br>Email: raymondlwalls@aol.com |
| with a copy to: | Mark A. Reinsch<br>Mark A. Reinsch, P.A.<br>2700 Lake Shore Blvd.<br>Jacksonville, FL 32210<br>Tel: (904) 384-8001<br>Fax: (904) 384-5768<br>Email: mark@reinschlaw.com |
| To the Title Company: | Fidelity National Title Agency, Inc. |

850 E. State Highway 114, Suite 200
Southlake, Texas 76092
Attn: Stephanie Kleam
Phone: 817.442.1111
Fax: 817.442.9997
E-Mail: skleam@fidelity-usa.com

All Notices delivered in the manner provided herein shall be deemed given upon actual receipt (or attempted delivery if delivery is refused). Facsimile transmissions shall be deemed given upon electronic confirmation of such transmission.

14.4 Successors and Assigns. This Contract shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Contract may not be assigned by Purchaser without the prior written consent of Seller.

14.5 Choice of Law, Venue and Forum. This Contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Illinois, without giving effect to its choice of laws principles. Exclusive venue for any litigation between the parties hereto shall be in Cook County, Illinois, and shall be brought in the State or Federal Courts for Cook County, Illinois. The parties hereto waive any challenge to personal jurisdiction or venue (including without limitation a challenge based on inconvenience) in Cook County, Illinois, and specifically consent to the jurisdiction of the State and Federal Courts of Cook County, Illinois.

14.6 No Third Parties Benefitted. The parties hereto do not intend to confer any benefit on any person, firm, or corporation other than the parties to this Contract, and their respective successors and assigns.

14.7 Legal Fees. In the event either party hereto fails to perform any of its obligations under this Contract or in the event a dispute arises concerning the meaning or interpretation of any provision of this Contract, the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other party in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable legal fees.

14.8 Construction. The section titles or captions in this Contract are for convenience only and shall not be deemed to be part of this Contract. All pronouns and any variations of pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the identity of the parties may require. Whenever the terms referred to herein are singular, the same shall be deemed to mean the plural, as the context indicates, and vice versa. This Contract shall not be construed as if it had been prepared only by Purchaser or Seller but rather as if both Purchaser and Seller had prepared the same. If any term, covenant, condition, or provision of this Contract or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Contract, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Contract shall be valid and shall be enforced to the fullest extent permitted by law.

14.9 Time of Essence. Time is of the essence of this Contract and each and every term and provision hereof.

14.10 Business Day. As used in this Contract, the term "business day" means Monday through Friday of each week, exclusive of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day, or any other holiday recognized by banks in Dallas, Texas. If the final date of any period which is set out in any paragraph of this Contract falls upon a day

which is not a business day, then, and in such event, the time of such period will be extended to the next business day.

14.11 Confidentiality. Purchaser covenants and agrees that: (i) all information provided to it by Seller in connection with the Project or resulting from Purchaser's inspections of the Project and review of relevant materials which is not already public information will be held in confidence by it, its agents and employees, and (ii) Purchaser will return all such written information to Seller in the event the transaction contemplated by this Contract is not consummated. Notwithstanding the foregoing, Purchaser may (A) share its information on a need-to-know basis with its consultants, accountants, attorneys and potential equity and financing sources so long as such information is delivered to such parties on the condition of confidentiality consistent with the requirements of this paragraph and (B) make disclosure as required by applicable law or court order. Purchaser further agrees that it will not issue any press releases regarding the Project or the transaction contemplated herein without the prior consultation and express written approval of Seller. Notwithstanding anything herein to the contrary, the provisions of this Section 14.11 shall survive the Closing.

14.12 Counterparts. This Contract may be executed in one or more counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

14.13 Exhibits. All of the Exhibits and Schedules referenced in this Contract are attached hereto and incorporated as part of this Contract and shall have the same meaning as if they were incorporated fully within the text of this Contract.

14.14 Like-Kind Exchange. If either party desires to have this transaction constitute a like-kind exchange of properties utilizing the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, each party agrees to cooperate with the other party in order to effectuate and facilitate such an exchange, provided that: (a) the exchange does not delay the Closing under this Contract, (b) the non-exchanging party does not incur any additional liability as a result of its cooperation, and (c) the non-exchanging party is not required to enter into any contract to purchase any other property, or take title to any property other than the Real Property. In particular, either party may assign its rights under this Agreement prior to Closing to a "Qualified Intermediary," as that term is defined in applicable Treasury Regulations; and Purchaser will, upon request of Seller, pay the balance of the Purchase Price to the Qualified Intermediary designated by Seller.

*[SIGNATURE PAGE FOLLOWS.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Contract as of the Contract Date.

**SELLER:**

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:__________________________
Jason Keen, Manager

**PURCHASER:**

**RAYMOND L. WALLS, AS TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013**

By: Raymond L Walls 3/24/2015
Name: Raymond L. Walls

**TERRYLL ANN WALLS, AS TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013**

By: Terryll Ann Walls
Name: Terryll Ann Walls

EXHIBITS ATTACHED:

| | |
|---|---|
| Exhibit 1.1 | Land |
| Exhibit 2.3 | Due Diligence Materials |
| Exhibit 6.1 | Form of Special Warranty Deed |
| Exhibit 6.2 | Form of Bill of Sale |
| Exhibit 6.3 | Form of Assignment and Assumption of Lease |
| Exhibit 6.4 | Tenant Notice |
| Exhibit 6.6 | Form of Non-Foreign Status Affidavit |
| Exhibit 6.7 | Form of Lien and Possession Affidavit |
| Exhibit 8.1.8 | Form of Estoppel Certificate |
| Exhibit 8.1.9 | Form of Subordination, Non-disturbance and Attornment Agreement |

**<u>EXHIBIT "1.1"</u>**
**<u>LEGAL DESCRIPTION OF LAND</u>**

LOTS 19 TO 28 INCLUSIVE IN BLOCK 8 IN COBE AND MCKINNON'S 59TH STREET AND WESTERN AVENUE SUBDIVISION IN THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 13, TOWNSHIP 38 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.



JT RSW PDW

**EXHIBIT "2.3"**

**DUE DILIGENCE MATERIALS**

1. All existing environmental reports, studies or surveys of the Project in Seller's possession.
2. Current zoning information relative to the Project.
3. A copy of the preliminary or final plat of the Project, if applicable.
4. A copy of the preliminary or, if available, final site plan for the Land and the Improvements.
5. A copy of the fully executed Tenant Lease.



RDW
TDW

**EXHIBIT "6.1"**
**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| STATE OF ___________ | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS |
| COUNTY OF _________ | § | |

FOR VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company ("**Grantor**"), hereby grants, bargains, sells and conveys to ________________________________ ("**Grantee**"), that certain real property located in the County of_______________, State of __________, more particularly described on Exhibit "A" attached hereto and incorporated herein by this reference (the "**Land**"), together with all of Grantor's right, title and interest in and to the fixtures and improvements located on the Land (the "**Improvements**"), and together with all rights, privileges and easements appurtenant to the Land, all water, wastewater and other utility rights relating to the Land and any and all easements, rights-of-way and other appurtenances used in connection with the beneficial use and enjoyment of the Land, in each case to the extent assignable (the "**Appurtenances**") (the Land, Improvements and Appurtenances collectively referred to as the "**Property**").

This conveyance is being made by Grantor and accepted by Grantee subject only to those certain title exceptions (the "**Permitted Exceptions**") set forth in Exhibit "B" attached hereto and made a part hereof for all purposes, but only to the extent that such exceptions are valid, existing, and, in fact, affect the Property.

**TO HAVE AND TO HOLD** the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

THESE NEED TO MATCH THE CONTRACT

Grantee by its acceptance of this Deed acknowledges that, except for the special warranty of title contained in this Deed, neither Grantor nor its representatives have made any representations or warranties as to the Property or its environmental or physical condition, upon which Grantee has relied. Grantee further acknowledges and agrees that it is purchasing the Property as set forth in the Purchase and Sale Agreement dated effective ___________, 20__, between Grantor and Grantee (the **"Contract"**) in its "as is" condition as set forth in Section 10.1 of the Contract, and that without Grantee agreeing to such conditions and terms this conveyance would not be made. Further, by acceptance of this Deed, Grantee agrees to and reaffirms its promises, obligations and acknowledgements, in the Contract, including that except for those representations and warranties expressly made by Grantor in the Contract or any closing documents:

(1) GRANTEE ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER BY GRANTOR OR ANY AGENT OR

EMPLOYEE THEREOF REGARDING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ITS PHYSICAL CONDITION, ITS SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS COMPLIANCE WITH LAWS, INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS, OR THE PRESENCE OR ABSENCE OF CHEMICALS, TOXIC OR HAZARDOUS SUBSTANCES, MATERIALS OR WASTES THEREUPON.

(2) GRANTEE SHALL ACCEPT THE PROPERTY IN ITS "AS IS", "WHERE IS", "WITH ALL FAULTS" CONDITION, AND GRANTEE ACKNOWLEDGES THAT GRANTOR HAS DISCLAIMED ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXPRESS OR IMPLIED.

(3) GRANTEE ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR WHO HAD OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PROPERTY THAT GRANTEE ELECTED TO CONDUCT, AND DID CONDUCT A COMPLETE AND THOROUGH Inspection, ANALYSIS AND EVALUATION OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL ISSUES, IF ANY, AND FURTHER RECEIVED AND REVIEWED SUCH INFORMATION AS GRANTEE IN ITS DISCRETION CHOSE TO REVIEW IN THE COURSE OF ITS INVESTIGATION OF THE PROPERTY.

GRANTEE FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY EXPLAINED TO GRANTEE AND THAT GRANTEE FULLY UNDERSTANDS AND ACCEPTS THE SAME.

Ad valorem taxes for the year of this deed have been prorated; accordingly, by its acceptance of this Deed, Grantee assumes responsibility to pay all ad valorem taxes on the Property for such year and all subsequent years.

Grantee's mailing address: ____________________
____________________
____________________

Executed as of this ______ day of ______________, 20__.

**GRANTOR:**

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:______________________________
Name:____________________________
Title:_____________________________

**THE STATE OF TEXAS** §
§
**COUNTY OF TARRANT** §

This instrument was acknowledged before me on ____________ ______, 20__, by __________________, ____________ of **VRE CHICAGO ELEVEN, LLC**, a Texas limited liability company, on behalf of said company.

______________________________________
Notary Public, State of Texas

My Commission Expires:

______________________________________
Printed/Typed Name of Notary

________________________

After Recording Return To:

___________________________
___________________________
___________________________
___________________________

**EXHIBIT "6.2"**
**FORM OF BILL OF SALE**

STATE OF ____________ §
§ KNOW ALL MEN BY THESE PRESENTS
COUNTY OF __________ §

That **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company (**"Grantor"**), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to it in hand paid by ________________________________ (**"Grantee"**) the receipt and sufficiency of which are hereby acknowledged and confessed, has SOLD, ASSIGNED, TRANSFERRED and DELIVERED and does by these presents SELL, ASSIGN, TRANSFER and DELIVER unto Grantee, all of Grantor's right, title and interest in and to the following described properties located on, and/or affixed to, and used in connection with, the buildings (the **"Improvements"**) situated on those certain lands (the **"Real Property"**) in the City of ___________________, _________________ County, _____________, more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes, which Real Property has been conveyed by Grantor to Grantee by Special Warranty Deed of even date herewith:

(a) All equipment and personal property owned by Grantor which is located on or in the Real Property or the Improvements (collectively, the **"Personalty"**). The Personalty Specifically excludes any equipment or personal property of _______________________.

(b) All right, title and interest to any unpaid insurance claims or proceeds or awards for damages to the Real Property and/or the Improvements resulting from any casualty or any taking in eminent domain or by reason of change of grade of any street.

(c) Except the name of the Grantor or affiliated entities, all of the interest of Grantor in any intangible property now or hereafter owned by Grantor and used or designed for use in connection with the Real Property, the Improvements and/or the Personalty, and any contract or lease rights, licenses, permits, certificates of occupancy, franchises, agreements, utility contracts, unexpired claims, warranties, guaranties and sureties belonging to Grantor, or other rights relating to the ownership, development, construction, design, use and operation of the Real Property and/or the Improvements, in each case to the extent assignable.

The property described in subsections (b) and (c) above is hereinafter sometimes referred to as the **"Intangible Property"**). Notwithstanding the foregoing, the property assigned and transferred hereunder shall not include any cash, bank accounts, prepaid obligations, and claims and causes of action.

TO HAVE AND TO HOLD the Grantor's rights, titles, and interests in and to the Personalty and the Intangible Property, unto the said Grantee, its successors and assigns, forever.

The Personalty and the Intangible Property and all other property being transferred or assigned hereunder are being transferred and assigned by Grantor to Grantee AS IS, WHERE IS, AND WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE. GRANTEE IS HEREBY THUS ACQUIRING SUCH PROPERTY BASED SOLELY UPON GRANTEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF SUCH PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY GRANTOR OR GRANTOR'S AGENTS OR CONTRACTORS.

Grantee hereby accepts such assignment and transfer and hereby assumes, and agrees to indemnify and hold harmless Grantor from and against, all obligations of Grantor under the Intangible Property which accrue after the date hereof.

This assignment and transfer is made subject to those matters of record affecting the Property to the extent valid and enforceable.

Grantor and Grantee represent that they each have the full right, power, and authority to execute this Bill of Sale and to perform their respective obligations hereunder.

EXECUTED to be effective the ______ day of __________________, 20__.

**GRANTOR:**

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:_______________________________
Name:_____________________________
Title:______________________________

**GRANTEE:**

___________________________________

By:_______________________________
Name:_____________________________
Title:______________________________

**EXHIBIT "6.3"**
**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE**

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("**Assignment**") is made effective this __ day of _________, 20__, by and between **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company ("**Assignor**"), and ________________________________ ("**Assignee**").

RECITALS

A. Assignor, as Landlord, and ___________________, as Tenant, have entered into that certain *[__________________]* Lease Agreement dated ____________ (the "**Lease**") relating to the real property described on the attached Exhibit "A" (the "**Property**"), which Property has been conveyed to Assignee by Assignor by Special Warranty Deed of even date herewith.

B. Assignor has agreed to assign the Lease to Assignee in connection with Assignor's sale of the Property to Assignee.

THEREFORE, in consideration of TEN DOLLARS and other valuable consideration, the receipt and sufficiency of which Assignor acknowledges, Assignor does hereby SELL, ASSIGN, TRANSFER, AND DELIVER to Assignee the Lease, all of Assignor's right, title, and interest in and to the Lease, and all of the rights, benefits and privileges of the landlord thereunder, including without limitation the rents and other charges to be payable under the Lease, all prepaid rents and security deposits, and all claims and actions, if any, against the tenants under the Lease, choate or inchoate, and all rents, issues, and profits of the Property (collectively, the "**Assigned Rights**"); TO HAVE AND TO HOLD all and singular the Lease unto Assignee, its successors and assigns, and Assignor does hereby bind itself and its successors to WARRANT AND FOREVER DEFEND all and singular the Lease and other Assigned Rights unto Assignee, its successors and assigns, against every person whomsoever lawfully claiming or attempting to claim same, or any part thereof, by through or under Assignor, but not otherwise, subject, however, to permitted exceptions set forth in the Deed of even date herewith from Assignor as Grantor to Assignee as Grantee.

Assignor states that no other assignment by Assignor exists in connection with the Lease or Assigned Rights.

Assignor represents, warrants, covenants, and agrees that Assignor has performed and discharged any and all obligations of Assignor under the Lease arising prior to the effective date of this Assignment. ASSIGNOR AGREES TO INDEMNIFY AND HOLD HARMLESS ASSIGNEE FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, OR CAUSES OF ACTION EXISTING IN FAVOR OF OR ASSERTED BY LESSEES UNDER THE LEASE AND ARISING OUT OF OR RELATING TO ASSIGNOR'S FAILURE TO PERFORM ANY OF THE OBLIGATIONS UNDER THE SAID LEASE, ARISING OR ACCRUING PRIOR TO THE DATE OF THIS ASSIGNMENT, BUT NOT OTHERWISE.

Assignee assumes all liability, obligations, and duties to perform all of the terms and conditions of the Lease on the part of the Assignor to be performed on and after the date of this Assignment, and Assignee covenants and agrees to discharge any and all obligations of Assignor under the Lease arising after the effective date of this Assignment. ASSIGNEE AGREES TO INDEMNIFY AND HOLD HARMLESS ASSIGNOR FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, OR CAUSES OF ACTION EXISTING IN FAVOR OF OR ASSERTED BY THE LESSEE UNDER THE LEASE AND ARISING OUT OF OR RELATING TO ASSIGNEE'S FAILURE TO PERFORM ANY OF THE OBLIGATIONS UNDER THE SAID LEASE, ARISING AFTER THE DATE OF THIS ASSIGNMENT, BUT NOT OTHERWISE.

All of the covenants, terms and conditions set forth herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, assigns, and legal representatives.

Assignee covenants and agrees to deliver a signed statement to the tenant under the Lease acknowledging that Assignee has received and is responsible for said tenant's security deposit as set forth on Exhibit "B".

ASSIGNOR:

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:______________________________
Name:____________________________
Title:_____________________________

ASSIGNEE:

_________________________________

By:______________________________
Name:____________________________
Title:_____________________________

**EXHIBIT "6.4"**
**FORM OF TENANT NOTICE**

_____________, 20___

_____________________________
_____________________________
_____________________________

Re: ____________________________________________________________ (the **"Lease"**)

Dear Sir or Madam:

This letter shall serve as notice to Tenant that the entire interest of the Landlord in the above-referenced Lease has been assigned to _______________________________ ("**Assignee**"), effective as of this date. Assignee has received the security deposit in the amount of $__________ under the Lease and is now fully responsible for the return of your security deposit (if any) in accordance with the terms of the Lease.

Tenant is further notified that all rental payments under the Lease shall be paid from this day forward in accordance with the terms of the Lease to Assignee at the following address until notified otherwise:

_____________________________
_____________________________
_____________________________
Phone: __________________
Fax: ____________________
E-Mail: __________________

and that all notices under the Lease shall be addressed to Assignee at the same address until Tenant is notified otherwise.

Very truly yours,

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:_________________________________
Name:_______________________________
Title:________________________________

cc: _________________________
_________________________

**EXHIBIT "6.6"**
**FORM OF NON-FOREIGN STATUS AFFIDAVIT**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF TARRANT | § | |

**THIS NON-FOREIGN STATUS AFFIDAVIT** is provided pursuant to the requirements of I.R.C. Section 1445(b)(2) in connection with the sale by **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company (the **"Transferor"**), to ______________________________ (the **"Transferee"**), of the property (the **"Property"**) described on Exhibit "A" attached hereto.

Under Section 1445 of the Internal Revenue Code, a transferee of U.S. real property interest must withhold tax with respect to certain transfers of property if the transferor is a foreign person. To inform Transferee that no withholding is required upon transfer of the Property by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign person (as such term is defined in the Internal Revenue Code and Income Tax Regulations).

2. Transferor's U.S. taxpayer identification number is ____________________.

3. Transferor's business address is 1211 S. White Chapel Blvd., Southlake, Texas 76092.

The Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punishable by fine, imprisonment, or both.

Under penalties of perjury, I declare that we have examined this certification, and to the best of my knowledge and belief, do swear it is true, correct and complete.

EXECUTED AND DELIVERED the _______day of ______________, 20__.

"Transferor":

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:______________________________
Jason Keen,____________________

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TARRANT** | § |

This instrument was acknowledged before me on ___________ _____, 20__, by ______________, ______________ of **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability, on behalf of said company.

______________________________
Notary Public, State of Texas

Exhibit 6.6 -- Form of Non-foreign Affidavit

Exhibit 6.6 -- Form of Non-foreign Affidavit

**EXHIBIT "6.7"**
**FORM OF LIEN AND POSSESSION AFFIDAVIT**

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF TARRANT §

**THIS LIEN AND POSSESSION AFFIDAVIT** is provided in connection with the sale by **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability company (the **"Transferor"**), to ______________________________ (the **"Transferee"**), of the property (the **"Property"**) described on Exhibit "A" attached hereto.

As an inducement to Fidelity Title Insurance Company to issue its policies of title insurance under Commitment ____________________, the undersigned hereby certifies to the best of its knowledge and belief the following on behalf of Transferor:

1. Within the last six (6) months: (a) no labor, services, or materials have been furnished to improve the land, or to rehabilitate, repair, refurbish, or remodel the building(s) situated on the land; (b) nor have any goods, chattels, machinery, apparatus, or equipment been attached to the land or building(s) thereon, as fixtures; (c) nor have any contracts been let for the furnishing of labor, service, materials, machinery, apparatus, or equipment that are to be completed subsequent to the date hereof; (d) nor have any notices of lien been received; except the following, if any:

2. There are no open mortgages, revolving credit mortgages, line of credit mortgages, home equity loan mortgages, or other voluntary liens or mortgages on title, other than those shown on Schedule B of the Commitment to Insure Title, except the following, if any:

3. All management fees are fully paid, except the following, if any:

4. There are no unrecorded security agreements, leases, financing statements, chattel mortgages, or conditional sales agreements regarding any appliances, equipment, or chattels that have or are to become attached to the land or any improvements thereon as fixtures, except the following, if any:

5. There are no unrecorded contracts or options to purchase the land, except the following, if any:

6. There are no unrecorded leases, easements, or other servitudes to which the land or building, or portions thereof, are subject, except the following, if any: Lease Agreement by and between Transferor, as lessor, and Frontier Star, LLC, as lessee dated effective February 27, 2015

7. If the land is "commercial real estate," as defined per statute, there are no written agreements with any "broker," nor has anyone provided licensed services that resulted in the procuring of a person or entity for the purpose of buying, selling, leasing, subleasing, or otherwise conveying or acquiring any interest in the land, except the following, if any: EXP Realty Advisors and DTZ Retail

EXECUTED AND DELIVERED the ______day of _____________, 20__.

"Transferor":

**VRE CHICAGO ELEVEN, LLC,**
a Texas limited liability company

By:____________________________________
Jason Keen,_______________________

**THE STATE OF TEXAS** §
§
**COUNTY OF TARRANT** §

This instrument was acknowledged before me on ____________ ______, 20__, by ______________, ______________ of **VRE CHICAGO ELEVEN, LLC,** a Texas limited liability, on behalf of said company.

____________________________________
Notary Public, State of Texas

**EXHIBIT "8.1.8"**

**FORM OF ESTOPPEL CERTIFICATE**

**ESTOPPEL CERTIFICATE**

______________, 20__

To: ______________________________
______________________________
______________________________

Re: That certain Lease Agreement dated as of ______________ by and between VRE Chicago Eleven, LLC, a Texas limited liability company ("Landlord"), and ____________________, a ______________ ("Tenant"), covering certain property located at __________________________, consisting of approximately ________ square feet of retail space more particularly described therein (the "Lease")

Dear _____________:

Tenant understands that Landlord (hereinafter called "Seller"), owner of the tract of land which is the subject of the Lease, which tract is located at the above-referenced location in the City of ______________, ___________ County, ________ (the "Property"), intends to sell the Property to you or your assigns ("Purchaser"). Tenant hereby certifies the following to Purchaser:

1. Attached hereto as Exhibit "A" are true, complete and accurate copies of the Lease, including all amendments and modifications.

2. The Lease is in full force and effect; there are no amendments or modifications of any kind to the Lease except as referenced herein; there are no other promises, agreements, understandings, or commitments between Landlord and Tenant relating to the Property, the Lease; and Tenant has not given Landlord any notice of termination under the Lease. There are no remaining conditions to Tenant's obligations under the Lease.

3. Tenant is in full and complete possession of the Property pursuant to the Lease, and there has not been an assignment by Tenant of the Lease, or any rights therein, nor any subletting, to any party.

4. There is no security deposit under the Lease.

5. To the best of the undersigned's knowledge and belief, no uncured default, event of default, or breach by Landlord exists under the Lease, and no facts or circumstances exist that, with the passage of time or the giving of notice, or both, will or could constitute a default, event of default, or breach under the Lease. Tenant has made no claim against Landlord alleging Landlord's default under the Lease.

6. To the best of the undersigned's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease, except as may be expressly set forth therein.

7. Tenant is obligated to pay rent to Landlord at the rate set forth in the Lease. The Tenant is current with respect to, and is paying the full rent and other charges stipulated in the Lease with no offsets, deductions, defenses or claims, and Tenant has not prepaid any rent or other amounts to Landlord other than rent and other charges due and payable in the calendar month of this certification. None of the rent which Tenant is required to pay under the Lease has been prepaid more than one (1) month in advance, and Tenant agrees not to pay rent more than one (1) month in advance unless otherwise Specified in the Lease.

8. Neither a purchaser at foreclosure nor owner by virtue of a deed in lieu of foreclosure of the Property shall be responsible for any security deposit or rent payment paid more than thirty (30) days in advance of its due date that is not actually received by such person or entity.

9. Tenant is not entitled to any concession or rebate or other charges from time to time due under the Lease.

10. The current monthly base rent under the Lease paid by Tenant is $__________, which has been paid in full for the period ending ____________________, 20___.

11. Tenant acknowledges that the initial "Lease Term" (as such term is defined in the Lease) of the Lease commenced on ________________, 20___, and shall expire on __________________, 20___, unless sooner terminated in accordance with the terms of the Lease. Tenant has the option to extend the Lease Term for __________ (____) additional periods of _________ (___) years each as expressly set forth in the Lease.

12. The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant, thereby binding Tenant.

13. All notices to be sent to Tenant shall be sent to the address as set forth in the Lease.

14. Tenant has no existing option or contractual right to purchase the Property or any part thereof.

15. Tenant is responsible for all taxes, insurance and maintenance obligations pertaining to the Property, and the Lease is intended to be a triple net lease. Any implications that Landlord is required to carry insurance in Section ___ of the Lease are incorrect, since Landlord has no obligation to carry insurance on the Property or the improvements thereon.

16. Landlord has completed all of its build out obligations under the Lease. Landlord has paid or repaid to the Tenant all moneys due to Tenant under the Lease, including all monies owed to Tenant as an improvement allowance.

17. Landlord acknowledges and agrees that Purchaser shall be entitled to rely on Tenant's certifications set forth herein.

IN WITNESS WHEREOF, Tenant has executed this instrument this _______ day of _______________, 20__.

______________________________,
a ____________________________

By: ________________________
Name: ________________________
Title: ________________________

**EXHIBIT "A"**
LEASE

[Attached]

**<u>EXHIBIT "8.1.9"</u>**

**<u>FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT</u>**

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

TO BE DETERMINED

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Amendment") is entered into effective as of the 16 day of April, 2015, by and **VRE CHICAGO ELEVEN, LLC**, a Texas limited liability company ("**Seller**") and **RAYMOND L. WALLS OR TERRYLL ANN WALLS, TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013** ("**Purchaser**")

Recitals

A. Seller and Purchaser are parties to that certain Purchase and Sale Agreement with an Effective Date of April 24, 2015 (the "Agreement"), for the purchase and sale of the Project (as defined in the Agreement). Unless otherwise defined herein, capitalized terms shall have the meaning assigned to them in the Agreement.

B. Purchaser and Seller desire to modify certain terms of the Agreement, and the parties have agreed to execute this Amendment to reflect such modification to the Agreement.

Agreement of the Parties

NOW THEREFORE, for and in consideration of the above recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, it is agreed that:

1. Incorporation of Recitals. The recitals set forth above are incorporated herein by reference as if set forth fully herein.

2. Closing. Section 7.1 of the Agreement is hereby amended and restated in its entirety to read as follows:

> "7.1 Closing. This transaction shall close, as evidenced by recordation of the Deed and delivery of the Purchase Price (net of prorations and Seller's share of closing costs pursuant to this Contract) (the "**Closing**"), on or before the date that is fifteen (15) days after the expiration of the Contingency Period (or such earlier date as both parties may mutually agree in writing) (the "**Closing Date**") (provided that if such date is not a business day in Tarrant County, Texas or Huntington Beach, California, and Chicago, Illinois, the Closing shall be held on the next business day thereafter). Purchaser will have the one-time option to extend the Closing Date for up to ten (10) days by delivering written notice of such extension to Seller and Title Company prior to the original Closing Date. In addition, Purchaser will have the one-time option to extend the Closing Date for an additional ten (10) days by delivering written notice of such extension to Seller and Title Company prior to the expiration of the extended Closing Date and payment to the Title Company of Fifty Thousand and 00/100 Dollars ($50,000.00) (the "**Extension Earnest Money**"), which shall be non-refundable to Purchaser except for Seller default. The Extension Earnest money shall be included in the term "Earnest Money" and held and credited against the Purchase Price pursuant to Section 2.2 of this Agreement."

3. Effect of Amendment. Except as modified in this Amendment, there are no changes to the Agreement, and the Agreement as herein modified remains in full force and effect as of the date hereof and is hereby ratified by the parties in all respects. The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of either party for any default



**Exhibit 13**

RLW TAW

under the Agreement, nor constitute a waiver of any provision of the Agreement. In the event of a conflict between the Agreement and this Amendment, the terms of this Amendment shall control.

4. Counterparts. This Amendment may be executed by the parties hereto individually or in combination or in one or more counterparts, each of which shall be an original, and all of which shall constitute one and the same instrument. Scanned and emailed or facsimile signatures shall be deemed original and binding on the parties.

*[Signatures appear on the following page.]*

ROW
TRW

Seller and Purchaser have executed this Amendment as of the date set forth above.

**SELLER:**

VRE CHICAGO ELEVEN, LLC,
a Texas limited liability company

By:____________________
Jason Keen, Manager

**PURCHASER:**

RAYMOND L. WALLS, AS TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013

By: Raymond L Walls 4/14/2015
Name: Raymond L. Walls

TERRYLL ANN WALLS, AS TRUSTEE OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS TRUST, UNDER DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013

By: Terryll Ann Walls 4/16/15
Name: Terryll Ann Walls



RLW
TAW

Gmail by Google

Matt Langfield <mrlangfield@gmail.com>

# Western Ave KFC

**Justin Huston** <jhuston@bamolaw.com> Tue, May 12, 2015 at 3:51 PM
To: "Frank, Jon" <jfrank@swlaw.com>
Cc: Matt Langfield <mrlangfield@gmail.com>, Shane Josephson <SJosephson@verdadrealestate.com>, Charles Robitaille <charles@exp1031.com>, Debra Whitaker <dwhitaker@bamolaw.com>

Matt & Jon,

Attached is the revised SNDA (and redline) and completed Estoppel. If everything looks good, please get this signed and send scans back to me at your earliest convenience. Buyer has requested originals, so if you don't mind, please send those to the title company at:

Fidelity National Title Company
c/o Stephanie Kleam
850 E. State Highway 114, Suite 200
Southlake, TX 76092

Thanks, and let me know if you have any questions.

Justin P. Huston
Baker Monroe, PLLC,
University Centre I
1300 S. University Dr, Ste. 318
Ft. Worth, TX 76107
817-632-6301 (direct)
817-735-8447 (cell)
jhuston@bamolaw.com

***PLEASE NOTE OUR NEW ADDRESS***

Internet Disclaimer:
*******************************************************************
This communication may be protected by the attorney/client privilege and may contain confidential information. It is intended only for the person to whom it is addressed. If it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error. Then delete this message without copying or reading it. Any use, dissemination, distribution, copying, or other reproduction of this message or any of its contents by anyone other than the stated recipient is strictly prohibited.
*******************************************************************

-----Original Message-----
From: Frank, Jon [mailto:jfrank@swlaw.com]
Sent: Wednesday, May 06, 2015 10:08 AM
To: Justin Huston
Cc: Matt Langfield; Shane Josephson
Subject: Re: Western Ave KFC

[Quoted text hidden]

**3 attachments**

**Tenant Estoppel (completed).doc**
58K

**Exhibit 14**

# TENANT ESTOPPEL CERTIFICATE

To: First Internet Bank of Indiana
8888 Keystone Crossing, Suite 1700
Indianapolis, IN 46240
Attn: Mike Lewis

| | | |
|---|---|---|
| Re: | Lease Dated: February 27, 2015 | (the "Lease") |
| | Tenant: MJC Holdings 123, LLC, a Delaware limited liability company | ("Tenant") |
| | Landlord: Raymond L. Walls and Terryll Ann Walls, Co-trustees of the Raymond L. Walls and Terryll Ann Walls Declaration of Trust dated May 30, 2002, as amended July 18, 2013, assignee of VRE Chicago Eleven, LLC, a Texas limited liability company | ("Landlord") |
| | Address of Premises: 5852 S. Western Avenue, Chicago, IL 60636 | ("Premises") |

Tenant acknowledges that (a) First Internet Bank of Indiana, its successors and assigns ("Lender") has agreed, subject to the satisfaction of certain terms and conditions, to make a loan ("Loan") to Landlord, secured by a mortgage lien on Landlord's interest in the Premises and the land on which the Premises is located, and (b) Lender is requiring this Certificate as a condition to its making the Loan. Accordingly, Tenant hereby certifies and confirms to Lender and acknowledges and agrees as follows:

1. Tenant is in full and complete possession of the Premises demised under the Lease, such possession having been delivered by the Landlord pursuant to the Lease and having been accepted by the Tenant.

2. Any improvements to the Premises that Landlord may be required to furnish under the Lease have been completed in all respects to the satisfaction of Tenant, and the Premises are open for the use of Tenant, its customers, employees and invitees. All contributions required to be paid by Landlord to Tenant in connection with improvements to the Premises have been paid in full.

3. All duties or obligations of Landlord required under the Lease which were an inducement to Tenant to enter into the Lease have been fully performed.

4. The Lease is in full force and effect. No default exists on the part of Landlord or Tenant under the Lease, nor does any circumstance currently exist that, but for the giving of notice or the passage of time, or both, would be such a default. The Lease constitutes the entire rental agreement between Landlord and Tenant with respect to the Premises and has not been

amended, modified or supplemented, except as attached hereto, and has not been superceded. There are no oral agreements between Landlord and Tenant with respect to the Premises. A true and correct copy of the Lease (including all amendments thereto) is attached to this Certificate and Tenant agrees not to amend or modify the Lease without the prior written consent of Lender.

5. No rents under the Lease have been prepaid, except the current month's rent. Tenant agrees that it shall not prepay any rents under the Lease more than one month from the date when such rents are due. Tenant does not now have or hold any claim or defense against Landlord which might be set off or credited against future accruing rents or which might otherwise excuse Tenant's performance under the Lease.

6. Tenant has received no notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease or of the rents secured therein.

7. Tenant does not have any outstanding options or rights of first refusal to purchase the Premises, or any part thereof, or to purchase or lease any other part of the Building, except (state none, if applicable): such rights set forth in Paragraph 20 of the Lease

8. No actions, whether voluntary or involuntary, are pending against Tenant or any guarantor of the Lease under any bankruptcy, insolvency or similar laws of the United States or any state thereof.

9. The term of the Lease commenced on the 27th day of February, 2015 and ends on the last day of February, 2035, subject to the right of Tenant to renew the Lease for four (4) separate options of five (5) years each as set forth in the Lease.

10. The current monthly base rental payable by Tenant under the Lease is $14,250.00. Percentage rent is not payable under the Lease. There is no security deposit under the Lease.

11. So long as the Loan is outstanding, Tenant shall pay any termination fees payable for the early termination of the Lease to Landlord and Lender jointly.

12. Lender will rely on the representations and agreements made by Tenant herein in connection with Lender's agreement to make the Loan and Tenant agrees that Lender may so rely on such representations and agreements.

Executed this 12 day of May, 2015

**Tenant:**

MJC Holdings 123, LLC, a Delaware limited liability company

By: ______________________

Print Name: Jason LeVecke

Title: CEO / Manager

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**THIS AGREEMENT** is made and entered into as of the _______ day of May, 2015, by and between **MJC HOLDINGS 123, LLC**, a Delaware limited liability company ("**Tenant**"), **RAYMOND L. WALLS AND TERRYLL ANN WALLS, AS CO-TRUSTEES OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013**, a California trust ("**Landlord**"), and **FIRST INTERNET BANK OF INDIANA**, its successors and assigns ("**Mortgagee**").

### RECITALS:

A. Mortgagee is the holder of a certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May__________, 2015, to be recorded concurrently herewith (as amended from time to time "Mortgage") encumbering the Real Estate (hereinafter defined) and securing a principal indebtedness in an amount equal to NINE HUNDRED SEVENTY-SEVEN THOUSAND TWO HUNDRED AND NO/100 Dollars ($977,200.00).

B. Tenant has entered into a lease agreement (such lease agreement hereinafter being referred to as "Lease Agreement," and the Lease Agreement, together with all amendments and modifications thereof, hereinafter being referred to as "Lease") dated February 27, 2015, with Landlord (or Landlord's predecessor-in-interest), pursuant to which Tenant leased certain premises ("Leased Premises") consisting of the building improvements ("Building") on the parcel of land ("Land") legally described in Exhibit "A" attached hereto (the Land and Building herein being collectively referred to as "Real Estate").

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby covenant and agree as follows:

1. Tenant represents and warrants to Mortgagee that the Lease constitutes the entire agreement between Tenant and Landlord with respect to the Leased Premises and there are no other agreements, written or verbal, governing the tenancy of Tenant with respect to the Leased Premises.

2. Tenant has executed and delivered to Mortgagee a certain Tenant Estoppel Certificate (the "Estoppel Certificate") dated on or about the date hereof. The provisions of the Estoppel Certificate are hereby incorporated into this Agreement as if fully set forth in this Agreement in their entirety, and Tenant acknowledges that Mortgagee will be relying on the statements made in the Estoppel Certificate in determining whether to disburse the proceeds of the loan secured by the Mortgage and whether to enter into this Agreement.

3. Prior to pursuing any remedy available to Tenant under the Lease, at law or in equity as a result of any failure of Landlord to perform or observe any covenant, condition, provision or obligation to be performed or observed by Landlord under the Lease (any such failure hereinafter referred to as a "Landlord's Default"), Tenant shall: (a) provide Mortgagee with a notice of Landlord's Default specifying the nature thereof, the Section of the Lease under which same arose and the remedy which Tenant will elect under the terms of the Lease or otherwise, and (b) allow Mortgagee not less than thirty (30) days following receipt of such notice of Landlord's Default to cure the same; provided, however, that, if such Landlord's Default is not readily curable within such thirty (30) day period, Tenant shall give Mortgagee such additional time as Mortgagee may reasonably need to obtain possession and control of the Real Estate and to cure such Landlord's Default so long as Mortgagee is diligently pursuing a cure. Tenant shall not be awarded any remedy available to it as a result of any Landlord's Default unless Mortgagee fails to cure same within the time period specified above. For purposes of this Paragraph 3, a Landlord's Default shall not be deemed to have occurred until all grace and/or cure periods applicable thereto under the Lease have lapsed without Landlord having effectuated a cure thereof.

4. Tenant covenants with Mortgagee that the Lease shall be subject and subordinate to the lien and all other provisions of the Mortgage and to all modifications and extensions thereof, to the full extent of all principal, interest and all other amounts now or hereafter secured thereby and with the same force and effect as if the Mortgage had been executed and delivered prior to the execution and delivery of the Lease. Without limiting the generality of the foregoing subordination provision, Tenant hereby agrees that any of its right, title and interest in and to insurance proceeds and condemnation awards (or other similar awards arising from eminent domain proceedings) with respect to damage to or the condemnation (or similar taking) of any of the Real Estate, shall be subject and subordinate to Mortgagee's right, title and interest in and to such proceeds and awards.

5. Tenant acknowledges that Landlord has collaterally assigned to Mortgagee all leases affecting the Real Estate, including the Lease, and the rents and other amounts, including, without limitation, lease termination fees, if any, due and payable under such leases. In connection therewith, Tenant agrees that, upon receipt of a notice of a default by Landlord under such assignment and a demand by Mortgagee for direct payment to Mortgagee of the rents due under the Lease, Tenant will honor such demand and make all subsequent rent payments directly to Mortgagee. Tenant further agrees that any Lease termination fees payable under the Lease shall be paid jointly to Landlord and Mortgagee.

6. Mortgagee agrees that so long as Tenant is not in default under the Lease:

(a) Tenant shall not be named or joined as a party in any suit, action or proceeding for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage (unless Tenant is a necessary party under applicable law); and

(b) The possession by Tenant of the Leased Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise materially adversely affected by (i) any suit, action or proceeding for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Leased Premises, or any deed given in lieu of foreclosure, or (ii) any default under the Mortgage.

7. If Mortgagee or any future holder of the Mortgage shall become the owner of the Real Estate by reason of foreclosure of the Mortgage or otherwise, or if the Real Estate shall be sold as a result of any action or proceeding to foreclose the Mortgage or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the new owner of the Real Estate as "landlord" upon all the same terms, covenants and provisions contained in the Lease (subject to the exclusions set forth in subparagraph (b) below), and in such event:

(a) Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the extension periods, if Tenant elects or has elected to exercise its options to extend the term), and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease without any additional documentation to effect such attornment (provided, however, if applicable law shall require additional documentation

at the time Mortgagee exercises its remedies then Tenant shall execute such additional documents evidencing such attornment as may be required by applicable law);

(b) Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the extension periods, if Tenant elects or has elected to exercise its options to extend the term); provided, however, that such new owner shall not be:

(i) liable for any act or omission of any prior landlord (including Landlord);

(ii) subject to any offsets or defenses which Tenant has against any prior landlord (including Landlord) unless Tenant shall have provided Mortgagee with (A) notice of the Landlord's Default that gave rise to such offset or defense and (B) the opportunity to cure the same, all in accordance with the terms of Section 3 above;

(iii) bound by any base rent, percentage rent, additional rent or any other amounts payable under the Lease which Tenant might have paid in advance for more than the current month to any prior landlord (including Landlord);

(iv) liable to refund or otherwise account to Tenant for any security deposit not actually paid over to such new owner by Landlord;

(v) bound by any amendment or modification of the Lease, which results in a reduction of any rent or other charges payable by Tenant or which increases the obligations of Landlord, made without Mortgagee's consent;

(vi) bound by, or liable for any breach of, any representation or warranty or indemnity agreement contained in the Lease or otherwise made by any prior landlord (including Landlord); or

(vii) personally liable or obligated to perform any such term, covenant or provision, such new owner's liability being limited in all cases to its interest in the Real Estate.

Notwithstanding anything to the contrary herein, Mortgagee's absence of liability for the matters set forth above or Tenant's unavailability of any claims shall not be deemed to permit the repetition or continuation of any such act or omission (or the continuation of a condition from a past act or omission) not otherwise permitted under the Lease.

8. Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iii) by overnight express carrier, addressed in each case as follows:

| | |
|---|---|
| To Mortgagee: | First Internet Bank of Indiana<br>8888 Keystone Crossing, Suite 1700<br>Indianapolis, Indiana 46240<br>Attn: |
| With a copy to:<br>To Tenant: | <br>MJC Holdings 123, LLC<br>5210 S. Priest Drive<br>Suite 3<br>Guadalupe, AZ 85283 |
| To Landlord: | Raymond L. Walls and Terryll Ann Walls Declaration of Trust<br>8541 Afton Circle<br>Huntington Beach, CA 92646 |

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this Paragraph shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

9. Tenant acknowledges and agrees that Mortgagee will be relying on the representations, warranties, covenants and agreements of Tenant contained herein and that any default by Tenant hereunder shall permit Mortgagee, at its option, to exercise any and all of its

rights and remedies at law and in equity against Tenant and to join Tenant in a foreclosure action thereby terminating Tenant's right, title and interest in and to the Leased Premises.

10. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and assigns and any nominees of Mortgagee, all of whom are entitled to rely upon the provisions hereof. This Agreement shall be governed by the laws of the State of Indiana.

11. This Agreement may be executed in multiple counterparts and all of such counterparts together shall constitute one and the same Agreement.

**(SIGNATURES BEGIN ON NEXT PAGE)**

**IN WITNESS WHEREOF**, the parties hereto have executed these presents the day and year first above written.

**TENANT:**

MJC 123, LLC,
a Delaware limited liability company

By: [signature]

Printed: JASON LEVECKE

Title: CEO / MANAGER

STATE OF ARIZONA )
) SS:
COUNTY OF MARICOPA )

Before me, a Notary Public in and for said County and State, personally appeared JASON LEVECKE the CEO/MANAGER of MJC 123, LLC, a Delaware limited liability company, and acknowledged the execution of the foregoing Subordination, Non-Disturbance and Attornment Agreement as the voluntary act and deed of such limited liability company and further acknowledged that he/she was authorized to execute the same.

Witness my hand and Notarial Seal this 12 day of May, 2015.

MATT LANGFIELD
Notary Public - Arizona
Maricopa County
My Comm. Expires Sep 1, 2015

[signature]
Notary Public

MATT LANGFIELD
Printed

My Commission Expires: 9/1/2015

**LANDLORD:**

RAYMOND L. WALLS AND TERRYLL ANN WALLS, AS CO-TRUSTEES OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013, a California trust

By: ______________________________
Raymond L. Walls, Co-Trustee

By: ______________________________
Terryll Ann Walls, Co-Trustee

STATE OF CALIFORNIA
COUNTY OF ___________

On May _______, 2015, before me, __________________________, a notary public, personally appeared **Raymond L. Walls and Terryll Ann Walls, Co-trustees of the Raymond L. Walls and Terryll Ann Walls Declaration of Trust dated May 30, 2002, as amended July 18, 2013**, a California trust, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to the within instrument and acknowledged to me that (he/she/they) executed the same in (his/her/their) authorized capacit(-y/-ies), and that by (his/her/their) signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

(Affix Seal)

______________________________________

Notary Public

**MORTGAGEE:**

**First Internet Bank of Indiana**

By:______________________________

Printed:___________________________

Title:_____________________________

STATE OF INDIANA )
) SS:
COUNTY OF MARION )

Before me, a Notary Public in and for said County and State, personally appeared __________________ the __________________ of FIRST INTERNET BANK OF INDIANA, and acknowledged the execution of the foregoing Subordination, Non-Disturbance and Attornment Agreement as the voluntary act and deed of such entity and further acknowledged that he/she was authorized to execute the same.

Witness my hand and Notarial Seal this ___________ day of May, 2015.

______________________________
Notary Public

______________________________
Printed

My Commission Expires: My County of Residence:

______________ ____________________

**EXHIBIT "A"**

## TO
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

## LEGAL DESCRIPTION OF REAL ESTATE

LOTS 19 TO 28 INCLUSIVE IN BLOCK 8 IN COBE AND MCKINNON'S 59TH STREET AND WESTERN AVENUE SUBDIVISION IN THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 13, TOWNSHIP 38 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

FOR INFORMATION ONY: TAX ID # 19-13-227-039-0000

**EXHIBIT A**

**COPY OF LEASE**

[TO BE ATTACHED BY TENANT]

**Sent:** Mon, 24 Aug 2015 08:17:01 -0700
**Subject:** Re: Demand Notice for Past Due Rent KFC 5852 S. Western, Chicago
**From:** Jason LeVecke <jasonlevecke@gmail.com>
**To:** raymondlwalls@aol.com
**Cc:** Matt Langfield <mrlangfield@gmail.com>, Neisha LeVecke <neishalevecke@gmail.com>, mreinsch@comcast.net, matt.mcneill@dtz.com

Regrettably we are having to make serious adjustments to our business. A recent culmination of events are putting real pressure on us. Frankly we are going to need to adjust the rents. We are working with consultants on restructuring and will be in touch soon. Jason

Jason LeVecke
(877) 312-4287 x307
jasonlevecke@gmail.com

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

On Sat, Aug 22, 2015 at 8:18 PM, <raymondlwalls@aol.com> wrote:
> As of Sat. Aug 22, 2015 we have not received any rent payment from the
> tenant for the above property. The rent and late fees are past due per
> the Demand Notice received by the tenant.
>
> I will let you know when we receive the rent and would appreciate an
> explanation why the rent for Aug has been delayed and if this is a one time
> problem or ???
>
> Raymond L. Walls, CA RE Broker
> BRE 00873995
> 714-612-4684
>
>
> -----Original Message-----
> From: Jason LeVecke <jasonlevecke@gmail.com>
> To: raymondlwalls <raymondlwalls@aol.com>
> Cc: Matt Langfield <mrlangfield@gmail.com>; Neisha LeVecke
> <neishalevecke@gmail.com>; mreinsch <mreinsch@comcast.net>
> Sent: Thu, Aug 20, 2015 2:50 pm
> Subject: Re: Demand Notice for Past Due Rent KFC 5852 S. Western, Chicago
>
> reissuing rent tomorrow 8-21. thank you.
>
>
>
> Jason LeVecke
> (877) 312-4287
> x307

**Exhibit 15**

**Sent:** Sat, 29 Aug 2015 14:07:11 -0700
**Subject:** Re: Demand Notice for Past Due Rent KFC 5852 S. Western, Chicago
**From:** Jason LeVecke <jasonlevecke@gmail.com>
**To:** raymondlwalls@aol.com, Todd Feltus <tfeltus@kflawaz.com>, Julia Guinane <jag@kflawaz.com>, Margaret LeVecke Edgar <margaretledgar@gmail.com>
**Cc:** tdr@rkjlegal.com, rh@rkjlegal.com, Matt Langfield <mrlangfield@gmail.com>, Neisha LeVecke <neishalevecke@gmail.com>, mreinsch@comcast.net, matt.mcneill@dtz.com
KFC Chicago Demand Notice Aug 25, 2015.pdf

Mr. Walls,

I know it has taken us time to get our head around things. This has been a difficult time for us. I was unable to answer sooner as we were not 100% sure what direction we needed or could take. As you may be aware, unfortunately two of our largest entities had to file for Chapter 11 reorg. A culmination of unfortunate events hit us very hard and it has forced us to move forward differently then we had expected. We are even having to reject several leases in those entities. It hit our businesses as well us personally. While our MJC entity that is your tenant has not filed we have no choice but to make adjustments to our business in order to move forward. Otherwise MJC may also have to file. As such we need to adjust our rents for this location to 70,000 in annual rent. We regret this situation but we have little choice. I have copied our counsel Todd Feltus. Please advise.

Very sincerely,
Jason

Jason LeVecke
(877) 312-4287 x307
jasonlevecke@gmail.com

CONFIDENTIALITY NOTICE: The information contained in this message is privileged and confidential. It is intended only to be read by the individual or entity named above or their designee. Any distribution or publication of this message by any person who is not the intended recipient is strictly prohibited. If you have received this message in error, do not read it. Please immediately notify the sender and delete it.

On Wed, Aug 26, 2015 at 10:12 AM, <raymondlwalls@aol.com> wrote:
> Attached Tenant Default Notice dated Aug 25, 2015 which was mailed by
> certified mail return receipt requested and certificate of mailing.
>
> Raymond L. Walls, CA RE Broker
> BRE 00873995
> 714-612-4684
>
>
> -----Original Message-----
> From: Jason LeVecke <jasonlevecke@gmail.com>
> To: raymondlwalls <raymondlwalls@aol.com>

**Exhibit 16**