# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RAYMOND L. and TERRYLL ANN WALLS,    )
as Co-Trustees of the RAYMOND L. WALLS    )
AND TERRYLL ANN WALLS    )
DECLARATION OF TRUST    )
DATED MAY 30, 2002,    )
AS AMENDED JULY 18, 2013,    )
    )
    *Plaintiffs,*    )
    )
    v.    )    No. 16-cv-4048
    )
VRE CHICAGO ELEVEN, LLC,    )
VERDAD REAL ESTATE, INC.,    )    Judge Thomas M. Durkin
EXP REALTY ADVISORS, INC.,    )
TARTAN REALTY GROUP, INC.,    )
BAKER MONROE PLLC,    )
B. JASON KEEN,    )
ROBERT J. MOORHEAD, RUSSELL SMITH,    )
CHRIS BAKER, JUSTIN HUSTON,    )
VPC CHICAGO11, LLC,    )
VESTAPOINT CAPITAL II LLC,    )
AARON STEARNS, and MATT LANGFIELD,    )
    )
    *Defendants.*    )
    )
    )
VERDAD REAL ESTATE, INC., and    )
VRE CHICAGO ELEVEN, LLC,    )
    )
    *Third-Party Plaintiffs*    )
    )
    v.    )
    )
MARK A. REINSCH,    )
MARK A. REINSCH, P.A.,    )
DTZ AMERICAS, INC.,    )
CUSHMAN & WAKEFIELD, INC., and    )
MATTHEW MCNEILL,    )
    )
    *Third-Party Defendants.*    )

# MEMORANDUM OPINION AND ORDER

The Second Amended Complaint (or "complaint") brings ten counts rooted in fraudulent inducement and negligent misrepresentation against several defendants for conduct during the purchase and sale of commercial property located in Cook County, Illinois. R. 89.[1] Two of those defendants, VRE Chicago Eleven, LLC ("VRE") and Verdad Real Estate, Inc. ("Verdad"), brought a Third-Party Complaint for Contribution against five third-parties. R. 93.

Pending before the Court are five motions to dismiss. Defendants Baker Monroe PLLC, Chris Baker, and Justin Huston (collectively the "Baker Monroe defendants") have moved to dismiss the complaint for, *inter alia*, lack of personal jurisdiction. R. 94. Defendant Matthew Langfield has also moved to dismiss for lack of personal jurisdiction. R. 152. Defendants VPC Chicago11, LLC, Vestapoint Capital II LLC, and Aaron Stearns (collectively, "Vestapoint") have moved to dismiss Count X of the complaint under Fed. R. Civ. P 12(b)(6). R. 129.

---

[1] The Court has subject matter jurisdiction based on diversity. Plaintiffs are California citizens, while the defendants are all citizens of states other than California. One of the third-party defendants is a citizen of California. However, that does not defeat diversity jurisdiction in the action between plaintiffs and defendants. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 67 (1996) ("Thus, assuming that jurisdiction is based upon diversity of citizenship between [plaintiff] and [defendant], the question concerning impleader is whether there is a jurisdictional basis for the claim by [defendant] against [third-party defendant]. The fact that [plaintiff] and [third-party defendant] may be co-citizens is completely irrelevant. Unless [plaintiff] chooses to amend his complaint to assert a claim against [third-party defendant], [plaintiff] and [third-party defendant] are simply not adverse, and there need be no basis of jurisdiction between them.").

Third-party defendants DTZ Americas, Inc., Cushman & Wakefield, Inc., and Matthew McNeill have moved to dismiss the third-party complaint for failure to state a claim. R. 150. Finally, third-party defendants Mark A. Reinsch and Mark A. Reinsch, P.A. have moved to dismiss for failure to state a claim on similar grounds and for lack of personal jurisdiction. R. 166.[2]

## BACKGROUND

### A. Acquisition of the Properties and Conversion Side Agreement

Verdad is a large developer of commercial properties, which it leases to single tenants such as fast food restaurants. In March 2014, Verdad and its wholly-owned subsidiary, VRE,[3] acquired a group of eleven properties (the "Chicago Eleven Properties") from an entity owned and/or controlled by third-party Jason LeVecke. R. 89 ¶ 22. All eleven properties were leased for use as Kentucky Fried Chicken ("KFC") restaurants, both before and after Verdad purchased the properties. The KFCs were owned and operated by LeVecke entities throughout the relevant period.

Verdad and LeVecke agreed to a sale/leaseback deal in which LeVecke purchased the properties from an unrelated party for $1 million each, and then immediately sold them to Verdad for $1.9 million each. *Id*. ¶¶ 27-28. After the closing in March 2014, Verdad and LeVecke entered into new leases for $171,000 in annual

---

[2] The remaining defendants—VRE Chicago Eleven, LLC, Verdad Real Estate Inc., EXP Realty Advisors, Inc., Robert J Moorhead, Russell Smith, Tartan Realty Group, Inc., and B. Jason Keen—have answered the Second Amended Complaint. R. 92, 141, 148.

[3] The Court will refer to actions taken by Verdad through VRE as actions taken by Verdad. For purposes of this opinion, it is largely irrelevant whether Verdad or VRE is implicated. Where necessary, the Court will refer to VRE by name.

rent, doubling the amount of rent paid by each KFC for the same operation. (Before the scheme, each KFC paid about $76,000 in annual rent.) The parties each profited from the scheme—LeVecke made just under $1 million for each property he immediately flipped to Verdad. Verdad made short-term profits by selling the properties above Verdad's purchase price through the higher cap rates achieved by the higher rents. *Id*. ¶ 32.

The deal also contemplated conversion of the Chicago Eleven Properties from KFCs to Hardee's restaurants. $400,000 per store was built into the price paid by Verdad for this purpose. *Id*. ¶ 38. LeVecke was to renovate and convert each property with the $400,000, and the increased rent amount represented repayment of those costs. *Id*.

In early 2015, the conversion plans were abandoned. But Verdad already had paid the $400,000 per store in conversion costs to LeVecke. To account for the change, Verdad and LeVecke entered into new leases in February 2015. *Id*. ¶ 43. Those leases removed the language requiring conversion, but the rent remained the same. Notably, the new leases Verdad entered into were with a different LeVecke entity, MJC Holdings 123, LLC ("MJC"). *Id*. The leases were guaranteed by yet another LeVecke entity, Frontier Star 1, LLC ("FS1"), as well as by LeVecke personally. *Id*. ¶ 37. Verdad also entered into a side agreement with LeVecke to account for the conversion costs. In that side agreement, Verdad and LeVecke agreed that if Verdad could obtain high enough sale prices for the properties, it would allow LeVecke to keep each $400,000 without having to spend the money on the properties or otherwise

account for it. If Verdad could not sell the properties for what it wanted, LeVecke would have to repay the money in exchange for a rent reduction, or make $400,000 of improvements to each property. *Id.* ¶ 45. The side agreement was omitted from the February 2015 leases. *Id.* ¶ 46.

**B. Sale of the Properties**

In February 2015, Verdad offered the Chicago Eleven Properties for sale. One of those properties was eventually purchased by Plaintiffs (the "Property"). Verdad listed the Property for 30 percent more than it had paid for it, marketing it largely on the basis that it would generate rental income of $171,000 per year. *Id.* ¶¶ 53-54. Verdad also touted the fact that the February 2015 lease was guaranteed by FS1, and circulated false financial information that, as of 2014, FS1 had a net worth of $70 million and an annual income of $15 million. *Id.* ¶ 55. The marketing materials also misrepresented the identity of the tenant of the properties, claiming it was Frontier Star, LLC (another LeVecke entity) when, in fact, it was MJC. *Id.* ¶ 56. And the materials misrepresented that MJC was part of the FS1 hierarchy of companies and operated 200 restaurants. *Id.*

When Plaintiffs sought financial statements and sales data related to the Property to verify these claims, defendants EXP and Tartan, acting as the sales and marketing agents for the Property, told Plaintiffs that doing so would violate the tenant's franchise agreement. *Id.* ¶ 61. During negotiations, EXP and Tartan also represented that Verdad had considered converting the KFC to a Hardee's

restaurant, but since the Property was doing so well as a KFC, Verdad decided to continue to operate the Property as a KFC. *Id*. ¶ 65.

On March 24, 2015, Plaintiffs and VRE entered into a Purchase and Sale Agreement, under which Plaintiffs agreed to purchase the Property for $2,443,000. The sale closed on May 15, 2015. *Id*. ¶ 67. In connection with the closing, defendant Baker Monroe prepared an Estoppel Certificate and Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), which represented that the February 2015 lease constituted the sole agreement between the landlord and the tenant of the Property. *Id*. ¶¶ 68-69.

Three months later, on July 27, 2015, Frontier Star filed for bankruptcy. In August, MJC fell behind in its rent payments. *Id*. ¶ 72. On August 29, 2015, LeVecke wrote Plaintiffs that, because of the financial distress of his various entities, MJC could not pay more than $70,000 in annual rent for the Property. *Id*. ¶¶ 74-75. FS1 filed for bankruptcy in November 2015. Finally, LeVecke filed for bankruptcy in January 2016. *Id*. ¶ 76.

Plaintiffs allege Verdad had a close and ongoing business relationship with LeVecke and his various entities. They allege Verdad knew of LeVecke's precarious financial position and potential bankruptcy before VRE and Plaintiffs closed on the sale of the Property. *Id*. ¶ 73. After LeVecke defaulted, Plaintiffs re-leased the Property, but the new tenant pays substantially lower rent than Plaintiffs expected under the February 2015 lease. *Id*. ¶ 77.

Plaintiffs filed suit against defendants VRE, Verdad, EXP, and Tartan on April 5, 2016, and added the remaining defendants in subsequent complaints. The Second Amended Complaint alleges that Plaintiffs were fraudulently induced into purchasing the Property by various misrepresentations and omissions of defendants, and that the defendants conspired with and aided and abetted each other in the fraud. The role of each defendant relevant to this opinion will be discussed in detail below.

## ANALYSIS

### I. Defendants' Motions to Dismiss

#### A. The Baker Monroe Defendants' Motion (R. 94)

Defendants Chris Baker and Justin Huston, through the law firm Baker Monroe PLLC, represented VRE in connection with the sale of the Property. Plaintiffs allege Baker and Huston played a key role in the side agreement regarding the $400,000 payments made to LeVecke for the conversion of the KFCs to Hardee's stores. Baker Monroe ultimately took the lead in implementing the plan by drafting and obtaining the execution of the side agreement. R. 89 ¶¶ 46-47, 49. Plaintiffs also allege that Baker wrote in an email to defendant Matt Langfield (LeVecke's employee) that the side agreement had to be terminable on a property-by-property basis, otherwise Verdad would have "to disclose it when we go under contract and you [LeVecke] would have to disclose it when you sign an estoppel." *Id*. ¶ 50. Further, Plaintiffs allege that the Baker Monroe defendants participated in obtaining and providing to potential buyers the Estoppel Certificate and SNDA, which falsely stated

that there were no other agreements in place relating to the properties other than the leases. *Id*. ¶¶ 68-69.

Plaintiffs bring six claims against the Baker Monroe defendants: fraudulent inducement – misrepresentation (Count V); fraudulent inducement – omissions (Count VI); negligent misrepresentations – affirmative statements (Count VII); negligent representations – omissions (Count VIII); aiding and abetting (Count IX); and civil conspiracy (Count X). All six claims stem from the Baker Monroe defendants' role in the fraudulent scheme, as described above.

The Baker Monroe defendants have moved to dismiss on several grounds. They first argue the Court cannot exercise personal jurisdiction over them in Illinois. R. 95. In the alternative, they argue that this Court should defer to a parallel state-court case filed in Texas, or that the claims against them should be dismissed under the attorney immunity doctrine. Finally, they argue that if this Court retains jurisdiction, Plaintiffs have failed to state a claim.

### 1. Personal Jurisdiction

A challenge to a court's exercise of personal jurisdiction over a defendant is made under Federal Rule of Civil Procedure 12(b)(2). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). The Illinois long-arm statute requires nothing more than the standard for federal due process: that the defendant have sufficient contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). While a complaint need not include facts alleging personal jurisdiction, once personal jurisdiction is challenged, the plaintiff has the burden of proving personal jurisdiction. *Northern Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). And where there has been no hearing on the matter, the plaintiff must make only a prima facie showing of jurisdiction.[4] *Id.*

There are two types of personal jurisdiction. General jurisdiction exists when the party's affiliations with the forum state "are so constant and pervasive as to render [it] essentially at home" there. *Daimler*, 571 U.S. 117, 122 (2014). Plaintiffs have not asserted that this Court may exercise general jurisdiction over the Baker Monroe defendants, so this Court considers only specific jurisdiction. Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden,* 571 U.S. at 284. This type of jurisdiction requires that "(1) the defendant [] purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the

---

[4] The Baker Monroe defendants submitted a Declaration in support of their motion to dismiss the complaint, contending they never communicated with anyone in Illinois. R. 95-2. When the Baker Monroe defendants presented their motion before the Court on August 16, 2017, the Court gave them the choice of having the Declaration considered, after limited discovery, or having the motion adjudicated solely based on the pleadings, without consideration of any extraneous facts. The Baker Monroe defendants chose the latter approach, and accordingly, the Court relies only on Plaintiffs' allegations.

exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012).

Where, as here, the plaintiff's claims are for intentional torts, the purposeful availment inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state. *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). In such cases, courts look to whether the plaintiff has shown "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Id.* at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). This is known as the *Calder* test.

Plaintiffs' allegations satisfy all three prongs of the *Calder* test. The first and third prongs are easily met. Plaintiffs allege the Baker Monroe defendants' actions were intentional fraudulent misrepresentations and omissions, satisfying the first prong. As to the third prong, although Plaintiffs were not Illinois citizens, their financial losses stem only and directly from the Property in Illinois.

The second prong—whether the Baker Monroe defendants' actions was expressly aimed at Illinois—warrants longer discussion. The Baker Monroe defendants argue that the only connection they have with Illinois is that their alleged conduct affected Plaintiffs, "who had connections with Illinois." R. 95 at 5. They contend they never directed any communications at Illinois nor did they contact anyone in Illinois. But that argument ignores the entire purpose of the allegedly tortious conduct—to sell eleven properties *located in Illinois*. The basis for

jurisdiction here does not depend on contacts the Baker Monroe defendants had with Illinois. The Court need not stretch its reach so far. Instead, the Baker Monroe defendants expressly aimed their conduct at Illinois by engaging in a fraudulent scheme regarding Illinois. On that basis—and not through Plaintiffs' citizenship or the communications the Baker Monroe defendants had with fellow co-defendants— the Court finds the express aiming requirement satisfied.

The Baker Monroe defendants cite *John Crane, Inc. v. Shein Law Ctr., Ltd.*, 891 F.3d 692 (7th Cir. 2018) in support of their argument against personal jurisdiction. But that case is not factually analogous. In *John Crane*, the Seventh Circuit held that out-of-state litigation against an Illinois resident was not sufficient to establish personal jurisdiction in Illinois over a lawyer involved in the out-of-state litigation. There, the only connection between the lawyer and the state was the Illinois resident, who was sued in Pennsylvania, California, and Texas. The district court ruled that any minor activities that occurred in Illinois related to the litigation were tangential and insufficient to confer personal jurisdiction over the out-of-state lawyers. *See John Crane Inc. v. Simon Greenstone Panatier Bartlett, APC*, 2017 WL 1093150, at *13 (N.D. Ill. Mar. 23, 2017) (jurisdiction was not proper in the Northern District of Illinois because the Illinois contacts were merely incidental to the out-of-state litigation).

The opposite is true here. The activities surrounding the transaction of the Property, such as the closing, were merely incidental to the fraudulent scheme, which was directed at eleven Illinois properties. It is not unreasonable or unfair to expect

the Baker Monroe defendants to defend their alleged fraud here, given that the subject of the transaction is in Illinois, and they actively participated in a fraudulent scheme that dealt with eleven Illinois properties. *See Walden*, 571 U.S. 277, 285 (2014) ("[I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.")

Exercising specific jurisdiction over the Baker Monroe defendants also comports with the traditional notions of fair play and substantial justice. The following factors are relevant: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Tamburo*, 601 F.3d at 709.

First, Illinois has a strong interest in providing a forum to seek redress for fraudulent schemes dealing with Illinois property and inflicted by out-of-state actors. Further, the Purchase and Sale Agreement ("PSA") for the purchase of the Property contains a choice of law, venue, and forum selection clause which designates Illinois as the proper venue for the action. R. 89-12 ¶ 14.5.[5] Plaintiffs, as signatories to the

---

[5] That provision states: "This Contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Illinois, without giving effect to its choice of laws principles. Exclusive venue for any litigation between the parties hereto shall be in Cook County, Illinois, and shall be brought in the State or Federal Courts for Cook County, Illinois. The parties hereto waive any challenge to personal jurisdiction or venue (including without limitation a challenge based on inconvenience) in Cook

PSA, are obligated to bring their suit against VRE in Illinois. It would be unreasonable to expect Plaintiffs to file separate lawsuits to give each defendant (residents of Texas, New York, Florida, Delaware, and Arizona) who allegedly participated in the scheme the privilege of defending this litigation in its home state when jurisdiction is otherwise proper in Illinois. That would be cumbersome and impractical, particularly when those states do not have any substantial interest in having the litigation in that state. A single suit in Illinois thus promotes the most efficient resolution of Plaintiffs' claims. *See Tamburo,* 601 F.3d at 710. Finally, the burden on the defendants, including the Baker Monroe defendants, is small. The defendants are individuals or entities that conducted business in Illinois or concerning Illinois (*i.e.*, the fraudulent scheme at issue), as evidenced by the deliberate choice to select Cook County, Illinois as the venue and forum and Illinois law as governing. The Baker Monroe defendants drafted the PSA that contains that clause, and are likely familiar with Illinois laws and courts for that reason as well.

A finding that the Baker Monroe defendants, as alleged participants in the fraudulent scheme, are not subject to personal jurisdiction in Illinois would create significant barriers to effective relief for Plaintiffs, who are bound by the PSA's forum selection clause. Under these circumstances, it is far more reasonable to conclude that the Baker Monroe defendants should anticipate being haled into court in Illinois rather than a court with little relation to the fraudulent scheme. The exercise of

---

County, Illinois, and specifically consent to the jurisdiction of the State and Federal Courts of Cook County, Illinois."

personal jurisdiction in Illinois over the Baker Monroe defendants comports with traditional notions of fair play and substantial justice, such that jurisdiction over the Baker Monroe defendants is proper in Illinois.

## 2. Attorney Immunity Doctrine

The Baker Monroe defendants next argue the Court should dismiss this case pursuant to the *Colorado River* abstention doctrine. But before the Court addresses abstention, it first addresses the choice of law issue raised by the Baker Monroe defendants regarding attorney immunity, which will affect the Court's abstention analysis.

Illinois choice of law principles govern the case because it was filed in Illinois. *CDX Liquidating Tr. v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011). But the choice of law provision in the PSA makes clear that "[t]his Contract, the entire relationship of the parties hereto, and any litigation between the parties (whether grounded in contract, tort, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Illinois, without giving effect to its choice of laws principles." R. 89-12 ¶¶ 14-5. Plaintiffs argue that the PSA's choice of law provision governs, even though the Baker Monroe defendants are not signatories to the contract, because they are "closely related" to the dispute so that it was foreseeable that they would be bound by the PSA. The Court agrees.

Illinois courts have held that nonparties to a contract containing choice of law and forum selection clauses can be bound by that clause "where the nonsignatory is 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."

*Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 183 (Ill. App. Ct. 2014); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993). In *Adams v. Raintree Vacation Exchange, LLC,* 702 F.3d 436 (7th Cir. 2012), the Seventh Circuit acknowledged that whether a party is "closely related" to a dispute is a "vague standard," and explained that "it can be decomposed into two reasonably precise principles": "'affiliation' and 'mutuality,'" either of which is sufficient to allow a nonparty to invoke (and be bound by) a forum selection clause. *Id.* at 439.

The mutuality principle applies here. In *Adams*, the Seventh Circuit explained that the concept of mutuality allows a coconspirator in a fraudulent scheme to invoke a forum selection clause. "[W]ere it not for this principle of mutuality," the court explained, "the plaintiffs would have a choice of forums, and [the coconspirator] would not; and that could not have been the intention behind a clause that makes Mexico the exclusive forum irrespective of the parties' domiciles." *Id.* at 443.

Here too, if the principle of mutuality were not applied against the Baker Monroe defendants, they would have their choice of forum and applicable law, but Plaintiffs would be bound to litigate in Illinois under Illinois law. This makes little sense from a practical standpoint—why should this case be litigated as two cases in two different states, applying two separate states' laws, rather than as one case in one court applying Illinois law, as the choice of law and forum selection clause intended? Like in *Adams*, the Baker Monroe defendants are alleged to be coconspirators in a fraudulent scheme. The Baker Monroe defendants also represented VRE and Verdad in connection with the sale of the Property, and were

involved with the drafting of many of the transaction's documents, including the PSA. As agents of VRE, they can enforce the PSA's choice of law clause against the Plaintiffs. For this reason, the choice of law clause can be enforced against them as "closely related" parties, just as their clients and coconspirators can enforce the clause against Plaintiffs. *See e.g., Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 213 (7th Cir. 2015), *as amended* (Dec. 14, 2015) (plaintiff, who was counsel to a corporation owned by the defendant and bond counsel to the transaction, and who was "intimately involved in the negotiations leading to, and the documents embodying, the bond transaction," could invoke a forum selection clause based on principles of affiliation and mutuality); *Mohamed v. Chicago Title Ins. Co.*, 2012 WL 4955309, at *4 (E.D. Wis. Oct. 17, 2012) (attorney acting as the agent of plaintiff during the formation of an agreement containing the forum selection clause could enforce the forum selection clause against third-party defendant). To hold otherwise would allow the choice of law clause to be too easily evaded. *Adams*, 702 F.3d at 441 ("Were it not for judicial willingness in appropriate circumstances to enforce forum selection clauses against affiliates of signatories, such clauses often could easily be evaded.").

The Baker Monroe defendants make a perfunctory argument that because they were not parties to the PSA, and their alleged fraudulent misrepresentations all occurred outside of Illinois, the forum selection clause should not apply to them. R. 95 at 10. In support, they cite *Int'l Profit Assocs., Inc. v. Linus Alarm Corp.*, 971 N.E.2d 1183, 1191 (Ill. App. Ct. 2012). But *Linus Alarm* discussed the Illinois

Consumer Fraud Act, and held that that Act has a territorial limitation that applies only to transactions occurring primarily and substantially in Illinois. Plaintiffs in this case bring allegations of common law fraud, not allegations under the Consumer Fraud Act. The Baker Monroe defendants do not cite any cases suggesting that common law fraud has a similar territorial limitation. For those same reasons, *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 340 (N.D. Ill. 1997), also cited by the Baker Monroe defendants, does not apply either.

The Baker Monroe defendants further argue that this Court rejected the "closely related" theory in *Guaranteed Rate, Inc. v. Conn,* 264 F. Supp. 3d 909, 925 (N.D. Ill. 2017). But in *Guaranteed Rate,* this Court refused to apply the "closely related" doctrine when determining whether it could exercise personal jurisdiction over an out-of-state litigant who was not a party to the agreement at issue. The Court refused to do so based on due process concerns underlying a personal jurisdiction analysis. *Id.* at 925-928. Those same constitutional concerns are not implicated here on a choice of law analysis. The Court also held that the record there contained no evidence of affiliation, mutuality, or any other type of relationship discussed in the case law for enforcing forum selection clauses against nonsignatories. *Id.* at 927. That is not the case here.

Finding that the Baker Monroe defendants are subject to the choice of law provision contained in the PSA, the Court next addresses whether that choice of law clause applies to this case. There is no question that it does. The choice of law clause is broad, stating that "*any* litigation between the parties (whether grounded in

contract, *tort*, statute, law or equity) shall be governed by, construed in accordance with, and interpreted pursuant to the laws of the State of Illinois, without giving effect to its choice of laws principles." R. 89-12 ¶ 14-5 (emphasis added). The claims against the Baker Monroe defendants (alleging fraudulent and negligent misrepresentation and omission, conspiracy, and aiding and abetting fraud) are grounded in tort principles. Because the clause states that *any* litigation arising out of such principles is subject to the laws of the State of Illinois, the Court will apply Illinois law pursuant to the PSA.

Even if the PSA's choice of law clause did not govern the claims against Baker Monroe, Illinois law would still apply. The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases. *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503-04 (7th Cir. 1998). This means that "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id*. at 504. Courts determine whether Illinois has the most significant relationship by examining the following factors: "(1) the place of the injury, (2) the place where the injury-causing conduct occurred, (3) the domicile of the parties, and (4) the place where the relationship between the parties is centered." *Id*. Illinois courts also consider "the interests and public policies of potentially concerned states . . . as they relate to the transaction in issue." *Id*. Here, the parties are domiciled in California and Texas, and the remaining defendants are in various states around the country. The place of the injury and the place where the

relationship between the parties is centered is undoubtedly Illinois, as the Property is in Illinois.

The Baker Monroe defendants argue that the injury-causing conduct, *i.e.*, their fraudulent misrepresentations, all occurred in Texas. As a result, they contend Texas law should apply. They cite to *Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 873-74 (N.D. Ill. 2003) in support of that argument. R. 118 at 12-13. In *Telular*, the court relied on the factors in the Restatement (Second) of Conflict of Laws § 148 to determine which state had the most significant relationship to the action. Those factors are:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract he has been induced to enter by the false representations of the defendant.

*Telular Corp.*, 282 F. Supp. 2d. at 873. Relying on the comments to Section 148, which assign weight to the various factors, the court held that the place where plaintiff received the representations (New York) was as important a contact as the place where defendant made them (also New York), but neither was as important as the place where the plaintiff acted in reliance on those representations (Illinois). *Id*. The court further held that the plaintiff's principal place of business (Illinois) was of "substantial significance" and was more important than similar contacts of the defendant (Oregon). *Id*. As a result, the court held Illinois law applied. Importantly,

the *Telular* court noted that the factor concerning "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time" was inapplicable, and so did not take that into its analysis. *Id.*

Here, by contrast, the tangible thing that is the subject of the transaction—the Property—is situated in Illinois. As the comments to Section 148 indicate, the place where a tangible thing is situated at the time of the transaction "is of particular importance when the subject of the transaction is land," Restatement (Second) of Conflict of Laws § 148 cmt. i. Illinois is thus of "particular importance" in this determination. The remaining factors do not favor Texas. Although the Baker Monroe defendants argue their fraudulent misrepresentations were made in Texas, there is no indication that Plaintiffs acted in reliance or received those misrepresentations anywhere but in California. Likewise, the parties are in Texas and California. And because the Plaintiffs' domicile or residence is more important than similar contacts of the defendants, *see Telular*, 282 F. Supp. 2d at 873, this choice of law analysis favors California, not Texas. But neither party argues California law should apply. In any event, as described in the personal jurisdiction section, Illinois has a significant public policy interest in having its law applied to fraudulent schemes made regarding Illinois property, further supporting application of Illinois law.

Finally, Restatement (Second) of Conflict of Laws § 223—the section involving conflict of laws regarding conveyances of interest in land—likewise supports applying Illinois law. That section favors applying the "local law of the situs" to ensure "certainty, predictability and uniformity of result and ease in the determination and

application of the law to be applied." Restatement (Second) of Conflict of Laws § 223 cmt. b. Illinois has the most significant relationship to this case.

Turning now to Illinois law, Illinois does not apply the same broad attorney immunity principle the Texas Supreme Court applied in *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (2015), which the Baker Monroe defendants cite in support of dismissal. *Cantey Hanger* states that an attorney is immune from liability to nonclients for conduct within the scope of his representation of his clients. *Id*. at 481. Put differently, an attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer. *See id*. at 482. Illinois, however, recognizes an "absolute litigation privilege." *See O'Callaghan v. Satherlie,* 36 N.E.3d 999, 1008 (Ill. App. Ct. 2015). Such a privilege applies only in the context of judicial proceedings. *Id*. (to be subject to the litigation privilege, "communications must relate to proposed or pending litigation, and must be in furtherance of representation."). And, as the Baker Monroe defendants acknowledge, the broad attorney immunity doctrine from *Cantey Hanger* "has not yet been adopted by the Illinois Supreme Court and the lower courts in Illinois are not bound by stare decisis to apply it." R. 118 at 12. There is simply no indication that attorneys in Illinois are immune from liability from misrepresentations made during a real estate transaction, like here.

In any event, Plaintiffs allege the Baker Monroe defendants were participants in the fraudulent scheme, not merely attorneys to VRE. For that reason, even if the Court were to apply Texas law, the doctrine described in *Cantey Hanger* would not be

case dispositive for the Baker Monroe defendants at this stage in the proceedings. Immunity as described in *Cantey Hanger* depends on factual inquiries regarding whether fraudulent representations were made in the scope of representation. 467 S.W.3d at 481. Discovery will reveal whether their role was within the scope of their representation of VRE.

Accordingly, the Court declines to dismiss the Baker Monroe defendants under attorney immunity principles.

### 3. *Colorado River* Abstention

The Court will now address whether it should defer to a parallel state court case pending in Texas and abstain from proceeding with this case pursuant to the *Colorado River* abstention doctrine. Under that doctrine, set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), a federal court may stay or dismiss a suit in exceptional circumstances when there is a concurrent state proceeding and the stay or dismissal would promote "wise judicial administration." *Id.* at 818. In the wake of *Colorado River*, courts use a two-part analysis to determine whether abstention is appropriate. "First, the court must determine whether the state and federal court actions are parallel." *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014). If so, the court must consider whether "exceptional circumstances" justify abstention. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498 (7th Cir. 2011).

Suit are parallel if substantially the same parties are litigating substantially the same issues. *Id.* "Suits need not be identical to be parallel, and the mere presence

of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel." *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001). "In essence, the question is whether there is a substantial likelihood that the state litigation will dispose of all claims presented in the federal case. Any doubt regarding the parallel nature of the [state] suit should be resolved in favor of exercising jurisdiction." *Adkins*, 644 F.3d at 499. Here, the same issues are implicated in both this case and the Texas state court case. But the only defendant in the Texas case is Baker Monroe. *See* R. 95-1. The remaining defendants (who are not dismissed in this opinion) will continue to litigate here. And even if the Baker Monroe defendants are dismissed, all the claims will remain, because all the claims implicate defendants other than the Baker Monroe defendants. Accordingly, the Texas litigation will not dispose of all the claims presented here—it will only dispose of the Baker Monroe defendants. The Texas suit and the case here are not parallel for that reason.

Even if the suits were parallel, the Baker Monroe defendants' abstention argument also fails at the second step of the *Colorado River* analysis: whether "exceptional circumstances" justify abstention. The Court's task "is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 25-26 (1983) (emphasis in original). Courts in this circuit consider ten non-

exclusive factors in determining whether exceptional circumstances exist. *Freed*, 756

F.3d at 1018. These are:

> (1) whether the state has assumed jurisdiction over property;
> (2) the inconvenience of the federal forum;
> (3) the desirability of avoiding piecemeal litigation;
> (4) the order in which jurisdiction was obtained by the concurrent forums;
> (5) the source of governing law, state or federal;
> (6) the adequacy of state-court action to protect the federal plaintiff's rights;
> (7) the relative progress of state and federal proceedings;
> (8) the presence or absence of concurrent jurisdiction;
> (9) the availability of removal; and
> (10) the vexatious or contrived nature of the federal claim.

*Id.*

Here, six of the factors weigh against abstention. *First*, Texas has not assumed

jurisdiction over the Property. The Baker Monroe defendants argue this factor "is

entirely irrelevant to this matter" without any explanation of why that is so. The

Court finds this factor weighs against abstention. The Property is in Illinois, and the

Baker Monroe defendants have not provided any indication that Texas has or can

assume jurisdiction over it. *Second*, the threat of piecemeal litigation weighs against

abstention. Several defendants, including Verdad, VRE, Tartan, and EXP, are subject

to jurisdiction in Illinois because of the forum selection clause. Those defendants, and

several others, have already answered the complaint in this case and are presumably

engaging in discovery. The discovery likely overlaps or is identical between the two

cases. This case will continue regardless of the Court's decision on abstention as to

the Baker Monroe defendants. And it makes little sense for Plaintiffs to litigate the

same fraudulent scheme related to the same property in two different fora—here

against most of the defendants, and in Texas against only the Baker Monroe defendants.

*Third*, this Court obtained jurisdiction first. This case was filed in April 2016. R. 1. On May 15, 2017, Plaintiffs filed a motion for leave to file an amended complaint adding defendant Baker Monroe, which the Court granted. R. 70, 78. That same day, Plaintiffs filed their complaint in the Texas case. R. 95-1. Shortly thereafter, in July 2017, Plaintiffs filed the Second Amended Complaint in this case adding the remaining defendants, including defendants Baker and Huston. R. 89. The Texas case was thus filed after this case was filed, and on the same day that Plaintiffs brought one of the Baker Monroe defendants into this case. Like the other *Colorado River* factors, when each court obtained jurisdiction is to be determined in a pragmatic, flexible manner. *See Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 702 (7th Cir. 1992). "Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Id.* This case had been pending for almost a year when Baker Monroe was added, and the Texas case had been pending for only three months when the remaining Baker Monroe defendants were added here. This factor weighs against abstention, particularly when viewed alongside the *fourth* factor: the relevant progress of each case. The Texas court stayed that action pending resolution of this case without ruling on Baker Monroe's summary judgment motion on a discrete issue—whether the attorney immunity doctrine applies to bar Plaintiffs' suit against the Baker Monroe defendants. Accordingly, the Texas case is no further along than

this case. *Fifth*, as the Court explained above, Illinois law governs Plaintiffs' claims against the Baker Monroe defendants as parties "closely related" to the PSA, which is at the heart of this dispute. *Finally*, there is no indication that this action was brought for a vexatious or improper purpose. Plaintiffs had no choice but to file this action against at least some of the defendants because of the PSA's choice of law, venue, and forum selection clause. Adding the Baker Monroe defendants made sense because they are part of the same alleged fraudulent scheme.

The remaining factors (convenience, adequacy of the Texas state court action to protect Plaintiffs' rights, concurrent jurisdiction, and the availability of removal) are neutral or weigh slightly in favor of abstention. But those factors do not justify the surrender of this Court's jurisdiction, especially when weighed against the six factors above supporting jurisdiction. The Baker Monroe defendants' motion to dismiss under the *Colorado River* abstention doctrine is denied.

### 4.    Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6)[6]

---

[6] A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 570). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

Finally, the Baker Monroe defendants argue that Plaintiffs failed to sufficiently allege that any fraudulent misrepresentations were made by the Baker Monroe defendants. R. 95 at 13. They contend that (1) the statements in the Estoppel Certificate and the SNDA were made by the tenant of the Property—MJC Holdings 123, LLC—not by them, and (2) the statements in the Estoppel and SNDA technically were true.

Plaintiffs brought six claims against the Baker Monroe defendants: fraudulent inducement – misrepresentation (Count V); fraudulent inducement – omissions (Count VI); negligent misrepresentations – affirmative statements (Count VII); negligent representations – omissions (Count VIII); aiding and abetting (Count IX); and civil conspiracy (Count X). The Baker Monroe defendants do not address the various standards and elements required for each claim, and it is unclear to which claims their motion to dismiss for failure to state a claim applies. Nor do they point to any case law in support of their undeveloped argument. "The court will not research and consider the details of defendant's argument where defendant has done little more than provide what would be an opening paragraph to a more properly framed argument." *Dawson v. W. & H. Voortman, Ltd.*, 853 F. Supp. 1038, 1046 (N.D. Ill. 1994); *United States v. Smith,* 26 F.3d 739, 743 (7th Cir. 1994) (courts need not research and construct legal arguments for parties).

Further, there is nothing about the Baker Monroe defendants' contentions that makes dismissal obvious. Plaintiffs allege the Baker Monroe defendants "participated in preparing, approving, obtaining the execution of, and disseminating to the parties

involved in the transaction" the Estoppel Certificate and SNDA. R. 89 ¶ 68. The Baker Monroe defendants' arguments that they did not misrepresent the facts contained in those documents simply because the documents were not signed by them misses the point of Plaintiffs' allegations—Plaintiffs allege the Baker Monroe defendants knew that the representations contained in those documents were false but continued to misrepresent the truth and prepare and disseminate the documents with that knowledge. *Id.* ¶¶ 69-70. It is plausible that the Baker Monroe defendants fraudulently or negligently misrepresented material facts, either themselves or as co-conspirators, through those documents and their role in their preparation, execution, and dissemination. The Baker Monroe defendants' motion to dismiss for failure to state a claim is therefore denied.

## B. Matt Langfield's Motion (R. 152)

As to defendant Matt Langfield, Plaintiffs allege he was an employee of various entities owned and/or controlled by LeVecke. R. 89 ¶ 15. They also allege he was LeVecke's "top lieutenant," had substantial knowledge of the scheme, and was a participant on many of the emails regarding the side agreement. *Id.* ¶¶ 41, 46, 47, 49-51, 69. Further, Plaintiffs allege Langfield "substantially participated in the efforts to withhold from Plaintiffs financial statements and sales data relating specifically to the Property." *Id.* ¶ 61. Langfield moves to dismiss for lack of personal jurisdiction, and attaches a declaration attesting to certain facts related to his employment with LeVecke. He argues that the fiduciary shield doctrine applies, precluding the Court from exercising jurisdiction.

The fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 550 (7th Cir. 2001) ("Illinois employs the fiduciary-shield doctrine, under which a person who enters the state solely as fiduciary for another may not be sued in Illinois."). As the Illinois Supreme Court explained, where a defendant's conduct in Illinois "was a product of, and was motivated by, his employment situation and not his personal interests . . . it would be unfair to use this conduct to assert personal jurisdiction over him as an individual." *Rollins v. Ellwood*, 565 N.E.2d 1302, 1318 (1990). Two exceptions apply: (1) actions motivated by an individual's personal interests, and (2) actions within an individual's discretion. *See Rice*, 38 F.3d at 912 (7th Cir. 1994); *Leong v. SAP Am., Inc.*, 901 F. Supp. 2d 1058, 1064 (N.D. Ill. 2012). Put simply, if an employee has control over his own duties, is a decision-maker for the company, and acts in his own personal interest, the fiduciary shield doctrine does not prevent the court from taking personal jurisdiction over that employee. *See Crisostomo v. Schneider-Kidan,* 2017 WL 2880893, at *2 (N.D. Ill. July 6, 2017) (listing cases).

Plaintiffs admit that Langfield acted at LeVecke's direction as his employee. R. 89 ¶ 15; *id*. ¶ 68 ("Among the persons involved in doing so on behalf of LeVecke and his entities was Langfield."). They fail to allege that Langfield was motivated by personal interests or acted within his discretion in participating in the fraudulent

scheme. Accordingly, based on Plaintiffs' own allegations, the Court finds Langfield is entitled to the fiduciary shield doctrine, and the Court cannot exercise personal jurisdiction over him.

But both parties also have provided the Court with extrinsic evidence to consider. In determining whether personal jurisdiction exists, the Court accepts all well-pleaded allegations in the complaint as true but may also consider outside materials such as affidavits. *See Felland*, 682 F.3d at 672. If, as here, the defendant submits declarations or other outside materials challenging personal jurisdiction, the plaintiff has an obligation to submit affirmative evidence supporting the exercise of jurisdiction. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782–83 (7th Cir. 2003). Although disputes must be resolved in the plaintiff's favor, unrefuted assertions contained in the defendant's affidavits will be accepted as true. *GCIU–Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n. 1 (7th Cir. 2009).

Langfield attached to his motion to dismiss a declaration describing his employment between 2008 and 2015 with various LeVecke entities. R. 153-1. He describes his role as being "purely administrative," consisting of "processing documents for LeVecke to sign and modify, printing and circulating leases for signatures, and keeping lease documents organized." *Id*. ¶ 6. Langfield explains that he was aware of the allegedly fraudulent transaction and assisted LeVecke when he closed on the Chicago Eleven Properties, but that his role was limited to forwarding copies of the Estoppel Certificate and the SNDA to LeVecke and LeVecke's attorney.

*Id.* ¶ 6. He also attests that he never had the authority to act on behalf of LeVecke or bind any LeVecke-controlled entities. *Id.* ¶ 10.

In response to Langfield's motion and declaration, Plaintiffs attach a declaration with several exhibits they contend demonstrate Langfield had significant involvement in the scheme. R. 162-1. To the extent the Court considers Langfield's declaration, Plaintiffs ask that they be permitted to conduct discovery and submit a supplemental response. R. 162 at 7. Langfield disagrees with that approach and instead asks the Court to follow the "traditional course" by considering his declaration and the extrinsic evidence included in Plaintiffs' response, without allowing Plaintiffs to take additional discovery that will be costly to Langfield. R. 170 at 5.

The Court finds that the extrinsic evidence Plaintiffs provide shows that Langfield had a more substantial role than the "purely administrative" one he describes. However, Plaintiffs' extrinsic evidence does not refute any of the remaining Langfield declarations. Importantly, the exhibits do not refute that Langfield was LeVecke's employee and did not have the authority to act on behalf of LeVecke or any of his entities. Instead, the exhibits show that LeVecke had final authority. LeVecke signed the original PSA between LeVecke and Verdad, R. 162-3, and LeVecke was the main and final decision-maker. *See* R. 162-6 (indicating Verdad needed to set up a call with LeVecke to make a decision regarding cap rates); R. 162-11 (Langfield noting LeVecke had a meeting with KFC, and Langfield would send updates once they spoke); 162-12 (LeVecke was the guarantor for the Chicago Eleven leases); *see also* R. 89-1 at 21 (LeVecke signed lease agreements); R. 89-5 at 19 (same); R. 89-6 at

4 (same); R. 89-7 at 3 (Langfield indicated he needed to review leases with LeVecke); R. 89-11 at 4 (Langfield not included on list of principals of FS1); R. 89-14 at 4 (LeVecke signed Estoppel Certificate).

In sum, even viewing all of Plaintiffs' allegations and extrinsic evidence in the light most favorable to Plaintiffs, Plaintiffs fail to make a prima facie showing (and fail to refute their own allegations) that Langfield was anything but LeVecke's employee, acting at LeVecke's direction. There is nothing in the complaint or the exhibits Plaintiffs offer suggesting that Langfield had any decision-making power or had any interest in the transactions. It would be unfair to assert personal jurisdiction over Langfield when his actions were directed by his employment situation, and not his personal interests.

For these reasons, Langfield's motion to dismiss for lack of personal jurisdiction is granted. The Court also declines to allow Plaintiffs additional discovery. *See Cent. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (holding that, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted"); *Sanderson v. Spectrum Labs, Inc.,* 248 F.3d 1159 (Table), 2000 WL 1909678, *3 (7th Cir. 2000) ("When the lack of personal jurisdiction is clear, jurisdictional discovery would serve no purpose and should not be permitted.") (citations omitted).

## C. Vestapoint's Motion (R. 129)

Next, Defendants VPC Chicago11, LLC, Vestapoint Capital II LLC, and Aaron Stearns (collectively, "Vestapoint")[7] move to dismiss pursuant to Rule 12(b)(6), arguing Plaintiffs have failed to sufficiently allege Vestapoint participated in the civil conspiracy as alleged in Count X. The Court agrees.

To bring a claim for civil conspiracy, Plaintiffs must allege: (1) an agreement between two or more persons for accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing Illinois law). Because Plaintiffs' conspiracy allegations sound in fraud, Plaintiffs must also make their allegations with particularity. *Id.* at 507. ("Although claims of . . . civil conspiracy are not by definition fraudulent torts, Rule 9(b) applies to 'averments of fraud,' not claims of fraud."). Under Rule 9(b), "a party who alleges fraud or mistake 'must state with particularity the circumstances constituting fraud or mistake.'" *Pirelli Armstrong Tire Corp. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Thus, a plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Id.*

---

[7] Defendant VPC Chicago11 was the "capital partner in the deal," investing $5.4 million for a "25 percent stake" in VRE. R. 89 ¶ 40. Defendant VestaPoint Capital II is the Managing Member of VPC Chicago11, and Stearns is the Managing Director of VestaPoint Capital II. *Id.* ¶¶ 13, 14, 40. For purposes of this opinion, those exact roles are unimportant, and the Court will treat the three defendants as one.

Plaintiffs fail to allege any agreement by Vestapoint in the conspiracy, much less one that meets the heightened requirements of Rule 9(b). Plaintiffs allege Vestapoint is a partial owner of VRE. R. 89 ¶ 40. But that is where its alleged fraudulent activities end. Plaintiffs make insufficient, conclusory allegations that Vestapoint, along with the rest of the co-conspirators, "formulated and carried out a plan and agreement to endeavor to unload some or all of the Chicago 11 properties," *id*. ¶ 155; "actively encouraged and supported the plan and agreement," *id*. ¶ 157; and was "a chief beneficiary of the plan and agreement," *id*. Nowhere do Plaintiffs allege Vestapoint had any actual knowledge of the agreement. They do not allege Vestapoint had any role in the original sale to Verdad, the side agreement, the marketing of the Chicago Eleven properties to potential buyers, the PSA or the SNDA, or the eventual sale of the Property to Plaintiffs. There are simply no allegations that VestaPoint "under[stood] the general objectives of [the purported] conspiratorial scheme," "accept[ed] the general objectives of the scheme," or "agree[d], either explicitly or implicitly[,] to do its part to further those objectives." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994).

Plaintiffs argue that the particularity requirement of Rule 9(b) should be relaxed because they lack access to all the facts necessary to state their claim. R. 161 at 5. The Court does not find that argument persuasive. Plaintiffs clearly have enough information to describe in significant detail the intricacies of the scheme, including by attaching several exhibits to both their complaint and various responses to the defendants' motions to dismiss. Further, Plaintiffs' counsel attests to having

already conducted discovery in other cases dealing with a related scheme against the same defendants. R. 152-1. Surely, if Vestapoint was involved in the scheme, Plaintiffs would have uncovered at least one fact supporting its alleged agreement. But Plaintiffs fail to point to *any* facts that indicate agreement in the conspiracy, and their speculation as to Vestapoint's involvement is insufficient to meet the pleading standards of Rule 8(b)(2), much less the heightened standards required by Rule 9(b). *See Twombly*, 550 U.S. at 555 (Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level.").

Plaintiffs also ask the Court to infer knowledge by Vestapoint. Plaintiffs admit that "there are no precise allegations in the Second Amended Complaint specifically mirroring those facts [of knowledge]." R. 161 at 6. Plaintiffs contend that their "other factual allegations are broad enough to subsume facts that the VestaPoint Defendants indeed did have knowledge and/or involvement with respect to some or all of the facts in question." *Id*. Taking all facts as true and drawing all reasonable inferences in Plaintiffs' favor, the Court cannot infer knowledge based on Plaintiffs' conclusory allegation that Vestapoint "formulated and carried out [the] plan and agreement" because it benefited from the transaction. Such an inference is entirely speculative.

In sum, Plaintiffs fail to point to anything suggesting Vestapoint agreed to the conspiracy. Accordingly, Plaintiffs cannot maintain their conspiracy claim against Vestapoint. *See Independent Trust Corp. v. Stewart Information Services Corp.*, 665

F. 3d 930, 938-39 (7th Cir. 2012) (dismissing conspiracy claim where complaint fails to allege an explicit or implicit agreement by the defendant to the alleged wrongful scheme); *Merrilees v. Merrilees*, 998 N.E.2d 147, 163 (Ill. App. Ct. 2013) (dismissing plaintiff's conspiracy claim where "no specific facts indicated that [defendant] knew about the alleged conspiracy and agreed to participate in it"); *Reuter v. MasterCard International, Inc.*, 921 N.E.2d 1205, 1217 (Ill. App. Ct. 2010) (dismissing plaintiff's conspiracy claim where the allegations "do not include any facts to support an *agreement*") (emphasis in original). Count X against Vestapoint is dismissed without prejudice. If Plaintiffs believe they can cure the deficiencies identified here, they may file a motion for leave to file an amended complaint on or before October 16, 2018. The motion should attach a redlined comparison between the current complaint and the proposed amended complaint, and it should be supported by a brief of no more than five pages describing how the proposed amended complaint cures the deficiencies in the current complaint. Vestapoint is not to respond unless ordered to do so by the Court.

## II.    Third-Party Defendants' Motions to Dismiss

The Court will now address the third-party complaint and motions to dismiss it. Defendants VRE Chicago Eleven, LLC and Verdad Real Estate, Inc. (again, "Verdad"), filed a third-party complaint for contribution against two groups of third-party defendants. R. 93. The first group consists of Plaintiffs' real estate brokers for the transaction—DTZ Americas, Inc., Cushman & Wakefield, Inc., and Matthew McNeill (collectively "Cushman & Wakefield"). The second group consists of

Plaintiffs' attorney, Mark A. Reinsch, P.A., and its principal Mark A. Reinsch (collectively "Reinsch"). Both groups have filed motions to dismiss.

### A. Cushman & Wakefield's Motion to Dismiss (R. 150)

Intentional tortfeasors have no right to contribution under the Illinois Contribution Act.[8] *See, e.g., Ziarko v. Soo Line Railroad*, 641 N.E.2d 402, 404 (Ill. 1994). Cushman & Wakefield argue that Verdad has no right to contribution from them because the only non-intentional claim alleged against Verdad (negligent misrepresentation/omission) is barred by the economic loss doctrine.[9] *See Allendale Mut. Ins. Co. v. MATRA Transp., S.A.*, 1999 WL 259960, *6 (N.D. Ill. Apr. 13, 1999) (where plaintiff's claims against defendant were barred under economic loss rule, third-party claim for contribution against third-party defendant was likewise barred).

Under the *Moorman* doctrine, a party may not recover in negligence for a purely economic loss. *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443 (1982).[10] However, an exception to the *Moorman* doctrine exists where someone

---

[8] An Act in Relation to Contribution Among Joint Tortfeasors ("Contribution Act"), 740 ILCS § 100/1 *et. seq.*

[9] It is permissible for third-party defendants such as Cushman & Wakefield to seek to dismiss complaints even where the defendants themselves have not made such motions. Fed. R. Civ. P. Rule 14(a)(2).

[10] Economic losses mean "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property." *Moorman,* 435 N.E.2d at 449. Plaintiffs' losses stem from the Property's reduced value (driven by the annual rental rate), and the loss of profits they incurred when LeVecke and his entities defaulted on the lease agreement. Accordingly, their damages are economic losses, and the *Moorman* doctrine applies.

in the business of supplying information to guide others in their business transactions makes a negligent representation. *Id*. at 452. For example, a plaintiff may recover economic losses in negligence from a real estate broker. *Zimmerman v. Northfield Real Estate, Inc.*, 510 N.E.2d 409, 413 (Ill. App. Ct. 1986). Cushman & Wakefield argue that because Verdad was merely a seller of real estate, it was not in the business of supplying information to others to guide them in their business transactions with third parties, and as a result, Plaintiffs' negligent misrepresentation claims are barred.

The Court agrees that as a general matter, sellers of real estate do not fall under the *Moorman* exception. *See Olson v. Hunter's Point Homes, LLC*, 964 N.E.2d 60, 64 (Ill. App. Ct. 2012). But the case here is not that simple. Verdad is not merely a seller of real estate. Plaintiffs allege it also provides "project financing, development and capital solutions, underwriting, and 'expert economic analysis & sales week increases.'" R. 89 ¶ 3. Relevant to this transaction, Plaintiffs allege Verdad distributed an offering memorandum and a confidential information memorandum, which included information on the tenant of the Property. *Id*. ¶ 55. This information was not about the Property itself, which is what Verdad was selling. Rather, it was information Verdad provided Plaintiffs about third parties, in order for Plaintiffs to transact business through a landlord-tenant relationship with those third parties. Where, as here, it is plausible that a company provides both information and non-informational goods, the dispositive question is whether the information furnished with the non-informational goods was central to the business transaction. *Orix Credit*

*All., Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 476 (7th Cir. 1997). That inquiry requires the Court to examine the particular information and transaction on a case-by-case basis. *Rankow v. First Chicago Corp.*, 870 F.2d 356, 364 (7th Cir. 1989). The Court cannot do that at this stage of the proceedings.

Plaintiffs plausibly allege Verdad was in the business of supplying information about the third party tenant. As a result, Plaintiffs have plausibly pleaded facts supporting that an exception to the *Moorman* doctrine applies. Plaintiffs' negligence claims against Verdad and VRE survive, and thus Verdad and VRE's contribution action survives. Cushman & Wakefield's motion to dismiss is denied.

### B. Reinsch's Motion to Dismiss (R. 166)

Finally, third-party defendant Reinsch brings a motion to dismiss arguing the Court lacks personal jurisdiction over him and his law firm. Reinsch is a Florida lawyer who represented Plaintiffs in the transaction regarding the Property. His clients are California residents. Verdad alleges that the Court may exercise personal jurisdiction over Reinsch because Reinsch (a) acted as the Plaintiffs' attorney in connection with the sale of the Property, (b) transacted business in Illinois in connection with the transaction from which this action arises, (c) was involved with the making of a contract that was premised on the purchase of property within Illinois, and (d) committed tortious acts and omissions which caused harm in Illinois. R. 93 ¶ 6. Verdad's specific allegations against Reinsch are rooted in negligence from Reinsch's alleged failure to investigate and identify the fraudulent scheme. *See id.* ¶ 31.

Specific personal jurisdiction requires that Reinsch either purposefully availed himself of benefits of Illinois law or that he directed his activities at Illinois and Plaintiffs' claims arose from those activities. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Drobny v. Lanham*, 680 F. App'x 486, 488 (7th Cir. 2017). Verdad fails to allege facts that support specific personal jurisdiction. First, Verdad does not contend that Reinsch availed himself of the benefits of Illinois law. Second, Verdad does not allege that Reinsch had any contact with Illinois. Plaintiffs were in California during the transaction leading to the purchase of the Property, and VRE was in Texas. *Walden* requires analysis of contacts between the defendants and the forum (here between the third-party defendants and the forum), not contacts between the plaintiff and the forum, or between the plaintiff and the defendants. Because Reinsch "formed no jurisdictionally relevant contacts" with Illinois during the transaction that led to the purchase of the Property, Verdad has not identified a basis for specific personal jurisdiction over Reinsch. *Walden,* 571 U.S. at 289.

Further, Verdad's allegations that Reinsch was "involved in the making of the contract" does not subject Reinsch to jurisdiction here either.[11] Reinsch's involvement with that contract stemmed only from his representation of Plaintiffs. Reinsch is a

---

[11] Verdad also argues Reinsch can be subjected to personal jurisdiction in Illinois as "closely related" to the dispute such that the PSA's forum selection clause binds him. As the Court detailed in *Guaranteed Rate*, forum selection clauses cannot bind a closely related party if due process would not otherwise allow the Court to exercise personal jurisdiction over that party. *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 925 (N.D. Ill. 2017).

Florida attorney, licensed to practice in Florida, and performed his services from Florida. R. 93 ¶¶ 5-6; R. 168-2. Verdad does not allege Reinsch ever appeared in Illinois during the negotiations or transaction of the Property. Any neglect on Reinsch's part in representing Plaintiffs occurred only in Florida. It does not subject Reinsch to jurisdiction in Illinois. *See Yates v. Muir*, 492 N.E.2d 1267, 1269 (1986) (attorney who practiced in Kentucky, represented a plaintiff on a federal administrative claim, and did not appear in any court in Illinois, was not subject to jurisdiction in Illinois because "[t]he legal services performed by the defendant were performed exclusively in Kentucky; if there was any malpractice in rendering those services it took place in Kentucky."). *Compare with Diamond Mortgage Corp. v. Sugar*, 913 F.2d 1233, 1246 (7th Cir. 1990) (attorneys' failure to disclose conflicts of interests related to services rendered within Illinois was sufficient to confer personal jurisdiction; the attorneys there visited Illinois and sent letters and phone calls to Illinois).

It is also important to note the distinction between Reinsch and the Baker Monroe defendants, who were also lawyers representing parties in the transaction. The Baker Monroe defendants are alleged to be not only attorneys to VRE in the transaction but are also alleged to be participants in the fraudulent scheme. Through that fraudulent conduct, they purposefully availed themselves of jurisdiction in Illinois, because the fraud involved Illinois properties. Reinsch's alleged negligence, however, is only connected with his representation of Plaintiffs, not to any conduct he directed at Illinois apart from that relationship. Reinsch did not purposefully avail

himself of this Court's jurisdiction. *See Walden*, 571 U.S. at 289 (rejecting the lower court's conclusion that the defendant's knowledge of the plaintiff's "strong forum connections," combined with the "conclusion that [the plaintiff] suffered foreseeable harm in [the forum]," was sufficient to establish minimum contacts). Reinsch's motion to dismiss is granted.

If Verdad believes it can cure the deficiencies identified here, it may file a motion for leave to file an amended complaint on or before October 16, 2018. The motion should attach a redlined comparison between the current third-party complaint and the proposed amended complaint, and it should be supported by a brief of no more than five pages describing how the proposed amended complaint cures the deficiencies in the current third-party complaint. Reinsch is not to respond unless ordered to do so by the Court.

## CONCLUSION

For the foregoing reasons,

1) Defendants Baker Monroe PLLC, Chris Baker, and Justin Huston's motion to dismiss (R. 94) is denied;

2) Defendant Matt Langfield's motion to dismiss (R. 152) is granted;

3) Defendants VPC Chicago11, LLC, Vestapoint Capital II LLC, and Aaron Stearns's motion to dismiss (R. 129) is granted;

4) Third-Party Defendants DTZ Americas, Inc., Cushman & Wakefield, Inc., and Matthew McNeill's motion to dismiss (R. 150) is denied;

5) Third-Party Defendants Mark A. Reinsch, P.A., and Mark A. Reinsch's motion to dismiss (R. 166) is granted.

ENTERED:

Dated: September 25, 2018

_____
Honorable Thomas M. Durkin
United States District Judge