**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAYMOND L. AND TERRYLL ANN WALLS, AS CO-TRUSTEES OF THE RAYMOND L. WALLS AND TERRYLL ANN WALLS DECLARATION OF TRUST DATED MAY 30, 2002, AS AMENDED JULY 18, 2013, | |
| *Plaintiffs*, | |
| v. | Case No. 1:16-cv-04048 |
| VRE CHICAGO ELEVEN, LLC, | Judge Thomas M. Durkin |
| VERDAD REAL ESTATE, INC., | Magistrate Jeffrey T. Gilbert |
| EXP REALTY ADVISORS, INC., | |
| TARTAN REALTY GROUP, INC., | |
| BAKER MONROE PLLC, | |
| B. JASON KEEN, | |
| ROBERT J. MOORHEAD, | |
| RUSSELL SMITH, | |
| CHRIS BAKER, | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| JUSTIN HUSTON, | |
| VPC CHICAGO11 LLC, | |
| VESTAPOINT CAPITAL II LLC, | |
| AARON STEARNS, | |
| and | |
| MATT LANGFIELD, | |
| *Defendants*. | |

**THIRD AMENDED COMPLAINT**

Come now Raymond L. and Terryll Ann Walls ("Plaintiffs"), as Co-Trustees of the Raymond L. Walls and Terryll Ann Walls Declaration of Trust dated May 30, 2002, as amended July 18, 2013 (the "Trust"), and state as follows for their Second Amended Complaint:

**PARTIES AND JURISDICTION**

1. Plaintiffs are the Co-Trustees of the Trust. Plaintiffs are citizens and residents of the State of California. Consequently, the Trust also is a citizen and resident of the State of California for purposes of 28 U.S.C. § 1332.

2. Defendant VRE Chicago Eleven, LLC ("VRE") is a limited liability company organized and existing under the laws of the State of Texas. The members of VRE are Verdad Real Estate, Inc. and VPC Chicago11 LLC. VRE sold to Plaintiffs real property and improvements located in Cook County, Illinois, which sale forms the basis for this action. By its contract with Plaintiffs, VRE consented to the exercise of personal jurisdiction by state or federal courts located in Cook County, Illinois.

3. Defendant Verdad Real Estate, Inc. ("Verdad") is a corporation organized and existing under the laws of the State of Texas, and having its principal place of business in Texas. Verdad advertises itself, on its website, as being "one of the nation's leading single-tenant real estate developers," having "almost 500 projects completed in 33 states, and over $800mm in real estate transactions." According to Verdad, "[t]he largest national brands trust Verdad from site selection to store opening." Among the services Verdad advertises are project financing, development and capital solutions, underwriting, and "expert economic analysis & sales week increases." As described more fully below, on information and belief, Verdad and VRE are the alter ego of one another.

4. Defendant EXP Realty Advisors, Inc. ("EXP") is a corporation organized and existing under the laws of the State of New York, and having its principal place of business in New York. EXP served as Verdad's and/or VRE's broker in their sale of real property and improvements located in Cook County, Illinois, which forms the basis for this action.

5. Defendant Tartan Realty Group, Inc. ("Tartan") is a corporation organized and existing under the laws of the State of Illinois, and having its principal place of business in Illinois. Tartan served as the Illinois broker of record for EXP, VRE and/or Verdad in connection with the listing and sale of the property that is the subject of this litigation.

6. Defendant Baker Monroe PLLC ("Baker Monroe") is a limited liability company organized and existing under the laws of the State of Texas, and having its principal place of business in Texas. Baker Monroe is a law firm and acted as counsel for VRE and Verdad in connection with the sale of the property that is the subject of this litigation.

7. Defendant B. Jason Keen ("Keen") is a citizen and resident of the State of Texas. Keen is, and at all pertinent times has been, the President of Verdad and the Manager of VRE.

8. Defendant Robert J. Moorhead ("Moorhead") is a citizen and resident of the State of Texas. At all pertinent times, Moorhead was a real estate broker and agent affiliated with, and acting on behalf of, EXP.

9. Defendant Russell Smith ("Smith") is a citizen and resident of the State of Texas. At all pertinent times, Smith was a real estate broker and agent affiliated with, and acting on behalf of, EXP.

10. Defendant Chris Baker ("Baker") is a citizen and resident of the State of Texas, and a lawyer engaged in the practice of law. Baker is, and at all pertinent times has been, a principal of Baker Monroe.

11. Defendant Justin Huston ("Huston") is a citizen and resident of the State of Texas, and a lawyer engaged in the practice of law. Huston is, and at all pertinent times has been, a principal of Baker Monroe.

12. Defendant VPC Chicago11 LLC ("VPC") is a limited liability company organized and existing under the laws of the State of Delaware. On information and belief, the members of VPC are citizens and residents of the State of New York, the State of Florida and/or one or more states other than the State of California.

13. Defendant VestaPoint Capital II LLC ("VestaPoint II") is a limited liability company organized and existing under the laws of the State of Delaware. On information and belief, the members of VPC are citizens and residents of the State of New York, the State of Florida and/or one or more states other than the State of California. At all pertinent times, Vesta Point II was the Managing Member of VPC.

14. Defendant Aaron Stearns ("Stearns") is a citizen and resident of the State of Florida. At all pertinent times, Stearns was Managing Director of VestaPoint II and, in that capacity, served as the manager of VPC.

15. Defendant Matt Langfield ("Langfield") is a citizen and resident of the State of Arizona. At all pertinent times, Langfield was an employee and agent of various entities owned and/or controlled by Jason LeVecke.

16. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a), because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17. This Court may exercise personal jurisdiction over Defendants VRE, Verdad, EXP, Tartan, Keen, Moorhead and Smith because: (a) VRE consented to same by contract;

(b) on information and belief, VRE and Verdad are the alter ego of one another; (c) Verdad executed a letter of intent pertaining to the sale of the subject real property in Illinois, which letter of intent contained material misrepresentations; (d) EXP, Moorhead and Smith served as Verdad and/or VRE's broker and agent in their sale of real property and improvements located in Cook County, Illinois, which forms the basis for this action; (e) Tartan is an Illinois citizen and resident; (f) VRE, Verdad, EXP, Keen, Moorhead and Smith, and each of them, transacted business in Illinois, either directly or through one or more agents or co-conspirators, in connection with the transaction from which this action arises; and/or (g) VRE, Verdad, EXP, Keen, Moorhead and Smith, and each of them, committed tortious acts and omissions outside of Illinois, directly or through one or more agents or co-conspirators, which caused harm within Illinois. With respect to the referenced out-of-state Defendants, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over the out-of-state defendants comports with constitutional due process.

18. This Court may exercise personal jurisdiction over Defendants Baker Monroe, Baker and Huston because: (a) they acted as legal counsel for VRE and Verdad in connection with the sale of real estate which forms the basis of this action, and negotiated and drafted the sale contract, which designated Illinois as the forum for any lawsuits arising in connection with the transaction; (b) on information and belief, they transacted business in Illinois, either directly or through one or more agents or co-conspirators, in connection with the transaction from which this action arises; and/or (c) they committed tortious acts and omissions outside of Illinois, directly or through one or more agents or co-conspirators, which caused harm within Illinois. With respect to Baker Monroe, Baker and Huston, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over them comports with constitutional due process.

19. This Court may exercise personal jurisdiction over VPC, VestaPoint II and Stearns because, through their ownership of and participation in the activities of VRE, the sale transaction out of which this action arises, and their receiving some of the proceeds of the said sale transaction, (a) they transacted business in Illinois, either directly or through one or more agents or co-conspirators, in connection with the transaction from which this action arises; and/or (b) they committed tortious acts and omissions outside of Illinois, directly or through one or more agents or co-conspirators, which caused harm within Illinois. With respect to VPC, VestaPoint II and Stearns, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over them comports with constitutional due process.

20. This Court may exercise personal jurisdiction over Defendant Langfield because he transacted business in Illinois, either directly or through one or more agents or co-conspirators, in connection with the transaction from which this action arises; and/or (b) he committed tortious acts and omissions outside of Illinois, directly or through one or more agents or co-conspirators, which caused harm within Illinois. With respect to Defendant Langfield, the foregoing facts satisfy Illinois' long-arm statute, and exercise of personal jurisdiction over him comports with constitutional due process.

21. Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because Tartan is a resident of this judicial district, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and/or some or all of the defendants may be deemed residents of this district or otherwise may be subject to suit in this district.

## FACTS COMMON TO ALL COUNTS

### I. VERDAD'S AND VRE'S ACQUISITION OF PROPERTY

22. This action concerns real property located at 5852 S. Western Ave., in Chicago, Illinois, which, as of March, 2014, was leased for use as a Kentucky Fried Chicken restaurant (the "Western Ave. KFC," or the "Property"). The Western Ave. KFC was part of a group of 11 properties located on the south side of Chicago, leased for use as Kentucky Fried Chicken restaurants, that Verdad and VRE purchased from an entity controlled by Jason LeVecke ("LeVecke"), JC123 Holdings LLC ("JC"), in March, 2014. (Those 11 properties are sometimes referred to as the "Chicago 11.")

23. LeVecke is a grandson of Carl Karcher, the founder of CKE Restaurants Holdings, Inc. ("CKE"), which operates Hardee's and Carl's Jr. restaurants, among others. As of early 2015, LeVecke claimed to operate approximately 200 fast food restaurants. At that time, LeVecke primarily operated through a network of companies under the umbrella of a holding company known as Frontier Star 1, LLC ("FS1"). Among the principal operating companies under the FS1 umbrella were Frontier Star, LLC ("Frontier Star"), which operated Hardee's, and Frontier Star CJ, LLC ("Frontier Star CJ"), which operated Carl's Jrs.

24. LeVecke and Verdad began doing deals together in 2013. As of that time, LeVecke had a checkered past. For instance, in or around 2004, LeVecke was sued by his mother, who alleged he had defrauded her into transferring an ownership stake in several restaurants to himself and his siblings. Also, in or around 2008, LeVecke and his entities were in arrears to CKE for approximately $5 million, and they had to bring in an outside investor and restructure the business. By 2014-15, it appears that LeVecke again was having difficulty meeting his payment obligations to CKE.

25. In or around 2013, Verdad began engaging in a series of transactions with LeVecke, most of which were construction or conversion sale/leasebacks. Overall, LeVecke and Verdad engaged in deals relating to more than 20 properties – including the Chicago 11 – before late July, 2015. Verdad effected the said acquisitions and subsequent sales through various special purpose entities it created and controlled, including VRE; VRE Chandler, LLC; VRE Waxahachie, LLC; VRE Forsyth, LLC; VRE Grayslake, LLC; VRE Joliet, LLC; and VRE Libertyville, LLC.

26. Upon information and belief, Verdad's special purpose entities, including VRE, were controlled entirely by Verdad, inadequately capitalized, and had no separate existence from Verdad, and they and Verdad were the alter ego of one another. Among other things, Jason Keen ("Keen") – a principal of Verdad and one of the six "team members" featured on Verdad's website – is the manager of VRE. Also, all actions taken by and on behalf of VRE pertinent to this action were undertaken by Keen and/or other principals, employees and/or agents of Verdad, acting in their capacity as such. Accordingly, Verdad is liable for the acts, omissions and wrongful conduct of VRE on either or both of two grounds: (a) they are the alter ego of one another; and (2) principals, employees and/or agents of Verdad committed the wrongful acts and omissions underlying this action, and Verdad is directly liable for its own wrongful conduct and that of its principals, employees and agents. Further, Keen is liable for the acts, omissions and wrongful conduct of VRE and Verdad in that all acts and omissions of those entities which are the subject of this action were undertaken by or at the direction of Keen – both on behalf of VRE and Verdad and, also, in furtherance of his personal interests in that he personally was a guarantor of the loans taken out by VRE in connection with its acquisition of the Chicago 11 properties.

27. Verdad and VRE purchased the Chicago 11 properties from JC in March, 2014. The original plan for the deal was: LeVecke identified 11 KFC restaurants owned and operated by an unrelated party, which LeVecke could purchase for approximately $1 million each. LeVecke then reached a deal with Verdad to immediately resell the properties to Verdad for $1.9 million each, with each property to be accompanied by a 20-year lease, dated March 6, 2014 (the "2014 Lease"), under which an entity owned and/or controlled by LeVecke, Frontier Star, would agree to pay rent at a vastly higher level than the rent that had been paid in the past. Prior to the sale, the Chicago 11 properties were commanding rents of approximately $76,000 per store, per year. In contrast, the leases that Verdad and VRE put in place with LeVecke provided for the payment of rent in the minimum amount of $171,000 per store, per year, to be increased over time pursuant to certain escalation clauses. (A copy of the March 6, 2014 lease for the Western Ave. KFC is appended hereto as Exhibit 1.)

28. JC's purchase of the Chicago 11 properties from an unrelated party, and its immediate resale of those properties to Verdad and VRE for nearly double the purchase price that JC paid, both closed in late March, 2014, with the closings occurring at the same time through a double escrow arrangement.

29. Following the closings, and continuing at least through May 15, 2015, when the sale to Plaintiffs closed, the Chicago 11 properties continued to operate as KFC stores. For most of that period, the stores were operated by the same entity that had operated them prior to the sale to JC, under a contractual arrangement between LeVecke and the operator. Thus, before and after March, 2014, the same KFC stores were being operated, in the same manner, and at the same locations. Nothing other than financial engineering by Verdad, VRE and LeVecke accounted for the property prices almost doubling, and the rents more than doubling.

30. In purchasing the Chicago 11 properties from LeVecke, Verdad and VRE did not care what price they paid for the properties in the abstract. Their sole focus was on how the prices related to the rents payable under the leases. Verdad wished to earn a nine (9) percent return, or cap rate, on the monies it was paying to purchase the properties.

31. Ultimately, Verdad, VRE and LeVecke agreed that the purchase price for the Chicago 11 properties would be $1.9 million each, and the rent under the leases for each of the stores would be at least $171,000 per year (calculated as nine percent of $1,900,000). As noted, above, those rent levels represented more than a doubling of the rents that had been paid on the properties prior to the sale.

32. The sale terms between Verdad, VRE and LeVecke were designed to enable LeVecke to make large and quick profits in that he would be acquiring 11 properties for $1 million each and immediately flipping them to Verdad and VRE for $1.9 million each. And, the terms similarly were designed to enable Verdad and VRE to make large short-term profits by reselling the properties within a short time for prices reflecting further large mark-ups.

33. How the Verdad/VRE side of the deal was intended to work was: they had no intention of owning the properties long term; rather, they planned to dispose of the properties within a year or so. And, how they planned to price the properties for resale was to select an exit cap rate they believed the market would bear in connection with the sale of triple net properties to investors – *e.g.*, 6.5 to 7 percent – and apply that cap rate to the rent payable under the lease on each property to arrive at the listed sale price.

34. Specifically, with the rent having been set at a minimum of $171,000 per year, Verdad and VRE would divide the annual rent by the selected cap rate, *e.g.*, 7 percent (.07), which would result in a proposed sale price of approximately $2,443,000 per store. If realized,

that sale price would net Verdad a profit of at least $543,000 for each of the Chicago 11 properties, from merely buying the properties and then reselling them within a year or so. Moreover, the actual return was even higher in that Verdad and VRE began collecting rent from LeVecke immediately upon the closing of the Chicago 11 transaction.

35. One wrinkle in the foregoing scenario was that, for the long-term owner of the property to have a reasonable expectation of receiving the rent payments promised under the leases (for at least 20 years), the business operations at the premises would have to be sufficiently profitable to support those rent payments. Here, that was not going to happen. As Verdad and VRE, as well as EXP and Tartan, knew or should have known, the typical annual rent to sales ratio for a fast food restaurant is 7 to 9 percent. The annual sales at the Chicago 11 properties were in the range of $1 million or less per store, and the rent between the prior owner and operator had been approximately $76,000 per year. So, as compared to the normal 7 to 9 percent rent to sales ratio, Verdad, VRE and LeVecke loaded up the Chicago 11 properties with rent obligations amounting to at least 17 percent of sales, approximately double the market.

36. The unsustainable rents resulting from the foregoing financial engineering were not a problem for Verdad and VRE, who planned to flip the properties and be out of them within a year or so. Nor were they a problem for LeVecke, at least initially. He had just made a large profit by buying properties for $1 million apiece and then immediately reselling them to Verdad and VRE for $1.9 million each. However, the foregoing circumstances created huge potential problems for third parties who might buy one or more of the Chicago 11 properties, based on an expectation that they would receive rent payments for 20 years of $171,000 per year or more. (The leases provided for periodic increases in rent and contained renewal options.) In light of

the circumstances discussed above, it was only a matter of time before the expected rent payments became unsustainable and ceased.

37. The inflated leases might pose a problem for LeVecke longer term, to the extent he was called upon to actually pay rent at the levels provided for in the leases, or he or the related entity that guaranteed the leases (FS1) were called upon to perform their guaranties. What ultimately happened, though – and likely always was the plan – was that a short time after the property sales closed, LeVecke went to the buyers, asserted that he could not continue to pay rent at the level provided for in the lease, and sought a drastic rent reduction. He likely banked on the expectation that the buyers, while unhappy at the prospect of a rent reduction, would survey the marketplace, find that the proposed reduced rent actually represented market rent for the property, and reluctantly accept the rent reductions since they were not likely to obtain payment of greater rents from anyone else. LeVecke also likely banked on the fact that if buyers sought to enforce the lease guaranties, they would find there was not much prospect of successfully doing so. The corporate guarantor was a holding company which had no liquid assets, and its holdings in subsidiaries – whose assets likely were substantially encumbered by liens of secured creditors – would be difficult to collect against. And, as to LeVecke personally, his assets were jointly held with his wife, but she had not joined in the guaranty, thus making the LeVecke guaranty pyrrhic and worthless.

38. Another significant aspect of the Chicago 11 deal was that, originally, the KFCs were to be converted to Hardee's restaurants, which are generally more valuable than KFCs; and, it was recognized that the costs of conversion would amount to at least $400,000 per store, to be paid by the tenant, which was part of the rationale for the large markup in what Verdad paid LeVecke for the properties, over and above the price LeVecke paid to buy the properties on the

same day. In essence, the Chicago 11 deal was supposed to involve conversions and leasebacks, in which part of the funds paid by Verdad for the properties represented conversion financing, to be used for improvements to the properties, and part of the rent under the leases represented repayment of the funds provided for the conversions.

## II. POST-ACQUISITION EVENTS

39. Following the March, 2014 closing of Verdad's and VRE's acquisition of the Chicago 11 properties, little, if anything, unfolded according to the original plan with respect to conversions, re-openings and prompt re-sales. While Verdad and VRE contemplated that the first conversions hopefully would be open by June, 2014, and in any event no later than October, 2014, nothing happened towards that end for more than a year. For months, the project supposedly was mired in the planning and permitting process. Months later, LeVecke began discussing a different plan, under which some or all of the restaurants might remain as KFCs instead of being converted to Hardee's. Finally, in early 2015, it was decided that all of the Chicago 11 properties would remain as KFCs, LeVecke would seek franchise agreements from KFC to operate them as such, and Verdad and VRE would endeavor to sell them as KFCs.

40. The delays and uncertainties concerning the Chicago 11 properties caused enormous headaches for Verdad and VRE. They had financed a large portion of the acquisition through bank loans and had expected to be out of the deal much earlier. Their loan agreements called for substantial balloon payments to be made on September 28, 2015, and the loan obligations were personally guaranteed by Verdad, Keen and other Verdad principals. Also, Verdad and VRE had a capital partner in the deal, VPC, whose activities were being directed by Stearns and VestaPoint II, and who had invested $5.4 million for a 25 percent stake. Stearns and his entities, too, expected to be out of the deal within a short time. And, Stearns recognized

that LeVecke kept dissembling and making unfulfilled promises, leading Stearns to express great distrust of LeVecke. Verdad and VRE, on the other hand, were afraid to rock the boat and push LeVecke too hard, for fear of jeopardizing their ongoing stream of deals with LeVecke, which they perceived to be highly lucrative.

41. Keeping the properties KFCs posed real problems for Verdad and VRE in that they now were put in the position of trying to market KFCs which had, in their own words, "Rent Coverage Ratio[s]" that were "unhealthy" and rents that were significantly higher than what was common in the market. Indeed, in internal discussions, Verdad and VRE expressed the need to "start working on restructuring the leases and economics to keep them as KFCs and then put them on the market[.]" In correspondence with LeVecke's top lieutenant, Langfield, Keen characterized the $171,000 annual rent as "[t]he ultimate challenge we are faced with[.]" Verdad and VRE were well aware that the rent paid by many KFCs was in the range of $60,000 to $80,000 per year. (See e-mails attached hereto as Exhibits 2, 3 and 4.)

42. Abandoning the plan to convert the Chicago 11 properties to Hardee's also raised issues as to how to handle the $400,000 per store in conversion costs that Verdad and VRE had funded, LeVecke had received, and LeVecke had committed – in the leases on the properties – to spend on conversion costs, but which no longer were going to be necessary if the properties were to remain as KFCs.

43. To address those issues, Verdad, VRE and LeVecke entered into new leases on the Chicago 11 properties, dated February 27, 2015, which deleted the language concerning conversion to Hardee's, and eliminated the requirement for the tenant to spend $400,000 per store on conversion costs or other improvements. Notwithstanding those changes, the rent of at least $171,000 per store, per year remained unchanged. The tenant under these leases was a

different entity owned and/or controlled by LeVecke, MJC Holdings 123, LLC ("MJC"). (A copy of the lease dated February 27, 2015 for the Western Ave. KFC is appended hereto as Exhibit 5.)

## III. MARKETING EFFORTS AND SECRET SIDE AGREEMENT

44. In February, 2015, Verdad and VRE decided to try to extricate themselves from the morass they were in with respect to the Chicago 11 properties by putting four of them on the market, on a test basis, to see what kind of prices they could induce buyers to pay. Verdad and LeVecke decided to deal with the anomaly of the $400,000 in conversion costs, when there no longer were going to be conversions, as follows.

45. They agreed that if Verdad and VRE could induce a potential buyer to pay roughly the same for a property that it would have paid had the property been converted to a Hardee's, and $400,000 been spent to improve the property, they would allow LeVecke to keep the $400,000 and never have to account for it. If, however, Verdad and VRE could not induce a buyer to pay the price they expected for the Chicago 11 properties – such expectations having been formed when the properties were to be converted to Hardee's, with at least $400,000 per store spent on improvements – Levecke would have to account for the $400,000 per store by refunding it – in which case the rent would be reduced – or spending that amount on improving the property.

46. Of course, if potential buyers were aware of these terms, that would serve as a substantial disincentive to pay the prices Verdad and VRE were seeking, as they would realize that at least $400,000 of the price of each property was attributable to contemplated tenant improvements, which the tenant no longer had any obligation to make. So, Verdad and VRE – with the knowledge and participation of Keen – and with substantial advice and assistance from

their lawyers, Baker Monroe, Baker and Huston, schemed with LeVecke – with substantial knowing participation by Langfield – to conceal their agreement regarding the $400,000 per store from prospective buyers. The agreement was purposely omitted from the February 27, 2015 leases, and instead incorporated into a secret side agreement (the "Side Agreement").

47. The pertinent facts relating to the secret Side Agreement may be summarized as follows. At the same time that the February, 2015 leases were prepared, Baker Monroe, through its principal and/or employee, Baker, also prepared an initial version of the Side Agreement (copy appended hereto as Exhibit 6). *See* e-mails among Baker, Langfield and others dated February 26 and 27, 2015 (copies appended hereto as Exhibit 7). The proposed Side Agreement stated, among other things, that the Landlord and Tenant under the March 6, 2014 leases for the Chicago 11 properties wished to terminate the leases, "execute new leases and guaranties in place thereof," and "delay and potentially terminate the obligation in Section 9.7 of the Leases to invest at least $400,000 in constructing improvements to each of the Properties ('Construction Obligation')."

48. With respect to the $400,000 per store, the initial version of the Side Agreement provided that the Landlord would attempt to sell the properties without any Construction Obligation in the leases; however, if the Landlord was unable to do so prior to August 1, 2015, then, for each unsold property, the Tenant would need to address the $400,000 Construction Obligation in one of the following three ways: (1) invest at least $400,000 in construction renovations in the property; (2) pay $400,000 to the Landlord, and receive an annual rent reduction of $34,000; or (3) if Tenant had spent money for construction renovations but less than $400,000, pay the difference to the Landlord and receive a specified rent reduction.

49. Baker and Baker Monroe prepared the initial version of the secret Side Agreement on or before February 26, 2015 and sent it to Langfield and LeVecke. Langfield made certain minor changes to it, which were accepted; and Baker and Baker Monroe then confirmed that the secret Side Agreement would be executed after the execution of the new February 27, 2015 leases.

50. Subsequently, on March 4, 2015, Baker sent an e-mail to Langfield, reflecting further thoughts he had concerning the secret Side Agreement. *See* e-mails dated March 4-17, 2015 among Baker, Langfield and others (copy appended hereto as Exhibit 8). In his March 4, 2015 e-mail, Baker wrote:

> So … I think I left some language out of the side letter that helps both of us and was the intent. There is nothing in the side letter that allows us to expressly terminate the side letter with respect to a certain property at the time of sale or any other time. It does say we can notify you if we don't sell, and then there are options, but there is nothing about terminating the side letter. ***Therefore, the side letter is arguably an amendment to the lease and we have to disclose it when we go under contract and you would have to disclose it when you sign an estoppel.*** We have two LOI's and are drafting contracts. Looked at the side letter again and I think the language needs to be cleaned up. (Emphasis added)

51. Langfield responded, "[s]ounds like we did miss our intent on the side letter. I think we would be fine with your suggestions…send over whatever you like and we will take a look." (Exhibit 8 hereto). Thereafter, on March 8, 2015, Baker sent a revised version of the secret Side Agreement to Langfield and LeVecke, with a copy to Keen, stating: "Attached is the revised letter agreement with proposed changes. It allows us to terminate the letter agreement with respect to properties that sell, so the letter agreement doesn't remain binding and arguably be an amendment to the lease. . . ." *(Id.)* Keen and LeVecke then proceeded to execute the revised secret Side Agreement as of March 17, 2015 (copy appended hereto as Exhibit 9).

52. The main difference between the two versions of the secret Side Agreement was that the later one, dated March 17, 2015 and ultimately executed, contained the following additional language (Exhibit 9 hereto):

> Landlord, in its discretion, may (by written notice to Tenant) unilaterally terminate this Letter Agreement as to some or all of the Properties in its efforts to market and sell the Properties on terms acceptable to Landlord. Such termination will only affect those specific Properties specified by Landlord and this Letter Agreement shall remain in full force and effect as to all other Properties as to which Landlord has not elected to terminate this Letter Agreement.

## IV. SALE OF WESTERN AVE. KFC TO PLAINTIFFS

53. In February, 2015, Verdad and VRE began marketing the Western Ave. KFC and other of the Chicago 11 properties. Verdad and VRE engaged EXP and Tartan to act as the seller's brokers and agents in marketing and selling the properties.

54. Verdad, VRE and their brokers set a list price for the stores of $2,443,000 each, advertising that this price reflected a 7 percent cap rate, when considered in the context of the $171,000 annual rent. (A copy of the offering memorandum for the Western Ave. KFC [the "Offering Memorandum"] prepared, approved and circulated by Defendants Verdad, VRE, EXP and Tartan is appended hereto as Exhibit 10.)

55. In marketing the Chicago 11 properties, Verdad, VRE and Keen, as well as their brokers and agents, EXP, Tartan, Moorhead and Smith, disseminated false and misleading material information in an effort to induce unsuspecting third parties to purchase the Chicago 11 properties for inflated prices that were vastly in excess of their fair market value. Such information included the Offering Memorandum, as well as an additional Confidential Information Memorandum (the "CIM," a copy of which is appended hereto as Exhibit 11.) The CIM contained purported financial information for FS1, which was a guarantor of the leases on the properties, representing that FS1 had a net worth of nearly $70 million, and annual net

income of nearly $15 million. As demonstrated by the bankruptcies that ultimately ensued a short time later, as well as other facts, that information was false and misleading.

56. Further, the marketing materials misrepresented the identity of the tenant of the properties, claiming it was Frontier Star when, in fact, it was a different entity, MJC, which was not part of the FS1 hierarchy of companies; and misrepresented that the actual tenant operated some 200 restaurants. Upon information and belief, at that time, MJC had no significant track record as a restaurant operator, and had not been finally approved as a KFC franchisee.

57. Additionally, the Offering Memorandum represented that rent of at least $171,000 per year (plus escalations) would be earned on the properties, for at least 20 years, when, as Verdad, VRE, Keen, EXP, Tartan, Moorhead and Smith knew or must have known, rent at that level was entirely unsustainable.

58. On or about March 6, 2015, as a result of Plaintiffs learning about the Western Ave. KFC through the Offering Memorandum coming to their attention, Plaintiffs and Verdad entered into a letter of intent for the purchase of the Property.

59. On or about March 19, 2015, Smith of EXP represented to Plaintiffs, through Plaintiffs' agent, that the present tenant of the Property was "Frontier Star, LLC" and that "Frontier Star I, LLC is the parent and a guarantor." The representation that Frontier Star, LLC was the tenant of the Property was false, as was the representation that FS1 was the parent of the tenant.

60. On or about March 24, 2015, Plaintiffs and VRE entered into a Purchase and Sale Agreement (the "PSA" or "Sale Contract"), pursuant to which Plaintiffs agreed to buy, and VRE agreed to sell, the Property subject to the terms and conditions described in that contract. (A copy of the PSA is appended hereto as Exhibit 12.) The PSA provided for a purchase price of

$2,443,000.00. Plaintiffs entered into the PSA in reliance on the information set forth in the Offering Memorandum or otherwise conveyed to them by VRE, Verdad, EXP, Tartan, Keen, Moorhead and/or Smith.

61. Prior to entering into the Sale Contract, Plaintiffs made clear to EXP, Tartan, Moorhead and Smith, and through them to Verdad, VRE and Keen, that Plaintiffs wished to see financial statements and sales data relating specifically to the Property. EXP, Tartan, Moorhead and Smith, on behalf of Verdad and VRE, represented to Plaintiffs that the franchise agreement with KFC relating to the Property prohibited such financial statements and sales data pertaining to the Property from being disclosed. On that basis, Verdad and VRE refused and failed to disclose the requested information, and it was not disclosed. Langfield also substantially participated in the efforts to withhold from Plaintiffs financial statements and sales data relating specifically to the Property.

62. On information and belief, the representations that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed were false; the information requested to be disclosed, but not disclosed, would have shown that the rent levels provided for in the February 27, 2015 lease were not viable or sustainable; and the non-disclosed information, therefore, was material. On information and belief, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

63. On April 16, 2015, the PSA was amended by a First Amendment. (A copy of the said First Amendment is appended hereto as Exhibit 13.)

64. In connection with due diligence under the PSA, Verdad, VRE and their brokers provided to Plaintiffs the February 27, 2015 Lease, but not the secret Side Agreement or the earlier lease for the Western Ave. KFC dated March 6, 2014; and also provided the CIM to Plaintiffs, representing that FS1 – the guarantor of the tenant's obligations under the February 27, 2015 lease – had a net worth of $70 million and earnings of $15 million per year.

65. In addition, EXP and Tartan, on behalf of Verdad and VRE, through Smith and/or Moorhead, represented to Plaintiffs, through Plaintiffs' agent, that there had been consideration of converting the Property to a Hardee's restaurant, but it was decided to continue to operate the Property as a KFC restaurant since the Property was doing so well as a KFC. The foregoing representation was false in that, from and after February 27, 2015, there was no reasonable expectation that the KFC restaurant on the Property could or would generate net operating income in amounts sufficient to provide for the ongoing payment of rent at the levels provided for in the February 27, 2015 lease, and, on information and belief, the true reason why the plan to convert the Property to a Hardee's was abandoned was LeVecke's financial arrearages to CKE. On information and belief, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith knew of the falsity of the foregoing representations, or made the representations without having any proper basis for knowing whether they were true.

66. All of the foregoing information and representations served to induce Plaintiffs to enter into the PSA, waive contingencies and/or otherwise go forward with the transaction.

67. The sale of the Property closed on May 15, 2015. In connection with the closing, Plaintiffs succeeded to the Landlord's rights under the February 27, 2015 Lease.

68. In connection with the closing, and as an inducement to Plaintiffs to proceed to close the transaction, Baker Monroe participated in preparing, approving, obtaining the execution

of, and disseminating to the parties involved in the transaction, an Estoppel Certificate and Subordination, Non-Disturbance and Attornment Agreement ("SNDA") – which were prerequisites to the transaction closing. Among the persons involved in doing so on behalf of Baker Monroe was Huston. *See* e-mail dated May 12, 2015 from Justin Huston to Jon Frank, with attached Estoppel Certificate and SNDA (copy appended hereto as Exhibit 14). Among the persons involved in doing so on behalf of LeVecke and his entities was Langfield.

69. The Estoppel Certificate and SNDA represented that the February 27, 2015 Lease constituted the sole agreement between Landlord and Tenant relating to the property; the Lease had not been amended, modified or supplemented; and there were no other agreements relating to the premises. Those representations were false in light of the secret Side Agreement, and were known to be false by Keen, VRE, Verdad, Baker Monroe, Baker, Huston and Langfield in light of their participation in negotiating, preparing, arranging for the execution of, and/or executing the secret Side Agreement.

70. On information and belief, the secret Side Agreement never was terminated with respect to the Western Ave. KFC. Moreover, even assuming *arguendo* it was terminated, that would have occurred only after the sale to Plaintiffs closed (on May 15, 2015). So, prior to closing, the secret Side Agreement should have been disclosed to Plaintiffs in that it indisputably served to amend and modify the February 27, 2015 Lease on the Western Ave. KFC – as Baker admitted in his e-mail dated March 4, 2015 – and was an understanding and agreement relating to the Property and the Lease.

71. Before, at and after the time that they closed the purchase and sale of the Western Ave. KFC, and continuing until they became involved in litigation and obtained the information in the course of discovery, Plaintiffs had no knowledge of the secret Side Agreement or the terms

agreed to therein. Had they known of such information, they would not have proceeded to purchase the Western Ave. KFC on the terms reflected in the PSA.

## V. LEVECKE DEFAULT

72. Following the closing, Plaintiffs received payment of the rent called for under the February 27, 2015 Lease for a mere two months. On July 27, 2015, less than 75 days after the closing, Frontier Star – the main operating subsidiary of FS1 – filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. And, commencing in August, 2015, the LeVecke entity that was the tenant of Plaintiffs' property under the February 27, 2015 Lease, MJC, defaulted on its rent obligations.

73. Upon information and belief, Verdad and/or VRE had a close and ongoing business relationship with Frontier Star, FS1 and/or LeVecke as of March, 2015. Counsel for Verdad and VRE stated that those parties had engaged in more than 30 transactions with one another. Upon information and belief, Verdad and VRE knew of Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy, prior to the date on which VRE and Plaintiffs closed on the sale of the Property under the PSA.

74. On August 24, 2015, LeVecke sent an e-mail to Raymond Walls (copy appended hereto as Exhibit 15), stating: "Regrettably, we are having to make serious adjustments to our business. A recent culmination of events are putting real pressure on us. Frankly we are going to need to adjust the rents. We are working with consultants on restructuring and will be in touch soon."

75. Five days later, on August 29, 2015, LeVecke sent a further e-mail to Raymond Walls (copy appended hereto as Exhibit 16), stating, in part: "While our MJC entity that is your tenant has not filed [for bankruptcy] we have no choice but to make adjustments to our business

in order to move forward. Otherwise MJC may also have to file. As such, we need to adjust our rents for this location to $70,000 in annual rent. . . ." Plaintiffs did not receive the rent payments required under the Lease in or after August, 2015.

76. FS1 filed for bankruptcy in November, 2015 and LeVecke personally filed for bankruptcy in January, 2016.

77. In late 2015, MJC vacated the premises. Since that time, Plaintiffs have been able to secure a replacement tenant only on terms under which the tenant pays rent in the range of $68,000 per year.

78. The financial impact of all of the foregoing on the Walls has been devastating. At a rental rate of $68,000 per year, the value of the Western Ave. KFC property is no more than approximately $1,130,000. Accordingly, the Walls were induced to overpay for the property in the amount of at least $1,313,000. Moreover, over the 20-year lease term, the differential in the rents provided for under the lease, and the rents the Walls realistically may be able to collect, is approximately $2 million. Additional damages include, but are not necessarily limited to, unpaid rent, additional borrowing costs incurred to pay the inflated purchase price, excessive transfer taxes, and attorney's fees and costs incurred in addressing MJC's default and in connection with the present litigation. Overall, the Walls' damages in this matter are well in excess of $4,600,000.

79. Notably, Verdad and VRE still own seven of the Chicago 11 properties, having been unable to sell them, and they experienced the same defaults by MJC that Plaintiffs did. Prior to September, 2016, Verdad and VRE were able to re-lease their seven Chicago 11 properties to a new tenant-operator, but only on terms providing for rent payments at a level of $70,000 to $80,000 per year.

80. More recently, with respect to three of the properties, Verdad and VRE have entered into 15-year leases, at rents ranging from $82,000 to $90,000 per year, and listed those properties for sale at asking prices of approximately $1.5 to $1.6 million. All of the foregoing facts confirm that the rent and sale price relating to the sale to Plaintiffs were grossly inflated.

81. At no time prior to the closing of the Sale Contract did Verdad, VRE, EXP, Tartan, Keen, Moorhead, Smith or anyone else disclose to Plaintiffs any of the following material facts:

a. that the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee, and, at the time of various communications, may not even have been an approved KFC franchisee;

g. the falsity of the information that the Property was doing so well as a KFC restaurant so as to generate net operating income in amounts sufficient to provide for the ongoing payment of rent at the levels provided for in the February 27, 2015 lease; and/or

h. the falsity of the information that the franchise agreement with KFC relating to the Property prohibited disclosure to Plaintiffs of financial statements and sales data specifically relating to the Property.

82. As a direct and proximate result of the foregoing, Plaintiffs have suffered substantial losses and damages, including but not limited to lost rents; paying $2,443,000.00 for the Property when its actual fair market value was approximately $1.3 million less than that amount; and legal fees and expenses.

## COUNT I – FRAUDULENT INDUCEMENT-MISREPRESENTATIONS
## (Against Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith)

83. Paragraphs 1 through 82 are incorporated by this reference as though set forth in full herein.

84. Prior to entering into the Sale Contract, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith made a number of false representations to Plaintiffs, in order to induce Plaintiffs to enter into the Sale Contract, including but not limited to the following:

a. the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

b. Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c. the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d. Defendants represented that the Property was doing so well as a KFC restaurant, thereby implying that the Property was generating sales, revenue and net operating income sufficient to support ongoing payment of rent at the levels provided for in the February 27, 2015 lease, which was false; and/or

e. Defendants represented that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiffs, which, on information and belief was false, and precluded Plaintiffs from obtaining financial information, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

85. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of such facts, or any of them, they would not have proceeded with the purchase of the Property.

86. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith made the foregoing false representations knowing the same to be false, or without any proper basis for knowing whether they were true, and with intent to deceive Plaintiffs.

87. Plaintiffs relied on the foregoing false representations, their reliance was reasonable, and Plaintiffs in fact were deceived by the false representations.

88. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to enter into the Sale Contract and purchase the Property.

89. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $4,600,000.

90. The actions of Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc., Tartan Realty Group, Inc., B. Jason Keen, Robert J. Moorhead and Russell Smith, jointly and severally; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of the said defendants; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT II – FRAUDULENT INDUCEMENT-OMISSIONS**
**(Against Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith)**

91. Paragraphs 1 through 90 are incorporated by this reference as though set forth in full herein.

92. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee; and/or

g. financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

93. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

94. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith, and each of them, omitted to disclose the foregoing facts with intent to deceive Plaintiffs, and Plaintiffs thereby were deceived.

95. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, the said Defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their partial disclosures conveyed a false impression, and because the said Defendants had superior knowledge and information concerning the omitted facts.

96. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to enter into the Sale Contract and purchase the Property.

97. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $4,600,000.

98. The actions of Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc., Tartan Realty Group, Inc., B. Jason Keen, Robert J. Moorhead and Russell Smith, jointly and severally; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of the said defendants; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT III – NEGLIGENT MISREPRESENTATIONS-AFFIRMATIVE STATEMENTS
**(Against Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith)**

99. Paragraphs 1 through 98 are incorporated by this reference as though set forth in full herein.

100. Plaintiffs allege this Count in the alternative to the claims alleged in Counts I and II.

101. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith made a number of false representations to Plaintiffs, which operated to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the brochure used to market the Property falsely represented that FS1 had substantial financial strength; that, as of 2014, FS1 had a net worth of nearly $70 million; and that, as of 2014, FS1 had an annual operating profit of nearly $15 million;

b. Defendants falsely represented that Frontier Star or FS1 was, and would be, the tenant of the Property; that the tenant of the Property operated 22 KFC restaurants in the Chicago Market; and that the tenant of the Property was one of the largest multi-unit franchise restaurant operators with over 200 locations;

c. the offering circular for the Property falsely represented that the Property was generating, and would in the future generate, rental income in the amount of $171,000 per year for the first five years, with rental income for years 16-20 of the lease rising to $227,601 per year;

d. Defendants represented that the Property was doing so well as a KFC restaurant, thereby implying that the Property was generating sales, revenue and net operating income sufficient to support ongoing payment of rent at the levels provided for in the February 27, 2015 lease, which was false; and/or

e. Defendants represented that the franchise agreement with KFC relating to the Property prohibited financial statements and sales data pertaining to the Property from being disclosed to Plaintiffs, which, on information and belief was false, and precluded Plaintiffs from obtaining financial information, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

102. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

103. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith made these statements to Plaintiffs in the course of their business and in a transaction in which they had an interest.

104. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading, and thus were negligent in making the misrepresentations set forth above.

105. Plaintiffs justifiably relied on the statements by Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith.

106. As a direct and proximate result of the foregoing negligent misrepresentations, Plaintiffs were damaged, and the amount of their damages exceeds $4,600,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc., Tartan Realty Group, Inc., B. Jason Keen, Robert J. Moorhead and Russell Smith, jointly and severally; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**<u>COUNT IV – NEGLIGENT MISREPRESENTATION-OMISSIONS</u>**
**(Against Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith)**

107. Paragraphs 1 through 106 are incorporated by this reference as though set forth in full herein.

108. Plaintiffs allege this Count in the alternative to the claims alleged in Counts I and II.

109. Prior to entering into the Sale Contract and/or closing the sale of the Property, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith omitted to disclose a number of material facts to Plaintiffs, which operated to induce Plaintiffs to enter into and close the Sale Contract, including but not limited to the following:

a. the February 27, 2015 lease provided for payment of rent at a level higher than the rent under the previous lease, higher than the fair market rental value of the Property, and higher than what a KFC franchisee operating at the Property could expect to be able to pay out of operating revenues, and the artificially high rent level was set forth in the February 27, 2015 lease in order to induce a buyer to pay a purchase price for the Property substantially higher than its fair market value;

b. the falsity of the information in the offering brochure that, as of 2014, FS1 had a net worth of nearly $70 million, and an annual operating profit of nearly $15 million;

c. the fact that, from and after February 27, 2015, there was no reasonable expectation that the Property could or would generate rental income at the levels represented in the offering circular, of $171,000 per year for the first five years, and even higher amounts in later lease years;

d. Frontier Star's and its affiliated entities' precarious financial position and potential bankruptcy;

e. MJC's inability to make the minimum rent payments called for in the February 27, 2015 lease, and desire and need to attempt to negotiate a severe reduction in rent, from $171,000 per year to $70,000 per year;

f. the fact that MJC had no track record as a KFC franchisee; and/or

g. financial statements and sales data relating specifically to the Property, which would have reflected that payment of rent at the levels provided for in the February 27, 2015 lease was not sustainable.

110. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

111. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith failed to disclose the foregoing facts to Plaintiffs in the course of their business and in a transaction in which they had an interest.

112. Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith failed to take reasonable care to ensure the statements they made were true and sufficiently complete that they would not be misleading; additionally, they failed to take reasonable care to ensure they disclosed the foregoing material information of which they had superior knowledge and which was not reasonably discoverable by Plaintiffs in the exercise of ordinary due diligence. In each and all of the foregoing respects, Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith were thereby negligent.

113. As a direct and proximate result of the negligent omissions by Verdad, VRE, EXP, Tartan, Keen, Moorhead and Smith, Plaintiffs were damaged, and the amount of their damages exceeds $4,600,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Verdad Real Estate, Inc., VRE Chicago Eleven, LLC, EXP Realty Advisors, Inc., Tartan Realty Group, Inc., B. Jason Keen, Robert J. Moorhead and Russell Smith, jointly and severally; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs from the said defendants, jointly and severally, pre and post-judgment interest; award to Plaintiffs from the said defendants, jointly and severally, the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT V – FRAUDULENT INDUCEMENT-MISREPRESENTATIONS**
**(Against Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield)**

114. Paragraphs 1 through 113 are incorporated by this reference as though set forth in full herein.

115. In connection with the closing of the sale of the Western Ave. KFC to Plaintiffs, Defendants Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield participated in the drafting, obtaining the execution, and dissemination – to Plaintiffs, the title company, Plaintiffs' lender and others – of the Estoppel Certificate and the SNDA, in order to induce Plaintiffs to close the sale transaction

116. The Estoppel Certificate and SNDA contained false representations, including but not limited to representations that there were no agreements among the Landlord and Tenant relating to the property other than the February 27, 2015 Lease. Those representations were false in light of the agreements embodied in the secret Side Agreement.

117. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

118. Defendants Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield made the foregoing false representations knowing the same to be false, or without any proper basis for knowing whether they were true, and with intent to deceive Plaintiffs – particularly in light of their roles in conceiving of and/or implementing the strategy of having the terms of the secret Side Agreement reflected in a separate agreement, to be kept secret from purchasers of the Chicago 11 properties, rather than embodying them in the leases.

119. Plaintiffs relied on the foregoing false representations, their reliance was reasonable, and Plaintiffs in fact were deceived by the false representations.

120. As a direct and proximate result of the foregoing, Plaintiffs were fraudulently induced to purchase the Property.

121. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $4,600,000.

122. The actions of Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against each of them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe PLLC, Chris Baker, Justin Huston, VRE Chicago Eleven, LLC, Verdad Real Estate, Inc., B. Jason Keen and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of

the said Defendants; award to Plaintiffs from each of the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT VI – FRAUDULENT INDUCEMENT-OMISSIONS
**(Against Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield)**

123. Paragraphs 1 through 122 are incorporated by this reference as though set forth in full herein.

124. Prior to the closing of the sale of the Property to Plaintiffs, Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, to-wit: the terms of agreement set forth in the secret Side Agreement.

125. All of the foregoing omitted facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

126. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield omitted to disclose the foregoing facts with intent to deceive Plaintiffs, and Plaintiffs thereby were deceived.

127. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, Defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their

partial disclosures conveyed a false impression, and because the Defendants had superior knowledge and information concerning the omitted facts.

128. As a direct and proximate result of the foregoing, Plaintiffs were wrongfully induced to purchase the Property.

129. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $4,600,000.

130. The actions of Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against it.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe PLLC, Chris Baker, Justin Huston, VRE Chicago Eleven, LLC, Verdad Real Estate, Inc., B. Jason Keen and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from each of the said Defendants; award to Plaintiffs from each of the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT VII – NEGLIGENT MISREPRESENTATIONS-AFFIRMATIVE STATEMENTS
**(Against Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield)**

131. Paragraphs 1 through 130 are incorporated by this reference as though set forth in full herein.

132. Plaintiffs allege this Count in the alternative to the claims alleged in Counts V and VI.

133. In connection with the closing of the sale of the Western Ave. KFC to Plaintiffs, Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield participated in the drafting, obtaining the execution, and dissemination – to Plaintiffs, the title company, Plaintiffs' lender and others – of the Estoppel Certificate and the SNDA, in order to induce Plaintiffs to close the sale transaction.

134. The Estoppel Certificate and SNDA contained false representations, including but not limited to representations that there were no agreements among the Landlord and Tenant relating to the property other than the February 27, 2015 Lease. Those representations were false in light of the agreements embodied in the secret Side Agreement.

135. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded to purchase the Property.

136. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield participated in the drafting, obtaining the execution, and dissemination of the foregoing false representations in the course of their business, and in connection with a transaction in which they had an interest.

137. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield failed to take reasonable care to ensure that the representations they drafted and disseminated were true and sufficiently complete that they would not be misleading, and thus were negligent in making the misrepresentations set forth above.

138. Plaintiffs justifiably relied on the foregoing false representations.

139. As a direct and proximate result of the foregoing, Plaintiffs were damaged, and the amount of their damages exceeds $4,600,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe PLLC, Chris Baker, Justin Huston, VRE Chicago Eleven, LLC, Verdad Real Estate, Inc., B. Jason Keen and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs from the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT VIII – NEGLIGENT REPRESENTATIONS-OMISSIONS**
**(Against Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield)**

140. Paragraphs 1 through 139 are incorporated by this reference as though set forth in full herein.

141. Plaintiffs allege this Count in the alternative to the claims alleged in Counts V and VI.

142. Prior to the closing of the sale of the Property to Plaintiffs, Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield omitted to disclose a number of material facts to Plaintiffs, in order to induce Plaintiffs to enter into and close the Sale Contract, to-wit: the terms of agreement set forth in the secret Side Agreement.

143. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield had a duty to disclose the foregoing facts to Plaintiffs because, in the absence of such disclosure, Defendants' other statements and representations to Plaintiffs were misleading and/or untrue, and/or their

partial disclosures conveyed a false impression, and because the Defendants had superior knowledge and information concerning the omitted facts.

144. All of the foregoing facts were material to the Sale Contract. Had Plaintiffs known of those facts, or any of them, they would not have proceeded with the purchase of the Property.

145. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield omitted to disclose the foregoing facts in the course of their business and in a transaction in which they had an interest.

146. Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield failed to take reasonable care to ensure that the representations they drafted and disseminated were true and sufficiently complete that they would not be misleading; additionally, they failed to take reasonable care to ensure they disclosed the foregoing material information of which they had superior knowledge and which was not reasonably discoverable by Plaintiffs in the exercise of ordinary diligence. In each and all of the foregoing respects, Baker Monroe, Baker, Huston, VRE, Verdad, Keen and Langfield were thereby negligent.

147. As a direct and proximate result of the foregoing, Plaintiffs were wrongfully induced to enter into the Sale Contract and purchase the Property.

148. As a direct and proximate result of the foregoing, Plaintiffs have been damaged, and the amount of their damages exceeds $4,600,000.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe PLLC, Chris Baker, Justin Huston, VRE Chicago Eleven, LLC, Verdad Real Estate, Inc., B. Jason Keen and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of

$4,600,000, in an amount to be proven at trial; award to Plaintiffs from the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**COUNT IX – AIDING AND ABETTING**
**(Against Baker Monroe, Baker, Huston and Langfield)**

149. Paragraphs 1 through 148 are incorporated by this reference as though set forth in full herein.

150. By their acts and omissions set forth above, including but not limited to their conceiving and implementing the concept of incorporating Verdad's and VRE's agreement with LeVecke into a secret Side Agreement; their participation in providing an Estoppel Certificate and SNDA in connection with the transaction, which falsely represented there were no other agreements relating to the Western Ave. KFC other than the February 27, 2015 Lease; and their otherwise concealing and failing to disclose the agreement embodied in the secret Side Agreement; Baker Monroe, Baker, Huston and Langfield knowingly and substantially assisted the wrongful conduct of Verdad, VRE, Keen, EXP, Tartan, Moorhead and Smith alleged above in wrongfully inducing Plaintiffs to purchase the property at a vastly inflated price.

151. In engaging in the foregoing wrongful acts and omissions, Baker Monroe, Baker, Huston and Langfield were regularly aware of their role as part of the overall or tortious activity being engaged in by the other defendants, at the time they provided their assistance.

152. The acts and omissions of Baker Monroe, Baker, Huston and Langfield, as aforesaid, in assisting, aiding and abetting the other defendants' wrongful conduct, were a

proximate cause of the damages suffered by Plaintiffs as a result of their being wrongfully induced to purchase the property at a vastly inflated price.

153. The acts and omissions of Baker Monroe, Baker, Huston and Langfield, as aforesaid, were willful, wanton, malicious, outrageous and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against Baker Monroe PLLC, Chris Baker, Justin Huston and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from the said Defendants; award to Plaintiffs from the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; and enter such other and additional relief as the Court deems just and appropriate.

## COUNT X – CIVIL CONSPIRACY
**(Against VRE, Verdad, Baker Monroe, Keen, Baker, Huston, VPC, VestaPoint II, Stearns and Langfield)**

154. Paragraphs 1 through 153 are incorporated by this reference as though set forth in full herein.

155. Beginning in late 2014 or early 2015, when it became apparent that none of the VRE's and Verdad's plans concerning conversions and re-openings of the Chicago 11 properties were coming to fruition, VRE, Verdad, Baker Monroe, Keen, Baker, Huston, VPC, VestaPoint II, Stearns and Langfield formulated and carried out a plan and agreement to endeavor to unload some or all of the Chicago 11 properties, for inflated prices, to buyers who had no knowledge or suspicions of the full and true facts relating to the Chicago 11 properties, including but not limited to the financial engineering underlying the rent levels in the March 6, 2014 and

February 27, 2015 leases and the prices paid by VRE and Verdad for the properties; the fact and extent to which the rents embodied in the said leases were unhealthy and significantly higher than what was common in the market; and the terms embodied in the secret Side Agreement.

156. The said plan and agreement was important to Keen not only as President of Verdad, Manager of VRE and a principal of both, but also on a personal basis, since Keen personally was a guarantor on bank loans taken out to finance the purchase of the Chicago 11 properties, and balloon payments on those loans were coming due in September, 2015.

157. The said plan and agreement further was important to VPC, VestaPoint II and Stearns in that they had invested in excess of $5,000,000 in VRE, and were at risk of losing some or all of their investment. Accordingly, Stearns, on behalf of VPC, VestaPoint II and himself, actively encouraged and supported the plan and agreement; and they were a chief beneficiary of the plan and agreement in that a large portion of the net proceeds VRE derived from the sale of the Western Ave. KFC to Plaintiffs, as well as the sales of the other three Chicago 11 properties that were effected before the VRE/Verdad/LeVecke house of cards came tumbling down, were paid to VPC as a return on its investment.

158. At all pertinent times, VPC, VestaPoint II and Stearns were kept abreast of the problems that arose in connection with selling the Chicago 11 properties, as well as the efforts being made to overcome those problems and sell the properties for top dollar, through regular communications with Keen and others at Verdad.

159. As a starting point, VestaPoint II and Stearns, through VPC, invested $5.5 million in the Chicago 11 properties deal, with the expectation of receiving a high rate of return, with repayment expected over a short time period. *See* e-mail dated March 5, 2014, from John

Walker to Aaron Stearns, produced in discovery by VPC and Bates-stamped VPC 0132-33 (copy appended hereto as Exhibit 17).

160. On October 2, 2014, Stearns sent an e-mail to Shane Josephson of Verdad, stating in part: "In advance of our call on Monday, could you touch base with Jason if necessary to get an update on the status of the Chicago11 conversions and if there have been any further discussions over the last ~10 days about certain properties remaining as KFCs and how the leases will be modified?" *See* email produced in discovery by VPC and Bates-stamped VPC 0148 (copy appended hereto as Exhibit 18). Accordingly, VPC, VestaPoint and Stearns were aware as of that time that some properties may remain as KFCs and, if that were the case, that lease modifications would be required.

161. On October 8, 2014, Keen forwarded to Stearns an e-mail string between Langfield and LeVecke addressing the question of which stores will be converted to Hardee's and which will remain as KFCs, and on October 15, 2014, Stearns sent an e-mail to Keen stating, [c]urious if you have heard back from LeVecke?" *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0151-52 (copy appended hereto as Exhibit 19).

162. A calendar entry in Verdad's records dated November 14, 2014 reflects that a weekly conference call was set to occur between Verdad and Stearns, the stated purpose being to "give an update call to Aaron every week until we determine the solution…." *See* document produced by VRE in discovery Bates-stamped VRE_036260 (copy appended hereto as Exhibit 20).

163. On November 14, 2014, Keen sent an e-mail to Stearns with a subject reference of "FW: Chicago 11," attaching an unknown document (redacted when the e-mail was produced) and stating "[t]they do not have the ability to terminate." *See* e-mail dated November 14, 2014

produced by VRE in discovery and Bates-stamped VRE_062287-88 (copy appended hereto as Exhibit 21).

164. On November 14, 2014, Keen and Joe Mann exchanged e-mails stating, among other things, that Keen was "[m]eeting with Stearns in an hour and [a] half," and Mann stated, "[l]et's start working on restructuring the leases and economics to keep them as KFCs and put them on the market??" *See* Exhibit 28 to the Deposition of Jason Keen taken Nov. 10, 2016 (copy appended hereto as Exhibit 22). Accordingly, it is clear that VPC, VestaPoint II and Stearns were being kept apprised with respect to developments concerning the Chicago 11 properties, and that there was a recognition that the leases and economics would need to be restructured if the properties were to remain as KFCs.

165. On December 5, 2014, Keen sent an e-mail to Stearns, updating him on a call with LeVecke and developments concerning the Chicago 11 properties, and reflecting that he and Stearns planned to meet in New York the following Monday, at which time it was anticipated that Keen and Stearns would "discuss everything in greater detail." *See* Exhibit 30 to the Deposition of Jason Keen taken Nov. 10, 2016 (copy appended hereto as Exhibit 23).

166. On December 18, 2014, Stearns exchanged e-mails with Keen and Joe Mann, in which Stearns asked: "Do we have store-level sales for the Chicago11 properties? If not, could we ask LeVecke for the data dating back to when they took over operations?" Mann responded: "Sure, we planned to ask. Will need the info to take several to market." *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0154 (copy appended hereto as Exhibit 24). Thus, Stearns recognized as early as December, 2014 the importance of store-level sales, which never were provided to Plaintiffs and about which misrepresentations were made to Plaintiffs.

167. Between December 23 and 29, 2014, Stearns exchanged e-mails concerning the Chicago 11 properties with Keen and Mann, which reflect Stearns being kept abreast concerning plans for the properties. *See* Exhibit 60 to the Deposition of Jason Keen taken Dec. 2, 2016 (copy appended hereto as Exhibit 25). Significantly, Stearns stated in his e-mails to Keen and Mann: "As it pertains to our existing leases, I assume that an amendment will be necessary to alter the d/b/a, the rent . . . ," and "I am also curious to hear your thoughts as to whether or not you think the marketing of these properties should be deferred until the uncertainties are resolved and a lease, reflective of actual circumstances, is in place." *Id*. Accordingly, Stearns recognized that the properties remaining as KFCs would require an alteration of the rent, and that the existing leases did not reflect actual circumstances – thus making it suspect to proceed with the marketing of the properties to unsuspecting buyers on the premise that the leases *did* reflect actual circumstances.

168. On December 31, 2014, Stearns was copied on e-mail correspondence from Chris Baker, Verdad's counsel, making clear that lease amendments were being entered into on the Chicago 11 store package so as "to push out the remodel dates to give you some cushion and for the parties to determine if these will be updated KFC stores instead of Hardees." *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0155-58 (copy appended hereto as Exhibit 26).

169. On January 26, 2015, Keen sent an e-mail to LeVecke and Langfield, stating "sorry to be a pain in the ass, but we really need to report back to our capital partner with the deliverables we discussed last week. . . . Going forward, we will utilize a different capital source for our deals, but this partner is requiring immediate feedback." *See* e-mail string produced in discovery by VRE and Bates-stamped VRE_040996-97 (copy appended hereto as Exhibit 27).

This constitutes further evidence that at all pertinent times, VPC, VestaPoint II and Stearns were kept aware of developments concerning the Chicago 11 properties and the efforts to sell them.

170. On January 27 and 28, 2015, Stearns, Keen and Mann exchanged a series of e-mails, which reflected Stearns' level of concern and distrust concerning LeVecke. *See* Exhibit 67 to the Deposition of Jason Keen taken Dec. 2, 2016 (copy appended hereto as Exhibit 28). For instance, Stearns stated, "[m]y intent was . . . to express a sense of concern and a sense of altering attitude as to how I view the relationship with LeVecke." Stearns further stated, "[e]ither way, he is taking liberties with our trust and my money (and your guarantee), and the longer that we remain without any form of documentation, the more likely it is that the latter scenario is accurate."

171. On February 5, 2015, Keen forwarded an e-mail to Stearns from Defendant Moorhead, one of the brokers engaged to try to sell the Chicago 11 properties, in which Moorhead stated, he "[t]old them [a prospective package buyer] they [the Chicago 11 portfolio] were bought out of Bankruptcy and sales were probably not great . . . ." *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0159-60 (copy appended hereto as Exhibit 29). Thus, VPC, VestaPoint and Stearns had knowledge that the sales at the Chicago 11 properties "were probably not great."

172. On February 16 and 18, 2015, Keen and Stearns exchanged e-mails reflecting that, as of that time, Keen was sufficiently suspicious of LeVecke that he began an investigation into the ownership of other properties LeVecke was operating as KFCs. *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0163-65 (copy appended hereto as Exhibit 30).

173. On February 25, 2015, Stearns received an e-mail reflecting that at least four of the Chicago 11 properties were being marketed as KFCs, at prices reflecting that the rent on the properties was still $171,000 per store, per year. This surprised Stearns, as "he thought we were working on perfecting a revised lease." *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0171-75 (copy appended hereto as Exhibit 31).

174. The same day, Stearns received similar information from another source, accompanied by the questions: "Is this the misbehaving Hardees portfolio we discussed? All worked out now?" *See* e-mail string produced in discovery by VPC and Bates-stamped VPC 0176-79 (copy appended hereto as Exhibit 32).

175. Based on all of the foregoing communications, VPC, VestaPoint II and Stearns were well aware of all of the difficulties and questions surrounding the Chicago 11 properties and the efforts to market them, and the fact that the leases on them were unrealistic. Nevertheless, they went along with the plan and agreement to market the properties to unsuspecting buyers at wildly inflated prices, so that VPC, VestaPoint II and Stearns could recoup their investment out of the sales proceeds – which they ultimately did.

176. The plan and agreement of the defendants, as alleged above, had an improper purpose, of inducing Plaintiffs and other prospective buyers of Chicago 11 properties, through false representations and omissions, to unknowingly and unwittingly purchase Chicago 11 properties for amounts vastly in excess of their true value.

177. The said plan and agreement further employed improper means of utilizing false representations and omissions, including but not limited to concealing the terms of the secret Side Agreement, the misrepresentations set forth in the Estoppel Agreement and SNDA, and the other false representations and omissions set forth above.

178. The said plan and agreement constituted and unlawful civil conspiracy among VRE, Verdad, Baker Monroe, Keen, Baker, Huston, VPC, VestaPoint II, Stearns and Langfield.

179. The said plan and agreement involved overt acts in furtherance of same by VRE, Verdad, Baker Monroe, Keen, Baker, Huston, and Langfield, including but not limited to their conceiving and implementing the concept of incorporating Verdad's and VRE's agreement with LeVecke into a secret Side Agreement; their participation in providing an Estoppel Certificate and SNDA in connection with the transaction, which falsely represented there were no other agreements relating to the Western Ave. KFC other than the February 27, 2015 Lease; their otherwise concealing and failing to disclose the terms of agreement embodied in the secret Side Agreement; and the other false representations and omissions alleged above.

180. The said conspiracy further involved other overt acts on the part of VRE and Verdad in contracting to sell the Western Ave. KFC to Plaintiffs, closing the transaction, and the other false representations and omissions alleged above.

181. The said conspiracy further involved overt acts on the part of VPC, VestaPoint II and Stearns in encouraging and supporting the plan and agreement and accepting millions of dollars of sales proceeds from sales of the Chicago 11 properties for inflated prices to unsuspecting buyers.

182. The acts and omissions of VRE, Verdad, Baker Monroe, Keen, Baker, Huston, VPC, VestaPoint II, Stearns and Langfield, as aforesaid, were a proximate cause of the damages suffered by Plaintiffs as a result of their being wrongfully induced to purchase the property at a vastly inflated price.

183. The actions of VRE, Verdad, Baker Monroe, Keen, Baker, Huston, VPC, VestaPoint II, Stearns and Langfield, as aforesaid, were willful, wanton, malicious, outrageous

and undertaken in reckless disregard of Plaintiffs' rights and interests, so as to warrant the imposition of punitive damages against them.

WHEREFORE, Plaintiffs respectfully request, pursuant to this Count, that the Court enter judgment in their favor, and against VRE Chicago Eleven, LLC, Verdad Real Estate, Inc., Baker Monroe PLLC, B. Jason Keen, Chris Baker, Justin Huston, VPC Chicago11 LLC, VestaPoint Capital II LLC, Aaron Stearns and Matt Langfield, jointly and severally with the other defendants; award to Plaintiffs their actual damages, in excess of $4,600,000, in an amount to be proven at trial; award to Plaintiffs punitive damages from the said Defendants; award to Plaintiffs from the said Defendants pre and post-judgment interest, and the costs of this action, including reasonable attorney's fees; as an alternative to awarding actual damages in respect of the property value differential, award to Plaintiffs appropriate equitable relief to remedy the wrongs alleged above, including but not limited to rescission of the Sale Contract; and enter such other and additional relief as the Court deems just and appropriate.

**PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted,

/s/Gerald P. Greiman

Gerald P. Greiman, MO Bar No. 26668
Ryan C. Hardy, IL Bar No. 6304782
SPENCER FANE LLP
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
314-863-7733 (Telephone)
314-862-4656 (Facsimile)
ggreiman@spencerfane.com
rhardy@spencerfane.com

John C. Martin, IL Bar No. 6225557
Sharon Doherty Sirott, IL Bar No. 6236973
SUGAR FELSENTHAL GRAIS and HELSINGER LLP
30 North LaSalle Street
Suite 3000
Chicago, IL 60602
(312) 704-9400
jmartin@sfgh.com
ssirott@sfgh.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 18th day of October, 2018, the foregoing document was filed electronically with the Clerk of the Court, to be served by the Court's electronic notification system upon all counsel of record.

/s/ Gerald P. Greiman