**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAYMOND L. and TERRYLL ANN WALLS, as Co-Trustees of the Raymond L. Walls and Terryll Ann Walls Declaration of Trust Dated May 30, 2002, as amended July 18, 2013, | No. 16 C 04048 |
| Plaintiffs, | Judge Thomas M. Durkin |
| v. | |
| VRE CHICAGO ELEVEN, LLC, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Raymond and Terryll Walls, as trustees for a joint trust, sued multiple defendants, asserting claims of fraudulent inducement and negligent misrepresentation in connection with their purchase of a KFC located on S. Western Ave. in Chicago ("the KFC Property"). Since its initial filing in 2016, the case has undergone significant motion practice, resulting in the dismissal of certain defendants and the addition of various third-party claims.[1] Now before the Court is the motion for summary judgment filed by Defendants VRE Chicago Eleven, LLC ("VRE"), Verdad Real Estate, Inc. ("Verdad"), and B. Jason Keen (collectively, the

---

[1] The Court's prior decisions can be found at *Walls v. VRE Chicago Eleven, LLC* ("*Walls I*"), 2016 WL 5477554 (N.D. Ill. Sept. 29, 2016); *Walls v. VRE Chicago Eleven, LLC* ("*Walls II*"), 344 F. Supp. 3d 932 (N.D. Ill. 2018); *Walls v. VRE Chicago Eleven, LLC*, 2019 WL 330476 (N.D. Ill. Jan. 25, 2019); and *Walls v. VRE Chicago Eleven, LLC*, 2020 WL 887488 (N.D. Ill. Feb. 24, 2020).

"Verdad Defendants"). For the reasons set forth below, the Verdad Defendants' motion for summary judgment is granted in part and denied in part.

## Background

I.   The Verdad Defendants acquire the Chicago 11 properties

The following facts are undisputed except where otherwise indicated. Verdad is a developer of commercial properties, which it leases to single tenants such as fast food restaurants. Jason Keen is the majority owner and President of Verdad. R. 343 ¶ 2.

Jason LeVecke is a grandson of Carl's Jr. founder Carl Karcher. R. 335 ¶ 11. He and his siblings formed Frontier Star 1, LLC ("FS1"), a holding company for several subsidiaries that collectively operated numerous fast food franchises. *Id.* Among FS1's subsidiaries were Frontier Star, LLC ("Frontier Star") and Frontier Star CJ, LLC. LeVecke also owned or controlled, at least in part, MJC Holdings 123, LLC ("MJC") and JC123 Holdings, LLC ("JC123").

On February 10, 2014, JC123 acquired a set of eleven commercial properties in the Chicago area (the "Chicago 11 properties") for $11.2 million. R. 343 ¶ 6. Among the Chicago 11 properties was the KFC Property. *Id.* At the time JC123 purchased the properties, they were subject to a Master Lease Agreement between the previous owner and tenant. *Id.* The annual rent on the KFC Property under that lease was $92,004. *Id.*

On February 13, 2014, Verdad acquired the Chicago 11 properties from JC123 for approximately $22 million. R. 343 ¶ 7. Verdad later transferred ownership of the Chicago 11 properties to VRE Chicago, a special purpose entity formed by Verdad and

managed by Keen. Verdad held a 75% interest, and VPC Chicago11 LLC held a 25% interest. R. 343 ¶ 3, 7. VestaPoint Capital II LLC is the managing member of VPC Chicago11, and Aaron Stearns is a beneficial owner and managing director of VestaPoint Capital II.

II.     The Verdad Defendants lease the Chicago 11 properties to a LeVecke entity

On March 6, 2014, VRE Chicago leased the Chicago 11 properties to Frontier Star. R. 343 ¶ 8. The lease established a 20-year base term with an initial annual rent on each property of $171,000. *Id.* The lease also provided that the properties would be converted to Hardee's restaurants and the tenant was required to spend $400,000 per property on improvement and/or conversion. *Id.* FS1 signed these leases as guarantor. R. 336 ¶ 14.

Plaintiffs allege that Stearns expressed concern over the rent levels around the time the March 2014 leases were executed, noting in an email that "[a]pplying a 10% rent factor to $171K rent would suggest that each store should generate at least $1.7MM in sales per year. The average sales per location for Hardees is ~$1.2MM (I'm taking this from company SEC filings). To achieve $1.7MM in sales, our locations would need to significantly outperform the average." R. 343 ¶ 9. Stearns also learned that the Chicago 11 properties had been sold in 2012 for $10.6 million with a capitalization rate of 7.42%. R. 343 ¶ 10. At some point, the Chicago 11 properties

were temporarily listed for sale as Hardee's restaurants at a price of $2,850,000 each, a capitalization rate of 6%, but those listings were taken down.[2] R. 343 ¶ 15.

Around November 2014, the Verdad Defendants began having trouble obtaining information from LeVecke. Correspondence from Keen to others in the investment group expressed concerns over the non-responsiveness of LeVecke and his assistant Matt Langfield. *See* R. 343 ¶ 16-20. On December 18, 2014, Keen sent an email to Langfield requesting sales data for the Chicago 11 properties, saying, "We need to validate the purchase price and show the sales will support the rent." R. 343 ¶ 17. Around this time, and despite the provisions in the lease, Langfield suggested that the plans to convert the restaurants to Hardees would not proceed. *Id.* Keen wrote back, "On another note, how is the $400K/TIA per store handled? It was to be invested but hasn't. The ultimate challenge we are faced with is a KFC on the market w/rent at $171K . . . ." *Id.* Langfield responded that once his team had "agreements in hand and long term formal commitments to the locations, our investments will far exceed the 400K. 400K was always just a portion of our total investment." *Id.*

Joe Mann (a co-owner of Verdad) asked Langfield to send him store sales for the Chicago 11 properties several more times in December 2014 and January 2015. R. 343 ¶ 19. By this time, the Verdad Defendants had learned that annual sales for KFC stores often ranged from $1.1 to $1.3 million on the high end. R. 343 ¶ 24. Keen testified that LeVecke told Verdad that sales at the Chicago 11 properties were in

---

[2] As used here, capitalization rate is a ratio of annual rent to sale price (e.g. $171,000 / 0.06 = $2,850,000).

that range. *Id.* While considering another deal for approximately 75 KFC/Taco Bell stores, Verdad and LeVecke had also obtained sales data for those stores for the years 2013 and 2014. *Id.* The data indicated that at least some of those stores had annual sales below $1 million. *Id.* However, LeVecke allegedly told Keen that store-level sales data could not be provided under the terms of his franchise agreement with KFC. R. 343 ¶ 19. In late January 2015, Stearns and Mann exchanged several emails in which they expressed concern that LeVecke was either not promptly responding to their information requests or outright lying to them. R. 343 ¶ 20.

By February 2015, the Verdad Defendants had floated the possibility of revising the rent levels on the Chicago 11 properties to LeVecke's group. In an email to Langfield, Mann proposed an option in which LeVecke's group would refund the $400,000 "tenant improvement allowance" to Verdad in exchange for a rent reduction of $35,000 per store. R. 343 ¶ 21. Mann wrote, "Getting [the Chicago 11 properties] sold is very important to us and our partners" and suggested that "[r]ents in the $130,000's is much more marketable." *Id.*

III. The Verdad Defendants execute new leases and a side agreement regarding the Chicago 11 properties

On February 27, 2015, the Verdad Defendants executed new leases on the Chicago 11 properties with VRE Chicago as landlord and MJC (one of LeVecke's entities) as tenant. R. 343 ¶ 28. The new lease eliminated the requirement that the tenant convert the stores to Hardees or spend a minimum of $400,000 on conversion or improvements. *Id.* The annual rent on the stores remained $171,000. *Id.* The new leases also added Jason LeVecke personally as a guarantor, in addition to FS1 which

5

had been a guarantor on the previous leases. R. 343 ¶ 29. Throughout early 2015, LeVecke repeatedly told the Verdad Defendants that MJC was either already approved or assured of franchisee approval by KFC, including representing that a franchise agreement was obtained in March 2015. R. 335 ¶ 28.

Around the time the new leases on the Chicago 11 properties were executed, the Verdad Defendants were also preparing another agreement (the "Side Agreement") with two LeVecke entities, Frontier Star and FS1. The final version of the Side Agreement is dated March 17, 2015 and is signed by Keen on behalf of landlord VRE Chicago and by LeVecke on behalf of tenant Frontier Star and guarantor FS1. R. 328-24 (Ex. 183). The Side Agreement memorializes the signatories' intent to terminate the March 6, 2014 leases on the Chicago 11 properties and execute new leases that permit the properties to be used as KFC restaurants and delay or terminate the $400,000 improvement obligation. *Id.* The Side Agreement further states,

> Landlord has agreed to place the Properties on the market and attempt to sell the Properties without any Construction Obligation in the Leases. Landlord, in its discretion, may (by written notice to Tenant) unilaterally terminate this Letter Agreement as to some or all of the Properties in its efforts to market and sell the Properties on terms acceptable to Landlord. Such termination will only affect those specific Properties specified by Landlord and this Letter Agreement shall remain in full force and effect as to all other Properties as to which Landlord has not elected to terminate this Letter Agreement. If Landlord has not sold all of the Properties on terms acceptable to Landlord prior to August 1, 2015, then Landlord may notify Tenant which Properties have not sold and Tenant shall have the following options with regard to each Property not sold, such options to be performed within sixty (60) days of Tenant's receipt of such notice ("Due Date"):

6

*Id.* The Side Agreement then gives the tenant the option of either (1) investing $400,000 in renovations on each property; (2) refunding $400,000 to the landlord in exchange for an annual rent reduction of $34,000; or (3) refunding any unspent portion of the $400,000 renovation obligation to the landlord in exchange for a proportional reduction in annual rent. *Id.*

While MJC is not a signatory to the Side Agreement, the parties dispute whether the Side Agreement was intended as an amendment to the February 27, 2015 leases and whether it was intended to bind MJC. *See* R. 343 ¶ 33. They also dispute whether the Side Agreement was terminated with respect to the KFC Property. *See* R. 343 ¶ 34. It is undisputed, however, that Plaintiffs did not receive a copy of the Side Agreement prior to closing. R. 343 ¶ 25.

IV.    The Verdad Defendants sell the KFC Property to Plaintiffs

In late February, 2015, the Verdad Defendants listed four of the Chicago 11 properties for sale, including the KFC Property, at a price of $2,443,000 each. R. 343 ¶ 37. The offering materials identified the tenant as FS1, described as "one of the largest multi-unit franchise restaurant operators with over 200 locations." R. 343 ¶ 38. The materials advertised the "net operating income" as $171,000 and listed the rent increases under the lease. R. 343 ¶ 39. The Verdad Defendants also provided Plaintiffs with a Confidential Information Memorandum ("CIM") relating to FS1 that included financial information about the company, representing that as of the end of 2014, FS1 had a net worth of nearly $70 million, annual operating profit of nearly $15 million, and EBITDA of $10 million. R. 343 ¶ 40. Although not entirely clear from

the record, it appears this financial information regarding FS1 was provided to the Verdad Defendants directly by LeVecke. *See* R. 335 ¶ 30.

According to Plaintiffs, at the time the Verdad Defendants were marketing the Chicago 11 properties, they possessed additional information related to FS1 that contradicted the claims in the offering materials. For example, LeVecke and/or his assistant had previously provided the Verdad Defendants with audited financial statements for FS1 from 2012 and 2013. R. 343 ¶ 41. *Id.* The statements reflect a 2013 net worth for FS1 of $46 million, with net earnings of approximately $1.32 million. Plaintiffs assert that this information makes the advertised $70 million net worth figure false, or at minimum implausible. *Id.* The audited financial statements also reflect lower profits and higher expenses than the annual figures included in the offering materials. *Id.* Plaintiffs also cite evidence that the Verdad Defendants knew that the reason LeVecke had abandoned plans to convert the KFC restaurants to Hardee's was that he was unable to secure franchise agreements from Hardee's (the Verdad Defendants dispute this evidence as speculative, vague, and based on inadmissible hearsay). R. 343 ¶ 42. As of April 2015, the Verdad Defendants also knew that LeVecke and his affiliate entities had not paid property taxes on the Chicago 11 properties since the inception of the March 6, 2014 leases. *Id.*

Plaintiffs and VRE Chicago executed the Purchase and Sale Agreement ("PSA") on March 24, 2015, whereby Plaintiffs agreed to pay $2,443,000 for the KFC Property; the PSA was subsequently amended on April 16, 2015. R. 335 ¶ 14. Section

10 of the PSA is titled "Condition of the Project," and subsection 10.1 is titled "As Is

Conveyance." R. 207 Ex. 12. This subsection states:

> EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS CONTRACT OR ANY CLOSING DOCUMENTS, PURCHASER ACKNOWLEDGES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER BY SELLER OR ANY AGENT OR EMPLOYEE THEREOF REGARDING THE PROJECT . . . .

> EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS CONTRACT OR ANY CLOSING DOCUMENTS, SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.

> PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED REAL ESTATE INVESTOR WHO SHALL HAVE HAD, AS OF THE CLOSING DATE, OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PROJECT THAT PURCHASER ELECTS TO CONDUCT, AND CONDUCT A COMPLETE AND THOROUGH INSPECTION, ANALYSIS AND EVALUATION OF THE PROJECT . . . AND RECEIVE AND REVIEW SUCH INFORMATION AS PURCHASER SHALL REQUIRE IN THE COURSE OF ITS INVESTIGATION.

> PURCHASER SHALL UNDERTAKE SUCH INVESTIGATION AS SHALL BE REQUIRED TO MAKE PURCHASER FULLY AWARE OF THE CONDITION OF THE PROJECT . . . AS WELL AS ALL FACTS, CIRCUMSTANCES AND INFORMATION WHICH MAY AFFECT THE USE AND OPERATION OF THE PROJECT, AND PURCHASER COVENANTS AND WARRANTS TO SELLER THAT PURCHASER SHALL RELY, EXCEPT TO THE EXTENT OF SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREUNDER, OR IN ANY CLOSING DOCUMENTS, SOLELY ON PURCHASER'S OWN DUE DILIGENCE INVESTIGATION IN DETERMINING TO PURCHASE THE PROJECT.

*Id.* The term "Project" as used in the PSA refers to "all of Seller's right, title and

interest in and to" the real property and tenant lease on the KFC Property. *Id.*

During the purchase process, Plaintiffs had access to sale prices and rent rates for comparable properties in the Chicago area and nationwide. R. 335 ¶ 17. Plaintiffs' mortgage broker said Plaintiffs' purchase price for the KFC Property fell within the range of similar-type properties. *Id.* Plaintiffs' real estate broker also said he could have researched prior sale prices for the KFC Property but did not. R. 335 ¶ 20. Plaintiffs received a copy of an appraisal of the KFC Property setting a value of $2.445 million. R. 335 ¶ 21. Five of the six rent comparables in the appraisal were other Chicago 11 properties, and the appraisal assumed that the obligations in the lease would be fully performed. *Id.*

Prior to closing on the sale of the KFC Property, Plaintiffs asked agents of the Verdad Defendants to see sales data for that store but were informed that LeVecke's franchise agreement prohibited disclosure of this data. R. 343 ¶ 44. Nonetheless, Plaintiffs elected to proceed with the purchase without the benefit of reviewing this data. R. 335 ¶ 22. Plaintiffs also knew at least a month before closing that MJC, not FS1, was the tenant on the lease, contrary to what had been stated in the offering materials. *Id.* In April 2015, Langfield told Plaintiffs' real estate broker that MJC was a wholly owned subsidiary of FS1, the lease guarantor. R. 335 ¶ 25. Shortly before closing, the Verdad Defendants received a copy of the first page of what purported to be MJC's franchise agreement with KFC, with an effective date of March 27, 2015. R. 335 ¶ 31. According to Plaintiffs, documents produced by KFC showed that MJC's franchise agreement for the KFC Property did not become effective until June 5, 2015. *Id.*

10

In addition to the February 27, 2015 lease then in effect, Plaintiffs received a copy of the prior March 6, 2014 lease on the KFC Property as part of a packet of title commitment and exception documents for the property provided by Fidelity National Title Company. R. 335 ¶ 24. Plaintiffs and their advisors said that because the prior lease had been terminated and did not affect title to the property, "there was no reason . . . to scrutinize it." *Id.*

On May 12, MJC provided Plaintiffs with a signed Estoppel Certificate and Subordination, Non-Disturbance and Attornment Agreement ("SNDA"). R.328-24 (Exs. 149, 150). These documents stated that the February 27, 2015 lease constituted the sole agreement between landlord and tenant relating to the KFC Property; that the lease had not been amended, modified, or supplemented; and that there were no other agreements relating to the premises. R. 343 ¶ 47. The Estoppel Certificate also states, "No default exists on the part of Landlord or Tenant under the Lease, nor does any circumstance currently exist that, but for the giving of notice or the passage of time, or both, would be such a default." R. 328-24 (Ex. 149). None of the Verdad Defendants are signatories to either of these documents. R. 335 ¶¶ 33, 34. Plaintiffs closed on the sale on May 15, 2015.

V.    MJC defaults on the KFC Property lease

Following the closing, MJC paid its June and July rent in full. R. 343 ¶ 49. On July 27, 2015, Frontier Star filed a voluntary petition for Chapter 11 bankruptcy. *Id.* By August 11, Plaintiffs had not received a rent payment from MJC, and sent a letter notifying MJC of the default and demanding payment. *Id.* On August 24, LeVecke sent an email to Plaintiffs stating: "Regrettably, we are having to make serious

11

adjustments to our business. A recent culmination of events are putting real pressure on us. Frankly we are going to need to adjust the rents. We are working with consultants on restructuring and will be in touch soon." *Id.* MJC also sent a partial payment of $5,916.42. *Id.*

Plaintiffs sent another default letter to MJC, FS1, and LeVecke on August 25. On August 29, LeVecke emailed Plaintiffs, writing "While our MJC entity that is your tenant has not filed [for bankruptcy] we have no choice but to make adjustments to our business in order to move forward. Otherwise MJC may also have to file. As such we need to adjust our rents for this location to 70,000 in annual rent . . . ." *Id.* MJC thereafter remained in default and vacated the premises in late 2015. R. 343 ¶ 50. FS1 filed for bankruptcy in November 2015, and LeVecke personally filed for bankruptcy in January 2016. *Id.* Plaintiff eventually secured a replacement tenant on a new lease with an annual rent around $68,000. *Id.*

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948

12

(7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

I.    <u>The Court's prior analysis of the no reliance clauses</u>

The Verdad Defendants' first argument for summary judgment largely tracks with the argument they advanced at the earlier motion to dismiss stage: that Plaintiffs' fraudulent inducement and negligent misrepresentation claims fail as a matter of law because the no reliance clauses in section 10.1 of the PSA conclusively negate the reliance elements of those claims. The most important language is found in the first and fourth paragraphs of section 10.1:

> Except for those representations and warranties expressly made by Seller in this contract or any closing documents, Purchaser acknowledges that ***it is not relying on any representations or warranties whatsoever by Seller or any agent or employee therefore regarding the Project*** . . . .
>
> . . .
>
> Purchaser covenants and warrants to Seller that Purchaser shall rely, except to the extent of Seller's representations and warranties contained hereunder, or in any closing documents, ***solely on Purchaser's own due diligence investigation in determining to purchase the Project***.

For reasons discussed below, the Court primarily focused on the language in the first paragraph.

13

The Court previously surveyed the law governing no reliance clauses. *See Walls I*, 2016 WL 5477554, at *2-3. As noted, "[t]he purpose of a 'no reliance' clause is 'to head off a suit for fraud' [by] removing the reliance element necessary to state such a claim." *In re Compl. of Kindra Lake Towing, L.P.*, 2016 WL 3227303, at *2 (N.D. Ill. June 13, 2016) (quoting *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724, 733 (7th Cir. 2008)). A no reliance clause "ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000).

The Court declined to dismiss Plaintiffs' claims based on the no reliance clause due to ambiguities in the language itself, as well as concerns over its enforceability. *See Walls I*, 2016 WL 5477554, at *3-7. The Court noted that "[e]xculpatory clauses," including no reliance clauses, "are not favored and are strictly construed and must have clear, explicit and unequivocal language showing that it was the intent of the parties." *Id.* at *3 (quoting *Zimmerman v. Northfield Real Estate, Inc.*, 510 N.E.2d 409, 415 (Ill. App. 1986)).

Several ambiguities in the clause at issue precluded dismissal at the pleading stage. First, the Court found the no reliance clause does not clearly cover fraudulent omissions. Courts in Illinois will not necessarily construe a no reliance clause that covers affirmative fraud to also cover fraudulent concealment. *See Benson v. Stafford*, 941 N.E.2d 386, 410 (Ill. App. Ct. 2010). Second, it found the no reliance clause does not unambiguously apply to the subject matter of Plaintiffs' claims, which center on

14

alleged misrepresentations about the financial health of the lessor and guarantor and the value of the KFC Property. Third, it found that the no reliance clause in the first paragraph of section 10.1 could be read in the context of surrounding "as-is" language as relating only to the "physical condition of or title to the real property." *Walls I*, 2016 WL 5477554, at \*4. Finally, the Court noted that the no reliance clause excluded representations made elsewhere in the contract or in the closing documents, and that Plaintiffs' claims implicated those documents.

As for the no reliance clause's enforceability, the Court noted that Illinois courts had declined to enforce similar clauses in fraud cases. *See id.* at \*5 (citing *Napcor Corp. v. JP Morgan Chase Bank, N.A.*, 938 N.E.2d 1181, 1187 (Ill. App. Ct. 2010), and *Bauer v. Giannis*, 834 N.E.2d 952, 957-58 (Ill. App. Ct. 2005)). It also observed that the question of enforceability required consideration of all the surrounding circumstances, including (1) ambiguity in the meaning of the provision; (2) Plaintiffs' alleged reliance on certain written misrepresentations; (3) Plaintiffs' allegations that the Verdad Defendants frustrated their due diligence by falsely telling them that store-level sales data could not be provided; and (4) Plaintiffs' allegations of an orchestrated plan of deception. *Id.* at \*7. Again, the Court said that a more complete record would be necessary to resolve these questions. *Id.*

In light of the procedural posture requiring it to credit Plaintiffs' allegations, the Court gave limited consideration to the no reliance language in the fourth paragraph of section 10.1, in which Plaintiffs warranted that they would rely "solely on [their] own due diligence investigation in determining to purchase the Project." *Id.*

15

at *7 n.5. It recognized, however, that this clause "seems more directly applicable to Plaintiffs' claims than the first no-reliance clause." *Id.*

II.    Analysis of the no reliance clauses on the summary judgment record

As the language of the PSA is unchanged from 2016, the question is whether the current record clarifies the ambiguity and uncertainty affecting the no reliance clauses such that they would bar Plaintiffs' claims. The Court finds that unsettled questions of fact remain that prevent resolution on this basis.

The Verdad Defendants advance several facts they claim support enforcing the no reliance clauses in this case. First, they note that Plaintiffs' client representative Ray Walls is an experienced real estate broker who has bought, sold, and managed multiple properties in his career, including several fast food restaurants. Plaintiffs were also represented throughout the purchase process by a team of experienced real estate experts.

Next, the Verdad Defendants point out that Plaintiffs were made aware of several facts they allege were misrepresented or withheld in the offering materials. This includes the identity of the tenant on the lease, advertised as FS1 but later clarified to be MJC, and the price that VRE Chicago paid for the KFC Property in March 2014. Plaintiffs were also given a copy of the original lease, which included the $400,000 tenant investment obligation, though Plaintiffs allege it was "buried" among 200 pages of other documents and would not have ordinarily warranted close scrutiny.

Finally, and more generally, the Verdad Defendants point to the host of pricing and rental data Plaintiffs either reviewed or had access to during the purchase

16

process. Plaintiffs reviewed financial data on comparable properties prior to closing on the sale, as well as an appraisal of the KFC Property. They also knew the average sales figures for KFC stores was around $1.2 million, which would yield a higher-than-typical rent to sales ratio of 14.25% when applied to the KFC Property.

All these facts may indeed be relevant. For example, the fact that Plaintiffs went ahead with the purchase without store-level sales data may suggest that it was not an important part of their decision, which cuts against materiality. They may also tend to prove that Plaintiffs did not actually rely on the Verdad Defendants' alleged misrepresentations or omissions, or that any such reliance was unreasonable. Either would defeat Plaintiffs' claims. But those are quintessential questions of fact best left for a jury. *See Kindra Lake Towing*, 2016 WL 3227303, at \*3.

These facts do not, however, demonstrate that the no reliance clauses conclusively bar Plaintiffs' claims. One the one hand, such clauses are generally enforceable in Illinois, particularly when the parties to the contract are sophisticated like Plaintiffs here. *See, e.g.*, *Extra*, 541 F.3d at 726; *Aeroground, Inc. v. CenterPoint Props. Tr.*, 2010 WL 2169493, at \*3 (N.D. Ill. May 27, 2010). The concern in failing to enforce a no reliance clause is that "contracts would not be worth the paper on which they are written." *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (quoting *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C. 1968)). But on the other hand, contractual provisions meant to shield a party from liability for an intentional tort such as fraud are void as against public policy. *See Bauer*, 834 N.E.2d at 958 (citing cases). If the Verdad Defendants did in fact knowingly misrepresent the

17

availability of store-level sales data, they cannot simply blame Plaintiffs for believing them. *See Eisenberg v. Goldstein*, 195 N.E.2d 184, 186 (Ill. 1963) (explaining that a seller cannot "impute negligence" to a buyer that relies on the seller's misrepresentation, because "[t]he law does not require that neither shall believe the statements of the other"). The same goes for the Verdad Defendants' alleged representations regarding the financial health of the LeVecke entities, which Plaintiffs claim to have incorporated alongside their own independent research. Notably, at least some of the misrepresentations were in writing, distinguishing those cases where no reliance provisions are enforced against prior oral promises. *See, e.g.*, *Rissman*, 213 F.3d at 384; *Pardo v. Mecum Auction, Inc.*, 77 F. Supp. 3d 703, 708 (N.D. Ill. 2014).

Separate from the question of enforceability, the record also fails to clarify the ambiguity in the PSA language. The Verdad Defendants' brief again fails to account for the full language of the "Project" definition in the PSA, arguing that it "includ[es] Land, Improvements, Personalty, Appurtenances, Tenant Lease, Awards, and Intangible Property." R. 327, at 10. True, all those words appear in the PSA. But as the Court previously explained, that does not automatically mean the Verdad Defendants' broad definition is correct. *See Walls I*, 2016 WL 5477554, at *4. The significance of the surrounding "as-is" language likewise remains disputed. The proper construction of ambiguous contract terms is a question of fact. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000). As neither side demonstrated its interpretation was clearly correct, the Court will not decide the matter now.

Admittedly, the no reliance clause in the fourth paragraph of section 10.1 is easier to understand and seemingly more on point. However, Plaintiffs' allegations that the Verdad Defendants interfered with their due diligence also remain unsettled. Most notably, the question of whether LeVecke's KFC franchise agreement prohibited the disclosure of store-level sales, and, if it did, whether Verdad knew as much, cannot be definitively answered on the summary judgment record. Much of Plaintiffs' evidence on this point is circumstantial or inferential, relying on a "specimen" KFC franchise agreement which does not contain such a prohibition, R. 343 ¶ 44, and the past conduct of various players in the transaction. While the Verdad Defendants deny Plaintiffs' assertions and raise several evidentiary objections, they have not pointed to contrary evidence conclusively rebutting Plaintiffs' position, and their past conduct (including requesting the same data and obtaining it for other stores) is at least suggestive that they believed the agreement permitted disclosure. In short, the record permits a reasonable jury to conclude that the Verdad Defendants knowingly withheld material facts requested by Plaintiffs as part of their due diligence. The exculpatory clause would not necessarily be a defense to such a finding.

The Verdad Defendants argue that the PSA does not guarantee the KFC Property would continue to generate rental income into the indefinite future and that reading such a "guarantee" of future rent payments into the sale of a lease would burden the seller with a risk of liability for default years or even decades after the sale. *See* R. 342, at 2-3. But the Court does not view Plaintiffs' claims as adding such a guarantee. Instead, Plaintiffs allege, in essence, that the Verdad Defendants sold

19

the KFC Property *knowing* that a near-term default on the existing lease was likely, if not imminent, because of pre-existing conditions, and either misrepresented or withheld that information to prop up the sale price. The evidence at least permits an inference that Plaintiffs were induced to purchase the KFC Property notwithstanding the inherent risk of default in part because they were assured that FS1, the guarantor, was a solid backstop against a tenant default, and that the performance of the KFC Property was up to par. Plaintiffs have identified evidence that the Verdad Defendants had strong reason to believe both matters were far more precarious at the time of sale than made to seem in the offering materials.

While a plaintiff could theoretically bring a comparable claim premised on a default 15 years after the sale, it would face near insurmountable proof problems. Proving the seller in that instance knew a default was going to occur 15 years later and lied about it would be extremely difficult. Perhaps even tougher, if not impossible as a matter of law, would be proving reliance on such an assurance of long-term success was reasonable. Accordingly, even in the absence of a no reliance clause, this scenario is not a serious concern.

In all this discussion, the Court has considered that a no reliance clause functions as an affirmative defense, and that the burden to prove its applicability rests with a defendant. *See Kindra Lake Towing*, 2016 WL 3227303, at *3. For these reasons, the Court cannot say with certainty that the Verdad Defendants have met their burden on summary judgment based on the PSA's purported no reliance clauses alone.

III.  <u>Significance of the Side Agreement</u>

Among Plaintiffs' cited misrepresentations are the statements in the Estoppel Certificate and SNDA to the effect that no other agreements existed related to the KFC Property other than the 2015 lease. Plaintiffs argue the existence of the Side Agreement renders these statements false and provides a hook for their misrepresentation claims. The Court disagrees. The Side Agreement was not signed by MJC, the tenant on the lease Plaintiffs were inheriting, placing it outside the scope of the promises in the closing documents. Furthermore, even if the Court agreed with Plaintiffs that the Side Agreement was not formally terminated in the manner contemplated by the signatories, by its own terms it ceased to have any application to the KFC Property once it was sold.

To the extent Plaintiffs have cited to evidence about contrary intent by the parties to the Side Agreement, that evidence all appears to refer to earlier drafts. Indeed, after several people raised concerns that the agreement as drafted could be considered an amendment to the February 27, 2015 leases, the document was changed in response. Finally, the fact that Plaintiffs received a copy of the prior March 2014 lease but decided it was of little importance cuts strongly against the materiality of the Side Agreement, as their own evidence suggests its primary effect would have been to clue Plaintiffs into any discrepancy between the two leases. Accordingly, to the extent Plaintiffs' fraud claims rely on misrepresentations or omissions in the Estoppel Certificate or SNDA about the Side Agreement, the Verdad Defendants are entitled to summary judgment.

21

IV.    Proximate causation

The Verdad Defendants next argue that Plaintiffs' claims fail as a matter of law because the Verdad Defendants did not proximately cause the alleged damages.[3] Borrowing from securities law, the defense theory is that Plaintiffs' damages were caused by MJC and FS1's default on the lease, not the Verdad Defendants' alleged misrepresentations, and that Plaintiffs have demonstrated only *transaction* causation (a mere "but for" cause), not *loss* causation (the real proximate cause).

A showing of "but for" causation alone is insufficient to impose legal liability in a claim for fraudulent or negligent misrepresentation. *See Movitz v. First Nat'l Bank of Chi.*, 148 F.3d 760, 762 (7th Cir. 1998); *Maxwell v. KPMG, LLP*, 2007 WL 2091184, at *4 (N.D. Ill. July 19, 2007). A plaintiff in a fraud case must also show that "but for the circumstances that the fraud concealed, the investment … would not have lost its value." *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997)). For example, in *Ray*, the plaintiffs allegedly invested in a wireless data services business at least in part because defendants had falsely told them the company had substantial contracts with other major companies and had obtained large sources of financing. *Id.* at 993. The company's stock price sharply declined, and plaintiffs sued for fraud. The court granted summary judgment because the plaintiffs

[3] The Verdad Defendants adopt the arguments on this point from the motion for summary judgment filed by the Baker Monroe defendants. *See* R. 330, at 3-6. Plaintiffs incorporate by reference their response to that motion. *See* R. 338, at 7-9. The Court previously denied the Baker Monroe defendants' motion as moot due to a partial settlement. R. 346.

offered no evidence that the company declined because it lacked such contracts or financing. *Id.* at 994. Rather, the undisputed expert evidence showed that the company (along with many of its competitors) declined because of market forces. *Id.* at 995.

The Verdad Defendants have cited evidence that LeVecke's financial troubles and eventual bankruptcy were precipitated by, among other things, debts called in on LeVecke *after* Plaintiffs closed on the KFC Property. As discussed above, the Court does not read any of the Verdad Defendants' offerings as "guaranteeing" future rental payments. Post-sale developments of which the Verdad Defendants had no knowledge would seem to break the chain of causation as an intervening force. *See Maxwell*, 2007 WL 2091184, at *4. Thus, if the Verdad Defendants' explanation of events is correct, it would be akin to a "general market decline" causing Plaintiffs' losses, and the Verdad Defendants could not be blamed even if they induced Plaintiffs to make the purchase in the first place. *See, e.g., Movitz*, 148 F.3d at 763 (plaintiff who purchased commercial building could not prove proximate cause because loss was caused by a city-wide collapse in real estate prices, not the alleged failure to apprise plaintiff about the building's poor condition or profitability); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (plaintiffs who invested in oil and gas partnerships failed to prove proximate cause because they offered no evidence as to why their investment was wiped out and only alleged misrepresentations as to "the defendants' competence and integrity").

23

In contrast, Plaintiffs have pointed to evidence that the Verdad Defendants knew LeVecke and his entities were in financial hot water well in advance of the sale (which meant the leases had less value) and were eager to unload the properties they had leased to him before the problems boiled over—just as they did shortly after the sale. Plaintiffs have also cited to evidence that the Verdad Defendants knew the rent figures on the leases were unsustainable and likely to result in default. The evidence offers a reasonable explanation of why the KFC Property transaction "turn[ed] out to be a losing one" for Plaintiffs. *See Bastian*, 892 F.2d at 684. A direct connection can be drawn between the alleged misrepresentations and the decline in value of Plaintiffs' purchase.[4] *See, e.g.*, *A.I. Credit Corp. v. Hartford Comput. Grp., Inc.*, 847 F. Supp. 588, 599 (N.D. Ill. 1994) ("If the facts had been as impliedly represented … it is reasonable to infer that the notes would have been worth *something*, and the fact that they were worthless could have caused at least some of the Plaintiffs' losses.").

Whether the likelihood of MJC/FS1's collapse and default arose pre- or post-sale, and when the Verdad Defendants knew about it, are simply factual disputes. It

---

[4] Both sides cite to *Cont'l Assurance Co. v. Dean Witter Reynolds, Inc.*, 1993 WL 101448 (N.D. Ill. Apr. 5, 1993). That case ultimately supports Plaintiffs' position. There the court said that "whether the plaintiffs have sufficiently alleged loss causation … depends on whether they have alleged that the misrepresentations caused Geothermal to run out of steam as a going energy concern." *Id.* at *2. While this language makes it sound like a plaintiff must show the decline in value *was caused by the defendant's lies themselves*, the subsequent analysis considered whether the decline would have occurred *had those lies in fact been accurate. See id.* at *3; *see also id.* at *2 (citing a definition of loss causation as "the requirement that a plaintiff allege that he would not have suffered a loss on his investment if the facts were as he believed them to be at the time that he purchased the securities in question").

will be up to the eventual factfinder to determine which side is right. *See Kavales v. City of Berwyn*, 712 N.E.2d 842, 849 (Ill. App. Ct. 1999) (stating that whether a defendant's conduct proximately caused an injury is typically a question of fact). Just as a reasonable jury could conclude from the evidence that the Verdad Defendants knew MJC and FS1's financial demise was likely (or at least a much stronger possibility than they let on) and misrepresented that fact, a reasonable jury could conclude that Plaintiffs' damages were the natural consequence of such misrepresentation. Accordingly, the Verdad Defendants are not entitled to summary judgment on this basis.

V.     Moorman doctrine

The Verdad Defendants also invoke the *Moorman* doctrine as a defense against Plaintiffs' negligent misrepresentation claims. "Under the *Moorman* doctrine a party may not recover in negligence for a purely economic loss." *Walls II*, 344 F. Supp. 3d at 957 (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982)). "However, an exception to the *Moorman* doctrine exists where someone in the business of supplying information to guide others in their business transactions makes a negligent representation." *Id.*

The Court previously confronted this argument on a motion to dismiss, albeit when raised by another party, and rejected it. Although "as a general matter, sellers of real estate do not fall under the *Moorman* exception" the Court observed that "Verdad is not merely a seller of real estate." *Id.* (citing *Olson v. Hunter's Point Homes, LLC*, 964 N.E.2d 60, 64 (Ill. App. Ct. 2012)). It cited allegations that Verdad distributed information about third parties, including the tenants on its properties,

25

and that the dispositive question was "whether the information furnished with the non-informational goods was central to the business transaction." *Id.* (citing *Orix Credit All., Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 476 (7th Cir. 1997)). That question could not be answered at the pleading stage.

The summary judgment record arguably reinforces that Verdad is not merely a seller of real estate and is less clear on whether the information provided by the Verdad Defendants through its agents was central to the business transaction. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that the information about MJC, FS1, and the health of the KFC store were a key element in Plaintiffs' decision to purchase. While some of the information was created by FS1 itself and communicated by Verdad's real estate broker, it is not entirely clear to what extent the Verdad Defendants themselves were involved. At minimum, Plaintiffs have cited to evidence that the Verdad Defendants knowingly withheld other financial information that painted a more dire picture regarding the value of what they were selling. Neither party addressed these questions in great detail, and the Court declines to grant summary judgement on this basis.

## VI. Civil conspiracy, punitive damages, and attorney's fees

Because the Court is denying summary judgment on Plaintiffs' core substantive claims, it likewise rejects the Verdad Defendants' argument that they are entitled to summary judgment on the derivative claims for civil conspiracy and for punitive damages on that basis. *See* R. 327, at 21-22. The Court grants the Verdad Defendants' motion as to punitive damages only to the extent such damages would be based on any negligent misrepresentation. *See Parks v. Wells Fargo Home Mortg.,*

*Inc.*, 398 F.3d 937, 942 (7th Cir. 2005) (noting that punitive damages are not available on claims of ordinary negligence). Their motion is denied as to Plaintiffs' claim for attorney's fees, which are permitted under the terms of the PSA. *See* R. 328-23 § 14.7.

### Conclusion

For the foregoing reasons, the Verdad Defendants' motion for summary judgment [R. 325] is granted in part and denied in part. The motion is granted as to all claims to the extent they are based on alleged misrepresentations in the Estoppel Certificate and SNDA related to the Side Agreement. The motion is also granted as to any claim for punitive damages premised on alleged negligent misrepresentation. It is otherwise denied in all respects.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 21, 2022